GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
20400 Stevens Creek Blvd, Suite 280
Cupertino, CA  95014
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff
IMPLICIT CONVERSIONS, INC.

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC, a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JACOB STINE, an individual, JUANITA TRAVERS STINE, an individual, SAYED MAHMOUD ALAWI, an individual, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.  3:24-cv-03744-WHO<br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**<br><br>**DATE: August 7, 2024**<br>**TIME: 2:00pm** |

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE** that on August 7, 2024, at 2:00 pm, or as soon thereafter as the matter may be heard in the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, 17th Floor, Courtroom 2, San Francisco, CA 94102, Plaintiff Implicit Conversions, Inc. ("Implicit") will and hereby does move the Court for an a Temporary Restraining Order and, upon its expiration, a Preliminary Injunction: (1) enjoining Jacob Stine and Juanita Stine (collectively, "Stines") from accessing Implicit's computer systems; (2) enjoining Jacob Stine and Juanita Stine from accessing, using, or disclosing any Implicit's confidential, proprietary, and trade secret information; and (3) directing Jacob Stine to return all Implicit confidential information and all Implicit property.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Robin Lavallee in Support of Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause, and any of the evidence attached to the above-titled declaration and on file with the Court, and/or evidence may be presented in support of the motion during the hearing, and on such other written and oral argument presented to the Court.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

**TABLE OF CONTENTS**

Page (s)

I.    INTRODUCTION ....................................................................................... 1

II.   STATEMENT OF ISSUES ......................................................................... 2

III.  FACTUAL BACKGROUND ....................................................................... 3

    A.  Implicit is Founded ........................................................................... 3

    B.  Implicit Terminated Jacob Stine; Jacob Stine and Juanita Stine
       Subsequently Accessed And Used Implicit's Computer Systems
       Without Authorization ...................................................................... 4

    C.  Implicit Investigates Jacob Stine's Unauthorized Access of the
       Implicit Computer System ................................................................ 5

    D.  Jacob Stine's Unauthorized Access to the Implicit's Systems Disrupts
       Implicit's Business ........................................................................... 7

    E.  Jacob Stine Continues to Hold, Without Authorization, Implicit
       Trade Secret's and Implicit's Data Center ...................................... 8

    F.  Jacob Stine Attempts to Usurp Control of Implicit ...................... 13

    G.  Jacob Stine's Unauthorized Access to Implicit's Systems Causes
       Significant Costs for an Investigation ........................................... 13

IV.   EMERGENCY INJUNCTIVE RELIEF IS WARRANTED ................... 14

    A.  Implicit Is Likely To Succeed On The Merits Of Its Claims Under
       the DTSA, CUTSA, CFAA, And California Penal Code § 502(c)
       Against Jacob And Juanita Stine .................................................... 15

       1.  Implicit is Likely to Prevail on its Claims Under the DTSA and
           CUTSA ................................................................................. 15

       2.  Implicit Is Likely To Prevail on its Claim Under the CFAA .......... 18

       3.  Implicit Is Likely To Prevail on its Claim under California Penal
           Code § 502(c) et seq ............................................................ 19

       4.  Implicit Is Likely To Prevail on its Claim for Breach of the
           CIIAA ................................................................................... 22

    B.  Implicit Will Suffer Irreparable Harm If A Temporary Restraining
       Order Is Not Granted Pending Hearing On A Motion For Preliminary
       Injunction ........................................................................................ 23

    C.  The Balance of Hardships Favors Implicit ..................................... 23

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

D.    A Temporary Restraining Order Serves the Public Interest......................24

E.    A Minimal Bond is Appropriate ...............................................................24

V.    CONCLUSION .................................................................................................25

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

# TABLE OF AUTHORITIES

**CASES**                                          Pages (s)

*Apple Inc. v. Rivos, Inc.*,
2023 WL 5183034 (N.D. Cal. Aug. 11, 2023)........................................................17

*Bui-Ford v. Tesla, Inc.*,
2024 WL 694485 (N.D. Cal. Feb. 20, 2024)..........................................................20

*Connecticut General Life Ins. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003)..............................................................................24

*Dish Network L.L.C. v. Ramirez*,
2016 WL 3092184 (N.D.Cal. June 2, 2016) ........................................................24

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)..............................................................................15

*Future Domain Corp. v. Trantor Sys.*,
1993 WL 270522 (N.D. Cal. May 3, 1993) ........................................................15

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000)............................................................................24

*Henry Schein, Inc. v. Jennifer Cook*,
191 F.Supp.3d 1072 (N.D. Cal. 2016) ................................................................24

*HiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022)............................................................................18

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020).......................................................................15, 16

*Lamont v. Conner*,
2019 WL 1369928 (N.D. Cal. Mar. 26, 2019)....................................................16

*Navigation Holdings, LLC v. Molavi*,
445 F. Supp. 3d 69 (N.D. Cal. 2020) ..........................................................15, 17

*Oakwood Lab'ys LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)..............................................................................17

*Stormans, Inc. v. Selecky*,
571 F.3d 960 (9th Cir. 2009)..............................................................................23

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001)..............................................................................14

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

iii

*Textile Unlimited, Inc. v. ABMH and Co., Inc.*,
　　240 F.3d 781 (9th Cir. 2001)................................................................................14

*United States v. Christensen*,
　　828 F.3d 763 (9th Cir. 2015)................................................................................19

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
　　840 A.2d 606 (Del. 2003) ....................................................................................22

**STATUTES**

18 U.S.C.:

　　§ 1030(a) ...................................................................................................18, 19

　　§ 1030(e)(6)...................................................................................................... 18

Cal. Pen. Code:

　　§ 502(c) .............................................................................................*passim*

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

**MEMORANDUM OF POINTS AND AUTHORITIES**

Implicit seeks a Temporary Restraining Order and Order to Show Cause: (1) enjoining Jacob Stine and Juanita Stine from accessing Implicit's computer systems; (2) enjoining Jacob Stine and Juanita Stine from acquiring, using or disclosing any of Implicit's confidential, proprietary, and trade secret information; and (3) directing Jacob Stine to return all Implicit confidential information and all Implicit property.  Implicit faces irreparable harm absent immediate injunctive relief.

**I.      INTRODUCTION**

Jacob Stine and Juanita Stine are engaged in a campaign to harm Implicit by stealing its proprietary information and trade secrets and by disrupting Implicit's day-to-day operations through unauthorized access to Implicit's computer system.  The catalyst for this scheme was Implicit's decision to terminate Jacob Stine's employment on June 14, 2024, for poor performance and menacing workplace behavior and to disable his access to Implicit's computer systems.  The very evening that Implicit terminated Jacob Stine, the Stines unlawfully reinstated Jacob Stine's access to the Implicit computer network after his credentials were revoked and subsequently removed computer system access for key Implicit personnel, exported large quantities of Implicit documents, and emailed Implicit employees claiming to be in control of Implicit.  Moreover, the Stines retain possession of one of Implicit's three data centers, which due to the nature of Implicit's computer infrastructure, necessitated a shutdown of all three data centers, causing a serious disruption in Implicit's operations.  The Stines' egregious conduct has forced Implicit to seek immediate relief from unlawful actions that threaten to cause lasting and irreparable harm.  Implicit is likely to succeed on the merits of each of its claims and emergency injunctive relief is warranted given the irreparable harm Implicit will suffer absent relief.

*First*, Implicit brings claims against the Stines under the Defend Trade Secret Act ("DTSA") and the California Trade Secret Act ("CUTSA").  Based on the confidential and proprietary nature of the information, unauthorized acquisition of the trade secrets, conversion of the trade secrets in violation of contractual duties to return them post-employment, and the extensive past, current, and future damage to Implicit, Implicit has been and will continue to be

Grellas Shah LLP
20400 Stevens Creek Blvd, Suite 280
Cupertino, CA 95014

1

harmed absent immediate relief.

*Second,* Implicit brings claims against the Stines under the Computer Fraud and Abuse Act ("CFAA") and California Penal Code § 502(c) *et seq.* In violation of both statutes, Jacob Stine intentionally accessed and tampered with key Implicit computer systems by restoring his own full access to Implicit's computer systems after his credentials had been revoked. Jacob Stine restored his access either by using Juanita Stine's credentials or by Juanita Stine reinstating his access herself. Neither was Jacob Stine authorized to access Implicit's computer systems after his termination nor was Juanita Stine authorized to provide Jacob Stine access to Implicit's computer systems.

*Lastly*, Jacob Stine is in breach of contract with Implicit due to his copying of Implicit proprietary information and trade secrets and his refusal to return the Implicit data center. The face of the contract is clear that these acts are in breach of his duties following termination.

In addition to Implicit's likelihood of success on the merits of each claim, Implicit has been harmed by the Stines and will continue to be irreparably harmed should the Stines retain possession of the data center or use or make public Implicit's trade secrets. Moreover, there is no harm to the Stines by simply requiring them to follow trade secret and computer privacy laws as well as abide by the terms of the contract with Implicit.

## II.    STATEMENT OF ISSUES

*First*, preliminary injunctive relief should issue where a plaintiff has shown a likelihood of success on the merits. This motion establishes that Jacob and Juanita Stine unlawfully acquired and converted Implicit's trade secrets in violation of the DTSA and CUTSA, unlawfully accessed or exceeded their authority in accessing Implicit's computer systems in violation of CFAA and California Penal Code § 502(c) *et seq*, and that Jacob Stine breached his confidentiality agreement with Implicit. Based on the foregoing, has Implicit met its burden of showing a likelihood of success on the merits?

*Second*, preliminary injunctive relief should issue when a plaintiff will suffer irreparable harm absent relief. This motion establishes that Jacob and Juanita Stine's violations of the DTSA, CUTSA, CFAA, and California Penal Code § 502(c) *et seq.* as well as Jacob Stine's

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

breach of his confidentiality agreement with Implicit will cause irreparable harm to Implicit absent emergency intervention from the Court. Based on the foregoing, has Implicit met its burden of showing irreparable harm?

*Third*, preliminary injunctive relief should issue where the balance of hardships favors the plaintiff. This motion establishes that Jacob and Juanita Stine's violations of the DTSA, CUTSA, CFAA, and California Penal Code § 502(c) *et seq.* as well as Jacob Stine's breach of his confidentiality agreement with Implicit will cause irreparable harm to Implicit whereas Jacob and Juanita Stine will face no hardship should the Court order them to comply with applicable federal and state laws. Based on the foregoing, has Implicit met its burden of showing the balance of harms favors Implicit?

*Fourth*, preliminary injunctive relief should issue where the relief serves the public. This motion establishes that Jacob and Juanita Stine's continued violation of the DTSA, CUTSA, CFAA, and California Penal Code § 502(c) *et seq.* as well as Jacob Stine's continued breach of his confidentiality agreement with Implicit provides no service to the public whereas compliance with federal and state law does serve the public. Based on the foregoing, has Implicit met its burden of showing preliminary injunctive relief serves the public?

*Lastly*, if preliminary injunctive relief is issued a movant must provide the Court security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. This motion establishes that the confidentiality agreement between Implicit and Jacob Stine provides that Implicit may move for injunctive relief. Based on the foregoing, has Implicit met its burden of showing that either no bond or a minimal bond is appropriate?

## III.   FACTUAL BACKGROUND

### A.   Implicit is Founded

Lavallee and Jacob Stine co-founded Implicit Conversions, LLC, the predecessor to Implicit, in 2019. Declaration of Robin Lavallee ("Decl."), ¶3. Implicit was formed as a Delaware C corporation in November 2022. Both entities merged in March 2023, with Implicit the surviving successor entity that would carry on the business. *Id.* ¶4

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Implicit's core business is producing proprietary video game emulators that allow classic video games that were produced for legacy consoles (e.g., PlayStation, Genesis, and Nintendo Entertainment System) to be played on modern video game consoles, such as PlayStation 5 and Nintendo Switch.  *Id.* ¶5.

Implicit issued 4,250,000 shares of Common Stock to Lavallee and 4,250,000 shares of Common Stock to Jacob Stine shortly after incorporation, both subject to vesting over a 4-year period, through Implicit's Common Stock Purchase Agreement ("CSPA").  *Id.* ¶9.  The CSPA with Jacob Stine provides that upon Jacob Stine's termination from Implicit, Implicit has the right to repurchase all unvested shares.  *Id*.

Implicit's original two-person Board of Directors was Lavallee and Jacob Stine.  *Id.* ¶9.  That remained the composition of Implicit's Board until a majority of Implicit's stockholders recently removed Jacob Stine from the Board.  *Id.*  Lavallee is now Implicit's only Board member.  *Id*.

On January 24, 2023, Implicit's Board appointed Lavallee as Implicit's Chief Executive Officer ("CEO"), President and Secretary.  *Id.* ¶13.  Per the Bylaws, the CEO is Impact's senior-most executive officer, has general supervision, direction and control of the business, and may appoint subordinate officers who serve at the CEO's discretion.  *Id.*  Lavallee appointed Jacob Stine as Chief Technology Officer ("CTO").  *Id.*  Jacob Stine served as Implicit's CTO until Implicit recently terminated his employment.  *Id.*  Implicit and Jacob Stine entered into a Confidential Information and Invention Assignment Agreement ("CIIAA") dated November 21, 2022, that required, among other things, that Jacob Stine hold all Implicit confidential and proprietary information and trade secrets as strictly confidential, that he make no unauthorized use or disclosure of this information, that he return this information upon termination and that he execute a termination certification confirming that he has complied with his duties and that he no longer holds such material.  *Id.* ¶14.

Implicit hired Juanita Stine as Human Resources and Payroll Administrator in March 2022.  *Id.* ¶8.  Under the terms of the Employment Agreement between Implicit and Juanita Stine, Juanita Stine is required to hold as confidential Implicit's confidential and proprietary

information and trade secrets. *Id.* ¶15. Through employee incentive stock options exercises, Juanita Stine owns 1,666 shares of Implicit stock. *Id.* ¶11.

### B. Implicit Terminated Jacob Stine; Jacob Stine and Juanita Stine Subsequently Accessed And Used Implicit's Computer Systems Without Authorization

Implicit made the difficult decision to terminate Jacob Stine's employment in June 2024. Implicit had grown increasingly concerned at Jacob Stine's erratic behavior and poor performance. *Id.* ¶17. As a manager, Jacob Stine fostered a toxic workplace relationship with other key personnel, impairing their ability to perform their jobs. *Id.* ¶16. Troublingly, Jacob Stine made increasingly alarming statements to co-workers in work communication channels which escalated to threats that he would harm or kill others or inflict harm on himself. *Id.*

On June 14, 2024, Implicit notified Jacob Stine that his employment was terminated effective immediately and that his access to company computer systems was being disabled. *Id.* ¶17. Implicit subsequently disabled Jacob Stine's access to its major systems. *Id.* Jacob Stine had no authority to access Implicit's computer systems and upon his termination. *Id.* ¶18.

On the evening of June 14, after his access had been disabled, Jacob Stine unlawfully accessed Implicit's Google Workspace, restored his own access rights, and disabled Lavallee's access to Google Workspace. *Id.* ¶19. Lavallee received an email auto-alert from Google Workspace that he had been removed as the Google Workspace administrator and had been replaced by Juanita Stine. *Id.* ¶20. That same evening, Jacob Stine used Implicit's email system to send a message to all Implicit employees in which he admitted that he had regained access to Implicit's computer systems after being locked out and terminated and that he had blocked Lavallee's access to Implicit's computer systems. *Id.* The following day, Jacob Stine sent multiple messages to employees promising to restore Lavallee's access, and eventually did so. *Id.* ¶21.

On June 17, Lavallee accessed Google Workspace and disabled Jacob Stine's and Juanita Stine's access to Google Workspace. *Id.* ¶24.

////

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

**C.      Implicit Investigates Jacob Stine's Unauthorized Access of the Implicit Computer System**

Following Jacob Stine's unauthorized access, Implicit initiated an investigation. *Id.* ¶25. While the full scope of Jacob Stine's and Juanita Stine's misconduct has not yet been determined, certain details have been confirmed. *Id.*

Implicit uses a suite of Google Workspace functionality, including email, calendaring, document storage, and document creation. *Id.* ¶26. The document storage function, called Google Drive, serves as a repository of Implicit's confidential and proprietary information and its trade secrets. *Id.* Not only do Implicit personnel store such material on Google Drive in the regular course of their duties, but Google Drive is used to coordinate the architecture of Implicit's three data centers to ensure that all data within the company is synchronized despite its use of distributed local data centers. *Id.* Therefore, through its function of synchronizing company confidential information from local locations, Google Drive necessarily stores company confidential information. *Id.* Moreover, unauthorized activity on Implicit's Google Workspace account is significant because those Google Workspace accounts are used as credentials for other Implicit software accounts, such as Implicit's Github source code repository and can be used through password resets to gain access to the entirety of Implicit's cloud-based data. *Id.*

After Implicit regained control of its Google Workspace and accessed it on June 17, it was able to determine at least some of Jacob Stine's and Juanita Stine's activities on its systems. *Id.* ¶27.

First, the Google Workspace audit trail activity shows that starting at approximately 9:39 p.m. on June 14, Juanita Stine's credentials were used to: 1) remove Lavallee as the primary email admin and backup email admin and place Juanita Stine in those positions; 2) suspend Lavallee's access to Google Workspace and restore Jacob Stine's access to Google Workspace; and 3) remove administrative rights for Lavallee and Bill Litshauer, Implicit's acting Chief Operating Officer. *Id.*

//

//

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Second, audit trail activity shows that on June 15, Jacob Stine's credentials were used to force a password change of the Google Workplace account implicitrunner@implicitconversions.com in an apparent attempt to regain access to that account. *Id.* The user implicitrunner@implicitconversions.com is a service machine account that is used to authenticate the machine and access other digital infrastructure. *Id.* ¶29. It is the main account used to generate Implicit's product. *Id.* But when Jacob Stine forced a password change to regain access to ImplicitRunner, the password no longer matched the local cached credentials at the Implicit data centers, therefore preventing all other data centers from accessing the ImplicitRunner account for a period of time. *Id.* ¶30.

Third, audit records also show that on June 16, Jacob Stine initiated a Google Takeout, which is a Google Workspace feature that allows a user to download a local copy of the user's entire Google Workspace email box. *Id.* ¶31.

Fourth, audit records of Jacob Stine's Google Drive activities show that he also exported substantial quantities of company documents during the June 14-17 time frame and appears to have attempted to download the entire Google Drive. *Id.* ¶32.

Jacob Stine was not authorized to access Implicit's computer systems after his termination or to copy any documents from Implicit's computer systems. *Id.* ¶33. Likewise, Juanita Stine was not authorized to provide Jacob Stine access to Implicit's computer systems. Nor was Juanita Stine authorized to disable my access to Implicit's systems. *Id.* ¶33.

**D.     Jacob Stine's Unauthorized Access to the Implicit's Systems Disrupts Implicit's Business Operations**

Jacob Stine's unauthorized accesses and malicious activity had far-reaching consequences for Implicit and caused significant disruption to Implicit's business operations. As the CEO of a small company, Lavallee has a central role in Implicit's operations. *Id.* ¶34. The loss of his access to Google Workspace and email, along with Jacob Stine's messaging that he had control of Implicit's systems and had removed Lavallee, caused widespread confusion and chaos among Implicit's employees, consultants and partners. *Id.* This disruption caused Implicit's productivity and work performance to suffer, as did Implicit's ability to make progress

towards deadlines. *Id.* Preliminary investigation also shows that Jacob Stine used his period of unauthorized access to Implicit's systems to communicate with partners and customers, but Implicit is not yet aware of the full scope of his activities or the ramifications of them. *Id.*

Jacob Stine also tampered with and therefore harmed Implicit's computer systems. As is discussed above, when Jacob Stine forced a password reset to the ImplicitRunner account, the account password no longer matched the local cached credentials at the Implicit data centers, therefore suspending access to the ImplicitRunner account to those data centers. *Id.* ¶35. This caused significant disruption to Implicit's operations and made it impossible for certain Implicit personnel to perform their duties and make progress on their projects for a period of time until Implicit was able to modify the password settings at these data centers. *Id.*

On June 17, 2024, Implicit sent to Jacob Stine via overnight Fedex delivery a Notice of Exercise of Repurchase Option with a copy sent via email. *Id.* ¶36. Through this letter, Implicit repurchased Jacob Stine's 2,656,250 unvested common shares of Implicit stock. *Id.* Implicit enclosed a certified check in the amount of $26.57 made payable to Jacob Stine for the repurchase. *Id.* As a result of the repurchase, Jacob Stine held only 1,593,750 vested shares of Implicit common stock. *Id.* ¶37. Lavallee subsequently executed a Stockholder Resolution By Written Consent, voting his 4,250,000 shares, which represents a majority of all outstanding Implicit shares, to remove Jacob Stine from the Implicit Board of Directors. *Id.* ¶38. Implicit also sent Jacob Stine a stockholder resolution on June 17, 2024. *Id.* ¶39.

Implicit suspended Juanita Stine's employment on June 17, 2024, pending investigation. Implicit terminated her employment on June 24. *Id.* ¶40.

**E.    Jacob Stine Continues to Hold, Without Authorization, Implicit Trade Secret's and Implicit's Data Center.**

Jacob Stine holds vast quantities of Implicit's confidential and proprietary information and its trade secrets. *Id.* ¶41. Among other things, Jacob Stine has copies of all of Implicit's source code, business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts,

internal budgets and forecasting, and the core methods and know-how of Implicit's technology. *Id.*

Jacob Stine, in his capacity as Implicit's CTO, already held substantial quantities of Implicit's confidential and proprietary information and its trade secrets by virtue of his day-to-day duties. *Id.* ¶42. These items were stored in digital file format on hardware and devices belonging to Implicit at the Implicit data center location under Jacob Stine's control (as is further detailed below) as well as on multiple personal devices held by Jacob Stine. *Id.* Moreover, during the period of Jacob Stine's post-termination unauthorized intrusion into Implicit's computer systems, he had access to all Google Drive documents, all emails, and access to Implicit's source code repository through Github through his unauthorized access to the ImplicitRunner account. *Id.* Implicit's ongoing investigation shows that Jacob Stine accessed Google documents and emails during his period of unauthorized access. *Id.* Jacob Stine has not returned any (much less all) Implicit confidential and proprietary information and trade secrets upon his termination, despite his obligation to do so under the terms of the CIIAA and despite Implicit's demands that he do so. *Id.*

The source code and software tools that remain in Jacob Stine's possession are what puts Implicit ahead of the competition and Implicit has expended tremendous time and resources developing them. *Id.* ¶43.

In particular, the source code and software are the backbone of Implicit's Syrup Emulation Engine as well as several other proprietary compilers, including a compiler that enables PlayStation 2 games run efficiently on new consoles and is the only compiler that can do so. *Id.* ¶44. Thus, maintaining the security of this information is of vital importance to its value. *Id.*

Additionally, Implicit has an exhaustive auto-test system that allows its engineers to work fast and with confidence that the code they write did not negatively affect the code for other games while fixing another game. *Id.* ¶45. This auto-test system operates by running, for each change of source code that an engineer performs, tests on hundreds of games by taking screenshots of these games at specific frames. *Id.* It then compares them against reference

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

frames, maintaining the fidelity of the original source code. *Id.* This proprietary testing method is integral to Implicit's product development and maintaining the quality of its emulator products. *Id.* Thus, maintaining the security of this information is of vital importance to its value.

On June 18, 2024, Implicit demanded that Jacob Stine return all physical hardware and digital files held at his La Honda, California home office. *Id.* ¶46. The significance of the La Honda home office is based on how Implicit uses local data centers as a key part of its operations.

Prior to these events, Implicit maintained three data centers: one in Pennsylvania, one in Canada, and one in a home office at Jacob Stine's residence in La Honda. *Id.* ¶47. Implicit's proprietary information and trade secrets are stored and accessible through these servers. *Id.*

Implicit uses physical data centers because the games it produces must be run on proprietary software provided by its clients. *Id.* ¶52. This involves large data transfers and would be cost-prohibitive and inefficient to run on the cloud. *Id.* Because of this, each data center is connected to each other using virtual private network ("VPN") software. *Id.* This protocol allows the data centers to communicate privately over a public communication channel without the use of cloud software. *Id.* Furthermore, having three data centers allows Implicit to continue functioning should one of the data centers fail. *Id.* Thus, access to one data center provides access to all the data centers. *Id.*

Implicit's confidential and proprietary information and trade secrets are also stored on Implicit's Google Workspace and accessible to any computer or laptop through that portal. *Id.* ¶48. So not only does Jacob Stine have a complete set of this data through his possession of the La Honda data center, but he could have downloaded the entirety of this information locally through his unauthorized access post-termination as well as at any time before he was terminated. *Id.*

Implicit maintains the security of its data centers (and the proprietary source code and software tools stored on them) by allowing access only through a password-protected Google Workspace authentication application. *Id.* ¶49. Access to the Google Workspace is also password protected. *Id.* Additionally, all Implicit employees who are given access to company

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

confidential information are required to enter into a contractual agreement to maintain the confidentiality of company information and to return any company data immediately upon termination. *Id.* This procedure is standard in the industry for protecting business critical proprietary information, source code, and software tools. *Id.*

The La Honda data center contains hardware and software that is critical to Implicit's ongoing operations and is the strongest and fastest data center of the three. *Id.* ¶50. Each of these data centers also contain computers and hardware proprietary to one of Implicit's clients that Implicit uses to develop its video game emulation software that it provides to them. *Id.*

The video games that Implicit produces for its clients using these proprietary tools are then sold through digital stores. *Id.* ¶51. More than 70 of the games Implicit has produced in the last two have been produced using these data centers. *Id.* The three data centers are thus critical to Implicit's business, accounting for at least tens of millions of dollars in sales for Implicit's clients if not more. *Id.*

Because the data centers are not cloud-based, Implicit lacks central control over the La Honda data center and cannot remotely change its password or otherwise prevent Jacob Stine from accessing it. *Id.* ¶53.

Given Jacob Stine's continued possession of the La Honda data center, the Canada and Pennsylvania data centers had to be turned offline to prevent his ability to tamper with those data centers. *Id.* ¶54.

While Implicit has diligently worked to secure the Pennsylvania and Canada data centers, Jacob Stine's possession of the La Honda data centers puts the security of key applications used across Implicit's network at risk, forcing Implicit to operate only in a severely degraded capacity. *Id.* ¶55.

Jacob Stine's ongoing possession of the La Honda data center overshadows all of his other activities. For instance, Implicit is aware that Jacob Stine had access to its source code as part of his regular duties as CTO. *Id.* ¶56. Moreover, Jacob Stine could have accessed the Github source code during his period of post-termination unauthorized access by using the ImplicitRunner Google Workspace account. But that would not have been necessary. *Id.* There

Grellas Shah LLP
20400 Stevens Creek Blvd, Suite 280
Cupertino, CA 95014

11

is a complete set of Implicit's source code on the La Honda data center, updated through at least June 18, 2024. *Id.* As a build machine, the La Honda data center downloads all source code locally to perform its functions. *Id.* It was only after Implicit both changed the password to the ImplicitRunner account again (so that Jacob Stine could no longer access it using the password he had changed it to), and it made the difficult decision to decouple the data centers that Jacob Stine's access to updated source code ended. *Id.*

Given the vital importance of the La Honda data center, Implicit demanded that Jacob Stine either allow Implicit to send a courier to the La Honda office, which was also Jacob and Juanita Stine's home, to take custody of all digital files and hardware within his possession or, if Jacob Stine preferred, for Jacob Stine to ship the data center back to Implicit with all costs to be reimbursed. *Id.* ¶57. In particular, Implicit requested the return of: 1) the data center maintained at Jacob Stine's La Honda home (referred to internally as "Reynard") along with all peripherals and components; 2) one Nintendo Switch SDEV Development kit (a console with advanced features, including a built-in debugger and capture software); 3) any and all devices containing Implicit's digital data; 4) a variety of PlayStation Development Kits, along with all components, original boxes, and cables; 5) all Implicit digital files in Jacob Stine's possess; and 5) all other Implicit hardware in Jacob Stine's possession. *Id.*

Jacob Stine did not comply with Implicit's demands, has not returned any of the requested Implicit property, and has apparently converted this Implicit property to his own use. *Id.* ¶58.

Nor has Jacob Stine returned a signed Termination Certificate as required by his CIIAA. *Id.* ¶59. The Termination Certificate includes certifications that, among other things, Jacob Stine complied with the terms of the CIIAA and has returned all Company property. *Id.*

Implicit cannot deliver its products or operate at its full capacity while Jacob Stine remains in possession of the La Honda data center and the proprietary source code and software tools accessible through the data center. *Id.* ¶60.

The facts stated above, including that it appears that Juanita Stine either gave Jacob Stine her credentials to access Implicit's computer systems after his termination, or accessed these

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

systems herself to restore Jacob Stine's access, show that Juanita Stine is conspiring with Jacob Stine. *Id.* ¶61.

### F. Jacob Stine Attempts to Usurp Control of Implicit

As a result of his termination and his removal from the Implicit Board of Directors, Jacob Stine has no further role of any kind in Implicit other than as a stockholder. *Id.* ¶62.

On the morning of June 20, 2024, Jacob Stine, through counsel, sent an Action By Written Consent of the Majority Stockholders, signed by Jacob Stine and Alawi, who purported to act as Implicit stockholders. *Id.* ¶63. The written consent states that Jacob Stine is still an Implicit Board member and purports to remove Lavallee from the Implicit Board and to appoint Juanita Stine and Alawi to the Board. *Id.* Notably, Jacob Stine, who has 1,593,750 shares, and Alawi, who has 250,000 shares, possess nowhere near a majority of Implicit's 6,095,957 outstanding common shares. *Id.*

Jacob Stine then transmitted a purported Unanimous Written Consent purporting to remove Lavallee as CEO of Implicit and appointing himself as interim CEO. *Id.* ¶64.

Jacob Stine, through his legal counsel, then sent these documents to Implicit personnel, demanding that they surrender access to Implicit's computer systems to Jacob Stine. These acts caused, and continue to cause, significant confusion and disruption to Implicit's workplace and to its business. *Id.* ¶65.

### G. Jacob Stine's Unauthorized Access to Implicit's Systems Causes Significant Costs for an Investigation

Implicit has incurred significant costs investigating and attempting to remediate the harms caused by Jacob Stine and Juanita Stine's unauthorized activities on Implicit's computer systems and the aftermath of this unauthorized access. *Id.* ¶67. Implicit still does not know the full extent of Jacob Stine and Juanita Stine's activities, whether they created backdoors or other security flaws in Implicit's computer systems, and what documents were tampered with. *Id.* Nor does it know the full effect of these acts on customer and partner relationships from the disruption caused by these acts. *Id.*

From June 14 to June 17, 10 Implicit personnel logged an estimated over 280 hours to

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

investigate the unauthorized access and attempt to remediate it. *Id.* ¶68. From June 18 to June 26, an estimated over 245 additional hours were logged expended in these investigation and remediation efforts. *Id.* ¶69. This represents tens of thousands of dollars' worth of personnel costs and lost productivity. *Id.* ¶70. Additionally, there have also been direct out-of-pocket costs associated with investigation and remediation efforts. *Id.* ¶71. Implicit incurred approximately $2,000 to add auditing and archiving functionality to its Google workspace. Implicit also purchased additional hardware to create a new data center given that Jacob Stine will not return the equipment in the La Honda data center. *Id.* This new equipment costs approximately $10,000, and there will be additional consultant fees to assemble and configure the equipment and costs to transfer it to a new location. *Id.*

Implicit plans to use an external IT and security advisor to investigate its systems and remediate any security gaps. *Id.* ¶72. The costs associated with these efforts have not yet been determined. *Id.* Implicit has also already incurred tens of thousands of dollars of legal fees in connection with investigating Jacob Stine and Juanita Stine's unlawful access to Implicit computer systems and efforts to address these acts through legal means. *Id.*

## IV.    Emergency Injunctive Relief Is Warranted

The traditional factors warranting a preliminary injunction are 1) a likelihood of success on the merits; (2) the possibility of irreparable injury; (3) a balance of hardships favoring the moving party; (4) that public policy favors such an order. *See Textile Unlimited, Inc. v. ABMH and Co., Inc.* 240 F.3d 781, 786 (9th Cir. 2001). The same standard applies to temporary restraining orders. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

The Ninth Circuit also recognizes an alternative formulation that the moving party can meet its burden of "demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Textile*, 240 F.3d at 786.

A temporary restraining order and subsequent preliminary injunction are appropriate (and necessary) here because Implicit is likely to succeed on the merits of its claims to prevent

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

irreparable harm to Implicit.  Under similar circumstances courts have ordered the return of trade secret documents as a form of injunctive relief.  *See, e.g.*, *Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582 WHA, 2019 WL 1045911, at \*22 (N.D. Cal. Mar. 5, 2019) (ordering the return of documents containing trade secrets).

### A. Implicit Is Likely To Succeed On The Merits Of Its Claims Under the DTSA, CUTSA, CFAA, And California Penal Code § 502(c) Against Jacob And Juanita Stine

A likelihood of success on the merits is the most important factor when considering whether to grant a motion for a preliminary injunction.  *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Implicit must show only likely, rather than certain, success.  *See Future Domain Corp. v. Trantor Sys. Ltd*., No. C 93 0812 TEH, 1993 WL 270522, at \*4 (N.D. Cal. May 3, 1993) ("It is well established that a party seeking a preliminary injunction must present a prima facie case but need not show that it is certain to win.") (citing Wright and Miller, *11 Federal Practice and Procedure: Civil*, § 2948 at 452).  Implicit is likely to succeed on the merits of its claims under the DTSA, CUTSA, Computer Fraud and Abuse Act, and California Penal Code § 502(c) *et seq.* against Jacob and Juanita Stine.

### 1. Implicit is Likely to Prevail on its Claims Under the DTSA and CUTSA

Courts analyze DTSA and CUTSA "claims together because the elements are substantially similar." *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citation omitted).  To state a claim under the DTSA and CUTSA, a plaintiff must allege that: (1) the plaintiff possessed a trade secret; (2) the defendant misappropriated the trade secret; and (3) the misappropriation caused or threatened damage to the plaintiff.  *See id.* at 657-58.  Furthermore, to properly plead a trade secret under the first element, plaintiffs need not "spell out the details of the trade secret," but they must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 75 (N.D. Cal. 2020).  Lastly, to plead misappropriation, plaintiffs must establish one of two categories of conduct: (1) acquisition of the secret by improper means, or (2) disclosure or

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

use of the trade secret without consent.  18 U.S.C. § 1839(5)(A)–(B); *Lamont v. Conner*, No. 5:18-cv-04327-EJD, 2019 WL 1369928, at \*8 (N.D. Cal. Mar. 26, 2019).  The DTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6)(A).  Here, based on the confidential and proprietary nature of the information, unauthorized acquisition of the trade secrets, conversion of the trade secrets in violation of contractual duties to return them post-employment, and the extensive past, current, and future damage to Implicit, Implicit has established a likelihood to succeed on its claims under the DTSA and CUTSA.

*First*, the proprietary information copied or retained by Jacob and Juanita Stine qualifies as a trade secret, per the DTSA and Ninth Circuit law.  This information includes: proprietary source code and software tools as well as business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology.  Decl. ¶41.  The source code and software tools that remain in the Stines' possession are the backbone of Implicit's Syrup Emulation Engine as well as several other proprietary compilers, including a compiler that enables PlayStation 2 games and set Implicit apart from the competition.  *Id.* ¶44.  Additionally, the auto-test system used for testing and development of Implicit's products is also proprietary.  *Id.* ¶45.  This source code, software, and development tool are unique to Implicit's products and development processes and are the exact type of information the Ninth Circuit has considered to be a trade secret.  *See InteliClear v. ETC Global Holdings*. 978 F.3d 653, 658 (describing plaintiff's trade secrets as the "unique design and concepts and the unique software, formulas, processes, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data").

Furthermore, Implicit takes appropriate measures that are standard in the industry to protect its proprietary information given the significant time and resources Implicit has invested into developing its trade secrets.  Decl. ¶49.  In particular, Implicit password-protects its

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

proprietary information using an authentication application and further requires employees to who are given access to company confidential information to enter into a contractual agreement to maintain the confidentiality of company information and to return any company data immediately upon termination. *Id*.

**Second**, the Stines misappropriated Implicit's trade secrets when they 1) accessed Implicit's computer systems after Jacob Stine's termination and downloaded confidential and proprietary materials from Implicit's Google Workspace (Decl. ¶31), 2) retained without authorization and refused to return and thereby converted for their own use Implicit's source code and other trade secrets acquired during employment at the time of termination (*id.* ¶58); and 3) converted the La Honda data center (which houses the trade secrets) by failing to return it to Implicit (*id.*). *See Navigation Holdings, LLC v. Molavi*, 445 F.Supp.3d 69, 75 (N.D.Cal. 2020) (explaining misappropriation of a trade secret may be established through acquisition of trade secrets by secret or improper means). The mass exportation of Implicit's proprietary information upon the Stines' termination and refusal return the information or the La Honda data center are more than sufficient to establish the Stines have misappropriated Implicit's trade secrets.

**Lastly**, the Stines' misappropriation has both caused and threatened further damage to Implicit. Harm is generally presumed when proprietary information is misappropriated. *See Apple Inc. v. Rivos, Inc.*, No. 5:22-CV-02637-EJD, 2023 WL 5183034, at *9 (N.D. Cal. Aug. 11, 2023) (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 913–14 (3d Cir. 2021) ("By statutory definition, trade secret misappropriation is harm.... [C]ognizable harm is pled when a plaintiff adequately alleges the existence of a trade secret and its misappropriation.") (emphasis in original)). Here, the harm to Implicit is extensive and crippling to the companies' operations. The Stines' refusal to return the La Honda data center to Implicit required the shutdown of all three data centers that are required for Implicit to operate and the further security measures that Implicit has had to implement to keep its data centers secure from future access by the Stines has left Implicit able to operate only in an extremely diminished capacity. Decl. ¶55. Furthermore, the possibility that the Stines' could use or disclose the misappropriated

17

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

information threatens the very existence of Implicit. *Id.* ¶56. Additionally, the Stines' possession of proprietary information belonging to Implicit's clients threatens Implicit's relationship with its clients and future business opportunities. *Id.* ¶51. With the presumption of harm coupled with the articulable past, current, and future damage to Implicit, there can be no doubt that the Stines' misappropriation of Implicit's trade secrets have and will continue to harm Implicit.

### 2.    Implicit Is Likely To Prevail on its Claim under the CFAA

"The CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking" and "is best understood as an anti-intrusion statute and not as a misappropriation statute[.]" *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (internal quotations and citations omitted). The CFAA prohibits, inter alia, intentionally accessing a computer "without authorization" or by "exceed[ing] authorized access" to obtain information from a protected computer. 18 U.S.C. § 1030(a)(2)(C). The phrase "without authorization" means without permission. *See HiQ Labs*, 31 F.4th at 1195. The phrase "exceeds authorized access" means accessing "a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

*First*, the Stines violated 18 U.S.C. § 1030(a)(2)(c) when Jacob Stine accessed Implicit's password-protected computer system after his access had been disabled. Indeed, Jacob Stine intentionally accessed and tampered with the system after restoring his own full access to Implicit's computer systems. Jacob restored his access by either using Juanita Stine's credentials or having Juanita restore access herself. Decl. ¶19. In either case, Jacob Stine was not authorized to access Implicit's computer systems after his termination nor was Juanita Stine authorized to provide Jacob Stine access to Implicit's computer systems. *Id.* ¶33. Jacob Stine accessed Implicit's computer system "without access" and Juanita Stine "exceeded authorized access" by either providing her husband with her credentials or by restoring his access herself.

*Second*, the Stines violated 18 U.S.C. § 1030(a)(4) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine fraudulently

restored his own access by either using Juanita Stine's credentials or by having Juanita restore his access herself and subsequently copied confidential, proprietary, and trade secret information, all of which are of significant value to Implicit.  Decl. ¶¶19, 44.

*Third*, the Stines violated 18 U.S.C. § 1030(a)(5)(A) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or by having Juanita his restore access herself and subsequently intentionally caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶19.

*Fourth*, the Stines violated 18 U.S.C. § 1030(a)(5)(B)-(C) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine intentionally restored his own access by either using Juanita Stine's credentials or by having Juanita restore his access herself and, as a result, recklessly caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶¶19, 54.

Given the Stines' flagrant conduct by fraudulently gaining unauthorized access to Implicit's protected computer system and the further damage caused by such conduct, Implicit is likely to prevail on the merits of its claims under the CFAA.

### 3.    Implicit Is Likely To Prevail on its Claim under California Penal Code § 502(c) *et seq.*

Section 502 makes it unlawful to "[k]nowingly access[ ] and without permission" take, copy, or make use of "any data from a computer, computer system, or computer network, or ... any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network."  Cal. Pen. Code § 502(c)(2).  Although Section 502 is a state law analogue of the CFAA, the provision of Section 502 at issue "does not require unauthorized access. It merely requires knowing access." *United States v. Christensen*, 828 F.3d

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

763, 788 (9th Cir. 2015); *see also Bui-Ford v. Tesla, Inc.*, No. 23-cv-2321-JST, 2024 WL 694485, at 5 (N.D. Cal. Feb. 20, 2024) (relying on Christensen to distinguish subsections of Section 502 where access must be knowing and unauthorized from subsections (c)(2) and (c)(4) which require only that access be knowing).  Under subsection (c)(2), access becomes unlawful when an individual or entity "'without permission takes, copies, or makes use of' data on the computer." *Christensen*, 828 F.3d at 788 (quoting Cal. Penal Code § 502(c)(2).)  In *Christensen*, the court held "logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly" would violate the statute. *Id.* at 789.  Here, the Stines did exactly that.  After Jacob Stine's access to Implicit's password-protected computer system had been disabled.  Indeed, Jacob Stine intentionally accessed and tampered with the system by restoring his own full access to Implicit's computer systems after initially accessing the system using Juanita Stine's credential.  Decl. ¶19.  Jacob Stine was not authorized to access Implicit's computer systems after his termination nor was Juanita Stine authorized to provide Jacob Stine access to Implicit's computer systems.  *Id.* ¶33.

***First***, Jacob Stine and Juanita Stine violated Penal Code § 502(c)(1) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently intentionally caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶¶19, 54.  Based on the disablement of Lavallee's access, the destruction of information from Implicit's computer system, and the Jacob Stine's subsequent attempts to usurp control of Implicit and sow disharmony among Implicit's employees, it is clear that Jacob Stine and Juanita Stine fraudulently accessed the Implicit computer system in and effort to "devise or execute any scheme or artifice to defraud, deceive, or extort, or … wrongfully control or obtain money, property, or data."  *See* Cal. Penal Code 502(c)(1).

***Second***, Jacob Stine and Juanita Stine violated Penal Code § 502(c)(2) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

fraudulently restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently copied confidential, proprietary, and trade secret information.  Decl. ¶¶19, 31-33.

*Third*, Jacob and Juanita Stine violated Penal Code § 502(c)(3) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine fraudulently restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently used the Implicit computer system.  Decl. ¶¶19.

*Fourth*, Jacob Stine and Juanita Stine violated Penal Code § 502(c)(4) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently intentionally caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶¶19, 35.

*Fifth*, Jacob Stine and Juanita Stine violated Penal Code § 502(c)(5) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently intentionally caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶¶19, 35.

*Sixth*, Juanita Stine violated Penal Code § 502(c)(6) when she either directly restored Jacob Stine's access or provided her credentials to Jacob Stine, which Jacob Stine used to access to Implicit's password-protected computer system, after his access had been disabled, and restored his own access using Juanita Stine's credentials.  Decl. ¶19.

*Lastly*, Jacob Stine and Juanita Stine violated Penal Code § 502(c)(7) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or having Juanita

21

restore his access herself and subsequently accessed the Implicit computer system in order to cause damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline.  Decl. ¶¶19, 35.

**4.      Implicit Is Likely To Prevail on its Claim for Breach of the CIIAA**

The CIIAA states that the performance of the agreement will be interpreted under the laws of the state of Delaware.  Decl. ¶14 & Ex. E, §12(a).  The elements for a breach of contract under Delaware law are: 1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) resulting damage to the plaintiff.  *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

*First*, there can be no dispute that the Implicit and Jacob Stine entered in the CIIAA, which was signed by the parties on January 24, 2023.  Decl. ¶14 & Ex. E, Signature Page.

*Second*, Jacob Stine breached the CIIAA by failing to perform the conditions, covenants and obligations required of him by the CIIAA.  In particular, the CIIAA requires that Jacob Stine "shall not make copies of [Implicit] Confidential Information except as authorized by the Company or in the ordinary course of my obligations to the Company under the Relationship." *Id.*, Ex. E, §3(a).  The CIIAA further requires that:

> [a]t the time of termination of the Relationship, [Jacob Stine] will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [Jacob Stine] pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns

*Id.* §5. Jacob Stine breached both provisions and continues to be in breach of the CIIAA. Indeed, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, he fraudulently restored his own access using Juanita Stine's credentials and copied confidential, proprietary, and trade secret information.  Decl. ¶¶19, 31-32; *see supra* Sections IV.A.1-3.  This alone is a breach of the CIIAA.  Furthermore, after his termination, Jacob Stine

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

refused to return the La Honda data center, which is one of Implicit's three data centers, and the most powerful.   Decl. ¶¶53-54.  As of the time of the filing of this motion, Jacob Stine remains in possession of the La Honda data center, along with Implicit's proprietary information and trade secrets that are stored thereon.  *Id.*  These acts are a clear violation of Section 5 of the CIIAA.  Thus, Jacob Stine has breached at least two of the CIIAA's provisions and Implicit is likely to succeed on the merits of its claim for breach of contract under the CIIAA.

*Lastly*, Jacob Stine's breach of the CIIAA has damaged Implicit and will continue to damage Implicit.  As explained above (*see supra* Section IV.A.1), the actions by Jacob Stine have damaged Implicit by tampering with the Implicit computer system, copying proprietary information and trade secrets, causing the shutdown of all three Implicit data centers, and causing Implicit to operate in an extremely diminished capacity.  Furthermore, the copying of trade secrets and continued refusal to return the La Honda data center threaten the very existence of Implicit should Jacob Stine disclose these trade secrets to third parties.  Thus, not only has Jacob Stine caused harm to Implicit by breaching the CIIAA, but his continued breach could damage Implicit irreparably.

### B.   Implicit Will Suffer Irreparable Harm If A Temporary Restraining Order Is Not Granted Pending Hearing On A Motion For Preliminary Injunction

Exigent circumstances necessitate a temporary restraining order until the Motion is heard.  If the Stines continue to maintain possession of Implicit's trade secrets and property and continue to attempt to access and tamper with Implicit's computer systems while the Motion is pending, the Stines will continue to harm Implicit in a manner that is irreparable, as already discussed in Section IV.A.1.

Thus, only a temporary restraining order can give Implicit necessary interim protection while the Court determines whether a preliminary injunction should issue.

### C.   The Balance of Hardships Favors Implicit

To determine whether the balance of hardships favors the moving party, courts must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 571 F.3d 960, 988 (9th Cir. 2009).  The balance of hardships decisively favors Implicit because

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

the only request it has is that Jacob Stine and Juanita simply do not violate federal and state laws. *See Dish Network L.L.C. v. Ramirez*, No. 15–CV–04712–BLF, 2016 WL 3092184, at *7 (N.D.Cal. June 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state...laws" (citation omitted)).  As explained above (*see* Section IV.A.1), the hardship that Implicit faces by the Stines' egregious behavior is immense.  By contrast, there is no hardship to either Jacob or Juanita Stine should they be ordered to return Implicit's vital company property, destroy all the unlawfully copied Implicit trade secrets, and be prohibited from accessing any Implicit system.  Thus, the balance of hardships decisively favors Implicit.

### D.    A Temporary Restraining Order Serves the Public Interest.

There is no public policy in favor of allowing a defendant to violate state or federal law or to breach a valid contract with his or her employer.  *See Henry Schein, Inc. v. Jennifer Cook*, 191 F.Supp.3d 1072 (N.D. Cal. 2016) ("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.")).  Moreover, "[p]ublic interest is also served by enabling the protection of trade secrets." *Id.*  Thus, public interest favors strongly favors the public interest.

### E.    A Minimal Bond is Appropriate

Federal Rule of Civil Procedure 65(c) provides that a temporary restraining order and/or preliminary injunction will only issue "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The amount of the bond is within the discretion of this Court. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000).  Where there is no evidence that the enjoined or restrained party will suffer material harm as a result of the injunction, the Court may set the bond amount at zero. *See Connecticut General Life Ins. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  Further, the parties have contractually agreed that Implicit is "entitled" to seeks injunctive relief for breach of the CIIAA without the need to post a security or bond, or if a security or bond is required, it should be no more than $1,000.  Decl ¶14, Ex. E §12(f).

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

The facts of this case warrant only a minimal bond because there is no evidence that the Stines will suffer material harm from a temporary restraining order and preliminary injunction. The bond should therefore be zero or a nominal amount.

## V.     CONCLUSION

For the above reasons, Implicit asks this Court to grant its motion for a temporary restraining order and, upon its expiration, a preliminary injunction: (1) enjoining Jacob Stine and Juanita Stine from accessing Implicit's computer systems; (2) enjoining Jacob Stine and Juanita Stine from accessing, using, transmitting and disclosing any Implicit's confidential, proprietary, and trade secret information; and (3) directing Jacob Stine to return all Implicit confidential information and all Implicit property.

Respectfully submitted,

Dated:  July 2, 2024                 GRELLAS SHAH LLP

By:  /s/ *Dhaivat H. Shah*
Dhaivat H. Shah, Esq.
Attorneys for PLAINTIFF
IMPLICIT CONVERSIONS, INC.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

25
MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO