1   GRELLAS SHAH LLP
2   DHAIVAT H. SHAH, ESQ. (SBN 196382)
    (ds@grellas.com)
3   DAVID I. SIEGEL, ESQ. (SBN 264247)
    (dsiegel@grellas.com)
    20400 Stevens Creek Blvd, Suite 280
4   Cupertino, CA 95014
    Telephone: (408) 255-6310
5   Facsimile: (408) 255-6350

6   Attorneys for Plaintiff
    IMPLICIT CONVERSIONS, INC.
7

8                  UNITED STATES DISTRICT COURT

9                 NOTHERN DISTRICT OF CALIFORNIA

10
    IMPLICIT CONVERSIONS, INC, a          Case No.  3:24-cv-03744-WHO
11  Delaware Corporation,
                                          **DECLARATION OF ROBIN**
12                  Plaintiff,            **LAVALLEE IN SUPPORT OF**
                                          **IMPLICIT'S MOTION FOR**
13          vs.                           **TEMPORARY RESTRAINING ORDER**
                                          **AND ORDER TO SHOW CAUSE**
14  JACOB STINE, an individual, JUANITA
    TRAVERS STINE, an individual, SAYED
15  MAHMOUD ALAWI, an individual, and
    DOES 1-10, inclusive,
16
                    Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

1    I, Robin Lavallee, declare that:

2    1.    I have personal knowledge of the facts stated herein.  If called upon as a witness,

3    I could and would testify competently to the following facts.

4    **THE FOUNDING OF IMPLICIT AND ITS CORE BUSINESS**

5    2.    I am the co-founder and CEO of Implicit Conversions, Inc. ("Implicit"), a

6    Delaware corporation.  I am also the sole member of Implicit's Board of Directors.

7    3.    In 2019, Jacob Stine and I co-founded Implicit Conversions, LLC, the

8    predecessor of Implicit.

9    4.    I incorporated Implicit in November 2022.  Implicit and Implicit Conversions,

10   LLC, then merged in March 2023.  Implicit is the surviving entity.

11   5.    Implicit's core business is producing proprietary video game emulators that allow

12   classic video games that were produced for legacy consoles (e.g., PlayStation, Genesis, and

13   Nintendo Entertainment System) to be played on modern video game consoles, such as

14   PlayStation 5 and Nintendo Switch.

15   6.    Historically, other video game emulators existed for PS1, PSP and PS2 consoles

16   but were not commercially viable as they required the users to modify their console. Implicit's

17   proprietary Syrup Emulation Engine ("Syrup") uses high-level emulation that allows Syrup to

18   emulate the function of legacy hardware as opposed to simulating the legacy hardware itself.

19   Furthermore, Syrup uses Ahead-of-Time compilation to pre-generate efficient code, thus

20   allowing the emulator to run the game with high performance without console modifications.

21   Implicit emulators also offers multiple tools, such as tools that make it easy to add

22   achievements/trophies for classic games, and tools that offer texture and video replacement.

23   These features are what set Implicit's emulators apart from other products on the market.

24   7.    I was the original director of Implicit.  The Implicit Bylaws specify that Implicit

25   will have a two-person Board of Directors.  Though Jacob Stine was not formally appointed to

26   the Implicit Board of Directors through stockholder vote or stockholder consent, both I and

27   Jacob Stine agreed that he would fill the second vacant Board seat.  Until he was recently

28

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

removed from the Implicit Board of Directors, Jacob Stine acted as an Implicit director, including participating in Board meetings and executing Board resolutions.

8.    Implicit hired Juanita Stine, Jacob Stine's spouse, as Human Resources and Payroll Administrator in March 2022.

9.    On or around January 26, 2023, Implicit issued 4,250,000 shares of Common Stock to me and 4,250,000 shares of Common Stock to Jacob Stine, both subject to vesting over a 4-year period.  A true and correct copy of Implicit's Common Stock Purchase Agreement ("CSPA") with me is attached as Exhibit **A**.  A true and correct copy of Implicit's CSPA with Jacob Stine is attached as Exhibit **B**.  The CSPA with Jacob Stine provides that upon Jacob Stine's termination from Implicit, Implicit has the right to repurchase all unvested shares.

10.    250,000 shares of Common Stock of Implicit were subsequently issued to Sayed Mahmood Alawi ("Alawi").

11.    In addition, the Board of Directors reserved shares for incentive stock options for its employees.  Through options exercises, Juanita Stine owns 1,666 shares of Implicit stock and Isabelle Gagnon owns 541 shares of Implicit stock.

12.    Implicit's Bylaws authorize the Board to appoint a Chief Executive Officer ("CEO") of Implicit.  Per the Bylaws, the CEO is the senior executive officer and has general supervision, direction and control of the business and subordinate officers. Further, the CEO has the authority to remove subordinate officers.  A true and correct copy of Implicit's Bylaws are attached as Exhibit **C**.  On January 24, 2023, by unanimous written consent, Implicit's Board of Directors adopted Implicit's Bylaws.  A true and correct copy of this Board consent is attached as Exhibit **D**.

13.    The Implicit Board appointed me as CEO of Implicit.  I have continuously held the position since that time.  In my capacity as CEO, I made Jacob Stine Implicit's Chief Technology Officer ("CTO").  Jacob Stine was Implicit's CTO until Implicit recently terminated his employment.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

14.     Implicit and Jacob Stine entered into a Confidential Information and Invention Assignment Agreement ("CIIAA") dated January 24, 2023.  A true and correct copy of the CIIAA is attached as Exhibit **E**.

15.     Implicit and Juanita Stine entered an Employment Agreement containing confidentiality provisions on April 1, 2024.  A true and correct copy of the Employment Agreement is attached as Exhibit **F**.

**THE TERMINATION OF JACOB STINE AND JUANITA STINE AND THE STINES' SUBSEQUENT UNAUTHORIZED ACCESS OF IMPLICIT'S COMPUTER SYSTEMS**

16.     Implicit had grown increasingly concerned at Jacob Stine's erratic behavior and poor performance.  As a manager, Jacob Stine fostered a toxic workplace relationship with other key personnel, impairing their ability to perform their jobs.  Moreover, Jacob Stine made increasingly alarming statements to co-workers in work communication channels which escalated to threats that he would harm or kill others or inflict harm on himself.  For instance, in referring to one subordinate, Jacob Stine communicated:  "I'll rub their fucking noses in the tear bag of proof until their lungs bleed" and "I'll bust his knee caps . . . ."  Jacob Stine relayed on several occasions that he hurt himself with messages such as:  "I actually broke a bone in my hand punching myself in the head . . . ."  Sometime his violent and escalating language would reference unidentified others dying, such as:  "holy fuck I hate this job.  I want all the people to die or myself . . . .  I hope all of them die."  Though not directly referencing a co-worker dying, the language was still alarming in the workplace.  There were many messages in this vein.

17.     On June 14, 2024, Implicit notified Jacob Stine that his employment was terminated effective immediately.  Implicit also notified Jacob Stine that his access to company computer systems was being disabled and that Implicit was exercising its right to repurchase his unvested shares.  A true and correct copy of the Employment Termination Letter and Notice of Intent to Exercise Repurchase Option is attached hereto as Exhibit **G**.

18.     Upon termination, Jacob Stine had no authority to access Implicit's computer systems.  Implicit disabled Jacob Stine's access to Implicit's major computer systems upon his termination.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

19. On the evening of June 14, after his access had been disabled, Juanita's Stine's credentials were used to access Implicit's computer systems and restore Jacob Stine's access rights. Either Juanita Stine accessed Implicit's systems herself and restored Jacob Stine's access, or Juanita Stine gave her credentials to Jacob Stine and he used them to restore his own access. Once his access was restored, Jacob Stine disabled my access to Implicit's systems. That evening, I received an automated email alert Google Workspace notifying me that the primary administrator for Implicit had been changed from myself to Juanita Stine. A true and correct copy of this notice from Google Workspace is attached as Exhibit **H**.

20. That same evening, Jacob Stine used Implicit's email system to send a message to all Implicit employees. Jacob Stine admitted that he had regained access to Implicit's computer systems and that he had blocked my access to Implicit's computer systems. A true and correct copy of this message to Implicit's employees is attached as Exhibit **I**.

21. The following day, Jacob Stine sent multiple messages to employees promising to restore my access. True and correct copies of these messages are attached as Exhibits **J** and **K**.

22. My access was apparently restored at some time on June 15 or 16.

23. Implicit began diagnostic testing to assess whether Jacob Stine had installed kill switches or other malicious artifacts on Implicit's computer systems.

24. On June 17, I accessed Google Workspace and disabled Jacob Stine's access to Google Workspace and also disabled Juanita Stine's access to Google Workspace.

25. Although Implicit's investigation is still ongoing, Implicit has discovered that Jacob Stine and Juanita Stine engaged in a number of unauthorized acts on Implicit's systems.

26. Upon regaining access to Implicit's systems, I examined the audit trail activity on the Google Workspace Admin platform. Implicit uses a suite of Google Workspace functionality, including email, calendaring, document storage, and document creation. The document storage function, called Google Drive, serves as a repository of Implicit's confidential and proprietary information and its trade secrets. Not only do Implicit personnel store such materials on Google Drive in the regular course of their duties, but Google Drive is also used to

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

coordinate the architecture of Implicit's three data centers (discussed further below) to ensure that all data within the company is synchronized despite its use of distributed local data centers. Therefore, all confidential and proprietary data and trade secrets, company-wide, is necessarily stored on Google Drive.  Moreover, unauthorized activity on Implicit's Google Workspace account is significant because those Google Workspace accounts are used as credentials for other Implicit software accounts, such as Implicit's Github source code repository and can be used through password resets to gain access to the entirety of Implicit's cloud-based data.

27.    The Google Workspace audit trail activity shows that starting at approximately 9:39 p.m., Juanita Stine's credentials were used to:  1) remove myself as the primary email admin and backup email admin and place Juanita Stine in those positions; 2) suspend my access to Google Workspace and restore Jacob Stine's access to Google Workspace; and 3) remove administrative rights for myself and Bill Litshauer, Implicit's acting Chief Operating Officer.  A true and correct copy of the Google Workspace admin audit trail activity reflecting these acts is attached as Exhibit **L**.  Relevant entries can be found at rows 194 to 198, 200, and 201.

28.    Rows 166-169 and 184 show that on June 15, Jacob Stine's credentials were used to force a password change of the Google Workplace account implicitrunner@implicitconversions.com.

29.    The user implicitrunner@implicitconversions.com is a service machine account that is used to authenticate the machine and access other digital infrastructure.  It is the main account used to generate Implicit's product.

30.    By forcing a password change, Jacob Stine was able to regain access to that account.  But by changing the ImplicitRunner password, it no longer matched the local cached credentials at the Implicit data centers, therefore preventing all other data centers from accessing the ImplicitRunner account for a period of time.

31.    Audit records also show that on June 16, Jacob Stine initiated a Google Takeout, which is a Google Workspace features that allowed him to download a local copy of his entire Google Workspace email box.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

32.    Audit records of Jacob Stine's Google Drive activities show that he also exported substantial quantities of company documents during the June 14-17 time frame and appears to have attempted to download the entire Google Drive.  A true and correct copy of this audit trail is attached as Exhibit **M**.

33.    Jacob Stine was not authorized to access Implicit's computer systems after his termination or to copy any documents from Implicit's computer systems.  Likewise, Juanita Stine was not authorized to provide Jacob Stine access to Implicit's computer systems.  Nor was Juanita Stine authorized to disable my access to Implicit's systems.

34.    By disabling my access to Google Workspace, Jacob Stine caused significant disruption to Implicit's business operations.  As the CEO of a small company, I have a fairly central role in Implicit's operations.  The loss of my access to Google Workspace, including email and Google Drive, along with Jacob Stine's messaging that he had control of Implicit's systems and had removed me, caused widespread confusion and chaos among our employees, consultants and partners.  Productivity and work performance suffered, as did our ability to make progress towards deadlines.  Preliminary investigation also shows that Jacob Stine used his period of unauthorized access to Implicit's systems to communicate with partners and customers.  Implicit is not yet aware of the full scope of his activities or the full ramifications of them.

35.    Jacob Stine also tampered with and therefore harmed Implicit's computer systems.  As is discussed above, when Jacob Stine forced a password reset to the ImplicitRunner account, the account password no longer matched the local cached credentials at the Implicit data centers, therefore suspending access to the ImplicitRunner account to those data centers.  This caused significant disruption to Implicit's operations and made it impossible for certain Implicit personnel to perform their duties and make progress on their projects for a period of time until Implicit was able to modify the password settings at these data centers.

36.    On June 17, 2024, Implicit sent to Jacob Stine via Fedex for overnight delivery a Notice of Exercise of Repurchase Option with a copy sent via email.  Through this letter, Implicit repurchased Jacob Stine's 2,656,250 unvested common shares of Implicit stock.  Implicit

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR TRO
CASE NO.: 3:24-cv-03744-WHO

enclosed a cashier's check in the amount of $26.57 made payable to Jacob Patrick Stine for the repurchase. A true and correct copy of this notice is attached as Exhibit **N**.

37. As a result of the repurchase, Jacob Stine held only 1,593,750 vested shares of Implicit common stock.

38. I subsequently executed a Stockholder Resolution By Written Consent, voting his 4,250,000 shares, which represents a majority of all outstanding Implicit shares, to remove Jacob Stine from the Implicit Board of Directors. Implicit also sent Jacob Stine this stockholder resolution on June 17, 2024, via Fedex for overnight delivery with copy by email. A true and correct copy of this stockholder resolution is attached as Exhibit **O**.

39. Also on June 17, 2024, Implicit suspended Juanita Stine with pay pending investigation.

40. On June 24, 2024, Implicit terminated Juanita Stine's employment.

## JACOB STINE HOLDS, WITHOUT AUTHORIZATION, IMPLICIT TRADE SECRETS AND IMPLICIT'S DATA CENTER

41. Jacob Stine holds vast quantities of Implicit's confidential and proprietary information and its trade secrets. Among other things, Jacob Stine has copies of all of Implicit's source code, business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology.

42. Jacob Stine, in his capacity as Implicit's CTO, already held substantial quantities of Implicit's confidential and proprietary information and its trade secrets by virtue of his day-to-day duties. These items were stored in digital file format on hardware and devices belonging to Implicit at the Implicit data center location under Jacob Stine's control (as is further detailed below) as well as on multiple personal devices held by Jacob Stine. Moreover, during the period of Jacob Stine's post-termination unauthorized intrusion into Implicit's computer systems, he had access to all Google Drive documents, all emails, and access to Implicit's source code repository through Github through his unauthorized access to the ImplicitRunner account. Implicit's ongoing investigation shows that Jacob Stine accessed Google documents and emails

1   during his period of unauthorized access. Jacob Stine has not returned any (much less all)

2   Implicit confidential and proprietary information and trade secrets upon his termination, despite

3   his obligation to do so under the terms of the CIIAA and despite Implicit's demands that he do

4   so.

5   43.    The source code and software tools that remain in Jacob Stine's possession are

6   what puts Implicit ahead of the competition and Implicit has expended tremendous time and

7   resources developing them.

8   44.    In particular, the source code and software are the backbone of Implicit's Syrup

9   Emulation Engine as well as several other proprietary compilers, including a compiler that

10   enables PlayStation 2 games run efficiently on new consoles and is the only compiler that I am

11   aware of that can do so. Thus, maintaining the security of this information is of vital importance

12   to its value.

13   45.    Additionally, Implicit has an exhaustive auto-test system that allows its engineers

14   to work fast and with confidence that the code they write did not negatively affect the code for

15   other games while fixing another game. This auto-test system operates by running, for each

16   change of source code that an engineer performs, tests on hundreds of games by taking

17   screenshots of these games at specific frames. It then compares them against reference frames,

18   maintaining the fidelity of the original source code. This proprietary testing method is integral

19   to Implicit's product development and maintaining the quality of its emulator products.

20   46.    On June 18, 2024, Implicit demanded that Jacob Stine return all physical

21   hardware and digital files held at his La Honda, California home office.

22   47.    Prior to these events, Implicit maintained three data centers: one in Pennsylvania,

23   one in Canada, and one in a home office at Jacob Stine's residence in La Honda. Implicit's

24   confidential and proprietary information and trade secrets are stored on and accessible through

25   these servers.

26   48.    Implicit's confidential and proprietary information and trade secrets are also

27   stored on Implicit's Google Workspace and accessible to any computer or laptop through that

28   portal. So not only does Jacob Stine have a complete set of this data through his possession of

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR TRO
CASE NO.: 3:24-cv-03744-WHO

1  the La Honda data center, but he could have downloaded the entirety of this information locally

2  through his unauthorized access post-termination as well as at any time before he was

3  terminated.

4      49.    Implicit maintains the security of its data centers (and the proprietary source code

5  and software tools stored on them) by allowing access only through a password-protected

6  Google Workspace authentication application.    Access to the Google Workspace is also

7  password protected.    Additionally, all Implicit employees who are given access to company

8  confidential information are required to enter into a contractual agreement to maintain the

9  confidentiality of company information and to return any company data immediately upon

10  termination. This procedure is standard in the industry for protecting business critical proprietary

11  information, source code, and software tools.

12      50.    The La Honda data center contains hardware and software that is critical to

13  Implicit's ongoing operations and is the strongest and fastest data center of the three.  Each of

14  these data centers also contain computers and hardware proprietary to one of Implicit's clients

15  that Implicit uses to develop its video game emulation software that it provides to them.

16      51.    The video games that Implicit produces for its clients using these proprietary

17  tools are then sold through digital stores.  More than 70 of the games Implicit has produced in

18  the last two have been produced using these data centers. The three data centers are thus critical

19  to Implicit's business, accounting for at least tens of millions of dollars in sales for Implicit's

20  clients if not more.

21      52.    Implicit uses physical data centers because the games it produces must be run on

22  proprietary software provided by its clients.  This involves large data transfers and would be

23  cost-prohibitive and inefficient to run on the cloud.  Because of this, each data center is

24  connected to each other using virtual private network ("VPN") software.  This protocol allows

25  the data centers to communicate privately over a public communication channel without the use

26  of cloud software.  Furthermore, having three data centers allows Implicit to continue

27  functioning should one of the data centers fail.  Thus, access to one data center provides access

28  to all the data centers.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR TRO
CASE NO.: 3:24-cv-03744-WHO

53.     Because the data centers are not cloud-based, Implicit lacks central control over the La Honda data center and cannot remotely change its password or otherwise prevent Jacob Stine from accessing it.

54.     Given Jacob Stine's continued possession of the La Honda data center, the Canada and Pennsylvania data centers had to be turned offline to prevent his ability to tamper with those data centers.

55.     While Implicit has diligently worked to secure the Pennsylvania and Canada data centers, Jacob Stine's possession of the La Honda data centers puts the security of key applications used across Implicit's network at risk, forcing Implicit to operate only in a severely degraded capacity.

56.     Jacob Stine's ongoing possession of the La Honda data center overshadows all of his other activities.  For instance, Implicit is aware that Jacob Stine had access to its source code as part of his regular duties as CTO.  Moreover, Jacob Stine could have accessed the Github source code during his period of post-termination unauthorized access by using the ImplicitRunner Google Workspace account.  But that would not have been necessary.  There is a complete set of Implicit's source code on the La Honda data center, updated through at least June 18, 2024.  As a build machine, the La Honda data center downloads all source code locally to perform its functions.  It was only after Implicit both changed the password to the ImplicitRunner account again (so that Jacob Stine could no longer access it using the password he had changed it to), and it made the difficult decision to decouple the data centers that Jacob Stine's access to updated source code ended.

57.     Given the vital importance of the La Honda data center, Implicit demanded that Jacob Stine either allow Implicit to send a courier to the La Honda office, which was also Jacob and Juanita Stine's home, to take custody of all digital files and hardware within his possession or, if Jacob Stine preferred, for Jacob Stine to ship the data center back to Implicit with all costs to be reimbursed.  In particular, Implicit requested the return of:  1) the data center maintained at Jacob Stine's La Honda home (referred to internally as "Reynard") along with all peripherals and components; 2) one Nintendo Switch SDEV Development kit (a console with advanced

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

features, including a built-in debugger and capture software); 3) any and all devices containing Implicit's digital data; 4) a variety of PlayStation Development Kits, along with all components, original boxes, and cables; 5) all Implicit digital files in Jacob Stine's possess; and 5) all other Implicit hardware in Jacob Stine's possession. A true and correct copy of these demands is attached as Exhibits **P** and **Q**.

58.     Jacob Stine did not comply with Implicit's demands, has not returned any of the requested Implicit property, and has apparently converted this Implicit property to his own use.

59.     Nor has Jacob Stine returned a signed Termination Certificate as required by his CIIAA. The Termination Certificate includes certifications that, among other things, Jacob Stine complied with the terms of the CIIAA and has returned all Company property.

60.     Implicit cannot deliver its products or operate at its full capacity while Jacob Stine remains in possession of the La Honda data center and the proprietary source code and software tools accessible through the data center.

61.     The facts stated above, including that it appears that Juanita Stine either gave Jacob Stine her credentials to access Implicit's computer systems after his termination, or accessed these systems herself to restore Jacob Stine's access, show that Juanita Stine is conspiring with Jacob Stine.

## JACOB STINE'S ATTEMPT TO USURP CONTROL OF IMPLICIT

62.     As a result of his termination and his removal from the Implicit Board of Directors, Jacob Stine has no further role of any kind in Implicit other than as a stockholder.

63.     On the morning of June 20, 2024, Jacob Stine, through counsel, sent an Action By Written Consent of the Majority Stockholders, signed by Jacob Stine and Alawi, who purported to act as Implicit stockholders. The written consent states that Jacob Stine is still an Implicit Board member and purports to remove me from the Implicit Board and to appoint Juanita Stine and Alawi to the Board. Notably, Jacob Stine, who has 1,593,750 shares, and Alawi, who has 250,000 shares, possess nowhere near a majority of Implicit's 6,095,957 outstanding common shares. A true and correct copy of the written consent is attached as Exhibit **R**.

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR TRO
CASE NO.: 3:24-cv-03744-WHO

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

64.     Jacob Stine then transmitted a purported Unanimous Written Consent purporting to remove me as CEO of Implicit and appointing Jacob Stine as interim CEO.  A true and correct copy of this unanimous written consent is attached as Exhibit **S**.

65.     Jacob Stine, through his legal counsel, then sent these documents to certain Implicit personnel, demanding that they surrender access to Implicit's computer systems to Jacob Stine.  These acts caused, and continue to cause, significant confusion and disruption to Implicit's workplace and to its business.  One such email is attached as Exhibit **T**.

**IMPLICIT'S COSTS OF INVESTIGATION OF UNAUTHORIZED ACCESS TO ITS SYSTEMS**

66.     Implicit has incurred significant costs investigating and attempting to remediate the harms caused by Jacob Stine and Juanita Stine's unauthorized activities on Implicit's computer systems and the aftermath of this unauthorized access.

67.     Implicit still does not know the full extent of Jacob Stine and Juanita Stine's activities, whether they created backdoors or other security flaws in Implicit's computer systems, and what documents were tampered with.  Nor does it know the full effect of these acts on customer and partner relationships from the disruption caused by these acts.

68.     For the June 14 to June 17 time period, I estimate that 10 Implicit personnel logged over 280 hours to investigate the unauthorized access and attempt to remediate it.

69.     From June 18 to June 26, I estimate that over 245 additional hours were logged expended in these investigation and remediation efforts.

70.     This represents tens of thousands of dollars' worth of personnel costs and lost productivity.

71.     There have also been direct out-of-pocket costs associated with investigation and remediation efforts.  Implicit incurred approximately $2,000 to add auditing and archiving functionality to its Google workspace.  Implicit also purchased additional hardware to create a new data center given that Jacob Stine will not return the equipment in the La Honda data center.  This new equipment costs approximately $10,000, and there will be additional consultant fees to assemble and configure the equipment and costs to transfer it to a new location.

72.     Implicit will also be using an external IT and security advisor to investigate its systems and close any security gaps. The costs associated with these efforts have not yet been determined.

73.     Implicit has also already incurred tens of thousands of dollars of legal fees in connection with investigating Jacob Stine and Juanita Stine's unlawful access to Implicit computer systems and efforts to address these acts through legal means.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 2, 2024, in Lansdale, PA.

By: _____
    Robin Lavallee

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR TRO
CASE NO.: 3:24-cv-03744-WHO

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

# Exhibit A

**Implicit Conversions, Inc.**

## ACTION BY WRITTEN CONSENT

## OF THE STOCKHOLDERS

Pursuant to Section 228 of the Delaware General Corporation Law and the Bylaws of Implicit Conversions, Inc., a Delaware corporation (the "Company"), the undersigned stockholders of the Company hereby take the following actions and adopt the following resolution by written consent.  This written consent will be filed in the minute book of the Company:

1.  **Adoption of 2023 Stock Plan**
    **RESOLVED:**  That the 2023 Stock Plan, in substantially the form attached hereto as Exhibit A, is hereby adopted and approved and 1500000 shares of the Company's Common Stock are hereby reserved for issuance thereunder.

*[Signature Page Follows]*

**In** accordance with the Company's Bylaws, this Action by Written Consent may be executed in writing, or consented to by electronic transmission, in any number of counterparts, each of which, when so executed, shall be deemed an original and all of which taken together shall constitute one and the same action.

Name: _____

(Please Print)

Dated: _____

_____

Signature

**EXHIBIT A**

**2023 STOCK PLAN**

# Exhibit B

## IMPLICIT CONVERSIONS, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (this "Agreement") is made as of the last date set forth on the signature pages hereto by and between Implicit Conversions, Inc., a Delaware corporation (the "Company"), and Jacob Stine ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 4,250,000 shares of the Company's Common Stock (the "Shares") at a purchase price of $0.00001 per share for a total purchase price of $42.50 (the "Aggregate Purchase Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the Company and the Company will enter the Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company. The Company will deliver to Purchaser, upon request, a notice of issuance with respect to the Shares as soon as practicable following such date. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Consideration.** As consideration for the mutual promises and covenants set forth in this Agreement, Purchaser will deliver the Aggregate Purchase Price to the Company by cash payment (via check, wire transfer, ACH transfer or other such means as is acceptable to the Company).

3. **Limitations on Transfer.** Purchaser acknowledges and agrees that the Shares purchased under this Agreement are subject to (i) the terms and conditions that apply to the Company's Common Stock including (without limitation) certain transfer restrictions set forth below, as may be in effect at the time of any proposed transfer (the "Transfer Restrictions"), and (ii) any other limitation or restriction on transfer created by applicable laws.

    (a) **No Transfer Without Consent.**

        (i). No Shares of the Company may be transferred, conveyed, encumbered or otherwise disposed of in any way without the consent of a majority of the Board of Directors. Any purported transfer, conveyance, encumbrance or other disposition attempted without such consent shall be null and void.

        (ii). **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3 notwithstanding, the transfer of any or all of the Shares on Holder's death by will or intestacy to Holder's Immediate Family or a trust for the benefit of Holder or Holder's Immediate Family shall be exempt from the provisions of this Section 3. "Immediate Family" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing Holder's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the Transfer Restrictions and the provisions of this Agreement, including this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3 and the Transfer Restrictions.

In addition to the foregoing limitations on transfer, Purchaser shall not assign, encumber or dispose of any interest in the Shares while the Shares are subject to the Company's Repurchase Option (as defined below).

(b) **Repurchase Option; Vesting.**

(i). In the event of the voluntary or involuntary termination of Purchaser's Continuous Service Status (as defined below) for any reason (including, without limitation, resignation, death or Disability (as defined below)), with or without cause, the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive option (the "Repurchase Option") for a period of 3 months from such date to repurchase all or any portion of the Unvested Shares (as defined below) held by Purchaser as of the Termination Date at the original purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section 1. As used in this Agreement, "Unvested Shares" means Shares, if any, that have not yet been released from the Repurchase Option.

(ii). Unless the Company notifies Purchaser within 3 months from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Unvested Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such 3-month period following such Termination Date, provided that the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such 3-month period. Unless Purchaser is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Unvested Shares to which it applies at the time of termination, execution of this Agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option with respect to all Unvested Shares to which such Repurchase Option applies. The Company, at its choice, may satisfy its payment obligation to Purchaser with respect to exercise of the Repurchase Option by either (A) delivering a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased, or (B) in the event Purchaser is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Unvested Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(b)(ii) in which Purchaser is indebted to the Company, such indebtedness equal to the purchase price of the Unvested Shares being repurchased shall be deemed automatically canceled as of the end of the 3-month period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Unvested Shares pursuant to this Section 3(b), the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Unvested Shares being repurchased by the Company, without further action by Purchaser.

(iii). 100% of the Shares shall initially be subject to the Repurchase Option (the "Vesting Shares"). 25% of the Vesting Shares shall be released from the Repurchase Option on November 21, 2023, and an additional 1/48th of the Vesting Shares shall be released from the Repurchase Option on the corresponding day of each month thereafter (and if there is no corresponding day, the last day of the month), until all Vesting Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded down to the nearest whole share.

(iv). Notwithstanding the foregoing, if Purchaser is terminated without Cause (as defined below) by the Company (or a successor, if appropriate) or resigns for Good Reason (as defined below) in connection with or following the consummation of a Change of Control (as defined below), then the vesting of the Unvested Shares shall accelerate such that the Repurchase Option in Section 3(b) shall lapse as to 100% of the Unvested Shares. The lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to the Termination Date. In the case of a sale of all or substantially all of the Company's assets other than to an Excluded Entity, if the acquirer of the Company's assets does not agree to assume this Agreement, or to substitute an equivalent award or right for this Agreement, and Purchaser transfers Purchaser's employment to such acquirer in connection with such asset sale transaction, then any acceleration of vesting that

would otherwise occur upon Purchaser's termination shall occur immediately prior to, and contingent upon, the consummation of such asset sale transaction. As used in this Agreement, "Change of Control" means (1) a sale of all or substantially all of the Company's assets other than to an Excluded Entity (as defined below), (2) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (3) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of all of the Company's then outstanding voting securities. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Board of Directors. An "Excluded Entity" means a corporation, limited liability company or other entity of which the holders of voting capital stock of the Company outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes entitled to be cast by all of such corporation's, limited liability company's or other entity's voting securities outstanding immediately after such transaction. As used in this Agreement, "Cause" for the Company (or a successor, if appropriate) to terminate Purchaser's employment shall exist under the following conditions (I) Purchaser's willful and continued failure to substantially perform Purchaser's duties to the Company after there has been delivered to Purchaser by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Purchaser has not substantially performed Purchaser's duties; (II) Purchaser having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Purchaser's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Purchaser's material breach of any material written agreement between Purchaser and the Company (including without limitation Purchaser's Confidential Information and Invention Assignment Agreement with the Company) and Purchaser's failure to cure such breach within 30 days after receiving written notice thereof. For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Purchaser's death or disability. The determination as to whether Purchaser's Continuous Service Status has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on Purchaser. The foregoing definition does not in any way limit the Company's ability to terminate Purchaser's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate. As used in this Agreement, "Good Reason" will mean Purchaser's resignation due to the occurrence of any of the following conditions which occurs without Purchaser's written consent, provided that the requirements regarding advance notice and an opportunity to cure set forth below are satisfied: (1) a reduction of Purchaser's then current base salary by 10% or more unless such reduction is part of a generalized salary reduction affecting similarly situated employees; (2) a change in Purchaser's position with the Company that materially reduces Purchaser's duties, level of authority or responsibility; or (3) the Company conditions Purchaser's continued service with the Company on Purchaser's being transferred to a site of employment that would increase Purchaser's one-way commute by more than 35 miles from Purchaser's then principal residence. In order for Purchaser to resign for Good Reason, Purchaser must provide written notice to the Company of the existence of the Good Reason condition within 60 days of the initial existence of such Good Reason condition. Upon receipt of such notice, the Company will have 30 days during which it may remedy the Good Reason condition and not be required to provide for the vesting acceleration described herein as a result of such proposed resignation. If the Good Reason condition is not remedied within such 30-day period, Purchaser may resign based on the Good Reason condition specified in the notice effective no later than 30 days following the expiration of the 30-day cure period. If Purchaser is a Director but not an Employee or Consultant of the Company (or a successor, if appropriate) at the time of consummation of the Change of

Control and Purchaser is removed from, or is not reelected to, the Board of Directors of the Company (or a successor, as appropriate) in connection with or following the consummation of a Change of Control, the vesting of any Unvested Shares shall accelerate such that the Repurchase Option shall lapse to the same extent as if Purchaser had been terminated without Cause as described above.

   (c)  **Transfer Restrictions; Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company shall first, to the extent the Company's approval is required by any applicable Transfer Restriction, have the right to approve such sale or transfer, in full or in part, and shall then have the right to purchase all or any part of the Shares proposed to be sold or transferred, in each case, in its sole and absolute discretion (the "Right of First Refusal"). If the Holder would like to sell or transfer any Shares, the Holder must provide the Company or its assignee(s) with a Notice (as defined below) requesting approval to sell or transfer the Shares and offering the Company or its assignee(s) a Right of First Refusal on the same terms and conditions set forth in this Section 3(c). The Company may either (1) exercise its Right of First Refusal in full or in part and purchase such Shares pursuant to this Section 3(c), (2) decline to exercise its Right of First Refusal in full or in part and permit the transfer of such Shares to the Proposed Transferee (as defined below) in full or in part or (3) decline to exercise its Right of First Refusal in full or in part and, to the extent the Company's approval is required by any applicable Transfer Restriction, decline the request to sell or transfer the Shares in full or in part.

     (i).  **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be sold or transferred to each Proposed Transferee; (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Transfer Purchase Price"); and (E) the Holder's offer to the Company or its assignee(s) to purchase the Shares at the Transfer Purchase Price and upon the same terms (or terms that are no less favorable to the Company).

     (ii).  **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) shall deliver a written notice to the Holder indicating whether the Company and/or its assignee(s) elect to permit or reject the proposed sale or transfer, in full or in part, and/or elect to accept or decline the offer to purchase any or all of the Shares proposed to be sold or transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

     (iii).  **Payment.** Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

     (iv).  **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be sold or transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this Section 3(c) and (B) approved by the Company to be sold or transferred, then the Holder may sell or otherwise transfer any such Shares to the applicable Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice; provided that any such sale or other transfer is also effected in accordance with the Transfer Restrictions and any applicable laws and the Proposed Transferee agrees in writing that the Transfer Restrictions and the provisions of this Agreement, including this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may

require the Holder to provide an opinion of counsel evidencing compliance with applicable laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

(d) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including intestate transfer upon death, but excluding transfer upon death by will (to any transferee) or a transfer to Immediate Family as set forth in Section 3(a)(ii) above) of all or a portion of the Shares, the Company shall have an option to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(e) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(f) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the Transfer Restrictions and the provisions of this Agreement, including, without limitation, Section 3 , including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee shall be obligated, if requested by the Company, to transfer the Shares or interest to Purchaser for consideration equal to the amount to be paid by the Company hereunder. In the event the Repurchase Option is deemed exercised by the Company pursuant to Section 3(b)(ii) hereof, the Company may deem any transferee to have transferred the Shares or interest to Purchaser prior to the purchase of the Shares by the Company, and payment of the purchase price by the Company to such transferee shall be deemed to satisfy Purchaser's obligation to pay such transferee for such Shares or interest, and also to satisfy the Company's obligation to pay Purchaser for such Shares or interest . Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(g) **Termination of Rights.** The transfer restrictions set forth in Section 3(c) above, the Right of First Refusal granted the Company by Section 3(c) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(d) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(h) **Lock-Up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

4. **Escrow of Unvested Shares.** For purposes of facilitating the enforcement of the provisions of Section 3 above, Purchaser agrees to deliver a Stock Power in the form attached to this Agreement as Exhibit A executed

by Purchaser, in blank, and such stock certificate(s), if any, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are required in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board of Directors of the Company shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

5. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d) Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 5(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 5(e) below.

(e) Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f) Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Purchaser also agrees to notify the Company if Purchaser becomes subject to such disqualifications after the date hereof.

(g) Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any

tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6. **Restrictive Legends and Stop-Transfer Orders.**

(a) **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares, shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i). "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii). "THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(iii). "THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO THE APPLICABLE COMMON STOCK PURCHASE AGREEMENT, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH SUCH AGREEMENT."

(b) **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d) **Legend and Notice Removal.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend specified in Section 6(a)(ii) and the Company will remove any stop-transfer notices associated with the transfer restrictions imposed by this Agreement:

(i). the termination of the Right of First Refusal;

(ii). the expiration or exercise in full of the Repurchase Option; and

(iii). the expiration or termination of the lock-up provisions of Section 3(h) (and of any agreement entered pursuant to Section 3(h)).

After such time and upon Purchaser's request, a new stock certificate or, in the case of uncertificated securities, notice of issuance, for the remaining Shares, shall be issued without the legend specified in Section 6 and delivered to Purchaser.

(e) **Required Notices.** Purchaser acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 6, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company. A statement

of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement. Purchaser acknowledges that the provisions of this Section 6 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and Purchaser hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation Law that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.

7. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

8. **Section 83(B) Election.** Purchaser understands that Section 83(a) of the Internal Revenue Code of 1986, as amended (the "Code"), taxes as ordinary income the difference between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" means the right of the Company to buy back the Shares pursuant to the Repurchase Option set forth in Section 3(b) of this Agreement. Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under Section 83(b) (an "83(b) Election") of the Code with the Internal Revenue Service within 30 days from the date of purchase. Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the election must be made to avoid income under Section 83(a) in the future. Purchaser understands that failure to file such an election in a timely manner may result in adverse tax consequences for Purchaser. Purchaser further understands that an additional copy of such election form should be filed with Purchaser's federal income tax return for the calendar year in which the date of this Agreement falls. Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares hereunder, does not purport to be complete, and is not intended or written to be used, and cannot be used, for the purposes of avoiding taxpayer penalties. Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death, and Purchaser has consulted, and has been fully advised by, Purchaser's own tax advisor regarding such tax laws and tax consequences or has knowingly chosen not to consult such a tax advisor. Purchaser further acknowledges that neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to Purchaser with respect to the tax consequences of Purchaser's purchase of the Shares or of the making or failure to make an 83(b) Election. PURCHASER (AND NOT THE COMPANY, ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR APPROPRIATELY FILING SUCH FORM WITH THE IRS, EVEN IF PURCHASER REQUESTS THE COMPANY, ITS AGENTS OR ANY OTHER PERSON MAKE THIS FILING ON PURCHASER'S BEHALF. Purchaser agrees that Purchaser will execute and deliver to the Company with this executed Agreement a copy of the Acknowledgment and Statement of Decision Regarding Section 83(b) Election (the "Acknowledgment"), attached hereto as <u>Exhibit B</u> and, if Purchaser decides to make an 83(b) Election, attached hereto as <u>Exhibit C</u>.

9. **Certain Defined Terms.**

(a) "**Affiliate**" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) "**Continuous Service Status**" means the absence of any interruption or termination of service as an Employee or Consultant. Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of: (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between Company, its Parents,

Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(c) "**Director**" means a member of the Board of Directors of the Company.

(d) "**Disability**" means "disability" within the meaning of Section 22(e)(3) of the Code.

(e) "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(f) "**Parent**" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such a chain.

(g) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

10. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware or the federal courts of the United States located in Delaware and no other courts.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under

applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)   **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i)   **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(j)   **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

[Signature Page Follows]

The parties have executed this Common Stock Purchase Agreement as of the last date set forth below.

THE COMPANY: Implicit Conversions, Inc.
Dated: 1/26/2023

*Robin Lavallee*
Robin Lavallee


PURCHASER:
Dated: 1/26/2023

*Jacob Stine*
Jacob Stine

**EXHIBIT A**

**STOCK POWER**

FOR VALUE RECEIVED, the undersigned ("Holder"), hereby sells, assigns and transfers unto _____ ("Transferee") _____ shares of the Common Stock of _____, a Delaware corporation (the "Company"), standing in Holder's name on the Company's books as Certificate No. UCS-_____ whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint _____ to transfer said stock on the books of the Company with full power of substitution in the premises.

HOLDER: Implicit Conversions, Inc.
Dated:

*Jacob Stine*
_____
Jacob Stine

This Stock Power may only be used as authorized by the Common Stock Purchase Agreement between the Holder and the Company, dated _____ and the exhibits thereto.

**Instructions:** Please do not fill in any blanks other than the signature line. The purpose of this Stock Power is to enable the Company to exercise its repurchase option set forth in the Agreement without requiring additional signatures on the part of Holder.

IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS YOUR RESPONSIBILITY.

THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT.

YOU MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.

YOU (AND NOT THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY, ITS AGENTS OR ANY OTHER PERSON TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON HAS PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.

The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See www.irs.gov.

**EXHIBIT B**

**ACKNOWLEDGMENT AND STATEMENT OF DECISION
REGARDING SECTION 83(B) ELECTION**

The undersigned has entered into a stock purchase agreement with _____, a Delaware corporation (the "Company"), pursuant to which the undersigned is purchasing _____ shares of Common Stock of the Company (the "Shares"). In connection with the purchase of the Shares, the undersigned hereby represents as follows:

1.  The undersigned has carefully reviewed the stock purchase agreement pursuant to which the undersigned is purchasing the Shares.
2.  The undersigned either [check and complete as applicable]:
    a.  _____ has consulted, and has been fully advised by, the undersigned's own tax advisor, _____, whose business address is _____, regarding the federal, state and local tax consequences of purchasing the Shares, and particularly regarding the advisability of making elections pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code") and pursuant to the corresponding provisions, if any, of applicable state law; or
    b.  _____ has knowingly chosen not to consult such a tax advisor.
3.  The undersigned hereby states that the undersigned has decided [check as applicable]:
    a.  _____ to make an election pursuant to Section 83(b) of the Code, and is submitting to the Company, together with the undersigned's executed stock purchase agreement, an executed form entitled "Election Under Section 83(b) of the Internal Revenue Code of 1986;" or
    b.  _____ not to make an election pursuant to Section 83(b) of the Code.
4.  Neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to the undersigned with respect to the tax consequences of the undersigned's purchase of the Shares or of the making or failure to make an election pursuant to Section 83(b) of the Code or the corresponding provisions, if any, of applicable state law.

Dated:                                              **PURCHASER:**

_____          _____
                                                            (PRINT NAME)

                                                       _____
                                                            (Signature)

**EXHIBIT C**

**ELECTION UNDER SECTION 83(B)**
**OF THE INTERNAL REVENUE CODE OF 1986**

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, to include in taxpayer's gross income for the current taxable year, the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below:

1.  The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

    NAME OF TAXPAYER: _____
    ADDRESS: _____
    _____
    IDENTIFICATION NO. OF TAXPAYER: _____
    TAXABLE YEAR: _____

2.  The property with respect to which the election is made is described as follows:

    _____ shares of the Common Stock of _____, a Delaware corporation (the "Company").

3.  The date on which the property was transferred is: _____.

4.  The property is subject to the following restrictions:

    Repurchase option at cost in favor of the Company upon termination of taxpayer's employment or consulting relationship.

5.  The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6.  The amount (if any) paid for such property: Paid for with cash and/or property having a value of $_____ and equivalent to the value of the Shares.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated:                                          **PURCHASER:**

_____      _____
                                                (PRINT NAME)

                                       _____
                                                (Signature)

                                       Address:

                                       _____

**<u>RECEIPT</u>**

Implicit Conversions, Inc., a Delaware corporation (the "Company"), hereby acknowledges the receipt of cash and other consideration having an aggregate value equal to at least $_____ given by _____ as consideration for _____ shares of Common Stock of the Company recorded on the books of the Company.

Dated:

**THE COMPANY:**
Implicit Conversions, Inc.

By: Robin Lavallee

_____
(Signature)

# Exhibit C

# IMPLICIT CONVERSIONS, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (this "Agreement") is made as of the last date set forth on the signature pages hereto by and between Implicit Conversions, Inc., a Delaware corporation (the "Company"), and Jacob Stine ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 4,250,000 shares of the Company's Common Stock (the "Shares") at a purchase price of $0.00001 per share for a total purchase price of $42.50 (the "Aggregate Purchase Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the Company and the Company will enter the Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company. The Company will deliver to Purchaser, upon request, a notice of issuance with respect to the Shares as soon as practicable following such date. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Consideration.** As consideration for the mutual promises and covenants set forth in this Agreement, Purchaser will deliver the Aggregate Purchase Price to the Company by cash payment (via check, wire transfer, ACH transfer or other such means as is acceptable to the Company).

3. **Limitations on Transfer.** Purchaser acknowledges and agrees that the Shares purchased under this Agreement are subject to (i) the terms and conditions that apply to the Company's Common Stock including (without limitation) certain transfer restrictions set forth below, as may be in effect at the time of any proposed transfer (the "Transfer Restrictions"), and (ii) any other limitation or restriction on transfer created by applicable laws.

(a)   **No Transfer Without Consent.**

(i). No Shares of the Company may be transferred, conveyed, encumbered or otherwise disposed of in any way without the consent of a majority of the Board of Directors. Any purported transfer, conveyance, encumbrance or other disposition attempted without such consent shall be null and void.

(ii).   **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3 notwithstanding, the transfer of any or all of the Shares on Holder's death by will or intestacy to Holder's Immediate Family or a trust for the benefit of Holder or Holder's Immediate Family shall be exempt from the provisions of this Section 3. "Immediate Family" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing Holder's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the Transfer Restrictions and the provisions of this Agreement, including this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3 and the Transfer Restrictions.

In addition to the foregoing limitations on transfer, Purchaser shall not assign, encumber or dispose of any interest in the Shares while the Shares are subject to the Company's Repurchase Option (as defined below).

(b)  **Repurchase Option; Vesting.**

(i). In the event of the voluntary or involuntary termination of Purchaser's Continuous Service Status (as defined below) for any reason (including, without limitation, resignation, death or Disability (as defined below)), with or without cause, the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive option (the "Repurchase Option") for a period of 3 months from such date to repurchase all or any portion of the Unvested Shares (as defined below) held by Purchaser as of the Termination Date at the original purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section 1. As used in this Agreement, "Unvested Shares" means Shares, if any, that have not yet been released from the Repurchase Option.

(ii). Unless the Company notifies Purchaser within 3 months from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Unvested Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such 3-month period following such Termination Date, provided that the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such 3-month period. Unless Purchaser is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Unvested Shares to which it applies at the time of termination, execution of this Agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option with respect to all Unvested Shares to which such Repurchase Option applies. The Company, at its choice, may satisfy its payment obligation to Purchaser with respect to exercise of the Repurchase Option by either (A) delivering a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased, or (B) in the event Purchaser is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Unvested Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(b)(ii) in which Purchaser is indebted to the Company, such indebtedness equal to the purchase price of the Unvested Shares being repurchased shall be deemed automatically canceled as of the end of the 3-month period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Unvested Shares pursuant to this Section 3(b), the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Unvested Shares being repurchased by the Company, without further action by Purchaser.

(iii). 100% of the Shares shall initially be subject to the Repurchase Option (the "Vesting Shares"). 25% of the Vesting Shares shall be released from the Repurchase Option on November 21, 2023, and an additional 1/48th of the Vesting Shares shall be released from the Repurchase Option on the corresponding day of each month thereafter (and if there is no corresponding day, the last day of the month), until all Vesting Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded down to the nearest whole share.

(iv). Notwithstanding the foregoing, if Purchaser is terminated without Cause (as defined below) by the Company (or a successor, if appropriate) or resigns for Good Reason (as defined below) in connection with or following the consummation of a Change of Control (as defined below), then the vesting of the Unvested Shares shall accelerate such that the Repurchase Option in Section 3(b) shall lapse as to 100% of the Unvested Shares. The lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to the Termination Date. In the case of a sale of all or substantially all of the Company's assets other than to an Excluded Entity, if the acquirer of the Company's assets does not agree to assume this Agreement, or to substitute an equivalent award or right for this Agreement, and Purchaser transfers Purchaser's employment to such acquirer in connection with such asset sale transaction, then any acceleration of vesting that

would otherwise occur upon Purchaser's termination shall occur immediately prior to, and contingent upon, the consummation of such asset sale transaction. As used in this Agreement, "Change of Control" means (1) a sale of all or substantially all of the Company's assets other than to an Excluded Entity (as defined below), (2) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (3) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of all of the Company's then outstanding voting securities. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Board of Directors. An "Excluded Entity" means a corporation, limited liability company or other entity of which the holders of voting capital stock of the Company outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes entitled to be cast by all of such corporation's, limited liability company's or other entity's voting securities outstanding immediately after such transaction. As used in this Agreement, "Cause" for the Company (or a successor, if appropriate) to terminate Purchaser's employment shall exist under the following conditions (I) Purchaser's willful and continued failure to substantially perform Purchaser's duties to the Company after there has been delivered to Purchaser by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Purchaser has not substantially performed Purchaser's duties; (II) Purchaser having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Purchaser's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Purchaser's material breach of any material written agreement between Purchaser and the Company (including without limitation Purchaser's Confidential Information and Invention Assignment Agreement with the Company) and Purchaser's failure to cure such breach within 30 days after receiving written notice thereof. For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Purchaser's death or disability. The determination as to whether Purchaser's Continuous Service Status has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on Purchaser. The foregoing definition does not in any way limit the Company's ability to terminate Purchaser's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate. As used in this Agreement, "Good Reason" will mean Purchaser's resignation due to the occurrence of any of the following conditions which occurs without Purchaser's written consent, provided that the requirements regarding advance notice and an opportunity to cure set forth below are satisfied: (1) a reduction of Purchaser's then current base salary by 10% or more unless such reduction is part of a generalized salary reduction affecting similarly situated employees; (2) a change in Purchaser's position with the Company that materially reduces Purchaser's duties, level of authority or responsibility; or (3) the Company conditions Purchaser's continued service with the Company on Purchaser's being transferred to a site of employment that would increase Purchaser's one-way commute by more than 35 miles from Purchaser's then principal residence. In order for Purchaser to resign for Good Reason, Purchaser must provide written notice to the Company of the existence of the Good Reason condition within 60 days of the initial existence of such Good Reason condition. Upon receipt of such notice, the Company will have 30 days during which it may remedy the Good Reason condition and not be required to provide for the vesting acceleration described herein as a result of such proposed resignation. If the Good Reason condition is not remedied within such 30-day period, Purchaser may resign based on the Good Reason condition specified in the notice effective no later than 30 days following the expiration of the 30-day cure period. If Purchaser is a Director but not an Employee or Consultant of the Company (or a successor, if appropriate) at the time of consummation of the Change of

Control and Purchaser is removed from, or is not reelected to, the Board of Directors of the Company (or a successor, as appropriate) in connection with or following the consummation of a Change of Control, the vesting of any Unvested Shares shall accelerate such that the Repurchase Option shall lapse to the same extent as if Purchaser had been terminated without Cause as described above.

(c)    **Transfer Restrictions; Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company shall first, to the extent the Company's approval is required by any applicable Transfer Restriction, have the right to approve such sale or transfer, in full or in part, and shall then have the right to purchase all or any part of the Shares proposed to be sold or transferred, in each case, in its sole and absolute discretion (the "Right of First Refusal"). If the Holder would like to sell or transfer any Shares, the Holder must provide the Company or its assignee(s) with a Notice (as defined below) requesting approval to sell or transfer the Shares and offering the Company or its assignee(s) a Right of First Refusal on the same terms and conditions set forth in this Section 3(c). The Company may either (1) exercise its Right of First Refusal in full or in part and purchase such Shares pursuant to this Section 3(c), (2) decline to exercise its Right of First Refusal in full or in part and permit the transfer of such Shares to the Proposed Transferee (as defined below) in full or in part or (3) decline to exercise its Right of First Refusal in full or in part and, to the extent the Company's approval is required by any applicable Transfer Restriction, decline the request to sell or transfer the Shares in full or in part.

(i).    **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be sold or transferred to each Proposed Transferee; (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Transfer Purchase Price"); and (E) the Holder's offer to the Company or its assignee(s) to purchase the Shares at the Transfer Purchase Price and upon the same terms (or terms that are no less favorable to the Company).

(ii).    **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) shall deliver a written notice to the Holder indicating whether the Company and/or its assignee(s) elect to permit or reject the proposed sale or transfer, in full or in part, and/or elect to accept or decline the offer to purchase any or all of the Shares proposed to be sold or transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

(iii).    **Payment.** Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(iv).    **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be sold or transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this Section 3(c) and (B) approved by the Company to be sold or transferred, then the Holder may sell or otherwise transfer any such Shares to the applicable Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice; provided that any such sale or other transfer is also effected in accordance with the Transfer Restrictions and any applicable laws and the Proposed Transferee agrees in writing that the Transfer Restrictions and the provisions of this Agreement, including this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may

require the Holder to provide an opinion of counsel evidencing compliance with applicable laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

(d) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including intestate transfer upon death, but excluding transfer upon death by will (to any transferee) or a transfer to Immediate Family as set forth in Section 3(a)(ii) above) of all or a portion of the Shares, the Company shall have an option to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(e) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(f) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the Transfer Restrictions and the provisions of this Agreement, including, without limitation, Section 3 , including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee shall be obligated, if requested by the Company, to transfer the Shares or interest to Purchaser for consideration equal to the amount to be paid by the Company hereunder. In the event the Repurchase Option is deemed exercised by the Company pursuant to Section 3(b)(ii) hereof, the Company may deem any transferee to have transferred the Shares or interest to Purchaser prior to the purchase of the Shares by the Company, and payment of the purchase price by the Company to such transferee shall be deemed to satisfy Purchaser's obligation to pay such transferee for such Shares or interest, and also to satisfy the Company's obligation to pay Purchaser for such Shares or interest . Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(g) **Termination of Rights.** The transfer restrictions set forth in Section 3(c) above, the Right of First Refusal granted the Company by Section 3(c) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(d) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(h) **Lock-Up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

4. **Escrow of Unvested Shares.** For purposes of facilitating the enforcement of the provisions of Section 3 above, Purchaser agrees to deliver a Stock Power in the form attached to this Agreement as Exhibit A executed

by Purchaser, in blank, and such stock certificate(s), if any, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are required in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board of Directors of the Company shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

5. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d) Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 5(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 5(e) below.

(e) Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f) Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Purchaser also agrees to notify the Company if Purchaser becomes subject to such disqualifications after the date hereof.

(g) Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any

tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6. **Restrictive Legends and Stop-Transfer Orders**.

(a) **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares, shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i). "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii). "THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(iii). "THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO THE APPLICABLE COMMON STOCK PURCHASE AGREEMENT, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH SUCH AGREEMENT."

(b) **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d) **Legend and Notice Removal**. When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend specified in Section 6(a)(ii) and the Company will remove any stop-transfer notices associated with the transfer restrictions imposed by this Agreement:

(i). the termination of the Right of First Refusal;

(ii). the expiration or exercise in full of the Repurchase Option; and

(iii). the expiration or termination of the lock-up provisions of Section 3(h) (and of any agreement entered pursuant to Section 3(h)).

After such time and upon Purchaser's request, a new stock certificate or, in the case of uncertificated securities, notice of issuance, for the remaining Shares, shall be issued without the legend specified in Section 6 and delivered to Purchaser.

(e) **Required Notices.** Purchaser acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 6, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company. A statement

of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement. Purchaser acknowledges that the provisions of this Section 6 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and Purchaser hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation Law that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.

7. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

8. **Section 83(B) Election.** Purchaser understands that Section 83(a) of the Internal Revenue Code of 1986, as amended (the "Code"), taxes as ordinary income the difference between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" means the right of the Company to buy back the Shares pursuant to the Repurchase Option set forth in Section 3(b) of this Agreement. Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under Section 83(b) (an "83(b) Election") of the Code with the Internal Revenue Service within 30 days from the date of purchase. Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the election must be made to avoid income under Section 83(a) in the future. Purchaser understands that failure to file such an election in a timely manner may result in adverse tax consequences for Purchaser. Purchaser further understands that an additional copy of such election form should be filed with Purchaser's federal income tax return for the calendar year in which the date of this Agreement falls. Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares hereunder, does not purport to be complete, and is not intended or written to be used, and cannot be used, for the purposes of avoiding taxpayer penalties. Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death, and Purchaser has consulted, and has been fully advised by, Purchaser's own tax advisor regarding such tax laws and tax consequences or has knowingly chosen not to consult such a tax advisor. Purchaser further acknowledges that neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to Purchaser with respect to the tax consequences of Purchaser's purchase of the Shares or of the making or failure to make an 83(b) Election. PURCHASER (AND NOT THE COMPANY, ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR APPROPRIATELY FILING SUCH FORM WITH THE IRS, EVEN IF PURCHASER REQUESTS THE COMPANY, ITS AGENTS OR ANY OTHER PERSON MAKE THIS FILING ON PURCHASER'S BEHALF. Purchaser agrees that Purchaser will execute and deliver to the Company with this executed Agreement a copy of the Acknowledgment and Statement of Decision Regarding Section 83(b) Election (the "Acknowledgment"), attached hereto as <u>Exhibit B</u> and, if Purchaser decides to make an 83(b) Election, a copy of the 83(b) Election, attached hereto as <u>Exhibit C</u>.

9. **Certain Defined Terms.**

(a) "**Affiliate**" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) "**Continuous Service Status**" means the absence of any interruption or termination of service as an Employee or Consultant. Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of: (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between Company, its Parents,

Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(c) "**Director**" means a member of the Board of Directors of the Company.

(d) "**Disability**" means "disability" within the meaning of Section 22(e)(3) of the Code.

(e) "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(f) "**Parent**" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such a chain.

(g) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

10. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware or the federal courts of the United States located in Delaware and no other courts.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under

applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i) **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(j) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

[Signature Page Follows]

The parties have executed this Common Stock Purchase Agreement as of the last date set forth below.

THE COMPANY: Implicit Conversions, Inc.
Dated: 1/26/2023

*Robin Lavallee*

Robin Lavallee

PURCHASER:
Dated: 1/26/2023

*Jacob Stine*

Jacob Stine

## EXHIBIT A

## STOCK POWER

FOR VALUE RECEIVED, the undersigned ("Holder"), hereby sells, assigns and transfers unto
_____ ("Transferee")
_____ shares of the Common Stock of _____, a Delaware corporation (the
"Company"), standing in Holder's name on the Company's books as Certificate No. UCS-_____ whether held in
certificated or uncertificated form, and does hereby irrevocably constitute and appoint
_____ to transfer said stock on the books of the Company with full power of
substitution in the premises.

<div style="margin-left: 40%">

HOLDER: Implicit Conversions, Inc.
Dated:

*Jacob Stine*
_____
Jacob Stine

</div>

This Stock Power may only be used as authorized by the Common Stock Purchase Agreement between the Holder
and the Company, dated _____ and the exhibits thereto.

***Instructions:*** Please do not fill in any blanks other than the signature line. The purpose of this Stock Power is to
enable the Company to exercise its repurchase option set forth in the Agreement without requiring additional
signatures on the part of Holder.

IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS YOUR RESPONSIBILITY.

THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT.

YOU MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.

YOU (AND NOT THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY, ITS AGENTS OR ANY OTHER PERSON TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON HAS PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.

The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See www.irs.gov.

**EXHIBIT B**

**ACKNOWLEDGMENT AND STATEMENT OF DECISION**
**REGARDING SECTION 83(B) ELECTION**

The undersigned has entered into a stock purchase agreement with _____, a Delaware corporation (the "Company"), pursuant to which the undersigned is purchasing _____ shares of Common Stock of the Company (the "Shares"). In connection with the purchase of the Shares, the undersigned hereby represents as follows:

1. The undersigned has carefully reviewed the stock purchase agreement pursuant to which the undersigned is purchasing the Shares.
2. The undersigned either [check and complete as applicable]:
    a. _____ has consulted, and has been fully advised by, the undersigned's own tax advisor, _____, whose business address is _____, regarding the federal, state and local tax consequences of purchasing the Shares, and particularly regarding the advisability of making elections pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code") and pursuant to the corresponding provisions, if any, of applicable state law; or
    b. _____ has knowingly chosen not to consult such a tax advisor.
3. The undersigned hereby states that the undersigned has decided [check as applicable]:
    a. _____ to make an election pursuant to Section 83(b) of the Code, and is submitting to the Company, together with the undersigned's executed stock purchase agreement, an executed form entitled "Election Under Section 83(b) of the Internal Revenue Code of 1986;" or
    b. _____ not to make an election pursuant to Section 83(b) of the Code.
4. Neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to the undersigned with respect to the tax consequences of the undersigned's purchase of the Shares or of the making or failure to make an election pursuant to Section 83(b) of the Code or the corresponding provisions, if any, of applicable state law.

Dated:                                          **PURCHASER:**

_____          _____
                                                          (PRINT NAME)


                                                        _____
                                                          (Signature)

**EXHIBIT C**

**ELECTION UNDER SECTION 83(B)**
**OF THE INTERNAL REVENUE CODE OF 1986**

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, to include in taxpayer's gross income for the current taxable year, the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below:

1.  The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

    NAME OF TAXPAYER: _____
    ADDRESS: _____
    _____
    IDENTIFICATION NO. OF TAXPAYER: _____
    TAXABLE YEAR: _____

2.  The property with respect to which the election is made is described as follows:

    _____ shares of the Common Stock of _____, a Delaware corporation (the "Company").

3.  The date on which the property was transferred is: _____.

4.  The property is subject to the following restrictions:

    Repurchase option at cost in favor of the Company upon termination of taxpayer's employment or consulting relationship.

5.  The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6.  The amount (if any) paid for such property: Paid for with cash and/or property having a value of $_____ and equivalent to the value of the Shares.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

<u>The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.</u>

Dated:                                              **PURCHASER:**

_____          _____
                                                         (PRINT NAME)


                                                         _____
                                                         (Signature)

                                              Address:

                                                         _____

**<u>RECEIPT</u>**

Implicit Conversions, Inc., a Delaware corporation (the "Company"), hereby acknowledges the receipt of cash and other consideration having an aggregate value equal to at least $_____ given by _____ as consideration for _____ shares of Common Stock of the Company recorded on the books of the Company.

Dated:

_____

**THE COMPANY:**
Implicit Conversions, Inc.

By: Robin Lavallee

_____
(Signature)

Exhibit D

**IMPLICIT CONVERSIONS, INC.**
**ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS**

In accordance with Section 108 and Section 141(f) of the Delaware General Corporation Law and the Bylaws of Implicit Conversions, Inc., a Delaware corporation (the "Company"), the undersigned, constituting all of the members of the Company's Board of Directors (the "Board"), hereby take the following actions and adopt the following resolutions by unanimous written consent without a meeting:

**1. Incorporator**

**RESOLVED:** That every action taken or authorized with respect to the Company by the Incorporator of the Company is ratified and the Incorporator is hereby discharged from any further liabilities or duties with respect to the Company and the Company further agrees to indemnify and hold harmless the Incorporator from any liability incurred in the past or the future with respect to organizing the Company.

**2. Minute Book**

**RESOLVED:** That the Company shall maintain as part of its corporate records a book, in electronic or physical form, entitled "Minute Book" which shall include, but not be limited to, (i) a record of its Certificate of incorporation and amendments thereto, (ii) its Bylaws and amendments thereto, and (iii) minutes of all meetings of its directors and of its stockholders with the time and place of holding, whether regular or special (and if special how authorized), the notice thereof given, the number of shares present or represented at stockholders' meetings, and the proceedings of the meetings.

**3. Election of Officers**

**RESOLVED:** That the following persons are elected as officers of the Company to the offices set forth opposite each person's respective name, to serve at the pleasure of the Board:

| Name | Title |
| --- | --- |
| Robin Lavallee | President and Chief Executive Officer |
| Robin Lavallee | Secretary |

**4. Adoption of Bylaws**

**RESOLVED:** That the Bylaws attached to this Action by Unanimous Written Consent as Exhibit A are hereby adopted as the Bylaws of the Company.

**RESOLVED FURTHER:** That the Secretary of the Company is hereby authorized and directed to execute a certificate of the adoption of the Bylaws and insert it in the Company's Minute Book and that the officers of the Company are ordered to maintain a copy of such Bylaws in the principal office of the Company for the transaction of its business open for inspection by the stockholders at all reasonable times during office hours.

**5. Officers**

**RESOLVED:** That the Chief Executive Officer is authorized to sign and deliver any agreement in the name of the Company and to otherwise obligate the Company in any respect relating to matters of the business of the Company, and to delegate such authority in the Chief Executive Officer's discretion.

**6. Uncertificated Stock**

**RESOLVED:** That the shares of the Company shall be uncertificated, provided that the Company may issue certificated shares for some or all of any or all classes or series of its stock if deemed advisable and in the best interests of the Company by the officers, in consultation with legal counsel.

**RESOLVED FURTHER:** That the officers are authorized and directed to send a written notice to record owners of shares of uncertificated stock in accordance with the Delaware General Corporation Law (upon the request of such record owner) substantially in the form provided herewith to the Board with such changes deemed necessary or advisable by the officers, in consultation with legal counsel.

7. **Employer Identification Number**

**RESOLVED:** That the officers are authorized and directed to apply for an employer identification number on IRS Form SS-4, unless the Incorporator of the Company has previously made such application.

8. **Fiscal Year**

**RESOLVED:** That the fiscal year of the Company shall end on December 31 of each year.

9. **Incorporation Expenses**

**RESOLVED:** That the officers are authorized and directed to pay the expenses of incorporation and organization of the Company and the expenses incurred in the formation of the Company.

**RESOLVED FURTHER:** That the Company elects to deduct currently its organizational expenses, as that term is defined by Section 248 of the Internal Revenue Code of 1986, as amended (the "Code"), to the maximum extent provided in Section 248 of the Code and to amortize the balance of its organizational expenses over a period of one hundred eighty (180) months beginning with the month in which the Company begins business; and that the officers are authorized and directed to take such action as necessary to effectuate this election.

10. **Withholding Taxes**

**RESOLVED:** That the officers are authorized and directed to consult with the bookkeeper, auditors and attorneys of the Company in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the Company may now be (or hereafter become) liable.

11. **Qualification to Do Business**

**RESOLVED:** That the officers of the Company are authorized to take any and all steps that the officers deem to be necessary to qualify the Company to do business as a foreign corporation in each state that the officers determine such qualification to be necessary or appropriate.

12. **Management of Fiscal Affairs**

**RESOLVED:** That the officers of the Company are authorized and directed, in the officers' discretion, to select and designate from time to time one or more banks or other financial institutions as a depository of funds of the Company, and that the proper officers are authorized to open and maintain, in the name of the Company, a checking, savings, safe deposit, payroll or other account or accounts with said depository.

**RESOLVED FURTHER:** That the standard form of corporate banking or financial resolutions of such banks or financial institutions necessary to accomplish the foregoing resolution and showing the persons authorized to draw on such account, are approved and adopted as the resolutions of this Board, and the officers are authorized to execute, certify, and deliver a copy thereof to such banks or financial institutions as the resolutions of this Company.

13. **Ratification**

**RESOLVED:** That all actions taken heretofore by the Incorporator, officers and directors with respect to all matters contemplated by the foregoing resolutions and the transactions contemplated thereby are hereby approved, adopted, ratified and confirmed.

**RESOLVED:** That all actions taken heretofore by the Incorporator, officers and directors with respect to any

agreements entered into on behalf of the Company, including, without limitation any "click through" agreements and the transactions contemplated thereby are hereby approved, adopted, ratified and confirmed.

**14. <u>Omnibus Resolution</u>**

**<u>RESOLVED:</u>** That each of the officers is authorized and empowered to take all such actions (including, without limitation, soliciting appropriate consents or waivers from stockholders) and to execute and deliver all such documents as may be necessary or advisable to carry out the intent and accomplish the purposes of the foregoing resolutions and to effect any transactions contemplated thereby and the performance of any such actions and the execution and delivery of any such documents shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

This action may be executed in writing, or consented to by electronic transmission, in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same action.

This consent of the undersigned shall be effective immediately after the filing of the Company's initial Certificate of Incorporation with the Delaware Secretary of State; provided, however, that if such event has already occurred before the time of execution of this consent by the undersigned, then this consent shall be effective immediately. This consent shall be deemed revoked if it has not become effective within 60 days of the Actual Date of Signature below, which Actual Date of Signature is the date on which provision for the effectiveness of this consent has been made.

Actual Date of Signature: 1/24/2023

*Robin Lavallee*
_____
Robin Lavallee


Actual Date of Signature: 1/24/2023

*Jacob Stine*
_____
Jacob Stine

# Exhibit E

**IMPLICIT CONVERSIONS, INC.**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

*Employee Name: Jacob Stine*

*Effective Date: November 21, 2022*

As a condition of my becoming employed (or my employment being continued) by Implicit Conversions, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree to the following:

1. **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement" ) will apply to my employment relationship with the Company. If that relationship ends and the Company, within one (1) year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2. **Applicability to Past Activities.** The Company and I acknowledge that I may have performed work, activities, services or made efforts on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been within the scope of my duties under this agreement if performed during the term of this Agreement, for a period of time prior to the Effective Date of this Agreement (the "Prior Period"). Accordingly, if and to the extent that, during the Prior Period: (i) I received access to any information from or on behalf of the Company that would have been Confidential Information (as defined below) if I received access to such information during the term of this Agreement; or (ii) I (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been an Invention (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a Prior Invention (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

3. **Confidential Information.**

    (a)   **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of my

obligations to the Company under the Relationship.

(b)  **Confidential Information.** I understand that "<u>Confidential Information</u>" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)  **Third Party Information.** My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence. During the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I will not bring any such information onto the Company's property or place of business.

(d)  **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)  **U.S. Defend Trade Secrets Act.** Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("<u>DTSA</u>") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

4.  **Ownership of Inventions.**

(a)  **Inventions Retained and Licensed.** I have attached hereto, as <u>Exhibit A</u>, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date: (i) have been created by or on behalf of me, and/or (ii) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively "<u>Prior Inventions</u>"); or, if no such list is attached, I represent and warrant that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on <u>Exhibit A</u>, I hereby irrevocably and forever waive any and all rights or claims of ownership to such Inventions. I understand that my listing of any Inventions on <u>Exhibit A</u> does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions. I further understand that I must receive the formal approval of the Company before

commencing my Relationship with the Company.

(b) **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into any of the Company's products, services, processes or machines any Invention not assigned to the Company pursuant to Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions.** I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship or otherwise in connection with the Relationship, except as otherwise provided in Section 4(g) below.

(d) **Assignment of Company Inventions.** I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all of my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If I have any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, I hereby unconditionally and irrevocably grant to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records.** I shall keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I shall not remove such records from the Company's place of business or systems except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I shall deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 5 and Section 6.

(f)  **Intellectual Property Rights.** I shall assist the Company, or its designee, at its expense, in every proper way in securing the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and shall never assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. My obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g)  **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.  **Company Property; Returning Company Documents.** I acknowledge that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further acknowledge that any property situated on the Company's premises or systems and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. At the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6.  **Termination Certification.** In the event of the termination of the Relationship, I shall sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7.  **Notice to Third Parties.** During the periods of time during which I am restricted in taking certain actions by the terms of Section 8 of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I acknowledge that the Company may, with or without prior notice to me and whether during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. Upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

8. **Solicitation of Employees, Consultants and Other Parties.** As described above, I acknowledge that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and I will not use or disclose such Confidential Information except as authorized by the Company in advance in writing. I further agree as follows:

(a) **Employees, Consultants.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate such employees' or consultants' relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

(b) **Other Parties.** During the term of the Relationship, I will not influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

9. **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

10. **Representations and Covenants.**

(a) **Facilitation of Agreement.** I shall execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b) **No Conflicts.** I represent and warrant that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I represent and warrant that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c) **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

11. **Electronic Delivery.** Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means. I hereby consent to receive

such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

12. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c) **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e) **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f) **Remedies.** I acknowledge that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g) **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND

I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(h)  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

THE COMPANY: IMPLICIT CONVERSIONS, INC.
Executed on 1/24/2023

*Robin Lavallee*
_____
Robin Lavallee


Employee:
Executed on 1/24/2023

*Jacob Stine*
_____
Jacob Stine


CONFIDENTIAL INFORMATION AND INVENTION
ASSIGNMENT AGREEMENT OF IMPLICIT CONVERSIONS, INC.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP
EXCLUDED UNDER SECTION 4(a)
AND CONFLICTING AGREEMENTS DISCLOSED UNDER SECTION 10(b)**

The following is a list of (i) all Inventions that, as of the Effective Date: (A) have been created by me or on my behalf, and/or (B) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

Except as indicated above on this Exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 4(a) of this Agreement and no agreements to disclose pursuant to Section 10(b) of this Agreement.

Executed on 1/24/2023

*Jacob Stine*
_____
Jacob Stine, Employee

**EXHIBIT B**

Section 2870 of the California Labor Code is as follows:

    (a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of the employee's rights in an invention to the employee's employer shall not apply to an invention that the employee developed entirely on the employee's own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

    (1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

    (2)    Result from any work performed by the employee for the employer.

    (b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

RCW 49.44.140 of the Revised Code of Washington is as follows:

    (1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

    (2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

    (3)    If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:

    (1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that the employee's invention qualifies under this

subsection.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)    If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.


Sections 44-130 of the Kansas Labor and Industries Code is as follows:


(a)    Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    the invention results from any work performed by the employee for the employer.

(b)    Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

(c)    If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    The invention results from any work performed by the employee for the employer.

(d)    Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.


Section 181.78 of the Minnesota Labor, Industry Code is as follows:

Subdivision 1. Inventions not related to employment. Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the

business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

Subd. 2. Effect of subdivision 1. No employer shall require a provision made void and unenforceable by subdivision 1 as a condition of employment or continuing employment.

Subd. 3. Notice to employee. If an employment agreement entered into after August 1, 1977 contains a provision requiring the employee to assign or offer to assign any of the employee's rights in any invention to an employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

## EXHIBIT C

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Implicit Conversions, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by the Confidentiality Agreement, and I acknowledge my continuing obligations under the Confidentiality Agreement.

I further agree that, in compliance with the Confidentiality Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months immediately following the termination of my Relationship with the Company, I shall not either directly or indirectly solicit any of the Company's employees or consultants to terminate such employees' or consultants' relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

Date:

_____

Jacob Stine, Employee

Exhibit F

# *EMPLOYMENT AGREEMENT*

This Employment Agreement (this "Agreement") is made effective as of April 1, 2024, by and between Implicit Conversions, Inc. of 100 Redwood Drive, La Honda, California, 94020 and Juanita Traver Stine of 100 Redwood Drive, La Honda, California, 94020

A. Implicit Conversions, Inc. is engaged in the business of Software Development. Juanita Traver Stine will primarily perform the job duties at the following location: Remote (USA).

B. Implicit Conversions, Inc. desires to have the services of Juanita Traver Stine

C. Juanita Traver Stine is an at-will employee of Implicit Conversions, Inc. Either party is able to terminate the employment agreement at any time.

Therefore, the parties agree as follows:

**1. EMPLOYMENT.** Implicit Conversions, Inc. shall employ Juanita Traver Stine as Human Resources and Payroll Administrator. Juanita Traver Stine shall provide to Implicit Conversions, Inc. duties as needed. Juanita Traver Stine accepts and agrees to such employment, and agrees to be subject to the general supervision, advice and direction of Implicit Conversions, Inc. and Implicit Conversions, Inc.'s supervisory personnel.

**2. BEST EFFORTS OF EMPLOYEE.** Juanita Traver Stine agrees to perform faithfully, industriously, and to the best of Juanita Traver Stine's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Agreement, to the reasonable satisfaction of Implicit Conversions, Inc. Such duties shall be provided at such place(s) as the needs, business, or opportunities of Implicit Conversions, Inc. may require from time to time.

**3. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Juanita Traver Stine under this Agreement, Implicit Conversions, Inc. will pay $66/hr. per hour worked up to a maximum of forty (40) hours per week unless more hours are specifically requested by IMPLICIT CONVERSIONS. Upon termination of this Agreement, payments under this paragraph shall cease; provided, however, that Juanita Traver Stine shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which Juanita Traver Stine has not yet been paid, and for any commission earned in accordance with Implicit Conversions, Inc.'s customary procedures, if applicable. This section of the Agreement is included only for accounting and payroll purposes and should not be construed as establishing a minimum or definite term of employment.

4. **EXPENSE REIMBURSEMENT.** Implicit Conversions, Inc. will reimburse Juanita Traver Stine for "out-of-pocket" expenses incurred by Juanita Traver Stine in accordance with Implicit Conversions, Inc.'s policies in effect from time to time.

**6. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Juanita Traver Stine shall provide Implicit Conversions, Inc. with all information, suggestions, and recommendations regarding Implicit Conversions, Inc.'s business, of which Juanita Traver Stine has knowledge, that will be of benefit to Implicit Conversions, Inc.

**7. CONFIDENTIALITY.** Juanita Traver Stine recognizes that Implicit Conversions, Inc. has and will have information regarding the following:
- inventions
- products
- product design
- processes
- technical matters
- trade secrets
- copyrights
- customer lists
- prices
- costs
- discounts
- business affairs
- future plans

and other vital information items (collectively, "Information") which are valuable, special and unique assets of Implicit Conversions, Inc. Juanita Traver Stine agrees that Juanita Traver Stine will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of Implicit Conversions, Inc. Juanita Traver Stine will protect the Information and treat it as strictly confidential. A violation by Juanita Traver Stine of this paragraph shall be a material violation of this Agreement and will justify legal and/or equitable relief.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**8. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Juanita Traver Stine has disclosed (or has threatened to disclose) Information in violation of this Agreement, Implicit Conversions, Inc. shall be entitled to an injunction to restrain Juanita Traver Stine from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Implicit Conversions, Inc. shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**9. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Agreement shall remain in full force and effect for a period of a period of 2 years after the voluntary or involuntary termination of Juanita Traver Stine's employment.

**10. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER.** Juanita Traver Stine shall not have the right to make any contracts or commitments for or on behalf of Implicit Conversions, Inc. without first obtaining the express written consent of Implicit Conversions, Inc.

**11. BENEFITS.** Juanita Traver Stine shall be entitled to employment benefits, as provided by Implicit Conversions, Inc.'s policies in effect during the term of employment. These benefits include:
- Implicit Conversion's 401k plan: match 100% of the first 6% of employee contributions.
- QSEHRA Health Benefit Reimbursement

**12. EMPLOYEE EQUITY -** Subject to Board approval, Juanita Traver Stine will receive a grant of 4,000 incentive stock options. These options will vest monthly over a 4-year period, with a 1-year cliff. This means that Juanita Traver Stine will earn their stock options gradually over 4 years, as long as Juanita Traver Stine remains an employee of the company. The 1-year cliff implies that the first 25% of the stock options will vest only after Juanita Traver Stine completes one year of service. The remaining 75% of the stock options will vest in equal monthly installments over the subsequent three years. The specific vesting dates for Juanita Traver Stine  will be outlined in a separate grant vesting schedule.

Juanita's specific grant vesting schedule. The grant of stock options will be governed in full by the terms of the Employee Equity Plan agreement and the Company's incentive plan. In case of any inconsistency between this offer letter and the Employee Equity grant notice, the grant notice shall prevail, unless explicitly stated otherwise in another agreement.

**13. TERM/TERMINATION.** Juanita Traver Stine''s employment under this Agreement shall be for an unspecified term on an "at will" basis. If Juanita Traver Stine is in violation of this Agreement, Implicit Conversions, Inc. may terminate employment without notice and with compensation to Juanita Traver Stine only to the date of such termination. The compensation paid under this Agreement shall be Juanita Traver Stine's exclusive remedy.

**14. COMPLIANCE WITH EMPLOYER'S RULES.** Juanita Traver Stine agrees to comply with all of the rules and regulations of Implicit Conversions, Inc.

**15. RETURN OF PROPERTY.** Upon termination of this Agreement, Juanita Traver Stine shall deliver to Implicit Conversions, Inc. all property which is Implicit Conversions, Inc.'s property or related to Implicit Conversions, Inc.'s business (including keys, records, notes, data, memoranda, models, and equipment) that is in Juanita Traver Stine's possession or under Juanita Traver Stine's control. Such obligation shall be governed by any separate confidentiality or proprietary rights agreement signed by Juanita Traver Stine.

**16. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid, addressed as follows:

Employer:

Implicit Conversions, Inc.
P. O. Box 332
La Honda, California 94020
Email: hr@implicitconversions.com

Employee:

Juanita Traver Stine
100 Redwood Drive
La Honda, Ca. 94020

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**16. ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**17. AMENDMENT.** This Agreement may be modified or amended, if the amendment is made in writing and is signed by both parties.

**18. SEVERABILITY.** If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**19. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

Doc ID: a8bd79f853ae7c5bfbcd75008e063bb517516fd4

**20. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**21. SIGNATORIES.** This Agreement shall be signed by Robin Lavallee and Jacob Patrick Stine, on behalf of Implicit Conversions, Inc. and by Juanita Traver Stine in an individual capacity. This Agreement is effective as of the date first above written.

By: _____    Date: __04 / 22 / 2024__
    Jacob Stine
    Co-Founder
    Implicit Conversions, Inc.

By: _____    Date: __04 / 22 / 2024__
    Robin Lavallée
    Co-Founder
    Implicit Conversions, Inc.

By: _____    Date: __04 / 22 / 2024__
    Juanita Traver Stine
    Human Resources and Payroll Administrator

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | Implicit Conversions Employee contract with Juanita Traver... |
| **File name** | Employment_Agreem...er_Stine.docx.pdf |
| **Document ID** | a8bd79f853ae7c5bfbcd75008e063bb517516fd4 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**

**04 / 19 / 2024**
21:56:29 UTC

Sent for signature to Robin Lavallee
(robin.lavallee@implicitconversions.com), Jake Stine
(jake.stine@implicitconversions.com) and Juanita Traver
Stine (juanita@implicitconversions.com) from
juanita@implicitconversions.com
IP: 50.247.86.118

**VIEWED**

**04 / 22 / 2024**
19:41:12 UTC

Viewed by Robin Lavallee
(robin.lavallee@implicitconversions.com)
IP: 68.163.40.49

**SIGNED**

**04 / 22 / 2024**
19:41:36 UTC

Signed by Robin Lavallee
(robin.lavallee@implicitconversions.com)
IP: 68.163.40.49

**VIEWED**

**04 / 22 / 2024**
19:53:20 UTC

Viewed by Jake Stine (jake.stine@implicitconversions.com)
IP: 50.247.86.113

**Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Implicit Conversions Employee contract with Juanita Traver... |
| **File name** | Employment_Agreem...er_Stine.docx.pdf |
| **Document ID** | a8bd79f853ae7c5bfbcd75008e063bb517516fd4 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SIGNED | **04 / 22 / 2024** 19:53:38 UTC | Signed by Jake Stine (jake.stine@implicitconversions.com) IP: 50.247.86.113 |
| VIEWED | **04 / 22 / 2024** 22:36:01 UTC | Viewed by Juanita Traver Stine (juanita@implicitconversions.com) IP: 50.247.86.118 |
| SIGNED | **04 / 22 / 2024** 22:36:31 UTC | Signed by Juanita Traver Stine (juanita@implicitconversions.com) IP: 50.247.86.118 |
| COMPLETED | **04 / 22 / 2024** 22:36:31 UTC | The document has been completed. |

# Exhibit G

June 14, 2024


<u>Via email only to jake.stine@gmail.com</u>


Jacob Stine
100 Redwood Drive
La Honda, CA 94020


RE:     **Employment Termination Letter**
              **Notice of Intent to Exercise Repurchase Option**


Dear Jacob:

I regret to inform you that your employment as Chief Technology Officer with Implicit Conversions, Inc., a Delaware corporation, is hereby terminated immediately for cause as of June 14, 2024 (the "**Effective Date**").

You have repeatedly demonstrated gross misconduct in the performance of your duties, including but not limited to mismanagement of multiple employees, mismanagement of the company, interpersonal misconduct, including violent physical threats against an employee, failure of duties and denigration of business partners. Implicit Conversions has carefully considered the issues at hand and has conducted a thorough investigation, including discussions with you and warnings to address the concerns. Despite these efforts, it has become evident that your conduct has not improved and your negative impact on Implicit Conversions' operations and work environment cannot continue.

Except as set forth in this letter, the Effective Date will be your employment termination date for all purposes, meaning you will no longer be entitled to any further compensation, monies, or other benefits from Implicit Conversions, including coverage under any benefits plans or programs sponsored by Implicit Conversions. Notwithstanding the previous sentence, Implicit Conversions will pay you vested or bonus royalty funds you earned during the term of your employment.

Your final paycheck, including your full pay as well as accrued but unused PTO, vacation, and sick days through the Effective Date will be paid in accordance with Implicit Conversions' standard payroll practices subject to all withholdings and deductions as required by law.

Implicit Conversions will reimburse you for any expenses you incurred in the performance of your duties in accordance with our expense reimbursement policy.

Your access to company systems will be disabled by the end of today. Within one week of the Effective Date, you must return all Implicit Conversions property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other Implicit Conversions

property and information in your possession. Shipping costs will be paid by Implicit Conversions. Please return this property and information to me by the Effective Date.

In accordance with the Common Stock Purchase Agreement dated January 26, 2023 (the "**Stock Purchase Agreement**"), Implicit Conversions hereby notifies you that it intends to exercise its repurchase option under Section 3 of the Stock Purchase Agreement with respect to all 2,744,795 unvested shares at the original purchase price of $0.00001 per share for a total purchase price of $27.45. Implicit Conversions will deliver a check to you in the amount of the total purchase price.

Nothing contained or omitted in this letter is or shall be deemed a limitation, restriction, or waiver of any of Implicit Conversions' right or remedies, either at law or in equity. All such rights and remedies are expressly reserved.

We wish you success in your future endeavors. If you have any questions or concerns about this letter or the agreements referenced herein, please contact Premack Rogers Downs P.C., legal counsel for Implicit Conversions, at benjamin@premackrogers.com and William Litshauer. Sr. Executive Producer, at bill@implicitconversions.com.

Sincerely,

DocuSigned by:

*Robin Lavallée*

BE54F77432C14C7

Robin Lavallée, CEO
Implicit Conversions, Inc.
robin.lavallee@implicitconversions.com

# Exhibit H

---------- Forwarded message ---------
De : **Robin Lavallee** <robin@guibec.com>
Date: sam. 15 juin 2024 06 h 03
Subject: Account Compromised
To: Juanita Traver Stine <juanita@implicitconversions.com>
Cc: Juanita Traver <JTraver6@yahoo.com>

Hello Juanita,

It looks like your account has been compromised and has let Jake Stine access
company resources illegally. I've disabled your Slack access as a security precaution.

Alert: Primary admin changed to juanita@implicitconversions.com 📁 Inbox ×



**Google Workspace Alerts** <google-workspace-alerts-noreply@google.com>    9:39 PM (8 minutes ago)
to me ▾

# Google Workspace

The primary admin for your organization was changed from robin.lavallee@implicitconversions.com to juanita@implicitconversions.com.

Alert details:

| | |
|---|---|
| **Date** | Sat, Jun 15 2024 01:39 UTC |
| **Actor** | juanita@implicitconversions.com |

**Review changes in Alert Center**

| | | | | |
|---|---|---|---|---|
| 🏃 Juanita Traver Stine ⋯ | Juanita Traver Stine | juanita@implicitconversions.com | Regular Member | Deactivated |

Robin

# Exhibit I

 Gmail

**Robin Lavallée <robin.lavallee2@gmail.com>**

---

## Fwd: Important Notice Regarding Recent Employment Status Changes
1 message

---

**Drew McLean** <drew.mclean@gmail.com>                                                                15 juin 2024 à 00 h 57
À : Robin Lavallee <robin@guibec.com>

---------- Forwarded message ---------
From: **Drew McLean** <drew@implicitconversions.com>
Date: Fri, Jun 14, 2024 at 9:56 PM
Subject: Fwd: Important Notice Regarding Recent Employment Status Changes
To: Drew McLean <drew.mclean@gmail.com>

---------- Forwarded message ---------
From: **Jake Stine** <jake.stine@implicitconversions.com>
Date: Fri, Jun 14, 2024 at 9:53 PM
Subject: Important Notice Regarding Recent Employment Status Changes
To: <all@implicitconversions.com>

Hi Team,

I am writing this message today with a heavy heart to inform you that Robin Lavallee's access to Google Admin, including Drive and Gmail, has been temporarily revoked. This action was done in response to bypassing the proper due processes which are required by our company policies, and also his repeated efforts to undermine efforts to engage in due diligence and fair communication. The announcement of my termination was not in accordance with company protocols, and the actions taken against me are unjust and inappropriate.

I want to be clear that Robin is not being terminated. This action is taken to help enforce a more stable environment where both parties are afforded the respect of due diligence and fair representation.

I have always valued my role here and have worked diligently to contribute to our team's success. It is disheartening to find myself in this situation, but I am committed to pursuing the appropriate channels to address this issue and seek a fair and amicable resolution.

I kindly request your understanding and support during this challenging time. If you have any questions or concerns, please do not hesitate to reach out to me directly. At this time I do not have access to Slack or Github, so please contact me via other contact methods listed below.

Sincerely,

Jake Stine
CTO & Co-Founder
Implicit Conversions, Inc
cell: 650-335-8946
discord: mysteriousnixon
jake.stine@gmail.com

---

# Exhibit J

On Sat, Jun 15, 2024 at 6:22 AM Jake Stine <jake.stine@implicitconversions.com> wrote:

> Hi Team,
>
> I am happy to issue an update that Robin's Google email access has been restored. Along with this, my own google email account will remain active and operational. This effort is made in the interest of allowing for due process and promoting fair and civil discourse.
>
> I reaffirm my role as a committed member of the Board of Directors and a significant shareholder in our organization. I remain steadfast in upholding my responsibilities and duties towards the company.
>
> Your patience is appreciated, and I would like to take this opportunity to thank each of you for your understanding and support during this process. Your professionalism and dedication are invaluable to our collective success.
>
> I would also like to take this brief opportunity to congratulate the Masticore team on our successful PS2 launch! I had wanted to issue this congratulatory fanfare on Monday as part of my return from leave, but given the sudden change in circumstances it seems prudent to include it here: Getting PS2 running properly on the PS5 was a project that first got started six years ago, and it's been a really long road to finally get there. And for my money, the PS2 emulator running well with a built-in rewind system is something of an engineering marvel. I'm really proud of everyone.

Sincerely,

Jake Stine
CTO & Co-Founder
Implicit Conversions, Inc
cell: 650-335-8946
discord: mysteriousnixon

# Exhibit K

---------- Forwarded message ---------
De : **Drew McLean** <drew.mclean@gmail.com>
Date: sam. 15 juin 2024, à 21 h 01
Subject: Fwd: Important Notice Regarding Recent Employment Status Changes
To: Robin Lavallee <robin@guibec.com>

---------- Forwarded message ---------
From: **Drew McLean** <drew@implicitconversions.com>
Date: Sat, Jun 15, 2024 at 6:00 PM
Subject: Fwd: Important Notice Regarding Recent Employment Status Changes
To: Drew McLean <drew.mclean@gmail.com>

---------- Forwarded message ---------
From: **Jake Stine** <jake.stine@implicitconversions.com>
Date: Sat, Jun 15, 2024 at 5:58 PM
Subject: Re: Important Notice Regarding Recent Employment Status Changes
To: <all@implicitconversions.com>

Hi Team,

Quick update on this, and massive apologies. I realized just now that Robin's email was

still deactivated! I made the change to re-activate it two hours prior to sending my update and I appear to have fumbled a step and not fully re-activated it. The mistake has been corrected, and in no way did I have any ill intention of issuing misleading communication.

I have now made good on my statement, and I apologize again to Robin in particular for causing unwarranted delays or confusion in the restoration of his email account.

Sincerely,

Jake Stine
CTO & Co-Founder
Implicit Conversions, Inc
cell: 650-335-8946
discord: mysteriousnixon

Exhibit L

| Date | Event | Description | Actor | IP address |
|---|---|---|---|---|
| 2024-06-17T22 | Audit and Investigation Query Export | Exported results from ADMIN LOG EVENTS q | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for ADMIN LOG EVENTS da | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query Export | Exported results from USER LOG EVENTS qu | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query Export | Exported results from USER LOG EVENTS qu | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Alert Center Viewed | Alert center details of alert 1d8e7428-ab16-45 | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was a | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was a | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Super Admin from juanita@ir | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Groups Editor from juanita@ | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Help Desk Admin from juanit | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Storage Admin from juanita@ | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Groups Reader from juanita@ | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Services Admin from juanita@ | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Groups Admin from juanita@ | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role User Management Admin fro | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Unassign Role | Unassigned role Super Admin from jake.stine( | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-17T22 | Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@impliciton | 68.163.40.49 |

| Timestamp / Event | Description | Actor | IP |
|---|---|---|---|
| 2024-06-17T22 Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was ac | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T22 User Creation | jake_inactive@implicitconversions.com create | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T22 User License Assignment | A license for Google Workspace product and | Google System | |
| 2024-06-17T22 Alert Center Viewed | Alert center details of alert 1d8e7428-ab16-45: | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T22 Alert Center Viewed | Alert center details of alert 1d8e7428-ab16-45: | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T22 Alert Center Viewed | Alert center details of alert 1d8e7428-ab16-45: | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was ac | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 User Creation | juanita_inactive@implicitconversions.com crea | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 User License Assignment | A license for Google Workspace product and | Google System | |
| 2024-06-17T21 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Allow 2-Step Verification | Allow 2-Step Verification has been set from IN | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Enforce 2-Step Verification | in security settings for your organization chan | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Change 2-Step Verification Enrollmen | 2-step verification enrollment period duration fi | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Change 2-Step Verification Start Date | 2-step verification start date has been change | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Password Change | Password changed for juanita@implicitconvers | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Password Change on Next Login | Password change requirement for juanita@imp | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Password Change | Password changed for jake.stine@implicitcon | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Password Change on Next Login | Password change requirement for jake.stine@ | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Alert Center Viewed | Alert center details of alert 12fd2064-0dab-4d: | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Create Application Setting | For Security, AdminAccountRecoverySettingsf | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User isabelle@implicitconversions.com delete | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User isabelle@implicitconversions.com delete | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine1@sony.com deleted from gro | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine1@sony.com deleted from gro | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine1@sony.com deleted from gro | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Delete Group | Group openai@implicitconversions.com delete | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Delete Group | Group openai@implicitconversions.com delete | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |

| Timestamp / Action | Detail | Actor | IP |
|---|---|---|---|
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine1@sony.com deleted from grou | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine1@sony.com deleted from grou | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 3-Legged OAuth Token Revoke | 3-legged OAuth tokens issued by user jake.sti | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Groups Admin assigned to user jimmy@ | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Groups Admin assigned to user mouse@ | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Groups Admin assigned to user drew@ir | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Super Admin assigned to user mouse@ir | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Super Admin assigned to user drew@mj | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 Assign Role | Role Super Admin assigned to user jimmy@ir | robin.lavallee@implicitcon | 68.163.40.49 |
| 2024-06-17T21 User Suspension | juanita@implicitconversions.com suspended | robin.lavallee@implicitcon | suspended 68.163.40.49 |
| 2024-06-17T21 User Suspension | jake.stine@implicitconversions.com suspende | robin.lavallee@implicitcon | suspended 68.163.40.49 |

| | | | | |
|---|---|---|---|---|
| 2024-06-17T21 | Update Domain Secondary Email | Secondary email for your organization change | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Update Domain Primary Admin Email | Primary admin for your organization changed | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Directory Sync Admin assigned to user r | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Storage Admin assigned to user mouse@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Services Admin assigned to user mouse( | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Help Desk Admin assigned to user mous | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Editor assigned to user mouse@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Mobile Admin assigned to user mouse@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Reader assigned to user mouse( | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Admin assigned to user mouse@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role User Management Admin assigned to us | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Editor assigned to user drew@ir | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Mobile Admin assigned to user drew@im | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Help Desk Admin assigned to user drew( | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Directory Sync Admin assigned to user d | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Storage Admin assigned to user drew@i | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Services Admin assigned to user drew@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Reader assigned to user drew@i | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Admin assigned to user drew@ir | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role User Management Admin assigned to us | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Super Admin assigned to user bill@mpl | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Mobile Admin assigned to user jimmy@ir | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Editor assigned to user jimmy@i | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Reader assigned to user jimmy@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Services Admin assigned to user jimmy( | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Directory Sync Admin assigned to user ji | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Help Desk Admin assigned to user jimmy | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Storage Admin assigned to user jimmy@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Groups Admin assigned to user jimmy@ | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role User Management Admin assigned to us | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Directory Sync Admin assigned to user b | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T21 | Assign Role | Role Mobile Admin assigned to user bill@impl | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T20 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T20 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T20 | Audit and Investigation Query | Performed query for DRIVE LOG EVENTS dat | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T19 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T19 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | robin.lavalee@implicit | con 68.163.40.49 |
| 2024-06-17T11 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-17T08 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-17T08 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | bill@implicitconversions.c | 24.141.205.234 |

| Timestamp | Event | Details | Actor | IP |
|---|---|---|---|---|
| 2024-06-16T11 | Assign Role | Role Super Admin assigned to user robin.laval | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Directory Sync Admin assigned to user rc | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Mobile Admin assigned to user robin.lave | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Services Admin assigned to user robin.la | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Groups Editor assigned to user robin.lavi | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Groups Admin assigned to user robin.lav | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role Help Desk Admin assigned to user robin. | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role User Management Admin assigned to us | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Assign Role | Role User Management Admin assigned to us | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-16T11 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T20 | User Unsuspension | robin.lavallee@implicitconversions.com unsus | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T19 | Password Change | Password changed for implicitrunner@implicit | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T19 | Password Change | Password changed for implicitrunner@implicit | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T19 | Password Change on Next Login | Password change requirement for implicitrunn | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T15 | Password Change | Password changed for implicitrunner@implicit | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T10 | Audit and Investigation Query | Performed query for USER LOG EVENTS dat | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Audit and Investigation Query | Performed query for CHROME LOG EVENTS | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Audit and Investigation Query | Performed query for CHAT LOG EVENTS dat | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Audit and Investigation Query | Performed query for CALENDAR LOG EVENT | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Alert Center Viewed | Alert center details of alert  viewed | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Alert Center Viewed | Alert center details of alert  viewed | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T10 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T09 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T09 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-15T09 | Assign Role | Role Storage Admin assigned to user robin.la | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T09 | Assign Role | Role Groups Reader assigned to user robin.la | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T07 | Password Change | Password changed for implicitrunner@implicit | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-15T00 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Password Change | Password changed for implicitrunner@implicit | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-14T21 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | jake.stine@implicitconver: | 50.247.86.113 |
| 2024-06-14T21 | Audit and Investigation Query | Performed query for ADMIN LOG EVENTS da | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Google Workspace Security Center In | Alert center Google Workspace Security Cent | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Listed Changes of an Alert | Alert center listed change ids  of alert e5c4d1a | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Listed Related Alerts of an Alert | Alert center listed related alerts  of alert e5c4d | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Listed Feedback of an Alert | Alert center listed feedback ids  of alert e5c4d | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Alert Center Viewed | Alert center details of alert e5c4d1a6-3a5f-429 | bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T21 | Unassign Role | Unassigned role Super Admin from robin.laval | juanita@implicitconversioi | 50.247.86.118 |

| Timestamp / Action | Description | IP |
|---|---|---|
| 2024-06-14T21 Unassign Role | Unassigned role Super Admin from bill@implic juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T21 Unassign Role | Unassigned role User Management Admin froi juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T21 User Unsuspension | jake.stine@implicitconversions.com unsuspen juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T21 User Suspension | robin.lavallee@implicitconversions.com suspe juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T21 Update Domain Secondary Email | Secondary email for your organization change juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T21 Update Domain Primary Admin Email | Primary email for your organization changed f juanita@implicitconversio | 50.247.86.118 |
| 2024-06-14T19 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T19 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T19 Reset Cookies and Force Relogin | Cookies reset for jake.stine@implicitconversio robin.lavallee@impliciton | 34.210.90.221 |
| 2024-06-14T18 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: bill@implicitconversions.c | 24.141.205.234 |
| 2024-06-14T18 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T18 User Suspension | jake.stine@implicitconversions.com suspende robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T18 Update Domain Secondary Email | Secondary email for your organization changed robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T18 Update Domain Primary Admin Email | Primary admin for your organization changed f robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T13 Assign Role | Role Storage Admin assigned to user bill@imr robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T13 Assign Role | Role Super Admin assigned to user bill@implc robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-14T13 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-13T14 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-13T14 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-13T14 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User juanita@implicitconversions.com created robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User admoreservices09@gmail.com created u robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User bill@implicitconversions.com created un robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User sylvia@solidgoldcfo.com created under c robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Change Group Settings | IS_ARCHIVED for group payroll@implicitconv robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Change Group Settings | WHO_CAN_JOIN for group payroll@implicitc robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User robin.lavallee@implicitconversions.com robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Create Group | Group payroll@implicitconversions.com create robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Change Group Name | Name of group invoices@implicitconversions. robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User sylvia@solidgoldcfo.com created under c robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User admoreservices09@gmail.com created u robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User juanita@implicitconversions.com created robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Change Group Settings | IS_ARCHIVED for group invoices@implicitcon robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User robin.lavallee@implicitconversions.com r robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Add Group Member | User bill@implicitconversions.com created un robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-09T12 Create Group | Group invoices@implicitconversions.com crea robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-07T13 Add Group Member | User robin.lavallee@implicitconversions.com robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-07T13 Add Group Member | User bill@implicitconversions.com created un robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-07T13 Add Group Member | User jean-andre@implicitconversions.com cre robin.lavallee@impliciton | 68.163.40.49 |
| 2024-06-07T13 Change Group Settings | WHO_CAN_JOIN for group playstation-cert@ robin.lavallee@impliciton | 68.163.40.49 |

| Date/Time & Action | Description | Actor | IP |
|---|---|---|---|
| 2024-06-07T13 Change Group Settings | WHO_CAN_VIEW_GROUP for group playstal | robin.lavalee@implicitconversions.com | |
| 2024-06-07T13 Change Group Settings | IS_ARCHIVED for group playstation-cert@imp | robin.lavalee@implicitconversions.com | |
| 2024-06-07T13 Change Group Settings | WHO_CAN_VIEW_MEMBERSHIP for group r | robin.lavalee@implicitconversions.com | |
| 2024-06-07T13 Create Group | Group playstation-cert@implicitconversions.cc | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-06-04T20 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42 | jake.stine@impliciton conver: | 50.247.86.118 |
| 2024-06-03T17 User Deletion | vincent.caruso@implicitconversions.com delet | robin.lavalee@implicitconversions.com | |
| 2024-06-03T17 User License Revoke | A license for Google Workspace product and | Google System | |
| 2024-06-03T17 Data Transfer Request Created | Data transfer request created from vincent.car | robin.lavalee@implicitconversions.com | |
| 2024-06-03T17 User Suspension | vincent.caruso@implicitconversions.com susp | robin.lavalee@implicitconversions.com | |
| 2024-06-03T17 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-06-03T17 Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was ac | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-06-03T17 Migration Setup | Migration setup is configured. (domain_name: | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-06-03T17 Authorize API Client Access | API client access to your organization from clie | robin.lavalee@implicitconversions.com | |
| 2024-06-03T17 Authorize API Client Access | API client access to your organization from clie | robin.lavalee@implicitconversions.com | |
| 2024-05-25T21 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Add Group Member | User jake.stine@implicitconversions.com a | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Add Group Member | User robin.lavalee@implicitconversions.com c | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User sgauthier@implicitconversions.com delet | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User tvangaste@implicitconversions.com crea | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User todd.christensen@implicitconversions.co | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User sadie@implicitconversions.com deleted f | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User robin.lavalee@implicitconversions.com c | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User plg@implicitconversions.com deleted fro | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User maxou@implicitconversions.com deleted | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User leiradel@implicitconversions.com delete | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User lucas@implicitconversions.com deleted f | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User jimmy@implicitconversions.com deleted | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User jean-andre@implicitconversions.com del | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User jake.stine@implicitconversions.com dele | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User gregory@implicitconversions.com delete | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User drew@implicitconversions.com deleted f | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User dave@implicitconversions.com deleted fr | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User cedric@implicitconversions.com deleted | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User chris.mcauley@implicitconversions.com | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Remove Group Member | User alexandre@implicitconversions.com dele | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-15T12 Add Group Member | User ic-engineers@implicitconversions.com cr | robin.lavalee@impliciton | 68.163.40.49 |
| 2024-05-10T08 Remove Group Member | User mouse@implicitconversions.com deleted | bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 Add Group Member | User sgauthier@implicitconversions.com creat | bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 Add Group Member | User alexandre@implicitconversions.com cree | bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 Add Group Member | User sadie@implicitconversions.com created l | bill@implicitconversions.c | 24.141.199.12 |

| Timestamp | Event | Description | IP |
|---|---|---|---|
| 2024-05-10T08 | Add Group Member | User lucas@implicitconversions.com created t bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User cedric@implicitconversions.com created bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User jimmy@implicitconversions.com created bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User tvangastel@implicitconversions.com crei bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User maxou@implicitconversions.com createc bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User plg@implicitconversions.com created un bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User gregory@implicitconversions.com create bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User jake.stine@implicitconversions.com crea bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User dave@implicitconversions.com created t bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User todd.christensen@implicitconversions.co bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User drew@implicitconversions.com created t bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User robin.lavallee@implicitconversions.com c bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User leiradel@implicitconversions.com createc bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User mouse@implicitconversions.com createc bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User chris.mcauley@implicitconversions.com bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User jean-andre@implicitconversions.com cre bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Remove Group Member | User engineers-all@implicitconversions.com d bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Add Group Member | User engineers-all@implicitconversions.com c bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Change Group Settings | WHO_CAN_JOIN for group ic-engineers@imp bill@implicitconversions.com | |
| 2024-05-10T08 | Change Group Settings | WHO_CAN_CONTACT_OWNER for group ic- bill@implicitconversions.com | |
| 2024-05-10T08 | Change Group Settings | WHO_CAN_VIEW_MEMBERSHIP for group i bill@implicitconversions.com | |
| 2024-05-10T08 | Change Group Settings | WHO_CAN_POST_MESSAGE for group ic-er bill@implicitconversions.com | |
| 2024-05-10T08 | Change Group Settings | IS_ARCHIVED for group ic-engineers@implici bill@implicitconversions.com | |
| 2024-05-10T08 | Add Group Member | User bill@implicitconversions.com created un bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Create Group | Group ic-engineers@implicitconversions.com bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-10T08 | Alert Center Viewed | Alert center details of alert viewed        bill@implicitconversions.c | 24.141.199.12 |
| 2024-05-03T11 | Change Group Settings | WHO_CAN_VIEW_MEMBERSHIP for group robin.lavallee@implicitconversions.com | |
| 2024-05-03T11 | Change Group Settings | WHO_CAN_JOIN for group titledev-account-p robin.lavallee@implicitconversions.com | |
| 2024-05-03T11 | Change Group Settings | IS_ARCHIVED for group titledev-account-play robin.lavallee@implicitconversions.com | |
| 2024-05-03T11 | Change Group Settings | WHO_CAN_VIEW_GROUP for group titledev- robin.lavallee@implicitconversions.com | |
| 2024-05-03T11 | Add Group Member | User bill@implicitconversions.com created unr robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-03T11 | Add Group Member | User robin.lavallee@implicitconversions.com cre robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-03T11 | Add Group Member | User jean-andre@implicitconversions.com cre robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-03T11 | Create Group | Group titledev-account-playstation@implicitcor robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-01T20 | Password Change on Next Login | Password change requirement for cedric@imr robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-01T20 | Password Change | Password changed for cedric@implicitconvers robin.lavallee@impliciton | 68.163.40.49 |
| 2024-05-01T18 | Add Group Member | User plg@implicitconversions.com created un juanita@implicitconversio | 50.247.86.118 |
| 2024-05-01T18 | Add Group Member | User plg@implicitconversions.com created un juanita@implicitconversio | 50.247.86.118 |
| 2024-05-01T18 | User Creation | plg@implicitconversions.com created        juanita@implicitconversio | 50.247.86.118 |
| 2024-05-01T18 | User License Assignment | A license for Google Workspace product and (Google System | |

| | | |
|---|---|---|
| 2024-04-15T12 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42! robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T12 Listed Changes of an Alert | Alert center listed change ids  of alert 4798f04! robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T12 Listed Related Alerts of an Alert. | Alert center listed related alerts  of alert 4798f( robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T12 Listed Feedback of an Alert | Alert center listed feedback ids  of alert 4798f0( robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T12 Alert Center Viewed | Alert center details of alert 4798f042-b00f-469: robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T12 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42! robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-15T08 Add Group Member | User mouse@implicitconversions.com createc bill@implicitconversions.c 24.141.199.12 |
| 2024-04-15T08 Add Group Member | User mouse@implicitconversions.com createc bill@implicitconversions.c 24.141.199.12 |
| 2024-04-15T08 Alert Center Viewed | Alert center details of alert viewed              bill@implicitconversions.c 24.141.199.12 |
| 2024-04-11T19 Add Group Member | User cristian.pena@sony.com created under g robin.lavallee@implicitcon 68.163.40.49 |
| 2024-04-06T11 Add Group Member | User jean-andre@implicitconversions.com cre jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T11 Add Group Member | User alexandre@implicitconversions.com crea jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T11 Add Group Member | User todd.christensen@implicitconversions.co jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T11 Add Group Member | User jimmy@implicitconversions.com created  jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T11 Change Group Description | Description for group it@implicitconversions.cc jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T11 Change Group Settings | WHO_CAN_CONTACT_OWNER for group o jake.stine@implicitconversions.com |
| 2024-04-06T11 Change Group Settings | IS_ARCHIVED for group operations@implicitc jake.stine@implicitconversions.com |
| 2024-04-06T11 Change Group Settings | WHO_CAN_POST_MESSAGE for group oper jake.stine@implicitconversions.com |
| 2024-04-06T11 Change Group Settings | WHO_CAN_JOIN for group operations@impli jake.stine@implicitconversions.com |
| 2024-04-06T11 Add Group Member | User juanita@implicitconversions.com created jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T10 Remove Group Member | User jimmy@implicitconversions.com deleted  jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T10 Remove Group Member | User jpdesjardins@implicitconversions.com d( jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T10 Add Group Member | User jimmy@implicitconversions.com created  unc jake.stine@implicitconver: 50.247.86.113 |
| 2024-04-06T10 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42! jake.stine@implicitconver: 50.247.86.113 |
| 2024-03-27T17 Add Group Member | User bill@implicitconversions.com created unc robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-14T15 Add Group Member | User Richard.Despojado@sony.com created t robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-14T08 Delete Gmail Setting | Gmail setting DOMAIN_DEFAULT was delete robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-06T15 Add Group Member | User Justin.Burgess@sony.com created unde robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-06T15 Add Group Member | User Simon.Grainger@sony.com created undi robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T17 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T17 Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was a( robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T17 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42! robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T17 User License Revoke | A license for Google Workspace product and i Google System |
| 2024-03-05T17 Data Transfer Request Created | Data transfer request created from starcaster( robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T17 Migration Report Download Started | Migration report download started for wave 1al robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Migration Summary Report Download | Migration summary report download started fo robin.lavallee@implicitconversions.com |

| Timestamp / Event | Description | Identifier |
|---|---|---|
| 2024-03-05T17 Migration Report Download Started | Migration report download started for wave 1al | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Migration Started | Full migration started for wave 1aboqm17vmg | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Connection Verification Requested | Connection verification requested for connecti | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Authorize API Client Access | API client access to your organization from cli | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Connection Created | GOOGLE_WORKSPACE connection created. | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Migration Map Created | Migration map: migration_maps_sample.csv c | robin.lavallee@implicitconversions.com |
| 2024-03-05T17 Connection Verification Requested | Connection verification requested for connecti | robin.lavallee@implicitconversions.com |
| 2024-03-05T16 Authorize API Client Access | API client access to your organization from cli | robin.lavallee@implicitconversions.com |
| 2024-03-05T16 Connection Created | GOOGLE_WORKSPACE connection created. | robin.lavallee@implicitconversions.com |
| 2024-03-05T16 Migration Setup Started | Migration setup started for wave 1aboqm17vm | robin.lavallee@implicitconversions.com |
| 2024-03-05T16 Password Change on Next Login | Password change requirement for starcaster@ | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T16 Password Change | Password changed for starcaster@implicitcon | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T16 Remove Group Member | User starcaster@implicitconversions.com dele | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-03-05T16 User Suspension | starcaster@implicitconversions.com suspende | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Add Group Member | User biz-dev-emails-aaaamhmf6akue6iqib2we | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Add Group Member | User jake.stine@implicitconversions.com creat | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Add Group Member | User bill@implicitconversions.com created unt | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Add Group Member | User starcaster@implicitconversions.com cree | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Add Group Member | User robin.lavallee@implicitconversions.com c | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-29T10 Change Group Settings | IS_ARCHIVED for group bizdev@implicitconv | robin.lavallee@implicitconversions.com |
| 2024-02-29T10 Change Group Settings | WHO_CAN_JOIN for group bizdev@implicitc | robin.lavallee@implicitconversions.com |
| 2024-02-29T10 Create Group | Group bizdev@implicitconversions.com create | robin.lavallee@implicitconversions.com |
| 2024-02-28T13 Add Group Member | User mouse@implicitconversions.com create | juanita@implicitconversio 50.247.86.118 |
| 2024-02-26T19 User Creation | mouse@implicitconversions.com created | juanita@implicitconversio 50.247.86.118 |
| 2024-02-26T19 User License Assignment | A license for Google Workspace product and | Google System |
| 2024-02-21T16 Add Group Member | User starcaster@implicitconversions.com cree | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-21T16 User Creation | starcaster@implicitconversions.com created | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-21T16 User License Assignment | A license for Google Workspace product and | Google System |
| 2024-02-10T10 Alert Center Viewed | Alert center details of alert viewed | bill@implicitconversions.c 24.141.199.12 |
| 2024-02-10T10 Alert Center Viewed | Alert center details of alert viewed | bill@implicitconversions.c 24.141.199.12 |
| 2024-02-08T20 Add Group Member | User lucas@implicitconversions.com created i | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-06T20 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; | jake.stine@implicitconver 50.247.86.113 |
| 2024-02-02T16 Change User Address | Addresses changed for chris.mcauley@implici | juanita@implicitconversio 50.247.86.118 |
| 2024-02-01T17 Add Group Member | User robin.lavallee@implicitconversions.com r | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-01T17 Add Group Member | User jake.stine@implicitconversions.com crea | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-01T17 Add Group Member | User bill@implicitconversions.com created unc | robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-01T17 Change Group Settings | WHO_CAN_JOIN for group support@implicit | robin.lavallee@implicitconversions.com |
| 2024-02-01T17 Change Group Settings | WHO_CAN_VIEW_MEMBERSHIP for group s | robin.lavallee@implicitconversions.com |
| 2024-02-01T17 Change Group Settings | WHO_CAN_VIEW_GROUP for group support | robin.lavallee@implicitconversions.com |
| 2024-02-01T17 Change Group Settings | IS_ARCHIVED for group support@implicitcom | robin.lavallee@implicitconversions.com |

| Timestamp / Event | Description |
| --- | --- |
| 2024-02-01T17 Create Group | Group support@implicitconversions.com creat robin.lavallee@implicitcon 68.163.40.49 |
| 2024-02-01T17 Nickname Deletion | support@implicitconversions.com deleted as robin.lavallee@implicitcon 68.163.40.49 |
| 2024-01-30T10 Add Group Member | User jimmy@implicitconversions.com created robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-29T08 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: jake.stine@implicitconver: 50.247.86.113 |
| 2024-01-27T03 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42: jake.stine@implicitconver: 50.247.86.113 |
| 2024-01-25T09 Add Group Member | User jimmy@implicitconversions.com created robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-17T13 Add Group Member | User David.Fernandez@sony.com created un robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Remove Group Member | User chris.mcauley@implicitconversions.com robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Remove Group Member | User drew@implicitconversions.com deleted fr robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Remove Group Member | User bill@implicitconversions.com deleted fror robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Remove Group Member | User dave@implicitconversions.com deleted fro robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Add Group Member | User chris.mcauley@implicitconversions.com robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Add Group Member | User bill@implicitconversions.com created un robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-12T10 Add Group Member | User drew@implicitconversions.com created u robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-11T14 User Creation | vincent.caruso@implicitconversions.com creal juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T14 User License Assignment | A license for Google Workspace product and Google System |
| 2024-01-11T13 Email Log Search | An email log search is performed for logs from juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T13 Email Log Search | An email log search is performed for logs from juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T13 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T13 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T13 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; juanita@implicitconversio 50.247.86.118 |
| 2024-01-11T12 Change Group Settings | WHO_CAN_MODERATE_MEMBERS for gro juanita@implicitconversions.com |
| 2024-01-08T17 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; jake.stine@implicitconver: 50.247.86.113 |
| 2024-01-08T17 Add Group Member | User admoreservices09@gmail.com created c robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T15 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T15 Alert Center Viewed | Alert center details of alert 0ca86b7b-515c-42; jake.stine@implicitconver: 50.247.86.113 |
| 2024-01-03T14 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T14 Change Gmail Setting | Gmail setting DOMAIN_DEFAULT was modifi robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T14 Create Gmail Setting | New gmail setting DOMAIN_DEFAULT was ac robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T13 User Deletion | eli@implicitconversions.com deleted robin.lavallee@implicitconversions.com |
| 2024-01-03T13 User License Revoke | A license for Google Workspace product and Google System |
| 2024-01-03T13 Data Transfer Request Created | Data transfer request created from eli@implici robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T13 User Suspension | eli@implicitconversions.com suspended robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T10 User Unsuspension | eli@implicitconversions.com unsuspended robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T10 Password Change on Next Login | Password change requirement for eli@implicit robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T10 Password Change | Password changed for eli@implicitconversions robin.lavallee@implicitcon 100.11.99.77 |
| 2024-01-03T09 User License Revoke | A license for Google Workspace product and Google System |
| 2024-01-03T09 User Deletion | pallaire@implicitconversions.com deleted bill@implicitconversions.c 24.141.199.12 |
| 2024-01-03T09 User Suspension | eli@implicitconversions.com suspended bill@implicitconversions.c 24.141.199.12 |
| 2024-01-03T08 Alert Center Viewed | Alert center details of alert viewed bill@implicitconversions.c 24.141.199.12 |

| 2024-01-02T22 Add Group Member | User dave@implicitconversions.com created ι juanita@implicitconversioi 50.247.86.118 |
| 2024-01-02T22 Add Group Member | User dave@implicitconversions.com created ι juanita@implicitconversioi 50.247.86.118 |
| 2023-12-22T16 Add Group Member | User lucas@implicitconversions.com created ι juanita@implicitconversioi 50.247.86.118 |
| 2023-12-21T20 User Creation | lucas@implicitconversions.com created    juanita@implicitconversioi 50.247.86.118 |
| 2023-12-21T20 User License Assignment | A license for Google Workspace product and ( Google System |

# Exhibit M

| Date | Takeout job ID | Event | Description | Actor | Target | Takeout initiato |
|---|---|---|---|---|---|---|
| 2024-06-17T21:42:39-04:0C | 8b30d55d-87df | User completed a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | USER |
| 2024-06-17T21:38:23-04:0C | d9361b8d-6b3f | User downloaded a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | |
| 2024-06-17T21:38:22-04:0C | d9361b8d-6b3f | User downloaded a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | |
| 2024-06-17T21:38:20-04:0C | d9361b8d-6b3f | User downloaded a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | |
| 2024-06-17T21:38:15-04:0C | d9361b8d-6b3f | User downloaded a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | |
| 2024-06-17T21:36:56-04:0C | d9361b8d-6b3f | User completed a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | USER |
| 2024-06-17T20:14:05-04:0C | d9361b8d-6b3f | User initiated a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | USER |
| 2024-06-17T20:14:05-04:0C | 8b30d55d-87df | User initiated a Takeout | | Robin Lavallée | robin.lavallee@ | robin.lavallee@ | USER |
| 2024-06-16T22:27:13-04:0C | e990036f-eecd | User downloaded a Takeout | | jake.stine@imp | jake.stine@imp | jake.stine@imp | |
| 2024-06-16T22:10:49-04:0C | e990036f-eecd | User completed a Takeout | | jake.stine@imp | jake.stine@imp | jake.stine@imp | USER |
| 2024-06-16T22:00:52-04:0C | cea93c25-d247 | User completed a Takeout | | jake.stine@imp | jake.stine@imp | jake.stine@imp | USER |
| 2024-06-16T21:26:17-04:0C | cea93c25-d247 | User initiated a Takeout | | jake.stine@imp | jake.stine@imp | jake.stine@imp | USER |
| 2024-06-16T21:26:17-04:0C | e990036f-eecd | User initiated a Takeout | | jake.stine@imp | jake.stine@imp | jake.stine@imp | USER |
| 2024-06-12T11:55:21-04:0C | 930fccd2-9f7b- | User downloaded a Takeout | | Sadie Bayless : | sadie@implicit: | sadie@implicit: | |
| 2024-06-12T11:54:24-04:0C | 48bcb319-60cb | User completed a Takeout | | Sadie Bayless : | sadie@implicit: | sadie@implicit: | USER |
| 2024-06-12T11:54:10-04:0C | 930fccd2-9f7b- | User completed a Takeout | | Sadie Bayless : | sadie@implicit: | sadie@implicit: | USER |
| 2024-06-12T11:54:07-04:0C | 48bcb319-60cb | User initiated a Takeout | | Sadie Bayless : | sadie@implicit: | sadie@implicit: | USER |
| 2024-06-12T11:54:07-04:0C | 930fccd2-9f7b- | User initiated a Takeout | | Sadie Bayless : | sadie@implicit: | sadie@implicit: | USER |

| Products reque | Takeout destin | Scheduled Tak | Scheduled Tak | Scheduled Tak | Takeout status | IP address |
|---|---|---|---|---|---|---|
| checkin, arts_a | Email | Unknown | | 0 | completed | 68.163.40.49 |
| checkin, arts_a | Unknown | Unknown | | 0 | Unknown | 68.163.40.49 |
| checkin, arts_a | Unknown | Unknown | | 0 | Unknown | 68.163.40.49 |
| checkin, arts_a | Unknown | Unknown | | 0 | Unknown | 68.163.40.49 |
| checkin, arts_a | Unknown | Unknown | | 0 | Unknown | 68.163.40.49 |
| checkin, arts_a | Email | Unknown | | 0 | completed | 68.163.40.49 |
| checkin, arts_a | Email | Unknown | | 0 | Unknown | 68.163.40.49 |
| checkin, arts_a | Email | Unknown | | 0 | Unknown | 68.163.40.49 |
| gmail | Unknown | Unknown | | 0 | Unknown | 50.247.86.113 |
| gmail | Email | Unknown | | 0 | completed | 50.247.86.113 |
| gmail | Email | Unknown | | 0 | completed | 50.247.86.113 |
| gmail | Email | Unknown | | 0 | Unknown | 50.247.86.113 |
| gmail | Email | Unknown | | 0 | Unknown | 50.247.86.113 |
| drive | Unknown | Unknown | | 0 | Unknown | 69.172.151.38 |
| drive | Email | Unknown | | 0 | completed | 69.172.151.38 |
| drive | Email | Unknown | | 0 | completed | 69.172.151.38 |
| drive | Email | Unknown | | 0 | Unknown | 69.172.151.38 |
| drive | Email | Unknown | | 0 | Unknown | 69.172.151.38 |

# Exhibit N


**Implicit Conversions**

June 17, 2024

VIA Registered Mail

Jacob Stine

Notice of Exercise of Repurchase Option

Dear Jacob,

Following the termination of your employment relationship with Implicit Conversions, Inc., a Delaware corporation (the "Company"), as of June 14, 2024, your 4,250,000 shares of Common Stock of the Company ceased to vest in accordance with Section 3(b) of your Common Stock Purchase Agreement dated January 26, 2023 (the "Purchase Agreement").

This letter serves to inform you that, pursuant to the terms of the Purchase Agreement, the Company is hereby exercising its right to repurchase from you 2,656,250 shares of unvested Common Stock of the Company. Please find enclosed a check in the amount of $26.57, the original purchase price for the repurchased unvested shares. Upon receipt of the check, all 2,656,250 shares of your Common Stock of the Company shall be deemed repurchased, pursuant to procedures specified in Section 3(c) of the Purchase Agreement and the Company shall transfer such shares to its own name. You shall continue to own 1,593,750 shares, which shall be deemed fully-vested.

If you have any questions, please contact me directly.

Sincerely,

Robin Lavallee
Chief Executive Officer

Acknowledged and Agreed:

_____

Jacob Stine

Dated: _____

Exhibit O

## IMPLICIT CONVERSIONS, INC.
### RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
### STOCKHOLDERS IN LIEU OF SPECIAL MEETING

The undersigned, being holders of a majority of the outstanding capital stock of Implicit Conversions, Inc., a Delaware corporation (the "**Company**"), pursuant to the provisions of Section 228 of the Delaware General Corporation Law and the Bylaws of the Company, do hereby consent that the following recitals and resolutions shall be deemed to be adopted to the same extent and to have the same force and effect as if such recitals and resolutions were adopted by the vote of the holders of the outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a special meeting of the stockholders of the Company duly called and held for the purposes of acting upon proposals to adopt such recitals and resolutions (the "**Requisite Vote**"), including, at least a majority of the Company's outstanding Common Stock, par value $0.00001 per share.

### REMOVAL FROM BOARD OF DIRECTORS

**WHEREAS**, the board of directors of the Company (the "**Board**") currently consists of two members, Robin Lavallee and Jacob Stine; and

**WHEREAS**, pursuant to Section 3.13 of the Bylaws of the Company, the stockholders constituting the Requisite Vote desire to remove Jacob Stine from the Board.

**IT IS THEREFORE RESOLVED AS FOLLOWS,** that Stockholders constituting the Requisite Vote hereby ratify and approve the removal of Jacob Stine as a director on the Board; and

**IT IS FURTHER RESOLVED**, that all acts and actions taken by the Company, or any officer, director, employee, agent or attorney of, or acting on behalf of, the Company, prior to the date hereof with respect to the foregoing resolutions prior to, on or after the date hereof, be, and hereby are, in all respects confirmed, approved, and ratified

This written consent may be executed in counterparts either manually or electronically, each of which shall constitute an original and all of which together shall constitute one instrument, to be effective upon the receipt of signatures from stockholders constituting the Requisite Vote. A copy of this written consent that is executed and delivered by e-mail or other electronic transmission shall constitute an original, executed written consent.

**STOCKHOLDERS:**

Dated: ___06/17/2024___        _____

Robin Lavallee

Dated: _____        _____

# Exhibit P

| **From:** | Robin Lavallee |
| **To:** | Jake Stine |
| **Cc:** | Robin Lavallée |
| **Subject:** | Immediate Return of all physical and digital Company Property in your Possession |
| **Date:** | Tuesday, June 18, 2024 3:36:11 PM |

Hi Jake,

Following the termination of your employment from Implicit Conversions, the Company requires the immediate return of all physical and digital Company property in your possession, custody or control.  The Company will be sending a messenger to your home (which also served as a Company data center) between 10-12 tomorrow morning to retrieve all physical assets of the Company, including:  1) the computer "Reynard" along with all peripherals and components; 2) one Nintendo Switch SDEV Development kit; 3) any devices containing Company digital data; 4) the following Playstation Development Kits, along with all components, original boxes and cables:  037675, PS5 DevKit; 0210926, PS4 DevKit; 373062, PS5TestKit; and 5) any other Company hardware in your possession.

Please confirm that you will have all of these materials assembled and ready for messenger pickup.

Thank you.
Robin

Exhibit Q

| | |
|---|---|
| **From:** | Robin Lavallee |
| **To:** | Jake Stine |
| **Cc:** | Robin Lavallée; Dhaivat Shah; David Siegel; Mital Makadia; Noah Downs |
| **Subject:** | Re: Immediate Return of all physical and digital Company Property in your Possession |
| **Date:** | Tuesday, June 18, 2024 4:59:36 PM |

Dear Jake,

In furtherance of obtaining a return of company property, please confirm that you will have all items properly and securely packed for travel by Noon tomorrow.  In particular, the Reynard computer system must be carefully packed and all peripherals that may be damaged in transit, such as its video card, must be removed.  Alternatively, if you wish to ship these materials to the company yourself, please confirm that you will have them shipped by Thursday morning. The company will, of course, reimburse you for any costs of shipment.  Please respond by 9 pm tonight as to which option you choose.  If we do not hear from you by then, we will have no choice but to assume that you will not permit a pickup tomorrow and will not voluntarily ship this company property back.  Thank you.

Robin

Le mar. 18 juin 2024, à 18 h 35, Robin Lavallee <robin@guibec.com> a écrit :

> Hi Jake,
>
> Following the termination of your employment from Implicit Conversions, the Company requires the immediate return of all physical and digital Company property in your possession, custody or control.  The Company will be sending a messenger to your home (which also served as a Company data center) between 10-12 tomorrow morning to retrieve all physical assets of the Company, including:  1) the computer "Reynard" along with all peripherals and components; 2) one Nintendo Switch SDEV Development kit; 3) any devices containing Company digital data; 4) the following Playstation Development Kits, along with all components, original boxes and cables:  037675, PS5 DevKit; 0210926, PS4 DevKit; 373062, PS5TestKit; and 5) any other Company hardware in your possession.
>
> Please confirm that you will have all of these materials assembled and ready for messenger pickup.
>
> Thank you.
> Robin

# Exhibit R

**WRITTEN CONSENT**
**OF THE MAJORITY STOCKHOLDERS OF**
**IMPLICIT CONVERSIONS, INC.,**
**a Delaware corporation**

The undersigned, being the majority stockholders (the **"Majority Stockholders"**) of all issued and outstanding capital stock of Implicit Conversions, Inc., a Delaware corporation (the **"Company"**), pursuant to Section 228 of the Delaware General Corporation Law, hereby adopts the following resolution by their written consent thereto, effective June 19, 2024, having the same force and effect as if adopted at a special meeting of the Majority Stockholders duly called and held on such date.

**REMOVAL FROM BOARD OF DIRECTORS**

**WHEREAS**, the board of directors of the Company (the **"Board"**) currently consists of two members, Jacob Stine and Robin Lavallee; and

**WHEREAS**, pursuant to Section 228 of the Delaware General Corporation Law, the Majority Stockholders of the Company wish to remove Robin Lavallee from the Board; be it therefore

**RESOLVED**, that the removal of Robin Lavallee from the Board is hereby approved by the Majority Stockholders.

**ELECTION OF DIRECTORS**

**WHEREAS**, the Majority Stockholders desire to elect new members of the Company's Board; and

**WHEREAS**, upon motion duly made by the Majority Stockholders, the following individuals were nominated and all votes were cast in equal amounts for their election to the Board:

Sayed Mahmood Alawi

Juanita Traver Stine

**RESOLVED**, that Sayed Mahmood Alawi and Juanita Traver Stine are hereby elected as members of the Board to serve until they resign, are removed from the Board or are otherwise disqualified from serving as members of the Board.

**RESOLVED FURTHER**, that this written consent may be executed by facsimile signature, signature on an electronic image (such as .pdf or .jpg format) or electronic signature and shall be deemed an original.

**IN WITNESS WHEREOF**, the undersigned has executed this written consent as of the date first written above.

MAJORITY STOCKHOLDERS OF IMPLICIT CONVERSIONS, INC., A DELAWARE CORPORATION

_____
Jacob Stine

_____
Sayed Mahmood Alawi

# Exhibit S

**UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**IMPLICIT CONVERSIONS, INC.,**
**a Delaware corporation**

_____

The undersigned, being all of the Directors of Implicit Conversions, Inc., a Delaware corporation (the **"Company"**), pursuant to Section 141 of the Delaware General Corporation Law, hereby waive the calling and convening of a meeting and consent to the adoption of the following recitals and resolutions effective as of June 20, 2024:

**REMOVAL OF OFFICER**

**WHEREAS**, the office of Chief Executive Officer (the **"CEO"**) is currently held by Robin Lavallee; and

**WHEREAS**, pursuant to Section 141 of the Delaware General Corporation Law, the Directors of the Company wish to remove Robin Lavallee as CEO and place Robin Lavallee on administrative leave pending further investigation; be it therefore

**RESOLVED**, that the Directors of the Company hereby approve the removal of Robin Lavallee from the position of CEO and authorize placing Robin Lavallee on paid administrative leave pending further determination.

**RESOLVED**, that Jacob Stine is hereby appointed interim CEO, until such time as the Board appoints a new CEO or he resigns.

**RESOLVED FURTHER**, that this written consent may be executed by facsimile signature, signature on an electronic image (such as .pdf or .jpg format) or electronic signature, and shall be deemed an original.

**IN WITNESS WHEREOF**, the undersigned have executed this written consent as of the date first written above.

BOARD OF DIRECTORS OF IMPLICIT
CONVERSIONS, INC., A DELAWARE
CORPORATION

_____
Sayed Mahmood Alawi

_____
Jacob Stine

_____
Juanita Traver Stine

# Exhibit T

---------- Forwarded message ---------
De : **Bill Litshauer** <bill.litshauer@gmail.com>
Date: jeu. 20 juin 2024, à 12 h 06
Subject: Email i got
To: Robin Lavallee <robin@guibec.com>


Bill,


Please see below and attached.  Robin has also been removed from his CEO position and placed on administrative leave.  The Company's management requires your cooperation with the request below.  To the extent you have the information indicated, please provide it to Jake.


Regards,


Jackie M. Ford, Esq.
STRUCTURE LAW GROUP, LLP
408-441-7500


---

**From:** Jackie Ford
**Sent:** Thursday, June 20, 2024 8:04 AM
**To:** robin@implicitconversions.com; robin@guibec.com
**Cc:** Noah Downs <noah@premackrogers.com>; Titania Jackson <titania@premackrogers.com>; Jake Stine <jake.stine@gmail.com>; Juanita Traver Stine <jtraver6@yahoo.com>; m.a.hot.m@gmail.com; Karen Rothschild <krothschild@structurelaw.com>
**Subject:** Unanimous Board of Directors Consent // Implicit Conversions, Inc.


Robin,

Please see attached.  The Board of Directors of Implicit Conversions, Inc. has removed you from your CEO position.  You still remain an employee of Implicit Conversions, Inc., and are on paid administrative leave until further notice.  Jake Stine is interim CEO.

Please immediately provide Jake with the following:

**Technology/SaaS**

Github Enterprise
Google Workspace
Slack
Amazon Web Services (AWS)
Linear
Dropbox Sign
Notion
1password

PS4 Devnet ([ps4.siedev.net](ps4.siedev.net))

PS5 Devnet ([ps5.siedev.net](ps5.siedev.net))

**Financial / HR**

Chase Bank
Royal Bank of Canada (US and CAD accounts)
Carta
Rippling
QuickBooks
Guideline
Peoplekeep
Manulife
Wise (aka TransferWise)
Gusto
WaveApps

**Social Community**

Discord
X/Twitter
Instagram
YouTube
Facebook
LinkedIn

Should we not receive the above by noon PDT today or at least hear from you by then, we will assume that you do not intend to cooperate and will proceed accordingly, including by exercising legal rights as necessary.

Regards,

Jackie M. Ford, Esq.
STRUCTURE LAW GROUP, LLP
1754 Technology Drive, Suite 135
San Jose, CA  95110
408-441-7500
jford@structurelaw.com

This E-mail is an electronic communication under the Electronic Communications Privacy Act, 18 USC 2510, and its disclosure is strictly limited to the intended recipient.  This E-mail may contain confidential and privileged material for the sole use of the intended recipient and receipt by anyone other than then the intended recipient does not constitute a loss of the confidential or privileged nature of the communication.   Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender by return electronic mail and delete all copies of this communication.