1   Jackie M. Ford, Esq. (SBN: 272641)
    jford@structurelaw.com
2   Karen F. Rothschild, Esq. (SBN: 346949)
    krothschild@structurelaw.com
3   STRUCTURE LAW GROUP, LLP
    1754 Technology Drive, Suite 135
4   San Jose, California 95110
    Telephone: (408) 441-7500
5   Facsimile: (408) 441-7501

6
    Attorneys for Defendants
7   JACOB STINE and JUANITA TRAVER STINE

8

9                   UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11
    IMPLICIT CONVERSIONS, INC., a          Case No. 3:24-cv-03744-JCS
12  Delaware Corporation,

13                  Plaintiff,              **DEFENDANTS JACOB STINE AND
                                            JUANITA TRAVER STINE'S
14          v.                              OPPOSITION TO PLAINTIFF'S MOTION
                                            FOR TEMPORARY RESTRAINING
15  JACOB STINE, an individual, JUANITA     ORDER**
    TRAVER STINE, an individual, SAYED
16  MAHMOOD ALAWI, an individual, and       Date:    August 7, 2024
    DOES 1-10, inclusive,                   Time:    2:00 p.m.
17                                          Judge:   Hon. William H. Orrick
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  STATEMENT OF ISSUES .................................................................................1

    A.  Whether Implicit Can Establish A Likelihood Of Success On The Merits In Light Of Lavallee's Removal From The Board Of Directors And His CEO Position ...........................................................................................1

    B.  Even If Lavallee Is The Rightful CEO Of Implicit, Which Is Disputed By The Stines, Whether Implicit Can Succeed On The Merits of Its Claims ..........................1

    C.  Whether The Proposed Preliminary Injunction Is Too Vague And Ambiguous To Grant, Thus Tipping The Balance Of Hardships, And Any Bonding Requirement, In The Stines' Favor .................................................2

    D.  Whether Implicit Can Demonstrate Irreparable Harm Should The Preliminary Injunction Not Issue ................................................................2

    E.  Whether Or Not Any Public Interests Are Implicated .................................2

III.  FACTS ...............................................................................................................2

    A.  Implicit Is Founded As A Equal Enterprise Between Stine And Lavallee .........................2

    B.  Stine Exhibits Behaviors Indicating He Is On The Autism Spectrum ..............................4

    C.  Implicit's Lack Of Corporate Documentation ................................................5

    D.  Lavallee Purports To Terminate Stine During His Medical Leave ..................................6

    E.  Stine Gains The Support Of A Majority Of Implicit Stockholders .................................6

IV.  LEGAL AUTHORITY AND ANALYSIS ........................................................7

    A.  Legal Standard on Emergency Injunctive Relief ..................................................7

    B.  Implicit is Unlikely to Prevail on the Merits ....................................................8

        1.  Even If The Stines Were Not Entitled To Access Implicit's Confidential Information At All Times, The Issue Is Now Moot In Light Of The Stockholder Consent Effective June 19, 2024 .......................................8

        2.  Stine Was Entitled to Access Implicit's Information at All Times, Negating Implicit's Arguments Under DTSA, CUTSA, CFAA, and Penal Code § 502 ..........................9

    C.  There Was No "Misappropriation" Under the DTSA or CUTSA as the Stines were Authorized to have all Implicit Information ...............................................10

    D.  Stine Did Not Sign the CIIAA – It Merely Has His Name Typed On The Signature Line ...........................................................................11

- i -

E.  The Balance Of Hardships Does Not Favor Implct As The Request Is
    Vague And Ambiguous ..................................................................................................12

F.  No Harm Will Befall Implicit – It Is In the Stines' Best Interests That
    Implicit Succeed ..........................................................................................................14

G.  Public Interest Rights Dictate That Ownership Rights Be Respected .............................15

V.  CONCLUSION .......................................................................................................................15

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

## TABLE OF AUTHORITIES

**Cases**

*DISH Network L.L.C. v. Ramirez*, Case No. 15-CV-04712-BLF,
    2016 WL 3092184 (N.D. Cal. June 2, 2016) ........................................................13

*Farrell v. Danielson,* 296 F.2d 39 (9th Cir. 1961) .........................................................12

*InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653 (9th Cir. 2020) ..............11

*Lamont v. Conner*, Case No. 5:18-cv-04327-EJD,
    2019 WL 1369928 (N.D. Cal. Mar. 26, 2019)..........................................................10

*Reno Air Racing Ass'n., Inc. v. McCord,* 452 F.3d 1126 (9th Cir. 2006 ........................8

*Scott v. Schedler*, 826 F.3d 207 (5th Cir.2016) ...............................................................8

*VLIW Tech, LLC v. Hewlett-Packard Co.,* 840 A.2d 606 (Del. 2003)............................11

*Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008) ..........................8


**Statutes**

18 USC § 1839(5)(A) .......................................................................................................10

18 USC § 1839(5)(B) .......................................................................................................10

42 USC § 1981(a)..............................................................................................................15

Delaware General Corporation Law § 220(d) ....................................................................9

Federal Rules of Civil Procedure, Rule 65(d) ...............................................................2, 8

Penal Code § 502................................................................................................................9

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

## I.    INTRODUCTION

At its heart, this case is an ownership dispute between Robin Lavallee ("Lavallee") and Defendant Jacob Stine ("Stine"), who co-founded Implicit with the intention that each would have equal ownership in the enterprise as between the two of them. That is until Lavallee, in an attempt to take control of Implicit for himself, purported to terminate Stine's employment while he was on medical leave and unseat him from Implicit's board of directors.

However, Stine was able to secure the consent of a majority of the stockholders to remove Lavallee from both his position on the board and as CEO. After this stockholder consent was reached on June 19, 2024, Lavallee and Implicit purported to tender payment to Stine to repurchase his unvested stock. But Lavallee was too late, and Stine is and remains a board member of Implicit, along with Juanita Traver Stine ("Traver Stine"), (collectively, the "Stines") and Sayed Mahmood Alawi ("Alawi"), who should be rightfully in control of Implicit.

The Stines implore this Court to read between the lines as to what is happening and recognize this dispute for what it is: Lavallee's drastic attempt to take control of Implicit to the detriment of Stine and a majority of stockholders.

## II.    STATEMENT OF ISSUES

### A.    Whether Implicit Can Establish A Likelihood Of Success On The Merits In Light Of Lavallee's Removal From The Board Of Directors And His CEO Position

The Stines contend that Lavallee is not on Implicit's board, is not the rightful CEO, and that Stine is the rightful CEO. Therefore, Implicit cannot establish a likelihood of success on the merits, as Stine is properly at the helm of Implicit.

### B.    Even If Lavallee Is The Rightful CEO Of Implicit, Which Is Disputed By The Stines, Whether Implicit Can Succeed On The Merits of Its Claims

There is no legitimate dispute that Stine was on Implicit's board of directors and was a significant stockholder at the time any allegedly unauthorized access took place. He was also the acting CTO of Implicit with a deep working knowledge of Implicit's technology and inner workings. Thus, whether he gained access or was given access to any Implicit computer system is of no consequence.

- 1 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**C. Whether The Proposed Preliminary Injunction Is Too Vague And Ambiguous To Grant, Thus Tipping The Balance Of Hardships, And Any Bonding Requirement, In The Stines' Favor**

An order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not be referring to the complaint or other document – the act or acts restrained or required." (FRCP, Rule 65(d).) The notice and proposed order provided by Implicit fails meet these requirements. Thus, the balance of hardships, and any bonding requirement, tips in the Stines' favor as there is a lack of clarity as to what they either are or are not supposed to do.

**D. Whether Implicit Can Demonstrate Irreparable Harm Should The Preliminary Injunction Not Issue**

Implicit cannot demonstrate any irreparable harm. As Stine is the rightful CEO, former CTO, a board member, and significant stockholder of Implicit, there is no harm to Implicit should the preliminary injunction not issue.

**E. Whether Or Not Any Public Interests Are Implicated**

The public interest rights implicated favor the Stines – the public has an interest in seeing that corporate formalities and the will of the stockholders be respected in accordance with the right to contract.

### III.    FACTS

**A. Implicit Is Founded As A Equal Enterprise Between Stine And Lavallee**

Lavallee and Stine co-founded Implicit Conversions, LLC in 2019 as 50/50 members, to emulate and produce classic/retro video games from obsolete consoles for play by individuals today. Declaration of Jacob Stine ("Stine Decl."), ¶2. Implicit Conversions, Inc. ("Implicit" or the "Company") was incorporated in 2022 in Delaware. The two companies were merged in March 2023, with the corporation being the surviving entity. *Id. ¶4.* Stine and Lavallee both signed an "Agreement of Merger" effective March 1, 2023 which specified that:

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

5. <u>Bylaws, Directors and Officers</u>. From and after the Effective Time until amended as provided by law, the Bylaws, as amended, of the Corporation shall be the Bylaws of the Surviving Corporation, and the directors and officers of the Corporation in office immediately prior to the Effective Time shall become the directors and officers of the Surviving Corporation as of the Effective Time.

The LLC never had any "bylaws," but it did have an Operating Agreement dated December 6, 2019 which was signed by both Lavallee and Stine as "members." *Id. ¶5.* It provided, in relevant parts:

35. **Management**

36. Management of this Company is vested in the Members.

41. **Duty to Devote Time**

42. Each Member will devote such time and attention to the business of the
Company as the majority of the Members will from time to time reasonably
determine for the conduct of the Company's business.

Upon the formation of Implicit (the corporation), Lavallee and Stine decided that they would be the only two members of its board of directors. *Id. ¶7.* The Company did not ever implement bylaws and never implemented a formal stock plan. (See, e.g., Ex. A to Lavallee Decl. – unsigned stock plan.)

Being a small family-friendly business, Lavallee and Stine both invited their respective wives to join the company. Isabelle Gagnon ("Gagnon"), Lavallee's wife, joined the Company as its Communications Advisor. *Stine Decl., ¶9.* Traver Stine, Stine's wife, joined the Company primarily as the Payroll Administrator and later expanded her role as a Human Resources Generalist. *Id.*

The Stines' home address was the principal address of the Company. Their home address, and personal PO Box, were listed on corporate filings, the Company's website, and were used to receive and send official Company correspondence. Stine's home hosted the individual personal computer Reynard that Implicit used to act as a server. *Id. ¶11.*

While it was decided that Stine would take on the title of CTO and Lavallee would take on the title of CEO, neither one placed much value in these titles and they intended that their relationship be one of equal partners, at least with respect to each other:

- 3 -

2022-04-28 16:49:55 -07:00   Robin: How much do you care about titles? I think we need to set things up. Would you be ok if I said I want to be the acting CEO while I assume, you would be the CTO? We are still 50%/50%. I just think it kind of makes sense since I've been driving a bit more on the administration side, VC/investing and general roadmap and ideas. Bookkeeping, finance. Recruiting. I am also the "people" person. Pushing on Canadian subsidies as well, website, etc. But I understand you are the one that came up originally with the Implicit Conversions idea. In practice, it doesn't change much. I am not your boss. You are not my boss. It just gives better split of responsibility for the people that we hire. They know who to look up to when they have questions, and that also means that you get to decide for tech questions. So let me know if that works or if that is a deal breaker.
2022-04-28 17:07:08 -07:00   Jake: nah I don't care.

Thus, Lavallee was not Stine's "boss," and the two of them were 50/50 with respect to their relative ownership stakes in Implicit. *Id. ¶12.*

Between 2022 and 2024, Implicit grew into a successful company, largely due to Stine's efforts. As the most technologically savvy member of the team with his computer engineering background, Stine was responsible for "producing" the services the Company provides – the very heart of the business. *Id. ¶13.*

**B.  Stine Exhibits Behaviors Indicating He Is On The Autism Spectrum**

Stine is an individual who Implicit has identified as being on the autism spectrum. Declaration of Juanita Traver Stine ("Traver Stine Decl."), ¶5. People with autism sometimes have challenges with understanding others' perspectives, which can lead to them saying things that might be considered inappropriate at times[1]. Stine was no different. He often shared his frustrations about co-workers with his close friend, Lavallee, using very direct language. *Stine Decl., ¶14.* Stine and Lavallee had an agreement that they could both express these frustrations with each other in a safe and private way. *Id.* Messages were not shared with any other co-workers by Stine, and nowhere in Lavallee's declaration does he identify any persons other than Lavallee to whom Stine made such comments.

On Friday, May 10, 2024, Stine unfortunately suffered a medical emergency that required immediate medical attention and resulted in him being placed on a medically advised leave of absence from work. *Id. ¶16.* In fact, Lavallee messaged Traver Stine on May 13, 2024 that: "Jake has always been writing stuff like that on Slack (self harm, harm to others), in my private messages and I've learned to ignore it; I shouldn't have." *Traver Stine Decl., ¶4.*

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6269388/

- 4 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

1    Lavallee and his wife, who have family members with autism, understood and

2    acknowledged that Stine's colorful language was a product of his likely being on the autism

3    spectrum. As an example, on May 16, 2024, Juanita Traver Stine, in her capacity as Implicit's

4    head of HR, conversed with Lavallee's wife and Implicit's Communications Advisor, Gagnon,

5    about Stine's medical leave and her concerns that Implicit needed to work with Stine to provide

6    reasonable medical accommodations for him. Gagnon wrote to Traver Stine:

7
> I'm the first one to know and take autism into consideration. I've been guiding Robin a lot over the last year about how to interact with … it's a sensitive topic. I know that a big part about this conflict is directly related to Jake's autism. It hurts me to know that it's difficult for Jake; I can see my [family members] in him …"

8

9
(First ellipses in original.) *Id. ¶5.*

10    **C. Implicit's Lack Of Corporate Documentation**

11    While he was on leave, Stine noticed that a new folder appeared in a shared Implicit drive

12    on or about May 29, 2024. There were new documents in this folder, which included unsigned

13    bylaws, stock purchase agreements for both Lavallee and Jacob Stine (See, e.g. Ex. B to Lavallee

14    Decl.) a Confidential Information and Invention Assignment Agreement ("CIIAA") for both

15    Lavallee and Jacob Stine, and an "Action By Unanimous Written Consent of the Board of

16    Directors" which named Lavallee as President, CEO, and Secretary (but not noting any positions

17    for Jacob Stine). *Stine Decl., ¶17.* With the exception of the bylaws, which were unsigned, the

18    documents all contained both Lavallee and Jacob Stine's typed signatures in the same script font.

19    Historically, corporate documentation was severely lacking at Implicit. Implicit never

20    implemented bylaws. There had never been any documents governing the stock issued (with the

21    exception of stock certificates), or any formal board actions. Stine thought the new documents

22    must have been drafts. *Id. ¶18.* Implicit's practice had always been to use a program such as

23    DocuSign or Drop Box Sign, or to wet sign official documents. *Id.* It was neither Implicit's nor

24    Stine's practice to simply type a signature on a document. Stine has no memory of ever signing

25    these documents or seeing his typed signature placed on such documents. *Id. ¶17.* Stine later

26    learned that Implicit had been invoiced by its attorneys for a "corporate governance cleanup"

27    entry dated May 24, 2024. *Id. ¶19.*

28

- 5 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**D. Lavallee Purports To Terminate Stine During His Medical Leave**

Instead of supporting Stine during his medical crisis, Lavallee sent him a letter on May 28, 2024, while he was on leave, that said "[p]lease reply no later than May 31, 2024 with your resignation notification and intent to transition from the company." *Id. ¶20.* On June 7th, Stine's counsel informed Lavallee that Stine remained on medical leave and they would be responding to his letter shortly. At that time, a call was scheduled between Stine's counsel and Implicit's counsel (not the counsel handing the current lawsuit) to discuss Stine's leave and Lavallee's request that he resign. *Id. ¶22.* However, before the scheduled phone call took place, Lavallee purported to "terminate" Stine's employment on June 14, 2024. *Id. ¶23.* There was no mention of Stine's role as a director. Later, on June 24, 2024, Lavallee sent Traver Stine a letter indicating that she was being terminated. *Traver Stine Decl., ¶6.*

**E. Stine Gains The Support Of A Majority Of Implicit Stockholders**

At the time of Stine's alleged termination, he owned 4,250,000 shares of Implicit stock. Lavallee also owned 4,250,000 shares of Implicit stock. *Stine Decl., ¶24.* When on June 14, 2024, Jacob Stine received the letter of termination of his employment (which had been DocuSigned by Lavallee), he was shocked. *Id. ¶23.* He did gain access to his email for a brief few days, as he was worried about Implicit's future.

Effective June 19, 2024, having secured a majority of the stockholders of Implicit (Stine with his 4,250,000 shares and Alawi with 250,000 shares)[2], Stine and Alawi signed a stockholder consent removing Lavallee from the Board of Directors and appointing Alawi and Traver Stine as Directors in addition to Stine. *Id. ¶25.* They then executed a Board Consent removing Lavallee as CEO effective June 20, 2024.

While Implicit contends it repurchased Stine's unvested stock *before* Stine and Alawi's stockholder consent, this cannot be true. Lavallee's declaration points out that "[o]n June 17, 2024, Implicit sent to Jacob Stine via FedEx for overnight delivery a Notice of Exercise of Repurchase

---

[2] In addition to Lavallee, Stine, and Alawi's stock, there was an additional 2,207 shares issued to other Implicit employees.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Option with a copy sent via email. Through this letter, Implicit repurchased Jacob Stine's 2,656,250 unvested common shares of Implicit stock." *Lavallee Decl., ¶36.* What Lavallee does not mention is that while Implicit may have *sent* the letter via FedEx on June 17, 2024, it is not clear when it was delivered. It was sent to the Stines' PO box address. However, FedEx cannot deliver overnight shipments to PO boxes.[3] The package was not deliverable. It was not until sometime *after* Stine and Alawi reached the stockholder consent that the FedEx package eventually reached the Stines' home address. This is significant because the Stock Purchase Agreement promoted by Implicit states that Implicit satisfies its obligation to purchase Stine's shares "by *delivering* a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased." (Lavallee Decl., ex. B at sec. 3(b)(ii), emphasis added.) The correspondence that was delivered indicated that it was re-sent on June 18th, and did not reach Stine until *after* the stockholder consent was effective.

Also significant is that on June 17, 2024, Lavallee signed a "Resolutions Adopted by Written Consent of Stockholders in Lieu of Special Meeting" purporting to unilaterally remove Stine from the Board of Directors. (Lavallee Decl, ¶38, Ex. O.) There can be no legitimate dispute that on June 17, 2024 there was no attempted delivery to Stine of any funds purporting to repurchase his unvested stock because that was the date Lavallee attempted the original overnight delivered. Therefore, there is no legitimate argument that Stine is not currently on the board of directors, there having been no attempt to remove him post- the alleged attempted repurchase of his unvested shares.

## IV.     LEGAL AUTHORITY AND ANALYSIS

### A.  Legal Standard on Emergency Injunctive Relief

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (*Winter v.*

---

[3]  https://www.fedex.com/en-us/shipping/faqs.html#:~:text=Does%20FedEx%20deliver%20to%20P.O.,to%20select%20FedEx%20Ground%20Economy.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

1    *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).) Each of these elements will be

2    addressed in the briefing below.

3        Procedurally, preliminary injunctions are governed by Rule 65 of the Federal Rules of

4    Civil Procedure. An order granting an injunction must: "(A) state the reasons why it issued; (B)

5    state its terms specifically; and (C) describe in reasonable detail – and not be referring to the

6    complaint or other document – the act or acts restrained or required." (FRCP, Rule 65(d).) The

7    notes to Rule 65 provide:

8          Scott v. Schedler, 826 F.3d 207, 211-12 (5th Cir.2016). "Analytically, . . .
9          vagueness refers to the particularity with which the proscribed activity is described.
           Vagueness is a question of notice, i.e., procedural due process, and broadness is a
10         matter of substantive law. Thus, an injunction is overly vague if it fails to satisfy
           the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not
11         narrowly tailored to remedy the specific action which gives rise to the order as
           determined by the substantive law at issue. [¶] [T]o comply with Rule 65(d) the
12         district court's order granting the injunction must state its terms specifically and
           describe in reasonable detail the conduct restrained or required. [A]n ordinary
13         person reading the court's order should be able to ascertain from the document itself
14         exactly what conduct is proscribed. … The Rule was designed to prevent
           uncertainty and confusion on the part of those faced with injunctive orders, and to
15         avoid the possible founding of a contempt citation on a decree too vague to be
           understood. At 213: An injunction should not contain broad generalities. Moreover,
16         an injunction must describe in reasonable detail the acts restrained or required not
17         by referring to any other document." (Internal quotes omitted.)

18       It is therefore axiomatic that a preliminary injunction clearly spell out what it is the

19   subjects are (or are not) permitted to do. "The 'specific terms' and 'reasonable detail' mandated

20   by Rule 65(d) should be understood by the lay person, who is the target of the injunction. This is

21   a circumstance, among many in the legal field, that cries out for 'plain English.'" (*Reno Air

22   Racing Ass'n., Inc. v. McCord,* 452 F.3d 1126, 1134 (9th Cir. 2006).)

23       **B. Implicit is Unlikely to Prevail on the Merits**

24          1.    **Even If The Stines Were Not Entitled To Access Implicit's
                  Confidential Information At All Times, The Issue Is Now Moot In
25                Light Of The Stockholder Consent Effective June 19, 2024**

26       The relevant sequence of events following Stine's purported termination demonstrates

27   that both he and Alawi had the authority to (i) remove Lavallee from the board of directors, (ii)

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

seat Alawi and Traver Stine on the board of directors, and (iii) then subsequently remove Lavallee

from his position as CEO and replace him with Stine. The Stock Purchase Agreement promoted

by Implicit states that Implicit satisfies its obligation to purchase Stine's shares "by delivering a

check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased."

(Lavallee Decl, ex. B at sec. 3(b)(ii), emphasis added.) On June 17, 2024, Lavallee could not have

removed Stine from the board because that was the same day Lavallee attempted (and failed) to

send overnight payment to Stine.

On June 19, 2024, prior to the time Implicit delivered purported payment to repurchase

Stine's unvested stock, a majority of the stockholders (Stine and Alawi) had already consented to

remove Lavallee from the board. The new board had the right to place Stine as the interim CEO,

which it did. Therefore, the issue of whether or not Stine was entitled to access or maintain any

property belonging to Implicit is now completely moot if he is rightfully at Implicit's helm.

Implicit cannot succeed on the merits of its underlying claims, including its claim for declaratory

relief deeming the Stine's stockholder board consents of no consequence. Stine should be declared

the rightful CEO of Implicit.

**2.      Stine Was Entitled to Access Implicit's Information at All Times, Negating Implicit's Arguments Under DTSA, CUTSA, CFAA, and Penal Code § 502**

As the rightful CEO of Implicit, there is no legitimate question that Stine should have

access to Implicit's confidential information. Furthermore, at the time of Stine's purported

unauthorized access to any of Implicit's computer systems, there is no dispute that Stine was a

board member. As a Delaware corporation, Implicit is governed by Delaware law. Delaware

General Corporation Law section 220(d) provides that directors "shall have the right to examine

the corporation's stock ledger, a list of its stockholders and its other books and records for a

purpose reasonably related to the director's position as a director." Furthermore, the Operating

Agreement which governs Implicit (as there were no bylaws ever enacted), provides that Implicit's

management is "vested in the members." Thus, even assuming that Implicit's position is correct,

which the Stines do not concede, Stine still would have had a right to access the corporation's

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

1  information to evaluate whether Implicit was compliant with client contracts, had conforming

2  corporate documentation, and to review financial information of the Company.

3  **C.  There Was No "Misappropriation" Under the DTSA or CUTSA as the Stines**
   **were Authorized to have all Implicit Information**
4

5  As acknowledged by Implicit, "to plead misappropriation, plaintiffs must establish one of

6  two categories of conduct: (1) acquisition of the secret by improper means, or (2) disclosure or

7  use of the trade secret without consent. 18 USC § 1839(5)(A)–(B); *Lamont v. Conner*, Case No.

8  5:18-cv-04327-EJD, 2019 WL 1369928, at *8 (N.D. Cal. Mar. 26, 2019)." Even assuming the

9  identified information is in fact a trade secret, Implicit cannot meet its burden that there was any

10 improper acquisition or any disclosure of use of the trade secret.

11 First, Implicit acknowledges: "Jacob Stine, in his capacity as Implicit's CTO, already held

12 substantial quantities of Implicit's confidential and proprietary information and its trade secrets

13 by virtue of his day-to-day duties. These items were stored . . . on multiple personal devices held

14 by Jacob Stine. . . . Moreover, . . . Implicit's ongoing investigation shows that Jacob Stine

15 *accessed* Google documents and emails during his period of authorized access." (Lavallee Decl.,

16 41, emphasis added.) Implicit's brief conflates the alleged "access" of Implicit's information by

17 either Stine or Traver Stine with the fact that Stine was the CTO of Implicit who necessarily had

18 access and possession to such information as part of his job duties. Traver Stine also legitimately

19 had access to Implicit confidential information in her role as an employee of Implicit.

20 As to the second element, "disclosure or use," nowhere in the Lavallee declaration is there

21 any disclosure or use alleged. While Stine's email access was restored on June 14th, even Implicit

22 must admit at that time he was a director, who was entitled to access his email. It would be

23 impossible to parse out his emails to say which were properly in his possession as an employee

24 as opposed to a director.

25 Thus, what "trade secret" information could Stine have acquired? By Implicit's own

26 admission, Stine was the CTO of Implicit who was deeply familiar with its trade secrets by nature

27 of his job duties. He cannot "erase" his memory to rid of him all information Implicit considers

28

- 10 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

1    to be confidential. Additionally, Implicit cannot say what it is that Stine even possesses, only that

2    he "accessed" information following his purported termination.

3         As to whether or not the identified information is in fact a trade secret, that is also

4    questionable. It is not clear what "trade secrets" Implicit refers to in its Notice of Motion, and the

5    proposed order is not an example of clarity. While the brief purports to identify several items that

6    may or may not qualify as a trade secret, there is no connection to any of those items and the

7    Stines' possession of them. For example, paragraph 32 and Exhibit M of the Lavallee Declaration

8    state that this "audit trail" demonstrates that Stine "exported substantial quantities of company

9    documents during the June 14-17 time frame." However, there is absolutely nothing in Exhibit M

10   which indicates that to be the case, and Implicit has made no attempt to explain it.

11        Additionally, to be a trade secret, the proponent must establish it took reasonable measures

12   to keep the purported trade secret confidential. (*InteliClear, LLC v. ETC Glob. Holdings, Inc.,*

13   978 F.3d 653, 660 (9th Cir. 2020).) Implicit failed to do so – by its own admission it left the wife

14   of one of its board members with access to its computer systems. If Implicit truly meant to keep

15   the information confidential from Stine, it should have taken appropriate measures to time his

16   separation in a way that appropriately protected its confidential information.

17        **D.  Implicit Has Failed To Establish That Jacob Stine Signed The CIIAA**

18        As Implicit laid out, the elements for a breach of contract under Delaware law are (1) the

19   existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) resulting

20   damage to the plaintiff. (*See VLIW Tech, LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.

21   2003).) Yet, Implicit has failed to establish a likelihood of success on the merits regarding its claim

22   for breach the CIIAA as significant questions exist as to whether a contract even existed. The face

23   of the CIIAA document attached to Lavallee's declaration does not establish that Stine ever signed

24   or even acknowledged the CIIAA. The alleged CIIAA merely shows Lavallee's and Stine's names

25   typed onto a document. There is no electronic confirmation of the signatures on the face of the

26   CIIAA as attached to Lavallee's declaration or any control number on the document that would

27   suggest its authenticity.

28

- 11 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

1   Stine has no recollection of seeing the CIIAA attached to Lavallee's declaration before

2   approximately May 29, 2024, when he noticed a set of documents in a folder which included

3   unsigned bylaws, stock purchase agreements for both Stine and Lavallee, and the CIIAA at issue

4   here.

5   It was Stine's pattern and practice to either sign paper documents, or to use an online

6   signature software such as Dropbox Sign or DocuSign. Implicit's other exhibits, such as Traver

7   Stine's employment agreement, Exhibit F to Lavallee's declaration, show that both Lavallee and

8   Stine utilized Dropbox Sign to digitally sign the agreement. Implicit fails to provide sufficient

9   evidence to establish the CIIAA was executed by both parties, as this form of signature was not

10  Stine's or Implicit's pattern and practice, and Stine has no memory of signing the CIIAA.

11  **E. The Balance Of Hardships Does Not Favor Implicit As The Request Is Vague
      And Ambiguous**

12

13  In *Farrell v. Danielson,* 296 F.2d 39, 41 (9th Cir. 1961), the Court of Appeals found that

14  a decree of preliminary injunction enjoining and restraining defendants "from selling, removing,

15  transferring, assigning, and/or otherwise disposing of or concealing funds and/or property in their

16  possession and/or under their control, and which may be established to be the property" of others

17  was defective in that it failed to set forth the reason for its issuance, was not specific in terms, and

18  failed to describe in reasonable detail the act or acts sought to be restrained or the property referred

19  to.

20  Similar here, it is unclear, based on Implicit's sweeping references to "access" and

21  "confidential, proprietary, and trade secret information," in the Notice of Motion and proposed

22  Order, what it is the Stines should be ordered to do or not do. By way of example and not limitation,

23  it is not known whether emailing individuals at Implicit would constitute "accessing" a computer

24  system, and it is not known what "confidential" information the Stines would be prevented from

25  "acquiring, using or disclosing," as there is dispute as to what confidential information is

26  rightfully in their possession by nature of their roles as employees, board members, and

27  stockholders. Additionally, as there is information that no doubt properly came into the Stines'

28

- 12 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

possession by virtue of their employment with Implicit and it is therefore unclear what wrongs they are alleged to have committed.

Further, Implicit's reliance on *DISH Network L.L.C. v. Ramirez*, Case No. 15-CV-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) is unfounded as the sought preliminary injunction here differs substantially from the narrowly tailored injunction in *DISH*. Plaintiff relies on *DISH* to say that balance of hardship favors Plaintiff where the injunction only seeks to make the defendant comply with State and Federal law.

In *DISH*, the court stated that a plaintiff was entitled to an injunction when the injunction was narrowly tailored to prevent only the illegal conduct at issue. *(Id.)* The permanent injunction was narrowly tailored to address the illegal conduct and listed the specific actions defendant was barred from doing. Specifically, the defendant was enjoined from "(a) manufacturing, importing, offering to the public, providing, or otherwise trafficking in passcodes to the NFPS service, any other code or password used in accessing an IKS server, and any other technology or part thereof that is used in circumventing DISH Network's security system or receiving DISH Network programming without authorization" amongst other specific directives. (*Id*.)

Here, the proposed preliminary injunction differs substantially from that in *DISH* because the sought injunction here only vaguely describes the prohibitory and mandatory conduct Plaintiff wants enjoined. Such conduct listed in the motion is not narrowly tailored to prevent illegal conduct. The preliminary injunction motion clearly goes beyond just asking the Stines to comply with the law, as it asks them to determine what, if any, documents in their possession are Implicit's proprietary, confidential, or trade secret information, even if that information came to them through channels even Implicit must acknowledge are legitimate.

Further, Implicit's argument that it only requests the Stines do not violate federal and state laws is contradicted by their early argument that they are entitled to an order requiring defendants return things that were rightfully in their possession to begin with. It is unclear if Implicit seeks several affirmative actions on the part of defendants, acts that go beyond the narrowly tailored prohibitory injunction in the case it relies on. The request sought by Implicit is so vague that any

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

1    bond that issues should necessarily be high enough to protect the Stines from the substantial harm

2    that will befall them in the event the preliminary injunction is granted.

3            An injunction such as the one proposed by Implicit would be incredibly difficult to enforce

4    – any such hearing would necessarily be a mini-trial on Implicit's misappropriation claim. Thus,

5    the hardships do not weigh in Implicit's favor.

6            **F.  No Harm Will Befall Implicit – It Is In the Stines' Best Interests That Implicit**

7                 **Succeed**

8            Nowhere do the moving papers allege that Stine or Traver Stine have caused harm to

9    Implicit by nature of their possession of any trade secrets or other confidential information. Nor

10   do the moving papers allege there is any significant continuing risk, particularly in light of the

11   Stines' roles as stockholders with a vested interest in seeing the Company succeed. And with

12   Stine being the rightful CEO of Implicit, he is committed to Implicit's success. Additionally, as

13   the long-time CTO of Implicit, a director, and significant stockholder, Stine already has

14   substantial knowledge regarding the innerworkings and confidential operations of Implicit.

15   Similarly, Traver Stine has such knowledge as a long-time employee of Implicit. Whether or not

16   any physical information is turned over, there is no practical way that a preliminary injunction

17   can encompass all of the Stines' knowledge regarding Implicit such that a preliminary injunction

18   will reduce any risk of harm.

19           While Implicit cries that "harm" will befall it if the Stines retain information that was

20   provided to them, it is unclear what that harm is. As stated by Lavallee: "having three data centers

21   allows Implicit to continue functioning should one of the data centers fail. Thus, access to one

22   data center provides access to all the data centers."

23           Should the requested preliminary injunction issue, it is the Stines who will suffer due to

24   the vagueness of the proposed order. The moving papers contain nothing implying that the Stines

25   have used or distributed any Implicit information they have allegedly possessed either by virtue

26   of their (former) employment with Implicit. In fact, as significant stockholders of Implicit, it is in

27   the best interests of the Stines that Implicit's trade secrets are not disclosed outside of Implicit.

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER

1

### G. Public Interest Rights Dictate That Ownership Rights Be Respected

2 　　As described above, having secured a majority of the stockholders on June 19, 2024, Stine

3 rightfully removed Lavallee's director seat and then with the new board of directors, replaced

4 Lavallee as CEO. There is clearly a public interest in seeing that ownership rights are respected

5 when it comes to corporations and that governing documents are followed. This right is enshrined

6 in federal law: "All persons within the jurisdiction of the United States shall have the same right

7 in every State and Territory to make and enforce contracts …." (42 USC § 1981(a).) Therefore,

8 this Court should find this factor weighs in the Stines' favor.

9 　　　　　　　　　　　　　　　　　V.　　CONCLUSION

10 　　For the foregoing reasons, the Stines respectfully request that this Court deny Implicit's

11 Motion for Temporary Restraining Order.

12

13 Date: July 16, 2024　　　　　　　　　　STRUCTURE LAW GROUP, LLP

14

15 　　　　　　　　　　　　　　　　　By: /s/Jackie Ford
　　　　　　　　　　　　　　　　　　　　Jackie Ford, Esq.
　　　　　　　　　　　　　　　　　　　　Karen Rothschild, Esq.
16 　　　　　　　　　　　　　　　　　　　　Attorneys for Defendants JACOB STINE
　　　　　　　　　　　　　　　　　　　　and JUANITA TRAVER STINE

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER