Jackie M. Ford, Esq. (SBN: 272641)
jford@structurelaw.com
Karen F. Rothschild, Esq. (SBN: 346949)
krothschild@structurelaw.com
STRUCTURE LAW GROUP, LLP
1754 Technology Drive, Suite 135
San Jose, California 95110
Telephone: (408) 441-7500
Facsimile: (408) 441-7501

Attorneys for Defendants
JACOB STINE and JUANITA TRAVER STINE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>JACOB STINE, an individual, JUANITA TRAVER STINE, an individual, SAYED MAHMOOD ALAWI, an individual, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 3:24-cv-03744-JCS<br><br>**DECLARATION OF JACOB STINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:     August 7, 2024<br>Time:     2:00 p.m.<br>Judge:    Hon. William H. Orrick |

I, Jacob Stine, declare as follows:

1.     I make this declaration in support of Jacob Stine and Juanita Traver Stine's Opposition to Plaintiff's Motion for Temporary Restraining Order.  The facts stated herein are true of my knowledge.   If called upon, I could and would competently testify thereto.

2.     I co-founded Implicit Conversions, LLC in 2019 as fifty-fifty owners with Robin Lavallee to emulate and produce classic and retro video games from obsolete gaming consoles for play by individuals today on modern gaming consoles.

3.     In 2022, Implicit Conversions, Inc. was formed. ("Implicit" or the "Company"). The Company is a Delaware corporation.

4.     In March 2023, Implicit Conversions, LLC and the Company merged, with the

- 1 -

Company as the surviving entity.

5.    I, along with Mr. Lavallee, signed an "Agreement of Merger" effective March 1, 2023. A true and correct copy of the Agreement of Merger is attached hereto as Exhibit 1.

6.    Implicit Conversions, LLC never had any "bylaws," although we did have an Operating Agreement dated December 6, 2019 that Mr. Lavallee and I signed as "members." A true and correct copy of the Operating Agreement is attached hereto as Exhibit 2.

7.    When the Company was formed, Mr. Lavallee and I decided that we would be the only two members on the Company's board of directors.

8.    During my time at the Company, the Company never implemented bylaws or a formal stock plan.

9.    Implicit is a small, family-friendly business. Both Mr. Lavallee and I invited our respective wives to join Implicit. Mr. Lavallee's wife, Isabelle Gagnon, joined as its Communication Advisor. My wife, Juanita Traver Stine, joined primarily as the Payroll Administrator, her role was later expanded to Human Resource Generalist.

10.    My home address was the principal address of Implicit. My home address along with my personal PO Box were listed on corporate filings for the Company, the Company website, and were used to receive and send official Company correspondence.

11.    My home hosted the computer that Mr. Lavallee is referring to as La Honda, which Implicit internally named "Reynard." Reynard is an individual personal computer that Implicit used to act as a server.

12.    I took the title of Chief Technology Officer of the Company while Mr. Lavallee took the title of Chief Executive Officer of the Company. Although, we had agreed that these titles meant little to us, and our intention was to be equal partners, and have an equal relationship to each other within Implicit. A true and correct copy of a conversation between myself and Mr. Lavallee relating to our respective titles and roles in Implicit is attached as Exhibit 3.

13.    I have a background in computer engineering. With that background, I was responsible for producing the services that the Company provided. My effort in producing the services the Company provided helped fuel the company to success between 2022 and 2024.

DECLARATION OF JACOB STINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

14.     I sometimes have challenges with understanding others' perspectives, which can lead to me occasionally saying things that might be considered socially inappropriate. Sometimes I would feel frustrated with co-workers and confide in my close friend, Mr. Lavallee, regarding these frustrations. Mr. Lavallee and I had an agreement that we could both express these sorts of frustrations with each other in a safe and private way. I would sometimes send messages directly to Mr. Lavallee regarding these frustrations using very direct language. The messages were intended for Mr. Lavallee's viewing only and I did not share these messages with anyone else.

15.     It is my understanding that Mr. Lavallee and his wife have family members with autism. I have had conversations with Mr. Lavallee regarding characteristics of people with autism, and it seemed he understood the characteristics I exhibited as being signals that I am on the autism spectrum.

16.     I suffered a medical emergency on Friday May 10, 2024, which required immediate medical attention, leading me to visit the hospital as recommended by the crisis center. While I was not hospitalized, I was assessed and deemed to be in crisis, resulting in my leave from work.

17.     On or around May 29, 2024, while I was on leave, I noticed a new folder appeared on the shared Company drive. This folder included new documents I did not recall seeing before. Specifically, the documents included unsigned bylaws, stock purchase agreements for both myself, and Mr. Lavallee, a Confidential Information and Invention Assignment Agreement ("CIIAA") for both myself, and Mr. Lavallee, and a document titled "Action By Unanimous Written Consent of the Board of Directors" which named Mr. Lavallee as the Company's President, CEO, and Secretary and did note my position in the Company. While the Bylaws were unsigned, all other documents contained my name and Mr. Lavallee's name typed out in the same script font. I do not recall ever seeing these documents before or ever signing or typing my name onto these documents.

18.     Implicit generally lacked corporate documentation, such as bylaws, documents governing the stock issued, and formal board actions. When I saw the new documents in the folder, I thought they were draft documents. As a company, it was our general practice to either

DECLARATION OF JACOB STINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

use an electronic signature platform such as DocuSign or Dropbox Sign or to wet sign official documents. Neither I, nor the Company, had the practice of typing signatures out on documents.

19.     I later reviewed an invoice from the Company's attorneys which had a "corporate governance cleanup" entry dated May 24, 2024.

20.     While I was out on medical leave, Mr. Lavallee sent me a letter asking me to "[p]lease reply no later than May 31, 2024 with your resignation notification and intent to transition from the company.

21.     My counsel informed Mr. Lavallee on June 7, 2024 that I was remaining on medical leave and would be responding to his letter shortly.

22.     I am informed and believe that my counsel scheduled a call with Implicit's counsel, although not the same counsel in this matter, to discuss my leave and Mr. Lavallee's request that I resign from the Company.

23.     Before the scheduled call was set to take place, Mr. Lavallee purported to terminate my employment with the Company on June 14, 2024. Mr. Lavallee purported to terminate me by way of sending a DocuSigned letter. I was shocked to receive this letter.  I thought our counsel were going to have a discussion about the future of Implicit.

24.     On June 14, 2024 I was (and am) an Implicit board member and had an equal number of Implicit stock shares as Mr. Lavallee, 4,250,000 shares.

25.     Sayed Mahmood Alawi and I agreed on June 18, 2024 to remove Mr. Lavallee from the Company's board of directors and to appoint Alawi and my wife to serve on the board of directors alongside myself. Mr. Alawi holds 250,000 shares of Implicit stock. Mr. Alawi and I executed a shareholder agreement effective June 19, 2024. Then, myself, my wife, and Mr. Alawi executed a Board Consent agreement to remove Mr. Lavallee as CEO of Implicit effective June 20, 2024.

26.     Mr. Lavallee and I were both issued 4,250,000 shares of Implicit stock each. Mr. Alawi owns 250,000 shares of Implicit stock.  There are an additional 2,207 shares of Implicit issued to other employees aside from myself, Mr. Lavallee, and Mr. Alawi. Mr. Lavallee and I are on the same stock vesting schedule.

- 4 -

DECLARATION OF JACOB STINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

27.    Lavallee and I are on the same stock vesting schedule for 4,250,000 shares of Implicit stock each. Mr. Alawi owns 250,000 shares of Implicit stock. After Mr. Lavallee purported to terminate me, I received a letter that Implicit intended to purchase my unvested shares, totaling 2,656,250 shares. There are an additional 2,207 shares of Implicit issued to other employees aside from myself, Mr. Lavallee, and Mr. Alawi.

28.    After Alawi and I agreed to remove Mr. Lavallee from the Company's board of directors and to appoint him and my wife to the Board, I received a FedEx package purporting to purchase my unvested Implicit shares.  However, the packaging indicates that it was originally sent to my PO box address, and that it was marked as being sent on June 18, 2024.  A true and correct copy of the envelopes I received are attached hereto as Exhibit 4.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 16th day of July, 2024.


_Jacob Stine_
_____
Jacob Stine

DECLARATION OF JACOB STINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

# EXHIBIT 1

## AGREEMENT OF MERGER

This Agreement of Merger (the "**Agreement**") is made as of March 1, 2023, between Implicit Conversions LLC, a California corporation and a Pennsylvania corporation (the "**Disappearing Corporation**") and Implicit Conversions, INC., a Delaware corporation (the "**Surviving Corporation**") (the "**Constituent Corporations**").

The Constituent Corporations agree as follows:

1. Disappearing Corporation is duly organized, existing and in good standing under the laws of the State of California and the State of Pennsylvania.

2. Surviving Corporation is duly organized, existing and in good standing under the laws of the State of Delaware.

3. The Owners of the Constituent Corporations deem it in the best interests of corporations and owners that Disappearing Corporation be merged with Surviving Corporation in accordance with Section 252 of the Delaware General Corporation Law (the "**DGCL**").

4. Merger: Upon the time of filing (the "**Effective Time**") of a Certificate of Merger with the Secretary of State of the State of Delaware, the Disappearing Corporation shall be merged with Surviving Corporation, which shall survive the merger. Disappearing Corporation's separate existence shall cease on the effective date of the merger. Without any other transfer or documentation, on the effective date of the merger Surviving Corporation shall (i) succeed to all of Disappearing Corporation's rights, property, assets, and existing contracts; and (ii) be subject to all Disappearing Corporation's liabilities and obligations.

Notwithstanding the above, after the effective date the Surviving Corporation's proper officers and directors may perform any acts necessary or desirable to vest or confirm Surviving Corporation's possession of and title to any property or rights of Disappearing Corporation, or otherwise carry out this Agreement's purposes. This includes execution and delivery of deeds, assurances, assignments or other instruments.

5. Bylaws, Directors and Officers. From and after the Effective Time until amended as provided by law, the Bylaws, as amended, of the Corporation shall be the Bylaws of the Surviving Corporation, and the directors and officers of the Corporation in office immediately prior to the Effective Time shall become the directors and officers of the Surviving Corporation as of the Effective Time.

6. Ownership Conversion. At the Effective Time each Membership Interest of the Disappearing Corporation outstanding immediately prior to the Effective Time shall, by virtue of the of the Merger and without any additional action on the part of the Disappearing Corporation or the Surviving Corporation shall be exchanged to shares of ownership in the Surviving Corporation as set forth on Schedule A hereto; and all shares of ownership of the Surviving Corporation existing prior to the Merger shall remain outstanding in the Surviving Corporation following the Merger.

Furthermore, 1,500,000 shares reserved for the employee equity plan shall be transferred to the Surviving Corporation at the Effective Time.

7. <u>Condition of the Merger</u>. The Merger shall have been duly authorized by both the Surviving Corporation and the Disappearing Corporation prior to the filing of the Certificate of Merger and Cancellation with the Secretary of State of the State of Delaware effecting the Merger.

8. <u>Termination</u>. Notwithstanding anything herein or elsewhere to the contrary, this Agreement may be terminated and abandoned at any time before the Effective Time, whether before or after adoption and approval of this Agreement, by the vote of either the members of the Disappearing Corporation or the board of directors of the Corporation. In the event of such termination and abandonment, this Agreement shall forthwith become void and neither party nor its respective officers, directors, managers, members or stockholders shall have any liability hereunder.

9. <u>Counterparts</u>. This Agreement may be in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

*[The remainder of this page has been intentionally left blank.]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first written above.

IMPLICIT CONVERSIONS, LLC

By: _____

Name: Robin Lavallee

Title: Co-Founder and CEO

By: _____

Name: Jake Stine

Title: Co-Founder and CTO

IMPLICIT CONVERSIONS, INC.

By: _____

Name: Robin Lavallee

Title: Co-Founder and CEO

By: _____

Name: Jake Stine

Title: Co-Founder and CTO

**SCHEDULE OF SHARE CONVERSION**

| MEMBER | OWNERSHIP | RESULTING SHARES IN CORPORATION |
|---|---|---|
| Robin Lavallee | 4,250,000 ownership interest (50%) | 4,250,000 shares |
| Jake Stine | 4,250,000 ownership interest (50%) | 4,250,000 shares |

 **Dropbox** Sign

Piste d'audit

| | |
|---|---|
| **Titre** | Merge Agreement between Implicit Conversions LLC and... |
| **Nom du fichier** | AGREEMENT OF MERGER [draft][v2].docx |
| **Identifiant du document** | 138a01bec33c672ba1db42632fbc7efb9d50b317 |
| **Format de date de la piste d'audit** | MM / DD / YYYY |
| **État** | ● Signé |

## Historique du document

**ENVOYÉ**
**03 / 09 / 2023**
21:28:45 UTC

Envoyé pour signature à Robin Lavallee (robin@implicitconversions.com) and Jake Stine (jake.stine@implicitconversions.com) depuis robin.lavallee@implicitconversions.com
IP: 36.65.135.14

**CONSULTÉ**
**03 / 09 / 2023**
21:33:33 UTC

Consulté par Robin Lavallee (robin@implicitconversions.com)
IP: 36.65.135.14

**SIGNÉ**
**03 / 09 / 2023**
21:35:20 UTC

Signé par Robin Lavallee (robin@implicitconversions.com)
IP: 36.65.135.14

**CONSULTÉ**
**03 / 11 / 2023**
05:23:53 UTC

Consulté par Jake Stine (jake.stine@implicitconversions.com)
IP: 36.65.135.14

**SIGNÉ**
**03 / 11 / 2023**
05:25:39 UTC

Signé par Jake Stine (jake.stine@implicitconversions.com)
IP: 36.65.135.14

**TERMINÉ**
**03 / 11 / 2023**
05:25:39 UTC

Le document a été terminé.

EXHIBIT 2

# OPERATING AGREEMENT

## of

## Implicit Conversion LLC

**This Operating Agreement** (the "Agreement") made and entered into this ___6th___ day of ___December___, ___2019___ (the "Execution Date"),

**BETWEEN:**

Jacob P. Stine of 100 Redwood Drive La Honda, CA 94020, and

Robin Lavallee of 8144 Aldea Street, Dublin, CA 94568

(individually the "Member" and collectively the "Members").

**BACKGROUND:**

1. The Members wish to associate themselves as members of a limited liability company.
2. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

1. **<u>Formation</u>**
2. By this Agreement, the Members form a Limited Liability Company (the "Company") in accordance with the laws of the State of California. The rights and obligations of the Members will be as stated in the California Revised Uniform Limited Liability Company Act (the "Act") except as otherwise provided in this agreement.

3. **<u>Name</u>**

4. The name of the Company will be Implicit Conversion LLC.

5. **<u>Purpose</u>**

6. The purpose of this LLC is to engage in any lawful act or activity for which an LLC may be organized under the California Revised Uniform Limited Liability Company Act.

7. **<u>Term</u>**

8. The Company will continue until terminated as provided in this Agreement or may dissolve under conditions provided in the Act.

9. **<u>Place of Business</u>**

10. The Principal Office of the Company will be located at 100 Redwoord Drive, La Honda,CA 94020 or such other place as the Members may from time to time designate.

11. **<u>Capital Contributions</u>**

12.   The following is a list of all Members and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution Description | Value of Contribution |
|---|---|---|
| Jacob P. Stine | $800 in Tax Registration Fees (2019) | $800.00 |

| Robin Lavallee | 0$ | $0.00 |
| --- | --- | --- |

13. **Allocation of Profits/Losses**

14. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will accrue to and be borne by the Members independent of the Members' Capital Contributions.

15. Income and expenses accrued by an individual Member while doing business on behalf of the Company, pursuant invoices or contracts on which the Member is named as the sole provider of work, will be distributed in full to the Member.

16. Shared LLC fees and operating expenses will be distributed equally among all members.

17. Shared LLC net profits will be distributed equally among all members.

18. Each Member will be responsible for opening an individual Company bank account, and tracking individual income and expenses incurred while doing business on behalf of the Company.

19. For shared expense, each member is responsible for their share of the expense, equally.

20. For shared asset, each member owns their share of the asset.

21. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

22. **Nature of Interest**

23. A Member's Interest in the Company will be considered personal property.

24. **Withdrawal of Contribution**

25. No Member will withdraw any portion of their Capital Contribution without the unanimous consent of the other Members.

26. **Liability for Contribution**

27. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all remaining Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of any remaining Members to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against the Member.

28. **Additional Contributions**

29. Capital Contributions may be amended from time to time, according to the business needs of the Company. However, if additional capital is determined to be required and an individual Member is unwilling or unable to meet the additional contribution requirement within a reasonable period, the remaining Members may contribute in proportion to their existing Capital Contributions to resolve the amount in default. In such case, the allocation of Net Profits or Losses and the distribution of assets on dissociation or dissolution will be adjusted accordingly.

30. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by a majority of the Members. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

31. **Capital Accounts**

32. An individual capital account (the "Capital Account") will be maintained for each Member and their Initial Contributions will be credited to this account. Any

Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

33. **Interest on Capital**

34. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

35. **Management**

36. Management of this Company is vested in the Members.

37. **Authority to Bind Company**

38. Any Member has the authority to bind the Company in contract.

39. **Duty of Loyalty**

40. Any Member may invest in or engage in any business of any type, including without limitation, a business that is similar to the business of the Company whether or not in direct competition with the Company and whether or not within the established or contemplated market regions of the Company. Neither the Company nor any Member will have any right to that opportunity or any income derived from that opportunity.

41. **Duty to Devote Time**

42. Each Member will devote such time and attention to the business of the Company as the majority of the Members will from time to time reasonably determine for the conduct of the Company's business.

43. **Member Meetings**

44. A meeting may be called by any Member providing that reasonable notice has been given to the other Members.

45. Regular meetings of the Members will be held only as required.

46. **Voting**

47. Each Member will be entitled to cast votes on any matter. Each member's vote has the same value.

48. **Admission of New Members**

49. A new Member may only be admitted to the Company with a unanimous vote of the existing Members.

50. The new Member agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to affect the admission of the new Member. Any new Member will receive such business interest in the Company as determined by a unanimous decision of the other Members.

51. **Voluntary Withdrawal of a Member**

52. Any Member will have the right to voluntarily withdraw from the Company. Written notice of intention to withdraw must be served upon the remaining Members at least one month prior to withdrawal.

53. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

54. It remains incumbent on the withdrawing Member to exercise this dissociation in good faith and to minimize any present or future harm done to the remaining Members as a result of the withdrawal.

55. **Involuntary Withdrawal of a Member**

56. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; criminal conviction of a Member; Operation of Law against a Member or a legal judgment against a Member that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member: has engaged in wrongful conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this

Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member.

57. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

58. **<u>Dissociation of a Member</u>**

59. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

60. Valuation and distribution will be determined as described in the Valuation of Interest section of this Agreement.

61. The remaining Members retain the right to seek damages from a dissociated Member where the dissociation resulted from a malicious or criminal act by the dissociated Member or where the dissociated Member had breached their fiduciary duty to the Company or was in breach of this Agreement or had acted in a way that could reasonably be foreseen to bring harm or damage to the Company or to the reputation of the Company.

62. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

63. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 90

days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

64. **Right of First Purchase**

65. In the event that a Member's Interest in the Company is or will be sold, due to any reason, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

66. **Assignment of Interest**

67. A Member's financial interest in the Company can only be assigned to another Member and cannot be assigned to a third party except with the unanimous consent of the remaining Members.

68. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or Operation of Law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

69. **Valuation of Interest**

70. A Member's financial interest in the Company will be in proportion to their Capital Contributions, inclusive of any Additional Capital Contributions.

71. In the absence of a written agreement setting a value, the value of the Company will be based on the fair market value appraisal of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members. An appraiser will be appointed within a reasonable period of the date of withdrawal or dissolution. The results of the appraisal will be binding on all Members. The intent of this

section is to ensure the survival of the Company despite the withdrawal of any individual Member.

72. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

73. **Dissolution**

74. The Company may be dissolved by a unanimous vote of the Members. The Company will also be dissolved on the occurrence of events specified in the Act.

75. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   1. in satisfaction of liabilities to creditors except Company obligations to current Members;
   2. in satisfaction of Company debt obligations to current Members; and then
   3. to the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

76. **Records**

77. The Company will at all times maintain accurate records of the following:

   1. Information regarding the status of the business and the financial condition of the Company.
   2. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.
   3. Name and last known business, residential, or mailing address of each Member, as well as the date that person became a Member.
   4. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement, articles or certificate, and any amendments have been executed.

5. The cash, property, and services contributed to the Company by each Member, along with a description and value, and any contributions that have been agreed to be made in the future.

78. Each Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

79. **Books of Account**

80. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any Member. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

81. **Banking and Company Funds**

82. The funds of the Company will be placed in such investments and banking accounts as will be designated by the Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by unanimous consent of the Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

83. **Audit**

84. Any of the Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Members for any fiscal year.

85. **Tax Treatment**

86. This Company is intended to be treated as a partnership, for the purposes of Federal and State Income Tax.

87. **Partnership Representative**

88. Jacob P. Stine will be the partnership representative ("the Partnership Representative") with the sole authority to act on behalf of the Company in relation to IRS tax audits pursuant to Chapter 63 Subchapter C of the Internal Revenue Code of 1986.

89. The Partnership Representative is appointed for the current tax year and subsequent tax years until otherwise designated by the Members.

90. The Members will indemnify the Partnership Representative from and against all claims, actions, suits, demands, damages, obligations, losses, settlements, judgments, costs and expenses brought by the Members or any of them in relation to any acts or omissions in the conduct of the role of Partnership Representative provided that the Partnership Representative is a Member, except to the extent that such losses result from, in whole or in part, the negligence, wilful misconduct or unlawful action of the Partnership Representative.

91. The Partnership Representative will promptly advise the Members of any audit of the Company initiated by the IRS and provide regular updates to the Members on the progress of such audits and any resulting settlement negotiations. The Partnership Representative will be generally accountable to the Members and will obtain the unanimous approval of the Members for (i) any decisions affecting the tax liability of the Company or the Members; and (ii) any decision finalizing tax settlement with the IRS.

92. The Partnership Representative may resign from the position by serving notice in writing on both the Company and the IRS. The Company, acting by majority vote, may revoke the designation of the Partnership Representative by serving notice on the Partnership Representative and the IRS and simultaneously appointing a new Partnership Representative for that taxable year.

93. Whether serving in an active capacity or not, any person who has served as Partnership Representative in respect of any given taxable year or portion thereof will remain accountable to the Company, throughout the period of

limitation relating to that taxable year, in respect of any notification received from the IRS and will promptly advise the Company of any and all such correspondence.

94. In the event that a tax settlement reached between the IRS and the Partnership Representative is not satisfactory to one or more of the Members and the matter cannot be resolved through negotiation in good faith at a meeting of the Members, then, two weeks, or such longer period as the Members may agree, following such meeting the Members agree to submit the dispute to mediation.

95. **Annual Report**

96. As soon as practicable after the close of each fiscal year, the Company will furnish to each Member an annual report showing a full and complete account of the condition of the Company including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    1. A copy of the Company's federal income tax returns for that fiscal year.
    2. Income statement.
    3. Balance sheet.
    4. Cash flow statement.
    5. A breakdown of the profit and loss attributable to each Member.

97. **Goodwill**

98. The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

99. **Governing Law**

100. The Members submit to the jurisdiction of the courts of the State of California for the enforcement of this Agreement or any arbitration award or decision arising from this Agreement.

101. **Force Majeure**

102.    A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to force majeure, such as earthquake, typhoon, flood, fire, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

103.    **Forbidden Acts**

104.    No Member may do any act in contravention of this Agreement.

105.    No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

106.    No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

107.    No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

108.    No Member may confess a judgment against the Company.

109.    Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

110.    **Indemnification**

111.    All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature, whatsoever, arising out of a Member's participation in Company affairs. A Member will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

112.    **Liability**

113.    A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

114.    **Actions Requiring Unanimous Consent**

115.    The following actions will require the unanimous consent of all Members:

    1. Endangering the ownership or possession of Company property including selling, transferring or loaning any Company property or using any Company property as collateral for a loan.
    2. Releasing any Company claim except for payment in full.

116.    **Amendment of this Agreement**

117.    No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all Members.

118.    **Title to Company Property**

119.    Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part.

120.    **Miscellaneous**

121.    Time is of the essence in this Agreement.

122.    This Agreement may be executed in counterparts.

123.    Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

124.    If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable

and enforceable and the remainder of the provisions of this Agreement will in
no way be affected, impaired or invalidated as a result.

125.    This Agreement contains the entire agreement between the Members. All
negotiations and understandings have been included in this Agreement.
Statements or representations that may have been made by any Member
during the negotiation stages of this Agreement, may in some way be
inconsistent with this final written Agreement. All such statements have no
force or effect in respect to this Agreement. Only the written terms of this
Agreement will bind the Members.

126.    This Agreement and the terms and conditions contained in this Agreement
apply to and are binding upon each Member's successors, assigns, executors,
administrators, beneficiaries, and representatives.

127.    Any notices or delivery required here will be deemed completed when
hand-delivered, delivered by agent, or seven (7) days after being placed in the
post, postage prepaid, to the Members at the addresses contained in this
Agreement or as the Members may later designate in writing.

128.    All of the rights, remedies and benefits provided by this Agreement will be
cumulative and will not be exclusive of any other such rights, remedies and
benefits allowed by law.

129.    **<u>Definitions</u>**

130.    For the purpose of this Agreement, the following terms are defined as
follows:

1.  "Additional Contribution" means Capital Contributions, other than
    Initial Contributions, made by Members to the Company.
2.  "Capital Contribution" means the total amount of cash, property, or
    services contributed to the Company by any one Member.
3.  "Distributions" means a payment of Company profits to the Members.
4.  "Initial Contribution" means the initial Capital Contributions made by
    any Member to acquire an interest in the Company.

5.  "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, and Member's rights to participate in the management of the Company.

6.  "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

7.  "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

8.  "Principal Office" means the office whether inside or outside the State of California where the executive or management of the Company maintain their primary office.

9.  "Voting Members" means the Members who belong to a membership class that has voting power. Where there is only one class of Members, then those Members constitute the Voting Members.

**IN WITNESS WHEREOF** the Members have duly affixed their signatures under hand and seal on this _____6th_____ day of _____December_____, ___2019___.


DocuSigned by:

7F8B9EB62A4A4DF

Jacob P. Stine (Member)


DocuSigned by:

Robin Lavallee
C7C9451BBBDA438...

Robin Lavallee (Member)

EXHIBIT 3

## Implicit Conversions CEO and CTO roles discussions

2022-04-28 14:48:40 -07:00   Robin: (edited) Quebec (JP) > The Multimedia Tax Credit is *a refundable tax credit that allows applicants to recover up to 37.5% of eligible labour expenditures in Quebec* Ontario: > This tax credit allows companies to claim up to 40% of eligible Ontario expenditures BC (Drew) > The British Columbia Interactive Digital Media Tax Credit (IDMTC) aims to provide these companies with additional cash flow, allowing them to claim 17.5% of eligible salary and wages incurred in the tax year

2022-04-28 14:48:52 -07:00   Robin: We can probably lower our cost by hiring them as FTE and opening a corporation in Canada

2022-04-28 14:49:00 -07:00   Robin: Anyway, I will brainstorm this over the weekend

2022-04-28 14:49:44 -07:00   Robin: For Alex Alta. I was thinking. We can probably hire him. We just need to tell Sony about a 50% mark-up over his rate or something.

2022-04-28 14:49:56 -07:00   Robin: And Sony can decide if that works or not

2022-04-28 14:58:50 -07:00   Jake: (edited) yeah that could work, if we decide he's worth while. I mean, we can also tell them we're just marking up our rate (if we think they'd say yes, they'll say yes regardless) and then hire 2.5x cheaper dudes.

2022-04-28 15:07:01 -07:00   Jake: I don't think sony would care if we said "we want to hire This Guy Here" (in fact, legally, they may not be allowed to care, there's rules prohibiting them from influencing contractor decisions)

2022-04-28 15:09:53 -07:00   Jake: either way, I think a data point like that needs to push the bar up.

2022-04-28 15:14:30 -07:00   Robin: yup, my only worry is "sorry we are out of budget" after 6 months and we have to let go people and we lose our reputation

2022-04-28 15:14:43 -07:00   Robin: I have been unable to get this number, but I can probably do some guesestimate

2022-04-28 15:14:49 -07:00   Robin: that will be my homework over the weekend

2022-04-28 16:49:55 -07:00   Robin: How much do you care about titles? I think we need to set things up. Would you be ok if I said I want to be the acting CEO while I assume, you would be the CTO? We are still 50%/50%. I just think it kind of makes sense since I've been driving a bit more on the administration side, VC/investing and general roadmap and ideas. Bookkeeping, finance. Recruiting. I am also the "people" person. Pushing on Canadian subsidies as well, website, etc. But I understand you are the one that came up originally with the Implicit Conversions idea. In practice, it doesn't change much. I am not your boss. You are not my boss. It just gives better split of responsibility for the people that we hire. They know who to look up to when they have questions, and that also means that you get to decide for tech questions. So let me know if that works or if that is a deal breaker.

2022-04-28 17:07:08 -07:00   Jake: nah I don't care.

2022-04-28 17:21:41 -07:00   Jake: (edited) Tim's trying to push some bugs off as legacy issues and I'm very skeptical. https://jira.wwsqawest.ship.scea.com/jira/browse/MAST-4082 https://jira.wwsqawest.ship.scea.com/jira/browse/MAST-4078 Probably emulation issues. Frequency is waay too high in both cases.

2022-04-29 07:09:48 -07:00   Jake: They are not legacy bugs. > Confirming issue does not occur on Mednafen in *Wild_Arms - SIEE.* Player has full control of Cecilia upon loading back into the save file located in front of the bird.

2022-04-29 07:10:00 -07:00   Robin: (edited) There would be awesome to automate btw, once we find the root cause.

2022-04-28 17:22:13 -07:00   Jake: we would only try the legacy issue approach on PS2 for <5% type issues.

# EXHIBIT 4

