GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
20400 Stevens Creek Blvd, Suite 280
Cupertino, CA 95014
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff
IMPLICIT CONVERSIONS, INC.

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

| IMPLICIT CONVERSIONS, INC, a Delaware Corporation, | Case No.  3:24-cv-03744-WHO |
|---|---|
| Plaintiff, | **IMPLICIT'S REPLY IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |
| vs. | |
| JACOB STINE, an individual, JUANITA TRAVERS STINE, an individual, SAYED MAHMOUD ALAWI, an individual, and DOES 1-10, inclusive, | **DATE: August 7, 2024** **TIME: 2:00pm** |
| Defendants. | |

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

**TABLE OF CONTENTS**

Page (s)

I.    INTRODUCTION ................................................................................................ 1

II.   IMPLCICIT IS ENTITLED TO INJUNCTIVE RELIEF ........................................ 3

    A.  Implicit Is Likely To Succeed On The Merits Of Its Claims Under the DTSA, CUTSA, CFAA, And California Penal Code § 502(c) Against Jacob And Juanita Stine ................................................................................ 3

        1.  The Motion Has Not Been Mooted By The Stines' Claim To Have Regained Control Of Implicit On June 20 ................................................ 3

        2.  Implicit is Likely to Prevail on its Claims Under the DTSA and CUTSA ................................................................................................ 8

        3.  Implicit is Likely To Prevail On Its Claims Under The CFAA .............. 10

        4.  Implicit Is Likely To Prevail on its Claim under California Penal Code § 502(c) et seq. ............................................................................ 11

        5.  Implicit Is Likely To Prevail on its Claim for Breach of the CIIAA ....... 11

        6.  Jacob Stine's Status As An Implicit Board Member Did Not Entitle Him To Trespass On Implicit's Computer Systems Or Misappropriate Its Trade Secrets ................................................................................ 13

    B.  Implicit Will Suffer Irreparable Harm If Preliminary Injunction is Not Granted ......................................................................................................... 13

    C.  The Stines Have Failed To Establish That They Will Face Harm From Injunctive Relief .......................................................................................... 14

    D.  The Stines Have Failed To Establish That A Preliminary Injunction Does Not Serve The Public Interest ........................................................................ 14

    E.  A Minimal Bond is Appropriate .................................................................... 15

III.  CONCLUSION ................................................................................................... 15

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

IMPLICIT'S REPLY ISO MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

**<u>TABLE OF AUTHORITIES</u>**

**CASES**                                                                   Pages (s)

*Henry Schein, Inc. v. Jennifer Cook,*
    191 F.Supp.3d 1072 (N.D. Cal. 2016) ...................................................................14

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020)...................................................................................8

*Navigation Holdings, LLC v. Molavi,*
    445 F. Supp. 3d 69 (N.D. Cal. 2020) .....................................................................9

**STATUTES**

8 DE Code:
    § 213(b) ..................................................................................................................6

    § 220.....................................................................................................................14

    § 220(d) ................................................................................................................13

    § 228(d) ..................................................................................................................6

18 U.S.C.:

    § 1030(a) ........................................................................................................10, 11

California Penal Code:

    § 502(c) ................................................................................................................11

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

## I.    INTRODUCTION

Implicit's Motion for a Temporary Restraining Order and Order to Show Cause ("Motion") showed why a preliminary injunction against Jacob Stine and Juanita Stine (the "Stines") should issue.

The Stines' Opposition ("Opposition" or "Opp") attempts to distract from the merits of the Motion by offering a narrative that is in some parts irrelevant and in other parts demonstrably false. The following facts have not been credibly refuted:

- Implicit is a C-corporation that was validly formed, and that adopted valid Bylaws approved by a resolution of the Implicit Board of Directors.

- The Bylaws allowed the Board to appoint a CEO, who would serve as the senior-most executive officer, with hiring and firing authority over all Implicit employees.  The Board appointed Lavallee as CEO.

- Lavallee, on behalf of Implicit, terminated Jacob Stine on June 14, 2024.  Implicit disabled Jacob Stine's access to its systems.

- On the evening of June 14, Juanita Stine's credentials were used to access Implicit's computer systems and restore Jacob Stine's access to Implicit's computer systems.

- Jacob Stine gained post-termination access to Implicit's computer systems from June 14-17. During the period of his unauthorized access, Jacob Stine disabled the access of other users, disrupted Implicit's operations and damaged its systems, and downloaded substantial quantities of Implicit trade secrets and confidential and proprietary information.

- By virtue of his position as CTO, at time of his June 14 termination, Jacob Stine held Implicit trade secrets and confidential information in digital form as well as critical Implicit property in the La Honda data center. This was in addition to the post-termination data he downloaded from Implicit's systems. Jacob Stine refused to return files and devices containing Implicit's trade secrets and confidential and proprietary information.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

- On June 17, 2024, Implicit emailed Jacob Stine notice that it was repurchasing his 2,656,250 shares of unvested Implicit common stock.

The Opposition denies that Jacob Stine signed any of the key documents and implies that they may have been fabricated recently and Jacob Stine's signature is not genuine. But these were regular corporate records generated in due course through Implicit's Stripe Atlas account. Jacob Stine signed each of these documents in Stripe Atlas. His statements otherwise are demonstrably false.

The Opposition also attempts to sanitize the Stines' continuing misconduct by arguing that they regained control of Implicit on June 19 after Jacob Stine and Sayed Mahmoud Alawi ("Alawi") purportedly "agreed" to vote to remove Lavallee from the Implicit Board. That is also demonstrably false. Per the terms of Implicit's Common Stock Purchase Agreement ("CSPA") with Jacob Stine, Implicit was entitled to repurchase his unvested shares after his termination and could provide notice of repurchase *by email*. Implicit emailed its notice of repurchase on June 17. Therefore, on June 17, Implicit repurchased 2,656,250 shares from Jacob Stine. From that moment forward, Jacob Stine and Alawi did not approach anywhere near a majority of Implicit's outstanding stock.

Jacob Stine attests that he did not receive a Fedex package containing a check for $26.57 until the morning of June 19, and that prior to his receipt of the check he and Alawi had already "agreed" that they would vote to remove Lavallee from Implicit's Board. He does not explain, however, why he failed to transmit any signed action by shareholder consent to Implicit until June 20. But even if his outlandish story is credited, it does not matter. Jacob Stine's unvested shares were repurchased on June 17, when Implicit emailed him notice.

Moreover, the shareholder consent executed by Jacob Stine and Alawi was delivered to Implicit on June 20. Under both Implicit's Bylaws and Delaware Law, the record date for determination of whether shareholder consent is executed by stockholders holding a majority of outstanding shares such that it is valid, is the date of delivery to the corporation. By Jacob Stine's own admission (and as shown by evidence offered by Implicit), Jacob Stine received the repurchase payment by the morning of June 19 and therefore all of his unvested shares had been

repurchased before the June 20 record date.

Jacob Stine and Juanita Stine fail to sufficiently address the heart of this matter. They are engaged in a campaign to harm Implicit by stealing its proprietary information and trade secrets and by disrupting Implicit's day-to-day operations through unauthorized access to Implicit's computer system. Implicit seeks relief the Stines' misappropriation of Implicit's trade secrets under the Defend Trade Secret Act ("DTSA") and the California Trade Secret Act ("CUTSA"), the Stines' unlawful access and tampering with Implicit computer systems under the Computer Fraud and Abuse Act ("CFAA") and California Penal Code § 502(c) *et seq*, and Jacob Stine's breach of contract with Implicit due to his copying of Implicit proprietary information and trade secrets and his refusal to return the Implicit data center. The Stines' egregious conduct has forced Implicit to seek injunctive relief from unlawful actions that threaten to cause lasting and irreparable harm.

## II.     Implicit is Entitled to Injunctive Relief

### A.     Implicit Is Likely To Succeed On The Merits Of Its Claims Under the DTSA, CUTSA, CFAA, And California Penal Code § 502(c) Against Jacob And Juanita Stine

The Motion detailed the evidence showing that Implicit was likely to succeed on the merits of its claims under the DTSA, CUTSA, CFAA, California Penal Code § 502 and breach of the CIIAA. Mot. at 15:5-23:15.

#### 1.     The Motion Has Not Been Mooted By The Stines' Claim To Have Regained Control Of Implicit On June 20

Jacob Stine was terminated on June 14. The Opposition argues that the Stines cannot be held accountable for unlawfully accessing Implicit's computer systems after Jacob Stine was terminated, damaging those systems and disrupting its operations, and stealing its trade secrets and refusing to return them, because the Stines now control Implicit after seizing control of the company on June 19. This argument fails, however, because the Stines do not control Implicit and do not hold majority voting power at Implicit.

Implicit entered into separate CSPAs with both Lavallee and Jacob Stine, on January 26, 2023, under which each of them was sold 4,250,000 shares of Implicit common stock.

Declaration of Robin Lavallee In Support Of Implicit's Motion For Temporary Restraining Order And Order To Show Cause ("First Lavallee Declaration") (ECF 17-2) at ¶9 & Exs. A & B. Though both Lavallee and Jacob Stine became owners of the full 4,250,000 shares upon the date of purchase and held full voting and other rights as equity holders, Implicit retained an option to repurchase a percentage of these shares depending on the period of time that Lavallee and Jacob Stine remained service providers to Implicit. *Id.*, Exs. A & B (Section 3(b)). The longer they remained with the company, the more of their shares would "vest," *i.e.*, the fewer of their shares would be subject to Implicit's repurchase rights. On June 14, 2024, in his capacity as Implicit's CEO, Lavallee terminated Jacob Stine. *Id.* ¶17 & Ex. G. On June 17, 2024, Implicit notified Jacob Stine, via email and Fedex overnight, that it was exercising its option to repurchase 2,656,250 unvested Implicit common shares. First Lavallee Declaration ¶36 & Ex. N; Reply Declaration of Robin Lavallee In Support Of Implicit's Motion For Temporary Restraining Order And Order To Show Cause ("Reply Lavallee Declaration") ¶29 & Ex. G. Therefore, from that moment onwards, Lavallee held 4,250,000 shares and Jacob Stine held only 1,593,750 shares. On June 20, Jacob Stine's lawyer emailed to Implicit a stockholder consent signed by Jacob Stine and Alawi, who held only 250,000 Implicit common shares, purporting to remove Lavallee and to place Alawi and Juanita Stine on Implicit's Board (the "Invalid Consent"). First Lavallee Declaration ¶63 & Ex. R; Lavallee Reply Declaration ¶33 & Ex. I. But Jacob Stine and Alawi held nowhere near a majority of Implicit's common shares. *Id.*

Fedex records show that Jacob Stine received the $26.57 repurchase payment check from Implicit at 10:30 a.m. on June 19. Reply Lavallee Declaration ¶31 & Ex. H. The Opposition argues that because Jacob Stine did not actually receive the Implicit's repurchase payment for his shares until June 19, the repurchase was not effective until the payment was received. Jacob Stine attests that he and Alawi "agreed" to remove Lavallee from the Implicit Board on June 18. Declaration of Jacob Stine In Support Of Defendants' Opposition To Plaintiffs' Motion For Temporary Restraining Order ("Stine Declaration") ¶25. Jacob Stine's declaration conspicuously fails to state, however, 1) when the Invalid Consent was actually executed, 2) whether it was executed on the June 19 "effective" date printed on the Invalid Consent and, 3)

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

if it was executed by both parties on June 19, whether it was executed before 10:30 a.m. on the morning of June 19 when Fedex records confirm that Jacob Stine received the check. We know only that Jacob Stine did not send the Invalid Consent until June 20. First Lavallee Declaration ¶63 & Ex. R; Lavallee Reply Declaration ¶33 & Ex. I (June 20 cover email showing attaching Invalid Consent).

But even the Jacob Stine Declaration's conspicuous omissions do not truly matter because the central premise of this argument is flawed. The Invalid Consent never had any force or effect and, as a result, the board composition changes purported to be effected by it never occurred. There are three reasons for this.

First, the Invalid Consent does not contain the date of signature of each shareholder. Under Section 2.11 of Implicit's Bylaws, " [e]very written consent [of the shareholders in lieu of a meeting] shall bear the date of signature of each stockholder who signs the consent." First Lavallee Declaration ¶12 & Ex. C. As noted above, the Invalid Consent fails to include a date for each signature and only fills in an "effective date." Therefore, the Invalid Consent does not comply with the company's Bylaws.

Second, the relevant record date for determining the shareholdings of Implicit was not June 19, when the Invalid Consent was purporting to be effective, but instead June 20, the date the Invalid Consent was delivered to Implicit. Under Section 2.12 of the Bylaws, "the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent (including consent by electronic mail or other electronic transmission as permitted by law) is delivered to the corporation." *Id*. This language mirrors the Delaware General Corporation Law, which provides the same record date as the default rule under Delaware law, regardless of whether a company has adopted bylaws addressing this issue. 8 DE Code § 213(b) (2023) ("[T]he record date for determining stockholders entitled to consent to corporate action without a meeting, when no prior action by the board of directors is required by this chapter, shall be the first date on which a signed consent setting forth the action taken or proposed to be taken is delivered to the corporation in accordance with § 228(d) of this title.").

Delivery to the corporation must be made either: "(i) to the principal place of business of the corporation; (ii) to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders or members are recorded; (iii) to the registered office of the corporation in this State [of Delaware] by hand or by certified or registered mail, return receipt requested; or (iv) subject to the next sentence, in accordance with § 116 of this title to an information processing system, if any, designated by the corporation for receiving such consents." 8 DE Code § 228(d) (2023)

The "principal place of business of the corporation" has always been Mr. Lavallee's address, 122 Holly Drive, Lansdale, PA 19446-1617. Lavallee Reply Decl. ¶36. This is also the Principal Address that Implicit listed in its registration documents signed by Jacob Stine and filed with the State of California. Lavallee Reply Decl. ¶37 & Ex. J. Mr. Lavallee has not received a copy of the Invalid Consent at that address. *Id.* ¶34.

Mr. Lavallee held all officer positions of Implicit. *Id.* ¶35. Mr. Lavallee has always held all corporate records of Implicit. *Id.* Therefore, under prong (ii), the Invalid Consent would not have been effective until Mr. Lavallee received it, which was on June 20. *Id.* ¶34.

Under prong (iii), the Invalid Consent would have to have been sent by mail to Implicit's Delaware registered agent. Mr. Lavallee receives copies of all materials served on the company's Delaware registered agent and he did not receive any notice that the Invalid Consent was served on such agent. *Id.*

Finally, prong (iv) does not apply, because Implicit does not maintain an information processing system of the type described.

Therefore, the Invalid Consent was only delivered to Implicit as required under Delaware Law and the Bylaws when it was delivered to Mr. Lavallee, which was on June 20. *Id.* As a result, under Section 213 of the Delaware General Corporation Law and Section 2.12 of the Bylaws, the relevant record date for fixing the shareholdings for the purposes of the Invalid Consent was June 20.

The record date shows that it is not relevant whether or not Jacob Stine and Alawi signed the Invalid Consent prior to the July 19 10:30 am delivery of Implicit's repurchase check.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Because even under the Stines' flawed theory that the repurchase occurred only at the time that Jacob Stine received the repurchase check, Jacob Stine has conceded Implicit repurchased his 2,656,250 unvested shares as of the morning of June 19 at the very latest. But in determining how many shares Jacob Stine had to vote towards the Invalid Consent, what matters is how many shares he held on the record date—*June 20*. As a result, Alawi and Jacob Stine lacked sufficient votes for the Invalid Consent ever to have effect.

Third, the repurchase itself was actually effective on June 17, in any case. Implicit emailed Jacob Stine notice of its repurchase of his 2,656,250 shares on June 17. The CSPA states unequivocally that "[a]ny notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or ***sent by email***." First Lavallee Declaration, Ex. B ¶10(e) (emphasis added). Jacob Stine does not dispute that he received this email. Opp. at 6-7. Therefore, because Implicit repurchased Jacob Stine's Implicit Shares on June 17, 2024, Jacob Stine and Alawi did not have sufficient shares to remove Lavallee as CEO at any time thereafter.

The Opposition argues that Implicit's repurchase did not occur until Implicit both 1) provided notice that it was repurchasing Jacob Stine's unvested shares; and 2) Jacob Stine received the $26.57 payment for his shares. But nowhere in the CSPA does it make actual receipt of the purchase price a condition precedent to Implicit exercising its repurchase option.

Rather, the CSPA states that Implicit can provide notice that it is exercising its repurchase option at any time within 3 months of Jacob Stine's termination and if it fails to do so it is deemed to have automatically exercised its option at the end of the 3 months unless it affirmatively opts out. First Lavallee Declaration, Ex. B ¶3(b)(ii). The CSPA refers to several ways Implicit can satisfy its "payment obligation" to Jacob Stine, including providing a check, cancelling debt, or some combination of the two. *Id.* Nothing in the CSPA dictates that exercising the repurchase option is only effective upon delivery of the check. It states only that delivery of a paper check is one of several methods to satisfy Implicit's independent payment obligation. Thus, Jacob Stine's unvested shares were properly repurchased on July 17 when he received the email notice, as permitted by Section 10(e) of the CSPA.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

IMPLICIT'S REPLY ISO MOTION FOR TRO AND OSC
Case No.  3:24-cv-03744-WHO

Accordingly, Implicit is likely to prevail on its claims and these claims are not rendered moot by Jacob Stine's failed attempt to seize control of Implicit.

### 2. Implicit is Likely to Prevail on its Claims Under the DTSA and CUTSA

Jacob Stine had no permission to access any Implicit computer system as of June 14, 2024 (the date of his termination) and Juanita Stine had no permission to access any Implicit computer system as of June 19, 2024 (the date of her termination). After those dates, both Jacob Stine and Juanita Stine possessed Implicit trade secrets, misappropriated those trade secrets; and the misappropriation caused and threatened damage. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020). Based on the confidential and proprietary nature of the information, unauthorized acquisition of the trade secrets, conversion of the trade secrets in violation of contractual duties to return them post-employment, and the extensive past, current, and future damage to Implicit, Implicit has established a likelihood to succeed on its claims under the DTSA and CUTSA.

***First***, the proprietary information copied or retained by Jacob and Juanita Stine qualifies as a trade secret, per the DTSA and Ninth Circuit law. Contrary to the Stines' assertion that "Implicit cannot say what it is that Stine even possesses" (Opp. at 11), Implicit has carefully explained that the trade secrets the Stines possess includes: proprietary source code and software tools as well as business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology. Mot. at 8:23-10:4; First Lavallee Declaration ¶¶41-45.

Furthermore, the Stines remain in possession of source code and software tools that are the backbone of Implicit's Syrup Emulation Engine, several other proprietary compilers that enable PlayStation 2 games, and the auto-test system used for testing and development of Implicit's products is also proprietary. *Id.* This source code, software, and development tool are unique to Implicit's products and development processes and are the exact type of information the Ninth Circuit has considered to be a trade secret. As this Court has explained, plaintiffs need

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

not "spell out the details of the trade secret," but they must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 75 (N.D. Cal. 2020). The Motion has met this standard.

Moreover, it is also of no consequence that Juanita Stine had access to Implicit's computer systems following Jacob Stine's termination for the period that she remained an Implicit employee. Implicit password-protects its proprietary information and requires employees to who are given access to company confidential information to enter into a contractual agreement to maintain the confidentiality of company information and to return any company data immediately upon termination. First Lavallee Declaration ¶49. Implicit employees also owe their employer a duty of loyalty. It was natural that Implicit expected Juanita Stine to abide by her contractual agreement to maintain the secrecy of Implicit information—including from her husband.

***Second***, the Stines misappropriated Implicit's trade secrets when they 1) accessed Implicit's computer systems after Jacob Stine's termination and downloaded confidential and proprietary materials from Implicit's Google Workspace, 2) retained without authorization and refused to return and thereby converted for their own use Implicit's source code and other trade secrets acquired during employment at the time of termination; and 3) converted the La Honda data center (which houses the trade secrets) by failing to return it to Implicit. Indeed, the Stines admit that Jacob Stine "did gain access to his email for a brief few days" following his termination. Opp. at 6. That Jacob Stine cannot erase certain trade secrets from his memory is of no moment. While Jacob Stine may retain certain know-how or general information, this is certainly different from unlawfully retaining vast libraries of source code that can be used in competition with Implicit. And the Stines' past conduct shows the compelling need for an injunction against future use or disclosure of Implicit's trade secrets. It is also of no consequence that Jacob Stine had possession Implicit trade secrets prior to his termination. Whether some information was in his possession prior to his termination does not mean that his continued

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

possession post-termination is not acquisition of a trade secret through "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A).

*Lastly*, the Stines' misappropriation has both caused and threatened further damage to Implicit. The Opposition fails to address the extensive harm that befell Implicit as a result of their actions following Jacob Stine's termination or the ongoing harm they continue to cause by retaining possession of Implicit's La Honda data center. As explained in the Motion, the harm to Implicit is extensive and crippling to the companies' operations, requiring the shutdown of all three of Implicit's data centers to keep its data centers secure from future access by the Stines. With the presumption of harm coupled with the articulable past, current, and future damage to Implicit, there can be no doubt that the Stines' misappropriation of Implicit's trade secrets have and will continue to harm Implicit.

### 3.    Implicit Is Likely To Prevail on its Claim under the CFAA

The Opposition offers no argument concerning the merits of Implicit's claims under the CFAA other than to argue that any claims regarding the Stines' unlawful conduct during the June 14-17 time period are moot because the Stines seized control of Implicit on June 19. For the reasons stated above, that argument fails.

The Stines have violated and continue to violate 18 U.S.C. §§ 1030(a)(2)(c), (a)(4), and (a)(5)(A)-(C) when Jacob Stine accessed Implicit's password-protected computer system after his access had been disabled. Indeed, Jacob Stine intentionally accessed and tampered with the system after restoring his own full access to Implicit's computer systems. Jacob restored his access by either using Juanita Stine's credentials or having Juanita restore access herself. In either case, Jacob Stine was not authorized to access Implicit's computer systems after his termination nor was Juanita Stine authorized to provide Jacob Stine access to Implicit's computer systems. Jacob Stine accessed Implicit's computer system "without access" and Juanita Stine "exceeded authorized access" by either providing her husband with her credentials or by restoring his access herself.

Given the Stines' flagrant conduct by fraudulently gaining unauthorized access to

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Implicit's protected computer system and the further damage caused by such conduct, Implicit is likely to prevail on the merits of its claims under the CFAA.

### 4. Implicit Is Likely To Prevail on its Claim under California Penal Code § 502(c) *et seq.*

The Opposition also offers no argument concerning the merits of Implicit's claims under California Penal Code Section 502, other than again arguing that all past transgressions are cleansed because they purported to seize control of Implicit on June 19. Again, this argument fails for the reasons stated above.

The Stines violated Penal Code §§ 502(c)(1)-(7) when, after Jacob Stine's access to Implicit's password-protected computer system had been disabled, Jacob Stine knowingly restored his own access by either using Juanita Stine's credentials or having Juanita restore his access herself and subsequently intentionally caused damage to Implicit's protected computers by intentionally disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline. Based on the disablement of Lavallee's access, the destruction of information from Implicit's computer system, and the Jacob Stine's subsequent attempts to usurp control of Implicit and sow disharmony among Implicit's employees, it is clear that Jacob Stine and Juanita Stine fraudulently accessed the Implicit computer system in an effort to "devise or execute any scheme or artifice to defraud, deceive, or extort, or … wrongfully control or obtain money, property, or data." *See* Cal. Penal Code 502(c)(1).

Given the Stines' flagrant conduct by fraudulently gaining unauthorized access to Implicit's protected computer system and the further damage caused by such conduct, Implicit is likely to prevail on the merits of its claims under Section 502.

### 5. Implicit Is Likely To Prevail on its Claim for Breach of the CIIAA

Implicit is also likely to prevail on its claim for breach of the CIIAA against Jacob Stine. As explained in Implicit's Motion, Jacob Stine breached the CIIAA by failing to perform the conditions, covenants and obligations required of him by the CIIAA. Indeed, Jacob Stine breached at least two provisions of the CIIAA and continues to be in breach of the CIIAA. After

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Jacob Stine's access to Implicit's password-protected computer system had been disabled, he fraudulently restored his own access using Juanita Stine's credentials and copied confidential, proprietary, and trade secret information. This alone is a breach of the CIIAA. Furthermore, after his termination, Jacob Stine refused to return the La Honda data center, which is one of Implicit's three data centers, and the most powerful. These acts are a clear violation of the CIIAA. Furthermore, the copying of trade secrets and continued refusal to return the La Honda data center threaten the very existence of Implicit should Jacob Stine disclose these trade secrets to third parties. Thus, not only has Jacob Stine caused harm to Implicit by breaching the CIIAA, but his continued breach could damage Implicit irreparably.

The face of the CIIAA shows that Implicit and Jacob Stine signed the agreement on January 24, 2023. Rather than address the merits of Implicit's claim for breach of the CIIAA, the Opposition disputes whether Jacob Stine entered into the CIIAA with Implicit because Jacob Stine allegedly does not remember signing it and because the signature page displays no electronic authentication, which Jacob Stine claims is not his practice. Opp. at 10-11; Stine Declaration ¶18. But Jacob Stine's Declaration is demonstrably false on this score. Both Lavallee and Jacob Stine signed the agreement using a service called Stripe Atlas—an online service that generated corporate documents through template workflows and allowed founders to sign these documents with the click of a button. Lavallee Reply Decl. ¶¶5-6. Implicit used Stripe Atlas for, among other things, preparing and filing its articles of incorporation, preparing its bylaws and the board consent approving its bylaws, creating its CIIAs for Lavallee and Jacob Stine, creating its CSPAs for Lavallee and Stine, and filing its tax registration with the Internal Revenue Service. *Id.* ¶¶6-7. In each instance, these documents were signed by Jacob Stine and Lavallee using Stripe Atlas. *Id.* ¶5. The Lavallee Reply Declaration attaches evidence that Jacob Stine was not only aware of Stripe Atlas when Implicit first obtained this service, but that Jacob Stine used it. *Id.* ¶¶24-25 & Ex. E. Indeed, the electronic signature on Jacob Stine's CSPA, which is the core document that gives him any equity in Implicit, is signed using Stripe Atlas and it is an identical signature to Jacob Stine's signature on the CIIAA. *Id.* ¶21.

Jacob Stine's claim that he, as the former CTO of Implicit, never signed the CIIAA and

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

apparently does not feel bound to any contractual duty of confidentiality to Implicit is deeply alarming and reinforces the critical need for a preliminary injunction here.

### 6. Jacob Stine's Status As An Implicit Board Member Did Not Entitle Him To Trespass On Implicit's Computer Systems Or Misappropriate Its Trade Secrets

Jacob Stine was a member of Implicit's Board on June 14, when Implicit terminated his employment and remained on the Implicit Board until June 17. There is no merit to the Opposition's argument that, as a sitting board member, Jacob Stine was privileged to conduct that constitutes criminal trespass on Implicit's computer systems and unlawful misappropriation of its trade secrets.

Delaware General Corporation Law section 220(d) gives sitting directors a right to request inspection of company books and records "for a purpose reasonably related to the director's position as a director." Notably, this is not a self-help statute. A director isn't allowed to break into a corporation's systems and take the records they want. The director must make a request and the corporation is entitled to refuse the request if it believes it is being made for "an improper purpose." 8 DE Code § 220(d). The Delaware Court of Chancery has exclusive jurisdiction to resolve these disputes. *Id.* It is unclear how Jacob Stine's duties as a director would require him to examine Implicit's most sensitive trade secrets, but regardless Section 220 is clear that Jacob Stine was not privileged to break into Implicit and take files and records of his choosing.

The Opposition's argument that Jacob Stine was privileged to break into Implicit and steal its trade secrets because he was a member of the LLC that was Implicit's predecessor is specious. Jacob Stine himself admits that the LLC merged with Implicit in 2023. Implicit is the surviving entity and a 2019 Operating Agreement of a predecessor entity gives Jacob Stine no rights whatsoever.

### B. Implicit Will Suffer Irreparable Harm If Preliminary Injunction is Not Granted

If the Stines continue to maintain possession of Implicit's trade secrets and property and continue to attempt to access and tamper with Implicit's computer systems while the lawsuit is

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

pending, the Stines will continue to harm Implicit in a manner that is irreparable, as already discussed in Section II.A.2. Furthermore, despite the Stines' contention that they have a vested interest in Implicit, there are no guarantees (particularly in view of their erratic and destructive behavior) that they will not use Implicit's trade secrets for personal gain.

**C.     The Stines Have Failed To Establish That They Will Face Harm From Injunctive Relief**

The balance of hardships decisively favors Implicit because, as explained above (*see* Section II.A.2), the hardship that Implicit faces by the Stines' egregious behavior is immense. The Stines' only apparent argument for their hardship is that complying with a preliminary injunction itself would be difficult, but the Stines do not explain how any hardship results if they simply return Implicit's vital company property, destroy all the unlawfully copied Implicit trade secrets, and be prohibited from accessing any Implicit system. Having to comply with a court order is not a hardship in and of itself.

Furthermore, as explained in Section II.A.2, Implicit has presented with particularity exactly what trade secrets the Stines have retained, and that compliance with a court order requires nothing more of them than returning what no longer belongs to them. No Implicit trade secrets "rightfully in their possession" (Opp. at 12). As explained in Section II.A.2, even if certain trade secrets or Implicit property was originally obtained through the course of their employment with Implicit, such property was apparently converted upon termination and is no longer "rightfully in their possession."

Thus, because the Opposition fails to articulate any hardship to the Stines the Motion has shown significant hardship to Implicit, the balance of hardships decisively favors Implicit.

**D.     The Stines Have Failed To Establish That A Preliminary Injunction Does Not Serve The Public Interest**

There is no public policy in favor of allowing a defendant to violate state or federal law or to breach a valid contract with his or her employer. *See Henry Schein, Inc. v. Jennifer Cook*, 191 F.Supp.3d 1072 (N.D. Cal. 2016) ("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.")). Moreover, "[p]ublic interest is also served by enabling the protection of

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

trade secrets." *Id.* The Opposition argues the public interest is served when "ownership rights are respected." Opp. at 15. As explained in Section II.A.1, however, neither Jacob Stine nor Juanita Stine's have any ownership interest in Implicit, other than through a minority ownership of common stock. Thus, public interest strongly favors Implicit.

### E.     A Minimal Bond is Appropriate

As explained in Section II.C, the Stines have failed to demonstrate how any harm to them will result should the Court issue injunctive relief. This alone is sufficient to warrant a minimal bond. Furthermore, the parties have contractually agreed that Implicit is "entitled" to seeks injunctive relief for breach of the CIIAA without the need to post a security or bond, or if a security or bond is required, it should be no more than $1,000. Thus, because there is no evidence that the Stines will suffer material harm should the Court order injunctive relief, the bond should therefore be zero or a nominal amount.

## III.     CONCLUSION

For the above reasons, Implicit asks this Court to grant its motion for a preliminary injunction: (1) enjoining Jacob Stine and Juanita Stine from accessing Implicit's computer systems; (2) enjoining Jacob Stine and Juanita Stine from accessing, using, transmitting and disclosing any Implicit's confidential, proprietary, and trade secret information; and (3) directing Jacob Stine to return all Implicit confidential information and all Implicit property.

Respectfully submitted,

Dated: July 23, 2024                    GRELLAS SHAH LLP

By:  /s/ *Dhaivat H. Shah*
       Dhaivat H. Shah, Esq.
       Attorneys for PLAINTIFF
       IMPLICIT CONVERSIONS, INC.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014