UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC., | Case No. 24-cv-03744-WHO |
| Plaintiff, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| v. | Dkt. No. 17 |
| JACOB STINE, et al., | |
| Defendants. | |

Plaintiff Implicit Conversions, Inc. ("Implicit") seeks a preliminary injunction enjoining its former Chief Technology Officer, defendant Jacob Stine ("Stine"), and its former human resources administrator, defendant Juanita Traver Stine ("Traver Stine"), (together, the "defendants") from (i) accessing its computer systems, or (ii) acquiring, using, or disclosing Implicit's confidential, proprietary, and trade secret information.[1] It also asks that I issue a mandatory injunction ordering the defendants to return all Implicit confidential information and Implicit property still in their possession to the company. The underlying complaint asserts claims for misappropriation of trade secrets, computer fraud, and breach of contract. Dkt. No. 1. The defendants do not contest that after Stine was terminated in June 2024, he (with Traver Stine's help) downloaded thousands of files, deleted others, and acted to supplant the Implicit Board of Directors. Nor do they contest that they still retain that proprietary information. Instead, Stine insists that he has a right to do all

---

[1] This matter came before the court on Implicit's request for a temporary restraining order and, upon its termination, a preliminary injunction. The Hon. Rita F. Lin, acting in her capacity as general duty judge, denied the motion for a temporary restraining order because Implicit had not shown exigent circumstances necessitating ex parte relief. Order Denying Temporary Restraining Order ("TRO Order") [Dkt. No. 19].

.

this as a member of Implicit's Board and as its "rightful" Chief Executive Officer.

Implicit's motion for a preliminary injunction is GRANTED except for its request for the return of property. Implicit has shown it is likely to prevail on the merits of its claims and is likely to suffer irreparable harm in the absence of preliminary relief granted in this Order.

### BACKGROUND

Implicit's business is producing "proprietary video game emulators that allow classic video games that were produced for legacy consoles (e.g., PlayStation, Genesis, and Nintendo Entertainment Systems) to be played on modern video game consoles." See Declaration of Robin Lavallee ("Lavallee Decl.") [Dkt. No. 17-2], ¶5. Stine helped to found Implicit Conversions, LLC, the predecessor to Implicit Conversions, Inc., with Robin Lavallee in 2019. Motion for TRO and Order to Show Cause ("Motion") [Dkt. No. 17] 3:25-27; *see also* Lavallee Decl., ¶ 3. Implicit initially formed a two-person board of directors that consisted of Lavallee and Stine. Lavallee Decl. ¶ 9.

On January 24, 2023, Implicit's Board (consisting of Lavallee and Stine) appointed Lavallee as Implicit's Chief Executive Officer ("CEO"), President and Secretary. *Id.* ¶ 13. The Implicit bylaws provided that the CEO was Implicit's most senior executive officer, and had general supervisory, direction, and control powers over the business, including appointment power for subordinate officers. *Id.* Exercising those powers, Lavallee appointed Stine as Implicit's Chief Technology Officer ("CTO"), a position Stine retained until his recent termination.

When Implicit Conversions, LLC incorporated as a Delaware company, Implicit issued 4,250,000 shares of Common Stock to Lavallee and 4,250,000 shares of Common Stock to Stine. *Id.* ¶ 9. Both issuances were subject to vesting over a 4-year period through Implicit's Common Stock Purchase Agreement ("CSPA"). *Id.* The CSPA, which appears to have been signed by Stine and Lavallee on January 26, 2023, provides that upon Stine's termination from Implicit, Implicit has the right to repurchase all unvested shares from him. *Id.*

In March 2022, Implicit hired Traver Stine as Human Resources and Payroll Administrator. Lavallee Decl. ¶ 8. She was also required to hold as confidential Implicit's confidential and proprietary information and trade secrets per the terms of her Employment

Agreement. *Id.* ¶ 15.

According to Implicit, Stine entered into a Confidential Information and Invention Assignment Agreement ("CIIAA") dated January 24, 2023. Lavallee Decl. ¶ 13; Complaint ("Compl.") [Dkt. No. 1] Ex. B (CIIAA, electronically signed by Lavallee and Stine on January 24, 2023).[2] The CIIAA required, among other things, that Stine:

> "shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved."

Compl., Ex. B

Implicit terminated Stine from his position as Implicit CTO on June 14, 2024, after the company had "grown increasingly concerned at Jacob Stine's erratic behavior and poor performance." Lavallee Decl. ¶ 17; Lavallee Decl. Ex. G (Termination Letter and Notice of Intent to Exercise Repurchase Option). Implicit claims that "[a]s a manager, Jacob Stine fostered a toxic workplace relationship with other key personnel, impairing their ability to perform their jobs. Moreover, Jacob Stine made increasingly alarming statements to co-workers in work communication channels which escalated to threats that he would harm or kill others or inflict harm on himself." Compl. ¶ 22.

Stine's termination notice stated that his access to company computer systems was being disabled. Lavallee Decl. ¶ 18; *see id.* Ex G (termination letter). It also says: "In accordance with the Common Stock Purchase Agreement dated January 26, 2023 . . . Implicit . . . hereby notifies you that it intends to exercise its repurchase option under Section 3 of the Stock Purchase Agreement with respect to all 2,744,795 unvested shares at the original purchase price of $0.00001 per share for a total purchase price of $27.45. Implicit Conversions will deliver a check to you in the amount of the total purchase price." Lavallee Decl. Ex. G.

---

[2] The Motion says that the CIIAA was entered into and signed on November 21, 2022, but the attached exhibit and Lavallee declaration indicate that it was signed by both Lavallee and Jacob Stine on January 24, 2023.

The same day, *after* his access to Implicit systems had been terminated, Stine "unlawfully accessed and tampered with Implicit's computer systems." Compl. ¶ 25.  According to the Complaint, "at a minimum, [Stine] restored his own full access to Implicit's computer systems and disabled Lavallee's access to Implicit's computer systems." *Id.*   The record shows that Stine sent an email to all Implicit employees on June 14, 2024, stating that he had regained access to Implicit's computer systems after having been banned, and that he had blocked Lavallee's access to Implicit's computer systems.  *See* Compl. Ex. D (email, subject line "Important Notice Regarding Recent Employment Status Changes").  The next day, he sent another email saying that he had restored Lavallee's access to Implicit's systems.  *See* Lavallee Decl. Ex. J.

Traver Stine's credentials were allegedly used to access Implicit's computer systems, restore Stine's access, and disable Lavallee's access.  Compl. ¶ 26; *see* Lavallee Decl. Ex. H (email to Juanita Traver Stine from Robin Lavallee stating "[i]t looks like your account has been compromised and has let Jake Stine access company resources illegally. I've disabled your Slack access as a security precaution.").  Traver Stine's credentials were used to: (1) remove Lavallee as email admin and place Traver Stine in those positions; (2) suspend Lavallee's access to Workspace; (3) remove admin rights for other C-Suite Implicit officers; (4) change passwords for Implicit's service operators; (5) use Google Takeout to download a local copy of Stine's entire Google Workspace email inbox; (6) export "substantial quantities of company documents"; and (7) attempt to download the entire Google Drive.  *See* Motion 6-7.  In the wake of this series of events, Implicit ran diagnostic tests to determine whether Stine had done any damage to its systems.  It then disabled Stine's access to Implicit's computer systems (once again) and disabled Traver Stine's access to the same.  Compl. ¶ 33.

On June 17, 2024, Implicit sent Stine a Notice of Exercise of Repurchase Option via overnight FedEx delivery; it also sent him a copy via email.  *See* Compl. Ex. E.  Implicit says that it "repurchased Jacob Stine's 2,656,250 unvested common shares of Implicit stock [and] enclosed a certified check in the amount of $26.57 made payable to Jacob Stine for the repurchase." Compl. ¶ 34; *id.* Ex. E.  Also on June 17, 2024, Lavallee executed a Stockholder Resolution by Written Consent, voting his 4,250,000 shares (which represented a majority of all outstanding

1    Implicit shares after he had exercised the repurchase option) to remove Stine from the Implicit

2    Board of Directors.  *Id.*  He sent a copy of the Resolution to Stine.  *Id.* Ex. F.  That same day,

3    Implicit suspended Traver Stine with pay pending investigation.  *Id.* ¶ 37.

4         The next day, Implicit "demanded that Jacob Stine return all physical hardware and digital

5    files held at his La Honda, California office." *Id.* ¶ 38; Lavallee Decl. Ex. P (email, subject line

6    "Immediate Return of all physical and digital Company Property in your possession").  According

7    to the Complaint, Implicit normally maintains three data centers: one in Pennsylvania, one in

8    Canada, and one in a home office at the defendants' residence in La Honda (the "La Honda

9    Center").  The La Honda Center contained "hardware critical to Implicit's ongoing operations."

10   Compl. ¶ 38.  Lavallee offered to send a courier to pick up that hardware, or to reimburse Stine for

11   the cost of sending the hardware back to Implicit.[3]  Lavallee Decl. Ex. P.  But Stine did not agree

12   to either.  *Id.*  Implicit explains that its data centers are not cloud-based, so Implicit lacks central

13   control over the La Honda Center and therefore cannot remotely change its passwords or prevent

14   Stine from accessing it.  Because Stine continued to possess the La Honda Center, to protect its

15   other data centers, Implicit took its Pennsylvania and Canada data centers offline for some period.

16   Lavallee Decl. ¶ 54.

17        Implicit says that Stine had "access to its source code as part of his regular duties as Chief

18   Technology Officer," and that he "could have accessed" other source code when he was accessing

19   the Implicit Google Workspace account, but that regardless of whether he did, there is a "complete

20   set" of Implicit's source code on the La Honda Center, which is up to date as of June 18, 2024.  *Id.*

21   at ¶ 56.  Until Implicit decided to "decouple" the data centers, Stine apparently had access to the

22   company's updated source code.  *Id.*

23        On June 20, 2024, Stine (through counsel) sent an Action by Written Consent of the

24   _____

25   [3] In particular, Implicit requested the return of: (1) the data center maintained at Jacob Stine's La
     Honda home (referred to internally as "Reynard") along with all peripherals and components; (2)
26   one Nintendo Switch SDEV Development kit (a console with advanced features, including a built-
     in debugger and capture software); (3) any and all devices containing Implicit's digital data; (4) a
27   variety of PlayStation Development Kits, along with all components, original boxes, and cables;
     (5) all Implicit digital files in Jacob Stine's possess; and (6) all other Implicit hardware in Jacob
28   Stine's possession.  Motion 12:11-17; Lavallee Decl. Ex. P.

United States District Court
Northern District of California

1    Majority Stockholders (the "Consent Action"), signed by himself and Sayed Mahmood Alawi[4],

2    who purported to act as Implicit stockholders.  The Consent Action stated that Stine was still an

3    Implicit board member and purported to remove Robin Lavallee from the Implicit Board and

4    appoint in his place Traver Stine and Alawi.  Compl. ¶ 41; *see id.* Ex. G (Consent Action).

5    Implicit claims that the Consent Action is a "farce" with "no legal import" because Stine and

6    Alawi do not own the majority of Implicit's outstanding shares after Lavallee exercised the stock

7    repurchase option in the wake of Stine's termination.  Compl. ¶ 41.

8        After purporting to create this new Board, Stine transmitted what appeared to be a

9    Unanimous Written Consent that purported to remove Lavallee as Chief Executive Officer

10   ("CEO") of Implicit and appoint Stine in his place as interim CEO.  *See* Compl. Ex. H.  Through

11   counsel, Stine sent the Unanimous Written Consent to Implicit personnel, "demanding that they

12   surrender access to Implicit's computer systems to Jacob Stine."  *Id.* ¶ 43; Lavallee Decl. Ex. T.

13   The Complaint states on information and belief that it is Stine's intent to "continue operating this

14   fake Implicit Board of Directors to issue additional resolutions and . . . to continue holding himself

15   out as Implicit's CEO to Implicit employees, partners, customers, and the marketplace." *Id.* ¶ 44.

16   To this day, Stine asserts that he is Implicit's rightful CEO.  *See* Defendants' Opposition to

17   Motion ("Oppo.") [Dkt. No. 22] 1:17-22.

18       Implicit alleges that "Juanita Stine and Jacob Stine entered into a civil conspiracy to

19   unlawfully access Implicit's computer systems." *Id.* ¶ 26.  And "[b]y disabling Lavallee's access

20   to Implicit's computer systems," Implicit says that "Stine caused significant disruption to [its]

21   business operations." *Id.* ¶ 27.  Stine allegedly made unauthorized copies of "vast quantities" of

22   Implicit's confidential and proprietary information as well as its trade secrets.  He still has copies

23   of all Implicit's "source code, business development opportunity plans and strategic initiatives," as

24   well as information about "ongoing customer negotiations, software tools and assets, confidential

25   customer contracts, internal budgets and forecasting, and the core methods and know-how of

26   Implicit's technology." *Id.* ¶ 28.  Stine also "deleted information from Implicit's computer systems

27

28   [4] Alawi resides in Dublin, Ireland.  It is not clear from the papers who Alawi is in relation to the
     Stines.  The motion for preliminary injunction is not sought against Alawi.

1   and tampered with other systems in a manner that brought them offline." *Id.* ¶ 29.

2       The Complaint states seven total causes of action. Counts 1-4 are asserted against Stine

3   and Traver Stine together, and assert: (1) violations of the Computer Fraud and Abuse Act

4   ("CFAA"), 18 U.S.C. § 1030, *et seq.*; (2) violations of California Penal Code § 502(c), *et seq.*; (3)

5   violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; and (4) violations of the

6   California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.* Count Five

7   asserts a claim for breach of contract, solely against Stine. Count Six asserts a breach of duty of

8   loyalty claim, solely against Traver Stine. Count Seven seeks declaratory relief against all

9   defendants, in their capacity as the self-declared Implicit Board of Directors.

10                          **LEGAL STANDARD**

11       To obtain a preliminary injunction, a plaintiff must demonstrate four factors: (1) "that he is

12   likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of

13   preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is

14   in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172

15   L.Ed.2d 249 (2008). While this is a four-part conjunctive test, the Ninth Circuit has held that a

16   plaintiff may also obtain an injunction if it has demonstrated "serious questions going to the

17   merits," that the balance of hardship "tips sharply" in its favor, that it is likely to suffer irreparable

18   harm, and that an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632

19   F.3d 1127, 1131–35 (9th Cir. 2011). Injunctive relief is "an extraordinary remedy that may only be

20   awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22,

21   129 S.Ct. 365.

22                          **DISCUSSION**

23       Implicit moves for a preliminary injunction enjoining the defendants from (1) "accessing

24   Implicit's computer system," and (2) "acquiring, using, or disclosing to any . . . third party"

25   Implicit's confidential, proprietary, and trade secret information. It also asks that I issue a

26   mandatory injunction ordering the defendants to return all Implicit confidential information and

27   Implicit property to the company. While the parties dispute each element of the preliminary

28   injunction analysis, the question of whether an injunction should issue turns on Implicit's

United States District Court
Northern District of California

likelihood of success on the merits and the risk of irreparable harm it faces absent the preliminary relief it seeks.

## I.        LIKELIHOOD OF SUCCESS ON THE MERITS

Implicit asserts claims for trade secrets misappropriation, computer fraud, and breach of contract.  Defendants do not dispute that after Stine was terminated and his access to Implicit computer systems was revoked, he and his wife, Traver Stine, accessed those systems, downloaded confidential and proprietary information, and deleted some files.  Stine then terminated Implicit CEO Robin Lavallee's email access and asserted control over Implicit.  To this day, despite being asked to return the information he has, Stine refuses to return it and says he is Implicit's rightful CEO.  The defendants' primary explanation for this behavior is that Stine was still a member of the Implicit Board of Directors as of June 14, 2024, when he downloaded and deleted Implicit files after his termination, that he is today the rightful CEO of Implicit, and as such he is entitled to retain the confidential information that he refuses to relinquish to Implicit. Stine also says that he never signed the Confidential Information and Invention Assignment Agreement bearing his electronic signature, which forms the basis of Implicit's breach of contract claim.  He says that he does not remember signing it and that Implicit used DocuSign or wet signatures as a matter of practice.

In contrast, Implicit insists that it followed the proper procedures in issuing a stock repurchase notice that divested Stine of his position as a majority shareholder as of June 17, 2024, making it impossible for him to replace Lavallee as CEO.  Moreover, it says that even if Stine *were* a director when he interfered with Implicit's property, the nature of his interference was such that his conduct would be wrongful even for a member of the Board.  As for the issue of Stine's signature, several documents signed by Stine and Lavallee in January 2023, bear the same kind of electronic signature as is on the CIIAA.

This much is clear: After he was terminated, Stine accessed and downloaded vast quantities of Implicit's proprietary and trade secret information.  He also interfered with the CEO's ability to access the company's computer systems.  Traver Stine helped him.  The defendants insist today that Stine had every right to do this even though they both signed contracts

8

United States District Court
Northern District of California

prohibiting this conduct.  Considering these facts, Implicit is likely to prevail on each of its claims that seek to hold the defendants liable for their actions against the company.

### A.    Count One: Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*

Count One asserts a claim for violation of the Computer Fraud and Abuse Act by both defendants.  The CFAA prohibits intentionally accessing a computer "without authorization"[5] or by "exceed[ing] authorized access"[6] to obtain information from a protected computer.  *See* 18 U.S.C. § 1030(a)(2)(C).

Implicit claims that the defendants violated 18 U.S.C. § 1030(a)(2)(C) when "Stine accessed Implicit's password-protected computer system after his access had been disabled."  Motion 18:18-19.  It states that Stine "intentionally accessed and tampered with the system after restoring his own full access to Implicit's computer systems," and he did so without authorization.  *Id.* at 18:24-27.  It contends that Traver Stine, for her part, "exceeded authorized access" when she "either provid[ed] her husband with her credentials" so he could restore his access, or by "restoring his access herself." *Id.* 18:25-26.  Implicit also alleges that the defendants violated various other CFAA provisions when they "fraudulently restored" Stine's access to Implicit computer systems, *see* Motion 18:27-28:3, and when Stine "caused damage to Implicit's protected computers by intentionally disabling Lavallee's access", "deleting information", and "tampering" with the systems, *see id.* 28:4-10.

Defendants' response is straightforward: They say that Stine was "entitled to access Implicit's information at all times." Oppo. 9:16-17.  They argue that when Stine accessed Implicit's computer systems, he was still a member of Implicit's Board of Directors, and as such had the right to do whatever he wanted with the company's information.  Under Delaware Law, they argue, members of a company's Board have access to its confidential information.  *See id.*

---

[5] The Ninth Circuit has clarified that "without authorization" means without permission.  *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195 (9th Cir. 2022).

[6] To "exceed authorized access" means to access ""a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

9

9:21-24 (quoting Delaware General Corporation Law section 220(d)). This is an argument they reassert in defense of essentially every claim. Defendants also contend that "[a]s the rightful CEO of Implicit, there is no legitimate question that Stine should have access to Implicit's confidential information" to this day. *Id.* 9:18-20.

As a preliminary matter, defendants' position with respect to Stine's status as "rightful" Implicit CEO relies on a tenuous argument about when Stine received the Notice of Exercise of Repurchase Option (the "Repurchase Notice"), which Lavallee sent to him via physical mail and via email on June 17, 2024. Defendants argue that because the physical copy of that Repurchase Notice did not arrive at their residence until "sometime after" Stine seized control of the Implicit Board, Stine had the right to exercise a stockholder consent agreement wresting control of the company from Lavalee. *See* Oppo. 6-7.

In response to this argument, Implicit has produced a copy of the Implicit Common Stock Purchase Agreement (CSPA), which outlines how Implicit may exercise its repurchase option after an employee's termination. It states, in relevant part:

> In the event of the voluntary or involuntary termination of Purchaser's Continuous Service Status . . . for any reason . . . with or without cause, the Company shall upon the date of such termination . . . have an irrevocable, exclusive option (the "Repurchase Option") for a period of 3 months from such date to repurchase all or any portion of the Unvested Shares . . . held by Purchaser as of the Termination Date . . . [and] the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such 3-month period . . . *execution of this agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option* . . . the Company . . . may satisfy its payment obligation to Purchaser by . . . delivering a check to Purchaser with respect to the amount of the purchase price of the Unvested Shares being Repurchased . . . As a result of any repurchase of the Unvested Shares pursuant to this Section . . . the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto.

*See* Dkt. No. 17-2 (CSPA) (emphasis added). The CSPA states that "[a]ny notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email." Lavallee Decl. Ex. B at 28. It also says that "[t]he Company may . . . decide to deliver any documents related to this Agreement or any notices required by applicable law . . . by email or any other

10

electronic means," and "[p]urchaser . . . consents to [conduct business and sign documents electronically]." *See id.* at 29.  Stine signed the CPSA on January 26, 2023.  He does not dispute that he received the Repurchase Notice by email on the day Lavallee sent it.  The record supports that the repurchase was conducted according to the terms laid out in the agreement that Stine signed, and he was therefore bought out of the Board as of June 17, 2024, making any action he took thereafter to replace Lavallee as CEO ineffective.

Moreover, defendants fail to address the accusations that Stine "delet[ed] information," and "tamper[ed]" with Implicit's systems between June 14 and June 17, after his termination as CTO but before he purportedly seized control of the Board.  *See generally* Oppo.  Such behavior is not acceptable, even for a director.  Delaware General Corporation Law section 220(d) gives sitting directors a right to request inspection of company books and records "for a purpose reasonably related to the director's position as a director."[7] Delaware code does not confer upon Stine unlimited leave to sift through Implicit's files upon his termination and take what he chose, regardless of whether he was on the Board.

The Ninth Circuit, in evaluating CFAA claims, has held that "a person uses a computer 'without authorization' [under the CFAA] … when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission), or when the employer has *rescinded permission* to access the computer and the defendant *uses the computer anyway*." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009) (emphasis added).  The defendants do not contest either (1) that Stine was terminated on June 14, or (2) that he accessed Implicit's confidential information after he was terminated.  Stine almost certainly accessed Implicit's computer systems without authorization.  Regardless of whether Stine had been effectively removed from the Board of Directors when he did this, Implicit is likely to prevail on the merits of Count One.

---

[7] The Delaware Court of Chancery has exclusive jurisdiction to determine whether a director has requested to use company information in an improper way, at the request of the corporation.  8 DE Code § 220(d).

United States District Court
Northern District of California

**B.**      **Count Two: Violations of California Penal Code § 502(c), *et seq*.**

Count Two asserts that the defendants violated Cal. Penal Code § 502(c), *et seq*., by intentionally accessing Implicit's protected computers without authorization, and accessing and copying confidential, proprietary, and trade secret information.  Compl. ¶ 55.  "In contrast to the CFAA, the California statute does not require unauthorized access. It merely requires *knowing* access . . . . What makes that access unlawful is that the person 'without permission takes, copies, or makes use of' data on the computer . . . [T]he term 'access' as defined in the California statute includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (emphasis added).

Implicit claims that the defendants violated Cal. Penal Code § 502(c)(1) when Stine "knowingly restored his own access" to Implicit's password-protected computer system after his access had been disabled, using Traver Stine's credentials to do so.  *See* Motion 20:15-20.  It points to Lavallee's disabled access, the deletion of some information from Implicit's system, and Stine's "subsequent attempts to usurp control of Implicit" as evidence that the defendants "fraudulently accessed the Implicit computer system in and [sic] effort to 'devise or execute any scheme or artifice to defraud, deceive, or extort, or . . . wrongfully control or obtain money, property, or data." *See* Motion 20 (quoting Cal. Penal Code 502(c)(1)).[8]

Defendants' only response to this allegation mirrors their response to the CFAA claim: They argue that "[a]s the rightful CEO of Implicit, there is no legitimate question that . . . Stine should have access to Implicit's confidential information[.]" Oppo. 9:19-10:2.  Again, the

---

[8] Implicit also claims that the defendants violated Cal. Penal Code §§ 502(c)(2)-(7).  Section 502 (c)(2) applies when a defendant "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." This claim is likely to succeed on the merits against Stine but not Traver Stine because he downloaded his entire Google Workplace mailbox and exported company documents between June 14-17.  *See* Lavallee Declaration ¶ 32, Ex. M.

Section 502(c)(3) applies when a defendant "knowingly and without permission uses or causes to be used computer services."  A claim arising from that section is also likely to succeed against Stine but not Traver Stine for the same reasons expressed above.  The same is true for Cal. Penal Code §§ 502(c)(4)-(7).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

defendants do not explain why Stine "deleted" and "tampered" with Implicit's information, nor do they address why Stine would be considered to still have "permission" to access its computer systems after he had been terminated and the termination letter explicitly stated that his access was revoked.

It is undisputed that Stine knew he was terminated effective immediately on June 14, 2024, and was notified that access to company systems was to be disabled by the end of the day. *See* Lavallee Declaration, Ex. G; J. Stine Declaration ¶ 23.  Traver Stine's credentials were apparently used to restore Stine's access, whereupon Stine disabled Lavallee's access to Implicit systems. Lavallee Declaration ¶ 19-20.  Stine knowingly accessed Implicit systems without permission using his own credentials, and he altered or disabled Lavallee's access to the same. *See* Ex. L. After termination, and before he purportedly replaced Lavallee as CEO, Stine obtained data by downloading his entire Google Workplace mailbox.  Lavallee Declaration, ¶ 31, Ex. M.  He retains that data now.  For the same reasons that Implicit has shown it is likely to prevail on the merits of Count One, it has done the same with respect to Count Two.[9]

### C.   Counts Three and Four: Violations of the Defend Trade Secrets Act (DTSA) and the California Uniform Trade Secret Act (CUTSA)

Counts Three and Four assert violations of the federal Defend Trade Secrets Act 18 U.S.C. § 1839, *et seq*. (DTSA), and the California Trade Secret Act (CUTSA), Cal. Civ. Code § 3426, *et seq*.  Courts analyze these claims together because the elements are substantially similar.  *See InteliClear, LLC v. ETC Glob. Holdings, Inc*., 978 F.3d 653, 657 (9th Cir. 2020).

Under the federal DTSA, a "trade secret" is defined as: "[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *InteliClear, LLC*, 978 F.3d at 657.  The information must "derive[] independent economic value,

---

[9] It is unclear whether Traver Stine personally restored Stine's access, so it is not clear whether she violated this statute without definitive information that she restored the access.

actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." 18 U.S.C. § 1839(3). Therefore, the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret. *See id.* §§ 1839(3), (5).

To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff. *See id.* § 1839(5).

### 1. "Plaintiff Possessed a Trade Secret"

To prove ownership of a trade secret, plaintiff "must identify the trade secrets and carr[ies] the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). "The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.' " *Imax Corp. v. Cinema Techs.*, *Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). A plaintiff must "clearly refer to tangible trade secret material" instead of referring to a "system which potentially qualifies for trade secret protection." *Imax Corp.*, 152 F.3d at 1167.

Implicit says that defendants possess source code software tools, business development opportunity plans, information about customer negotiations, customer contracts, internal budgets, and forecasting which constitute trade secrets. *See* Lavallee Decl. ¶¶ 41, 44; Motion 16:10-25. Defendants do not deny it. The source code and software tools that remain in the defendants' possession are alleged to be "the backbone of Implicit's Syrup Emulation Engine as well as several other proprietary compilers, including a compiler that enables PlayStation 2 games and set Implicit apart from the competition." *Id.* ¶ 44. Implicit has also shown that it takes appropriate, industry-standard measures to protect its proprietary information. Lavallee Decl. ¶ 49. These allegations are sufficient to show that Implicit "possessed a trade secret."

### 2.    "Defendant Misappropriated That Trade Secret"

To show misappropriation for the purposes of stating a DTSA/CUTSA claim, a plaintiff must show one of two categories: (1) wrongful acquisition, or (2) disclosure or use of the trade secret without consent. 18 U.S.C. § 1839(5)(A)-(B).

Implicit argues that the defendants misappropriated its trade secrets when they: (i) "accessed Implicit's computer systems after Jacob Stine's termination and downloaded confidential and proprietary materials from Implicit's Google Workspace," *see* Lavallee Decl. ¶ 31, (ii) "retained without authorization and refused to return and thereby converted for their own use Implicit's source code and other trade secrets acquired during employment at the time of termination," *see id.* ¶ 58, and (iii) "converted the La Honda data center (which houses the trade secrets) by failing to return it to Implicit," *id.*; *see* Motion 17:5-16.  These allegations are more than sufficient to meet the second prong of the DTSA/CUTSA pleading requirement as to Stine. Implicit has alleged it is the owner of the source code and software tools (Syrup compiler and Auto-test system).  *See* Lavallee Declaration ¶ 57.  Stine downloaded that information and has refused to return it.

With respect to Traver Stine, to state a claim for *indirect* trade secret misappropriation, a plaintiff must allege facts showing that a defendant: (i) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (ii) knew or had reason to know it was a trade secret and that the disclosure was a mistake.  *See Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78–79 (N.D. Cal. 2020) (citing *Cal. Police Activities League v. Cal. Police Youth Charities, Inc.*, No. C 08-1991 PJH, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009)).  Traver Stine had reason to know the information like the Syrup compiler and Auto-test system stored on the La Honda data center were trade secrets because she signed a confidentiality agreement on April 1, 2024. *See* Compl. ¶¶ 20, 73, 84; Lavallee Declaration, Ex. F.  It is likely that Traver Stine had reason to know that Stine's downloading Implicit's information after termination was improper.

Defendants' only response to the misappropriation prong is, once again, that Stine himself

United States District Court
Northern District of California

1    was authorized to have "all Implicit information."  Oppo. 10-11.  First, this argument depends

2    upon Stine's insistence that even after termination, he was allowed to retain all Implicit's

3    proprietary information as Implicit's "rightful CEO".  As discussed above, that defense is

4    probably not a winning one.  Moreover, defendants appear to make this argument only about the

5    information they already had at the La Honda data center as a function of Stine's prior role as

6    Implicit CTO.  *See id.* ("Implicit acknowledges: 'Jacob Stine, in his capacity as Implicit's CTO,

7    already held substantial quantities of Implicit's confidential and proprietary information and its

8    trade secrets by virtue of his day-to-day duties'.")  But Implicit alleges that Stine downloaded

9    more information than what he already had.  Implicit has met its burden to show that defendants

10   "wrongfully acquir[ed]" its information. [10]

11   **3.    "Misappropriation Caused or Threatened Damage to Plaintiff"**

12   Courts generally presume harm when proprietary information is misappropriated.  *See,*

13   *e.g., Apple Inc. v. Rivos, Inc.*, No. 5:22-CV-02637-EJD, 2023 WL 5183034, at *9 (N.D. Cal. Aug.

14   11, 2023); *Cisco Sys., Inc. v. Chung*, 2020 WL 4505509, at *9 (N.D. Cal. Aug. 5, 2020).

15   Defendants offer no reason why the same should not be true here.  I will presume harm,

16   particularly considering that Implicit shut down its data centers to mitigate damages.

17   Implicit has shown each requisite element to plead DTSA/CUTSA claims.  And because

18   the defendants' only affirmative defense at this point is that they had authorization to appropriate

19   the information that they did (a defense that I have already considered and found unpersuasive at

20   least as of now), Implicit has shown it is likely to prevail on the merits of Counts Three and Four.

21   **D.    Counts Five and Six: Breach of Contract (Stine) and Breach of Loyalty**
            **(Traver Stine)**

22   The Confidential Information and Invention Assignment Agreement (CIIAA) that Stine

23   apparently signed states that the performance of the agreement will be interpreted under the laws

24   of the state of Delaware.  Lavallee Decl. ¶ 14, Ex. E.   The parties agree that Delaware law applies.

25   *See* Oppo. 11:18-19.  The elements for a breach of contract under Delaware law are: (1) the

26

27

28   ───────────────
     [10] They also ignore that even if Stine was authorized to possess Implicit's proprietary information,
     Traver Stine probably was not, so that defense would not apply to her.

1    existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) resulting

2    damage to the plaintiff.  *See VLIW Tech., LLC v. HewlettPackard Co*., 840 A.2d 606, 612 (Del.

3    2003).

4            Implicit has produced a copy of the CIIAA signed by Stine and Lavallee on January 24,

5    2023.  Lavallee Decl. Ex. E.  The CIIAA provides that Stine "shall not make copies of [Implicit]

6    Confidential Information except as authorized by the Company or in the ordinary course of my

7    obligations to the Company under the Relationship," and that "[a]t the time of termination of the

8    Relationship, [Stine] will deliver to the Company (and will not keep in [his] possession, recreate

9    or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists,

10   correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials,

11   flow charts, equipment, other documents or property, or reproductions of any of the

12   aforementioned items developed by [Stine] pursuant to the Relationship or otherwise belonging to

13   the Company, its successors or assigns." *Id.*

14           The defendants contend that Stine did not sign the CIIAA.  They argue that "[t]he face of

15   the CIIAA document attached to Lavallee's declaration does not establish that Stine ever signed or

16   even acknowledged the CIIAA. The alleged CIIAA merely shows Lavallee's and Stine's names

17   typed onto a document. There is no electronic confirmation of the signatures on the face of the

18   CIIAA as attached to Lavallee's declaration or any control number on the document that would

19   suggest its authenticity." Oppo. 11:23-27.  Stine says that he has "no recollection of seeing the

20   CIIAA attached to Lavallee's declaration before approximately May 29, 2024." *Id.* 12:1-2.  He

21   says that it was his practice to sign paper documents or use online signature software like Dropbox

22   Sign or DocuSign. *Id.* 12:2-4.

23           On this record, Stine's argument is unpersuasive.  Implicit has produced what appears to

24   be a run-of-the-mill confidentiality agreement, the likes of which employees are often required to

25   sign as a condition of employment.  It appears that several documents were signed in the same

26   manner by both Stine and Lavallee around the same dates, January 24, 2023, and January 26,

27   2023, including the CSPA and the document that Stine and Lavallee that made Lavallee CEO and

28   Stine CTO of Implicit.  *See* Lavallee Decl. Ex. D.  And as a founder, one of the senior executives

United States District Court
Northern District of California

1    and one of two members of the Board, it is difficult to believe that Stine was unaware of the

2    agreements.  In the absence of evidence other than Stine's lack of recall that he did not sign the

3    CIIAA, it is more likely than not that he did.

4         Accordingly, Implicit's likelihood of success on the merits of a breach of contract claim is

5    high.  Section 3(a) of the confidentiality agreement states, "I shall not make copies of . . .

6    Confidential Information except as authorized by the Company or in the ordinary course of my

7    obligations to the Company under the relationship." Lavalee Decl. Ex. E.  According to section

8    3(b) of the same, confidential information includes: "technical data, trade secrets, research,

9    agreements with third parties, lists of or information relating to employees and consultants,

10   marketing plans, business plans, financials forecasts etc." and means "any and all information and

11   physical manifestations thereof not generally known or available outside the company[.]" *Id.*

12        Stine remains in possession of the La Honda data center and has refused to return any

13   items requested by Implicit, suggesting breach of an obligation imposed by section 3(b) of the

14   CIIAA.  And as for the damages, Implicit's diminished capacity and the possibility of the public

15   gaining access to its proprietary information pose a threat to the company. Plaintiff has shown it is

16   likely to prevail on the merits of Counts Five and Six. [11]

17    **II.**     **LIKELIHOOD OF IRREPARABLE HARM**

18        To obtain a preliminary injunction, "a plaintiff must *demonstrate* immediate threatened

19   injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d

20   1011, 1022 (9th Cir. 2016) (emphasis in original).  Implicit has demonstrated that it faces

21   irreparable harm if the defendants are not enjoined from both (1) accessing its computer systems

22   and (2) acquiring, using, or disclosing its confidential, proprietary, and trade secret information,

23   which the defendants still possess.  A preliminary injunction is appropriate.

24        Implicit has shown that the defendants believe that Implicit's proprietary information is

25   theirs to do with what they will.  The defendants contend that Stine is Implicit's rightful CEO, *see*

26

27      _____

[11] As for Implicit's breach of loyalty claim against Traver Stine, the defendants do not address it in their opposition.  It is not necessary to consider the merits of that claim, as Implicit has shown it is likely to prevail on the merits of each of its other claims against both defendants.

28

*(left margin)* United States District Court  Northern District of California

United States District Court
Northern District of California

1  Oppo. 1:17-21, and assert that he did not sign a confidentiality agreement, *see id.* 11:18-12:10.

2  Taken alongside their retention of Implicit's data, this creates a high risk that the defendants could

3  use or disclose Implicit's proprietary information in a way that would irreparably harm the

4  company.  While the defendants do insist that they only have Implicit's best interests in mind, *see*

5  *id.* 13-14, this does not mitigate the high risk that they would use or disclose Implicit's proprietary

6  information in a way that *they* believe would benefit the company but that is contrary to how

7  Implicit chooses to use its information and technology and may ultimately cause the company

8  irreparable harm.

9  **III.     BALANCE OF EQUITIES AND PUBLIC INTEREST**

10  Finally, a plaintiff seeking a preliminary injunction must show that "the balance of equities

11  tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S.Ct.

12  365.  The court "must balance the competing claims of injury and must consider the effect on each

13  party of the granting or withholding of the requested relief." *Id.* at 24, 129 S.Ct. 365.  Implicit has

14  shown that the balance of equities tips in its favor with respect to its first two requests for

15  preliminary relief, which ask that the defendants be enjoined from (1) accessing its computer

16  systems and (2) from acquiring, using, or disclosing its confidential, proprietary, and trade secret

17  information.  It has not done the same for its third request, which seeks a mandatory injunction

18  requiring the defendants to return all of Implicit's information currently in their possession at the

19  La Honda data center to the company.

20  The first two requests seek an injunction that will protect Implicit's proprietary,

21  confidential, and trade secrets information without imposing an undue burden upon the

22  defendants.  The only hardship that defendants have identified with respect to these requests is that

23  compliance would be difficult.  They protest that it is "not known what 'confidential' information

24  the defendants would be prevented from 'accessing, using or disclosing,' as there is a dispute as to

25  what confidential information they rightfully possess." Oppo. 12:20-28.  This argument is

26  unpersuasive.  Implicit has clearly identified what assets it seeks to protect, *see* Dkt. No. 36, Ex.

27  A; *see also* Lavallee Decl. Ex. P (email outlining exactly what physical assets Implicit seeks back

28  from the defendants).  The defendants' arguments that they "rightfully possess" the information

1    are unlikely to prevail, and they provide no reason why they should be allowed to access, acquire,

2    use, or disclose information that is not theirs.  *See supra*, Section A.  And the defendants assert

3    that it is "in the Stines' best interests that Implicit succeed" and that it is their best interest "as

4    significant stockholders of Implicit" that Implicit's trade secrets are not disclosed.  *See* Oppo. 13-

5    14.  Taking the defendants at their word, it would seem granting the preliminary injunction

6    enjoining them from accessing Implicit's computer systems and from acquiring, using, or

7    disclosing Implicit's confidential, proprietary, and trade secret information will serve all parties'

8    interests while the questions driving this litigation are resolved.  Finally, it is well settled that the

9    public interest is served by the protection of trade secrets.  *See e.g.*, *Bank of Am., N.A. v. Lee*, 2008

10   WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072,

11   1078 (N.D. Cal. 2016).

12          However, as I indicated at the preliminary injunction hearing, the *mandatory* injunction

13   that Implicit seeks is not justified.  "In general, mandatory injunctions are not granted unless

14   extreme or very serious damage will result."  *Doe v. Snyder*, 28 F. 4th 103, 112 (9th Cir. 2022).

15   That standard is not met here.  While Implicit has shown it is likely to prevail on its claims, there

16   remains a possibility that the defendants will prevail in this litigation.  If that were to happen after

17   the defendants had complied with a court order to surrender all the property Implicit now seeks,

18   that surrender could prove heavily burdensome.  Critically, Stine says that the computer that

19   Implicit asks him to physically return, which is called "Reynard," is an "individual personal

20   computer" that resides at the home he shares with Traver Stine.  Stine Decl. ¶ 11; Oppo. 3:23-24

21   ("Stine's home hosted the individual personal computer Reynard that Implicit used to act as a

22   server").  A mandatory injunction ordering the defendants to turn over to Implicit property that

23   appears to be merged at least in part with their personal computer system would impose an undue

24   burden on the defendants.  Stine asserts that he does not intend to do anything to harm Implicit,

25   and in fact believes that the litigation will result in his control of the company.

26          This order enjoins the defendants from accessing Implicit's computer systems and from

27   acquiring, using, or disclosing its confidential, proprietary, and trade secret information.  The risk

28   of irreparable harm that Implicit has identified is mitigated by the preliminary relief I am granting

United States District Court
Northern District of California

it in accordance with its first two requests and by the action Implicit has already taken to decouple the data centers.  A mandatory injunction would unnecessarily burden the defendants while providing no measurable added protection to Implicit or benefit to the public.  But if Implicit learns that the defendants are preparing to violate this order, it should inform the court and I will revisit the question of whether a mandatory injunction should issue.

Balancing the equities and considering both sides' impacts, as well as the public interest, I conclude that the balance weighs in favor of granting the preliminary injunction subject to the limitations outlined above.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. The defendants, Jacob Stine and Juanita Traver Stine, are enjoined from (1) accessing Implicit's computer systems; and (2) to the extent any of the following information is not publicly available or is not kept confidential, they are enjoined from acquiring, using or disclosing to any third-party (other than to those with a need-to-know, such as attorneys of record or expert witnesses, and in accordance with any stipulated protective order entered in this litigation), all of the following Implicit confidential, proprietary, and trade secret information, including: all source code and software tools which are protected by Implicit logins from Git, GitHub, and GitLab; all source code from any Implicit source code repository; all confidential partner source code; all generated binary files; all intermediate object files; all game symbol files; business development plans and strategic initiatives; information and communications concerning ongoing customer negotiations; confidential customer contracts; internal budgeting and forecasts; and financial records.

**IT IS SO ORDERED.**

Dated: September 6, 2024

William H. Orrick
United States District Judge