UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IMPLICIT CONVERSIONS, INC.,

       Plaintiff,

    v.

JACOB STINE, et al.,

       Defendants.

Case No. 24-cv-03744-WHO

**ORDER GRANTING MOTIONS TO DISMISS**

Re: Dkt. Nos. 38, 39

After Implicit Conversions, Inc. ("Implicit") filed suit against its former employees Jacob Stine ("Stine") and Juanita Traver Stine ("Traver Stine"), alleging that they committed computer fraud against the company and violated their contracts, Stine and Traver Stine (who are married) filed counterclaims, alleging that Implicit and its Chief Executive Officer Robin Lavallee acted wrongfully with respect to their terminations. Stine asserts counterclaims against both Lavallee and Implicit; only Lavallee has moved to dismiss. Traver Stine also asserts counterclaims against both Lavallee and Implicit; both counter defendants have moved to dismiss her claims. I vacated the hearings on these motions because oral argument is unnecessary. *See* Civ. L.R. 7-1(b). The motions to dismiss are GRANTED.

**BACKGROUND**

**A.**     **Regarding Stine**

According to Stine's Countercomplaint, Stine and Lavallee co-founded Implicit in 2019 as "50/50 members." Stine Countercomplaint ("Stine Counter Compl.") [Dkt. No. 25] ¶ 6. At the time of Implicit's incorporation in 2023, Stine's home (that he shared with Traver Stine) was Implicit's principal place of business and that address and PO Box were used when sending and receiving official company correspondence. *Id.* ¶ 8. That home also held one of the "individual

1    personal computers" that Implicit used as a server, called "Reynard." *Id.*

2         Stine and Lavallee agreed that Lavallee would serve as Implicit's Chief Executive Officer

3    ("CEO") and Stine would serve as its Chief Technology Officer ("CTO"). *Id.* ¶ 9.  On April 28,

4    2022, Lavallee told Stine: "I am not your boss. You are not my boss. It just gives better

5    responsibility for the people that we hire. They know who to look up to when they have questions,

6    and that also means that you get to decide for tech questions. So let me know if that works or if

7    that is a deal breaker." Stine agreed to this arrangement. *Id.*

8         While Stine was employed at Implicit, Lavallee and Implicit "[were] aware" that Stine had

9    "neurodivergent traits consistent with traits of those with autism." *Id.* ¶ 13.  Stine and Lavallee had

10   an understanding that Stine could "vent his personal stresses related to the workplace to Lavallee

11   privately so that he was better able to perform his job." *Id.* ¶ 14.

12        On May 10, 2024, Stine "suffered a medical crisis that required medical attention." *Id.* ¶

13   15.  As a result, he was placed on a medically advised leave of absence from work. *Id.*  Stine

14   claims that the medical crisis stemmed from "Stine and Lavallee having a communication

15   breakdown." *Id.*  Lavallee was "aware" of Stine's medical crisis.  *Id.*

16        On May 28, 2024, while Stine was still on medical leave, Lavallee sent him a letter asking

17   that he resign from his position at Implicit by May 31, 2024.  *Id.* ¶ 17.  Stine's counsel responded

18   on May 31, 2024, stating that Stine had retained counsel, remained on medical leave, and that

19   "communication would be forthcoming." *Id.*  A few days later, Stine's counsel reached out again

20   to schedule a phone call with Implicit's corporate counsel.  *Id.*  On June 14, 2024, Lavallee sent

21   Stine a letter informing him that he had been terminated. *Id.*  That same day, after he was

22   terminated, Stine accessed Implicit's computer systems.  *See* Stine Answer [Dkt. No. 25] ¶¶ 22-24.

23        On June 17, 2024, Lavallee signed a "Resolution Adopted by Written Consent of

24   Stockholders in Lieu of Special Meeting" that purported to remove Stine from the Implicit Board

25   of Directors. *Id.* ¶ 21.  Implicit paid Stine his final wages on June 19, 2024.  *Id.*  After Stine was

26   terminated, he "secured a majority of the stockholders of Implicit" and signed a stockholder

27   consent removing Lavallee from Implicit's Board of Directors and appointing Traver Stine and

28

United States District Court
Northern District of California

2

1    Sayed Mahmood Alawi[1] as Directors.  The stockholder consent purported to be effective June 19,

2    2024. *Id.* ¶ 20.

3          **B.      Regarding Traver Stine**

4          According to Traver Stine's Countercomplaint, Traver Stine joined Implicit in "early

5    2022" as a Payroll Administrator and later moved to Human Resources.  *See* Traver Stine

6    Countercomplaint ("Traver Stine Counter Compl.") [Dkt. No. 26] ¶ 6.

7          On May 10, 2024, Traver Stine and Stine met to discuss "various issues surrounding the

8    workplace, particularly communication issues with other employees." *Id.* ¶ 10.  According to

9    Traver Stine, Stine "did not seem to be aware of any outstanding issues," and the two of them

10   discussed ways that Stine could improve his communication skills. *Id.*  But that meeting ended

11   when Stine "began to demonstrate that he was in a medical crisis," which "continued to intensify

12   over the next day." *Id.* ¶ 11.  On May 11, 2024, Stine sought medical attention, and took time off.

13   *Id.*  On or about May 13, 2024, Lavallee messaged Traver Stine, stating that "[Stine] has always

14   been writing stuff like that on Slack (self-harm, harm to others), in my private messages and I've

15   learned to ignore it; I shouldn't have." *Id.* ¶ 12.  At this point, acting in her capacity as Human

16   Resources leader, Traver Stine approached another Implicit employee on the management team,

17   non-party William Litshauer, to discuss the issue of Stine's medical leave and how the company

18   could support his return to work.  *Id.*  Traver Stine describes this as "start[ing] the interactive

19   process to see if there were any reasonable accommodations Implicit could offer Stine to address

20   his medical and health needs." *Id.* ¶ 13.

21         Eventually, Lavallee suggested "working with an outside vendor who could assist with

22   better communications between Lavallee and Stine." *Id.*  Before they met with the outside vendor,

23   Lavallee expressed to Traver Stine that he talked with Litshauer and the two had agreed that Stine

24   should not come back to work. *Id.* ¶ 14.  Nevertheless, Litshauer and Traver Stine met with the

25   outside vendor one time.  *Id.* ¶ 15.  Traver Stine alleges that there "has been no communication

26   between Stine and anyone other than her at Implicit regarding the interactive process, reasonable

27

28   [1] Mr. Alawi has since been dismissed from the case as a defendant.  *See* Dkt. No. 48 (Notice of
Voluntary Dismissal re: Sayed Alawi).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    accommodation, or his return to work." *Id.*

2         Shortly after Implicit terminated Stine's employment, Traver Stine's credentials were used

3    to login to Implicit's computer systems, *see id.* ¶ 16; Stine Answer ¶ 26.  Around the same time,

4    Lavallee sent Traver Stine what appeared to be a performance review stating that her role as

5    Human Resources leader was a "failure."  *Id.* ¶ 17.[2]  Lavallee referenced how Traver Stine had

6    handled Stine's departure from the company and how she had handled prior employee complaints

7    about Stine (and perhaps other matters) as justification for this conclusion.  *Id.*

8         Also on June 14, 2024, Lavallee called the police to the home that Traver Stine shares with

9    Stine, and police officers arrived at their residence. *Id.* ¶ 18.  The police apparently stated that they

10   were checking on "disturbing messages" sent "months ago." *Id.* ¶ 19.[3]  After this, Lavallee sent an

11   email to "the female employees of Implicit" and to a "female external vendor," "informing them

12   that he had called 9-1-1 to perform a wellness check on Traver Stine." *Id.* ¶ 20.  Three days later,

13   Traver Stine sent a written dispute of her performance review to Litshauer.  In her dispute, she

14   provided several explanations for the problems that Lavallee raised in her performance review.

15   *See id.* ¶ 21(a)-(c).  Litshauer forwarded the dispute to Lavallee, who responded on June 17, 2024,

16   stating that her complaint was received, would be investigated, and that she was being placed on

17   paid leave.  *Id.* ¶ 22.  On June 24, 2024, Traver Stine received paperwork indicating that she too

18   had been terminated.  *Id.* ¶ 23.

19        **C.    Procedural Background**

20        Implicit filed the underlying case against Stine and Traver Stine on June 21, 2024.  Dkt.

21   No. 1 (Complaint).  On July 2, 2024, Implicit filed a motion seeking a temporary restraining order

22   ("TRO") and preliminary injunction against the defendants; I denied the TRO, but later granted

23   the preliminary injunction.  *See* Dkt. Nos. 19, 43.

24        In the intervening weeks, Stine and Traver Stine answered the complaint and filed their

25   counterclaims against Implicit and Lavallee.  *See* Dkt. Nos. 25, 26.  Both counter defendants

26

27   ───────────────
     [2] This email is not attached as an exhibit.

28   [3] There is also no associated police report or write-up for this visit in the record.

                                        4

United States District Court
Northern District of California

1  moved to dismiss Traver Stine's counterclaims against them.  *See* Dkt. No. 38 (Implicit &

2  Lavallee's Motion to Dismiss Traver Stine's Counterclaim).  Lavallee moved to dismiss Stine's

3  counterclaims against him, *see* Dkt. No. 39 (Lavallee's Motion to Dismiss Stine's Counterclaim);

4  Implicit did not move to dismiss Stine's counterclaims against it.  This order resolves both

5  motions to dismiss.

6  **LEGAL STANDARD**

7  Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

8  if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

9  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

10  face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A

11  claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the

12  reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

13  U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). There must be "more

14  than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require

15  "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to

16  relief above the speculative level." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955.

17  In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

18  court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

19  plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is

20  not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

21  fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

22  2008).  If the court dismisses the complaint, it "should grant leave to amend even if no request to

23  amend the pleading was made, unless it determines that the pleading could not possibly be cured

24  by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

25  **DISCUSSION**

26  **I.   STINE'S COUNTERCLAIMS**

27  **A.  Counterclaim 1: Breach of Contract (Against Lavallee)**

28  Stine contends that "[a]s the co-founders of Implicit, Stine and Lavallee agreed as between

5

United States District Court
Northern District of California

1   the two of them that neither would be the other's boss and that they would be '50/50' as to each

2   other within the company." Stine Counter Compl. ¶ 21.  He claims that this was a "a key term of

3   the agreement between Lavallee and Stine – Stine would not have agreed to work with Lavallee if

4   Lavallee could simply 'fire' Stine from the company he founded." *Id.* ¶ 22.  This agreement forms

5   the basis for his breach of contract claim against Lavallee.

6          To be entitled to damages for breach of contract, a plaintiff must plead and prove the

7   following elements: (1) the existence of a contract, (2) plaintiff's performance or excuse for

8   nonperformance, (3) defendant's breach, and (4) resulting damage to the plaintiff. *Oasis West*

9   *Realty, LLC v. Goldman,* 51 Cal. 4th 811, 821 (2011); *Reichert v. General Ins. Co.,* 68 Cal. 2d

10   822, 830 (1968).  Stine has not shown the first element, let alone the following three.  The

11   purported contract is insufficiently definite to plausibly state a claim for breach.  Stine has only

12   pleaded that Lavallee stated on April 28, 2022, that: "I am not your boss. You are not my boss. It

13   just gives better responsibility for the people that we hire. They know who to look up to when they

14   have questions, and that also means that you get to decide for tech questions. So let me know if

15   that works or if that is a deal breaker." Stine Counter Compl. ¶ 9.  This statement provides no

16   notice of the bounds of the supposed contract or the obligations of either party under such an

17   agreement.  From the pleadings, this appears to have been a conversation about titles, not a

18   binding contract in any way.

19          Stine responds that the statement, "let me know if that works or if that is a deal breaker"

20   indicates that it was a contract, *see* Stine Opposition ("Stine Oppo.") [Dkt. No. 46] 4:14-19, but I

21   am not persuaded.  Without firmer indication that Stine and Lavallee formed a cognizable contract

22   such that Lavallee was somehow prevented from terminating Stine's employment, Stine's breach

23   claim as it is alleged cannot proceed.  The motion to dismiss counterclaim one is GRANTED.

24          **B.  Counterclaim 5: Waiting Time Penalties (Against Lavallee)**

25          Stine also alleges that Lavallee violated California Labor Code section 201 when he failed

26   to timely pay Stine the approximately $5,000.00 earned and unpaid wages that Implicit owed Stine

27   at the time of his discharge.  But the counterclaim does not allege any facts that would give rise to

28   personal liability for Lavallee.

6

1   California Labor Code section 201(a) provides that employees are entitled to their pay

2   "immediately" upon discharge by the employer.  Cal. Labor Code § 201.  If the employer fails to

3   make such payment immediately, "the wages of the employee shall continue as a penalty from the

4   due date thereof at the same rate until paid." Labor Code § 203.  Section 558.1(a) of the same

5   imposes personal liability for a Section 203 violation on those who cause the violation: "[a]ny

6   employer or other person acting on behalf of an employer, who violates, or causes to be violated,

7   any provision regulating minimum wages or hours and days of work in any order of the Industrial

8   Welfare Commission, or violates, or causes to be violated, Sections 203 . . . may be held liable as

9   the employer for such violation." Cal. Labor Code § 558.1(a).

10   The pleadings fail to show that Lavallee "caused" Stine to be paid late, as is required to

11   impose personal liability on a company officer for violations of sections 203.  Stine offers the

12   letter submitted with Lavallee's prior declaration, from Lavallee to Stine, stating that Stine will be

13   paid in accordance with Implicit's payroll practices following his termination.  *See* Dkt. No. 17-2

14   Ex. G.  Stine argues that this letter shows that it is "certainly 'plausible' under [section 558.1(a)]

15   that Lavallee 'caused' this violation of Labor Code § 203." Stine Oppo. 6:14-23.  But he does not

16   plead facts in support.  I agree with Lavallee that just because he purportedly signed a letter stating

17   that Stine would be paid out does not mean that Lavallee was the reason that it took five days for

18   Stine to receive payment.  *See* Lavallee Motion 9-10.

19   Stine's only support for personal liability is that Lavallee was the "outward-facing Chief

20   Executive Officer," *see* Stine Counter Compl.  ¶ 9, and that Lavallee "willfully failed to pay Stine

21   all his earned wages upon termination for a total of 5 days," *id.* ¶ 55.  The former allegation is too

22   vague to support the kind of personal liability Stine is trying to show, and the latter is conclusory.

23   Without more specific allegations showing that Lavallee caused Stine's post-termination payout to

24   be delayed, this counterclaim is not plausible.  Lavallee's motion to dismiss Stine's fifth

25   counterclaim is GRANTED.

26

27

28

United States District Court
Northern District of California

II.     **TRAVER STINE'S COUNTERCLAIMS**

A.     **Counterclaim 1: Wrongful Termination Based on Association (Against Implicit)**

Traver Stine alleges that Implicit terminated her because of her association with Stine, who is allegedly perceived to have autism.  Her first counterclaim asserts "wrongful termination based on association with member of a FEHA protected class." Traver Stine Counter Compl. ¶ 24.

To state a claim for wrongful termination, the plaintiff must allege facts showing that the plaintiff, "(1) was a member of a protected class; (2) was qualified for the position sought or was performing competently in the position already held; (3) suffered an adverse employment action, such as termination, demotion, or denial of an available job; and (4) some other circumstance suggests discriminatory motive." *Brown v. Los Angeles Unified School Dist.*, 60 Cal. App. 5th 1092, 1105 (2021).  Association with a person perceived to have a disability qualifies as a disability, but in that situation, "the disability must be a substantial factor motivating the employer's adverse employment action." *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1037 (2016).

The facts as pleaded fail to plausibly allege that Stine's disability was a substantial factor motivating Implicit's termination of Traver Stine.  Stine's Answer admits that Traver Stine's credentials were used to access Implicit's Google Admin system, restore Stine's access to the company's computer systems, and disable Lavallee's access to Implicit's computer systems.  *See* Stine's Answer to Complaint and Counterclaim ("Stine Answer") [Dkt. No. 25] ¶¶ 26-28.  Stine also admitted that after Traver Stine's credentials were used to restore his access to the company computer systems, Stine used that renewed access to take Implicit's computer systems offline. *See id.* ¶¶ 29-33.  Counterclaim one fails to mention that Traver Stine had been helping Stine manipulate Implicit's computer systems immediately before she was suspended and then terminated.  *See generally* Complaint [Dkt. No. 1]; *see also* Order Granting Preliminary Injunction [Dkt. No. 43].  She attempts to now distance herself from these circumstances, but if she is to plausibly state a claim for wrongful termination based on association, she will need to address them head-on.

Her theory of termination based on association is not plausible, at least as pleaded.  Traver

1   Stine's counterclaim alleges that "it was more convenient for Implicit to (a) fire both Stine and

2   Traver Stine rather than have to engage in the interactive process with Stine or Traver Stine for

3   Stine's benefit, and (b) concoct reasons that Traver Stine did not control her neurodivergent

4   husband as the basis for her termination." Traver Stine Counter Compl. ¶ 31.  This allegation is

5   conclusory and finds no support in the facts as alleged.  The justifications that Implicit gave for

6   firing Traver Stine include what Implicit framed as her failure in dealing with other employees'

7   issues with Stine, and her apparent failure in dealing with him as an employee.  While those

8   reasons were connected to Stine and how Traver Stine handled him in her capacity as HR leader,

9   none of the reasons given for Traver Stine's termination, at least that she has identified thus far,

10  are recognizably connected to Stine's perceived autism.  Again, to state a plausible claim, Traver

11  Stine must allege facts from which I could infer that Stine's disability was a "substantial factor

12  motivating [Implicit's] adverse employment action." *See Castro-Ramirez*, 2 Cal. App. 5th at 1037.

13      In her Opposition, Traver Stine insists that "[t]he facts leading up to [her] termination,

14  including a meritless negative performance review which was leveled at [her] failure to do

15  something about her husband, suggest that Implicit had a substantial motivating reason to

16  discipline and then terminate [her] due to her association with her husband, who had been fired the

17  same day due to his perceived medical condition." Traver Stine Opposition ("Traver Stine Oppo.")

18  [Dkt. No. 47] 6:6-12.  This reasoning fails to engage with the admitted fact that her login

19  credentials were used to enable Stine's interference with Implicit's computer systems, which

20  would be grounds for termination.  Unless Traver Stine can plead specific, nonconclusory facts

21  that show a connection between her, her husband's perceived disability, and Implicit's decision to

22  terminate her, this claim cannot proceed.[4]

23      **B.      Counterclaim 2: Intrusion into Private Affairs (Against Lavallee and Implicit)**

24      Traver Stine alleges that when Lavallee sent out an email to "all the female employees" at

25

26  [4] In her Opposition, Traver Stine states that she can "amend this disability-based associational
    discrimination claim to allege further details of her purported performance review and attempts
27  she made at getting Stine accommodations in the workplace . . . [and] allege details of the 911
    incident, *see infra* Section II(B), which indicate that Implicit and Lavallee found it easier to
28  terminate her than to continue employing the wife of a person with a perceived mental condition."
    Oppo. 6:23-28.  I encourage her to do so.

United States District Court
Northern District of California

1    Implicit stating that he had called 9-1-1 to perform a wellness check on her at the residence she

2    shares with Stine, he violated her reasonable expectation that her personnel file would be kept

3    confidential by her employer.  *See* Traver Stine Counter Compl. ¶¶ 38-39.  The tort of intrusion

4    "has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner

5    highly offensive to a reasonable person." *Sanders v. American Broadcasting Co.*, 20 Cal. 4th 907,

6    914 (1999).  The first element requires that the plaintiff show that she had a "reasonable

7    expectation of seclusion or solitude in the private place, conversation, or [matter]." *Shulman v.*

8    *Group W Productions, Inc.*, 18 Cal. 4th 200, 232 (1998).

9         Traver Stine argues that she had a reasonable expectation that "personal issues related to

10   her personnel file . . . would be kept confidential." Traver Stine Counter Compl. ¶ 38.  She

11   reasserts the same in her Opposition.  *See* Traver Stine Oppo. 7:6-25.  But she does not state how

12   Lavallee's communicating to other Implicit employees that he had called the police to conduct a

13   wellness check on her revealed information that was related to her personnel file.

14        It is not obvious why Lavallee would decide to inform other members of the company

15   team that he had made such a call, but the counterclaim does not allege facts from which I can

16   infer that Lavallee intruded into a "private place, conversation or matter" about which Traver Stine

17   had a "reasonable expectation of privacy."  More is needed to plausibly allege this claim.

**CONCLUSION**

19        For the foregoing reasons, Lavallee's motion to dismiss Stine's first and fifth counterclaim

20   is GRANTED, as is the counter defendants' motion to dismiss Traver Stine's counterclaims.  Stine

21   and Traver Stine shall file any amended counterclaims within 20 days of the date below.

22        **IT IS SO ORDERED.**

23   Dated: October 15, 2024



William H. Orrick
United States District Judge