UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JACOB STINE, et al.,<br><br>Defendants. | Case No. 24-cv-03744-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND DENYING MOTIONS TO STRIKE**<br><br>Re: Dkt. Nos. 62, 64 |

Defendants and countercomplainants Jacob Stine ("Stine") and Juanita Traver Stine ("Traver Stine"), who are married, have amended their counterclaims against their former employer, plaintiff and counter defendant Implicit Conversions, Inc. ("Implicit"), and its Chief Executive Officer, Robin Lavallee. Implicit had filed suit against them alleging that they committed computer fraud and violated their contracts. They responded with claims challenging the justifications for their respective terminations and asserting other individual claims against Lavallee. Implicit and Lavallee now move to dismiss three of Stine's seven counterclaims and all three of Traver Stine's counterclaims, and ask that I strike both Stine and Traver Stine's defamation counterclaims for violating California's anti-SLAPP laws.[1]

Stine's first counterclaim for promissory estoppel and Traver Stine's first two counterclaims under the Fair Housing and Employment Act ("FEHA") are not plausible; no clear and unambiguous promise was made to Stine, and Traver Stine cannot plead damages arising from her demotion. Their defamation claims are plausible, however. Accordingly, the motions to dismiss are GRANTED in part and DENIED in part, and the motions to strike are DENIED.

---

[1] The counter defendants have not mooved to dismiss Stine's counterclaims for wrongful termination based on disability (Counterclaim Two, against Implicit), disability discrimination (Counterclaim Three, against Implicit), failure to reasonably accommodate (Counterclaim Four, against Implicit), or his counterclaim for declaratory relief (Counterclaim Six, against Implicit).

**BACKGROUND**

I will presume the parties' familiarity with the factual background of this case, and only outline what has changed from the first counterclaims.

**A. Stine's First Amended Counterclaim**

Stine has renamed what was once a breach of contract counterclaim as a counterclaim for promissory estoppel, asserting the same underlying facts: he and Lavallee had a conversation in which they agreed not to be each other's bosses and to split leadership responsibilities "50/50." Stine contends that he reasonably relied on that conversation as a promise not to fire him. *See* Stine First Amended Counterclaim ("Stine FACC") [Dkt. No. 58] at pp. 15-26 ¶¶ 22-27 (Counterclaim One – Promissory Estoppel).

Stine also reasserts his counterclaim for waiting time penalties under Cal. Labor Code §§ 201 and 203. Stine FACC ¶¶ 53-62 (Counterclaim Five – Waiting Time Penalties). Before, he only brought this claim against Lavallee. I dismissed it with leave to amend because he had not met the pleading standard for such a claim against an individual defendant. *See* Order Granting Motions to Dismiss Counterclaims [Dkt. No. 55] 6-7. Stine now asserts waiting time penalties against both defendants and alleges that Lavallee "made the sole decision to terminate [him]" and that it was "Lavallee's responsibility to ensure that Stine would be timely issued his final wages." Stine FACC ¶¶ 55-62. He also alleges that Lavallee informed Stine that he was terminated in such a way that it was "impossible for Stine to be timely paid his final wages" and seeks $5,288.46 in related damages. *See id.* ¶ 59.

Finally, Stine has added a defamation counterclaim against Lavallee, arising from the June 14, 2024, 911 call that Lavallee made requesting a wellness check on Traver Stine at the residence she shares with Stine. As a result of the call, law enforcement officials visited the couple's home. Later, Lavallee emailed the female employees at Implicit informing them that he had made this call. Stine FACC ¶¶ 73, 77 (Counterclaim Seven – Defamation). Stine alleges that Lavallee made the call knowing that Traver Stine was not in any danger. *Id.* ¶¶ 73-82. Stine compares Lavallee's actions with respect to the 911 call to the phenomena known as "SWATTING," which involves making false reports to police so that a SWAT team arrives at the target's home. *Id.* ¶ 79.

### B. Traver Stine's First Amended Counterclaim

Traver Stine's amended counterclaims assert different theories of liability than her first but rely on the same facts. *See* Traver Stine Answer and First Amended Counterclaim ("Traver Stine FACC") [Dkt. No. 59] at pp. 15-21. She has reframed what was once a singular Fair Housing and Employment Act ("FEHA") counterclaim against Implicit as two counterclaims: the first for adverse employment action in violation of public policy based on her association with a person perceived to have autism, (Counterclaim One), and the second for adverse employment action in violation of the FEHA, based on the same association (Counterclaim Two). She claims that Lavallee "extend[ed] [his] animosity towards Stine" to her by "removing her job responsibilities and calling her a 'failure'" in the context of a negative performance review that Lavallee gave her on June 14, 2024. Traver Stine FACC ¶ 24.

She has also reframed what was once her counterclaim for Intrusion into Private Affairs as a counterclaim for defamation, the facts of which mirror her husband's defamation counterclaim (Counterclaim Three). *Id.* ¶¶ 40-49.

## LEGAL STANDARD

### I. RULE 12(B)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

1  plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is
2  not required to accept as true "allegations that are merely conclusory, unwarranted deductions of
3  fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.
4  2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to
5  amend the pleading was made, unless it determines that the pleading could not possibly be cured
6  by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## II. ANTI-SLAPP

"California, like some other states, has a statute designed to discourage 'strategic lawsuits against public participation',"  which are referred to as "SLAPPS." *See Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2010). SLAPPS " 'masquerade as ordinary lawsuits but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so.'" *Id*. Under California's anti-SLAPP statute, state law claims that arise from defendants' exercise of their speech rights—or any action taken in furtherance of those rights—must be stricken unless the plaintiff establishes that it can make out a claim on the merits. Cal. Civ. Proc. Code § 425.16(a). Anti–SLAPP Motions challenge particular causes of action, rather than individual allegations or theories supporting a cause of action. Cal. Civ. Proc. Code § 425.16(b)(1) ("A cause of action ... shall be subject to a special motion to strike...").

The anti-SLAPP statute itself describes four kinds of activity that qualify as protected conduct:

> "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Cal. Civ. Proc. Code § 425.16(e)

California courts evaluate a defendant's anti-SLAPP motion in two steps. First, the moving defendant must make a " 'threshold showing . . . that the act or acts of which the plaintiff

4

1  complains were taken in furtherance of the defendant's right of petition or free speech under the
2  United States or California Constitution in connection with a public issue as defined in [subsection
3  (e)] of the statute.'" *Hilton*, at 903 (quoting *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal.
4  4th 53 (2002) (internal quotations omitted).  Second, " 'if the court finds that such a showing has
5  been made, it must then determine whether the plaintiff has demonstrated a probability of
6  prevailing on the claim.'" *Hilton*, at 903 (quoting *Navellier v. Sletten*, 29 Cal. 4th 82 (2002)).

7       In other words, the plaintiff must "demonstrate that the complaint is both legally sufficient
8  and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the
9  evidence submitted by the plaintiff is credited.  *Hilton*, at 903 (quoting *Wilson v. Parker, Covert &*
10 *Chidester*, 28 Cal. 4th 811 (2002).  The court should not weigh the credibility or strength of
11 competing evidence, but it should grant the motion if, as a matter of law, the defendant's evidence
12 that supports the motion defeats the plaintiff's attempt to establish evidentiary support for the
13 claim.  *See* Cal. Civ. Proc. Code § 425.16(b)(2).

## DISCUSSION

### I.  STINE'S AMENDED COUNTERCLAIMS

#### A.  Counterclaim One: Promissory Estoppel (Against Lavallee)

In California, the elements of promissory estoppel are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance. *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012) (citing *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887 (2005)).  If a statement is too indefinite to form a contract, then it is not a clear and unambiguous promise and is also insufficient to support a claim for promissory estoppel. *See Garcia v. World Savings, FSB*, 183 Cal. App. 4th 1031, 1045 (2010); *see also Bhandari v. Cap. One, N.A.*, No. C 12-04533 PSG, 2012 WL 5904694, at *5 (N.D. Cal. Nov. 26, 2012) (citing *Garcia*, 138 Cal. App. 4th at 1045). To be enforceable, a promise must be "'definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages' . . . [but] where 'a supposed contract does not provide a basis for

determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, . . . there is no contract.'" *Garcia*, 183 Cal. App. at 1045; *see also Bhandari*, 2012 WL 5904694, at *5.

Stine argues that he reasonably relied upon an arrangement that he and Lavallee reached in April 2022 that they would "remain 50/50 partners in the company and not be each other's boss"; Stine contends that this was a "clear and unambiguous promise" by Lavallee not to fire him. Stine FACC ¶ 23. Stine claims that he understood that in making this agreement, "he was not giving up any rights," and as a result he "continued to work diligently." *Id.* ¶¶ 24, 25. He alleges no other concrete agreements, promises, or arrangements between himself and Lavallee. He claims that Lavallee violated the parameters of this arrangement when he fired him.

I dismissed this theory of liability against Lavallee once already. *See* Order Granting Motions to Dismiss Counterclaims [Dkt. No. 55] 5-6 (granting motion to dismiss Stine's first counterclaim for breach of contract against Lavallee). It fares no better as a promissory estoppel claim than it did as a breach of contract claim. Putting aside for the moment that the conversation that Stine recounts with Lavallee could not be understood as a "clear and unambiguous promise" not to fire him, the Confidential Information and Invention Assignment Agreement (the "CIIAA") that Stine signed in January 2023 as a condition of his employment makes apparent that Stine could not have "reasonably relied" on the agreement to split responsibility "50/50" as a promise not to fire him. *See* Complaint [Dkt. No. 1] Ex. B (the CIIAA, electronically signed by Lavallee and Stine on January 24, 2023).[2] The CIIAA provides that Stine was an at-will employee at Implicit, who could be fired at any time, for "any reason or no reason." *Id.*[3] Its existence makes

---

[2] I have already taken judicial notice of the existence of the CIIAA through Implicit's Complaint, *see* Preliminary Injunction Order 17-18, rendering moot the parties' dispute about whether I should take judicial notice of it.

[3] Stine has contested the CIIAA throughout the course of litigation; in opposing Implicit's request for a preliminary injunction, he argued that it could not prevail on its breach of contract claim against him because he never signed the CIIAA. As I explained in the Preliminary Injunction Order, the CIIAA appears to be a run-of-the-mill confidentiality agreement, the likes of which employees are often required to sign as a condition of employment. *See* Preliminary Injunction Order 17-18. It bears Stine's electronic signature, an electronic signature that matches several other documents that were signed in the same manner by both Stine and Lavallee in January 2023.

Stine's promissory estoppel claim implausible.

Moreover, Stine fails to identify anything close to a clear and unambiguous promise not to fire him. One undocumented conversation with Lavallee in which Lavallee proposed that the two men "remain 50/50 partners in the company" is not a clear and unambiguous promise not to fire Stine if he did something that hurt the company. As I explained in the prior order, this was a conversation about titles, not a binding agreement. Stine's response is that his reliance upon this arrangement was reasonable and foreseeable because "[he] would have no reason to continue doing business with Lavallee if he knew he would renege on his promise to remain 50/50 in the company he founded." Stine FACC ¶ 26; Stine Opposition [Dkt. No. 65] 12:22-13:1, 13:2-8. But particularly in light of the CIIAA that Stine signed, the conclusory nature of Stine's reasoning on this point is not plausible. Assuming, for the sake of argument, that the agreement that Stine and Lavallee reached in April 2022 *was* a "clear and unambiguous promise" that Lavallee would not fire Stine, the terms of the CIIAA, to which Stine agreed less than a year later, supersede that arrangement to the extent that they provide that Stine could be terminated at any time, for any or no reason. Stine's allegations are not plausible, and Lavallee's motion to dismiss Stine's first counterclaim is granted.

### B.     Counterclaim Five: Waiting Time Penalties (Against Lavallee and Implicit)

California Labor Code section 201 generally requires an employer to pay an employee "the wages earned and unpaid at the time of discharge." Cal. Labor Code § 201(a). Employees are awarded a penalty if an employer willfully fails to pay unpaid wages pursuant to section 201. *See* Cal. Labor Code § 203(a). Waiting time penalties can be recovered only if the failure to pay was "willful," *see id.*, meaning that it was intentional. "The plain purpose of [Labor Code] sections 201 and 203 is to compel the immediate payment of earned wages upon a discharge. The prompt payment of an employee's earned wages is a fundamental public policy of this state." *Kao v. Holiday*, 12 Cal. App. 5th 947, 962 (Ct. App. 2017) (alteration in original) (internal quotation marks omitted) (quoting *Smith v. Superior Ct.*, 39 Cal. 4th 77, 92 (2006)).

Stine alleges that Implicit and Lavallee violated sections 201 and 203 of the California Labor Code when they failed to pay him his earned wages in a timely manner upon his discharge.

7

1  The counter defendants respond that Stine has failed to show that the delay in payment that he
2  experienced after his termination was willful, or the result of an "intentional act" by Implicit, as
3  opposed to what Implicit insists that it was: a natural function of Stine's takeover of Implicit's
4  computer systems. *See* Motion to Dismiss Stine FACC 15:12-21.

5  Stine has pleaded facts that plausibly show intent. He says that the timing of how Lavallee
6  terminated him shows that the company could not have paid him his wages on time. Stine FACC
7  ¶¶ 58, 59. Lavallee terminated him "after Eastern Time business hours on a Friday, [meaning] it
8  was impossible for Stine to be timely paid his final wages due to Lavallee's actions as there was
9  no way to get payment to him that same day[.]" *Id.* ¶ 59. The counter defendants protest that this
10 does not show intent; they say that the reason that Implicit could not pay Stine on time is because
11 Stine seized control of Implicit's computer systems during the time between his termination and
12 the close of business that same day, which was a Friday. *See* Reply ISO Motion to Dismiss Stine
13 FACC ("Reply") [Dkt. No. 67] 9:15-18. But at oral argument, counsel for Stine pointed out that
14 nothing in Implicit's complaint states that Stine shut down its payroll system, only Implicit's
15 Google Administrative system.

16 Regardless of who is correct, this is not a question to be resolved at the pleadings stage.
17 Stine has stated facts that, if true, support his theory that Implicit and Lavallee intentionally
18 delayed paying him unpaid wages. He does not need to disprove every other plausible explanation
19 for why his wages were not paid on time. And to the extent that he asserts this claim against
20 Lavallee as an individual defendant, he has also plausibly alleged that Lavallee "caused" the
21 delay: he claims that Lavallee made the "sole decision" to terminate Stine, that it was Lavallee's
22 responsibility to ensure that Stine was timely issued his final wages, and that Lavallee was the
23 only Implicit employee with access to the company's payroll capabilities who had prior
24 knowledge of Stine's termination.[4] Stine FACC ¶ 58; *see* Cal. Labor Code § 558.1(a). The motion
25 to dismiss Stine's fifth counterclaim is denied.

---

[4] An individual can only be liable under section 203 if the individual themselves "causes" the violation. Cal. Labor Code § 558.1(a). I previously granted Lavallee's motion to dismiss Stine's waiting time penalties claim because Stine had not plausibly alleged that Lavallee, as an individual, had "caused" the delay in his wages. *See* Prior Order 6-7.

### C. Counterclaim Seven: Defamation (Against Lavallee)

To state a claim for defamation, a complaint must allege "'(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.'" *John Doe 2 v. Sup. Ct.*, 1 Cal. App. 5th 1300, 1312 (2016) (citation omitted). A communication between a person and a law enforcement agency, such as a 911 call, is privileged unless "the person makes a false report that another person has committed, or is in the act of committing, a criminal act or is engaged in an activity requiring law enforcement intervention, knowing that the report is false, or with reckless disregard for the truth or falsity of the report." Cal. Civ. Code § 47(b)(5). "The reckless disregard test is not a negligence test measured by whether a reasonably prudent person would have published, or would have investigated before publishing, the defamatory statement." *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 114 (2007). "Instead, the evidence must 'permit the conclusion that the defendant actually had a high degree of awareness of . . . probable falsity.'" *Id.*

Stine's seventh counterclaim asserts that Lavallee defamed him when Lavallee called 911 and "made statements to a 911 operator indicating that Stine may physically harm his wife," even though "Lavallee knew this statement was false, or made it with reckless disregard for [its] [truth] or falsity[.]" Stine FACC ¶ 74 (Counterclaim Seven). Stine alleges that when Lavallee made the call, "Lavallee and Stine had not conversed in over a month." *Id.* He adds that "the law enforcement personnel reasonably understood Lavallee's statements to be true" but that Lavallee himself did not believe the statements he made to be true. *Id.* ¶¶ 74-75. Stine claims that Lavallee "only made the 911 call as a flex of power over Stine and Traver Stine because he was mad at Stine for blocking his computer access." *Id.*

Lavallee does not contest that the statements he made to the police were injurious to Stine's reputation; instead, he argues that (1) he had reason to believe that they were true, and (2) his call to 911 was privileged. He insists that Stine's behavior over the course of the preceding months made him concerned that Stine might be triggered by news of his termination and pose some kind of threat to Traver Stine. Lavallee points out that as of June 14, 2024, Stine had been on an extended medical leave from Implicit due to an ongoing mental health crisis, that he had

often made threats of self-harm, that Stine was engaged in "erratic behavior" at the time, and that Lavallee was concerned that being terminated might cause Stine to act out even more than he did when he took over Implicit's computer systems earlier that day. *See* Reply 11-12.

The true nature of the motivation behind Lavallee's call will be revealed in the course of discovery and trial. The facts, as pleaded, make it plausible that Lavallee called the police to the home that Stine and Traver Stine share in retaliation for both individuals' allegedly adversarial actions against Implicit, not out of concern for Traver Stine's safety. Lavallee's motion to dismiss Stine's seventh counterclaim is denied.

## II.  TRAVER STINE'S AMENDED COUNTERCLAIMS

### A.  Counterclaims One and Two: FEHA and Public Policy Violations (Against Implicit)

Traver Stine's first and second counterclaims, alleged solely against Implicit, are related. Her first counterclaim, which alleges that she was subject to an adverse employment action in violation of public policy, is a derivative of her second, which asserts violations of the FEHA. Both fail because she cannot allege damages that are connected to the alleged adverse employment action.

To state a claim for adverse employment action in violation of the FEHA, a complaint must allege facts showing "(1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action and the damage." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 713 (2008); *see also Brown v. Los Angeles Unified School Dist.*, 60 Cal. App. 5th 1092, 1105 (2021). To state a claim for adverse employment action in violation of public policy, a complaint must allege "(1) an employer-employee relationship; (2) termination or other adverse employment action; (3) the termination or adverse action was a violation of public policy; [and] (4) the termination or adverse action was a legal cause of plaintiff's damages." *McCarthy v.*

*R.J. Reynolds Tobacco Co.*, 819 F. Supp. 2d 923, 937 (E.D. Cal. 2011).[5]

According to Traver Stine's amended counterclaims, on June 14, 2024, which was the same day that Stine was terminated, Lavallee, in the context of a performance review, "turned his emotions on Traver Stine, based on her association with Stine, removing most of her job responsibilities and calling her a 'failure' for not controlling her husband's autistic traits." Traver Stine FACC ¶ 32. Traver Stine claims that she received her negative job performance review and related reduction in responsibilities "based on her marital relationship with Stine," and alleges that Lavallee had "previously told Traver Stine not to be concerned with the issues he ultimately cited for the reasons for her demotion." *Id.* ¶ 24. She claims that Lavallee "suddenly became hostile against [her] for both her attempting to seek accommodations for Stine, and for failing to control Stine's alleged workplace communications, which were tied to his autistic traits." *Id.*

In the performance review, Lavallee allegedly provided the following justifications for his poor evaluation of Traver Stine: (1) because one Implicit employee's improved performance coincided with Stine's medical leave, Traver Stine should have followed up with that employee but apparently did not; (2) another employee's complaints about Stine should have prompted Traver Stine, as the company's human resources coordinator, to implement a "formal improvement plan" for Stine; and (3) other "unspecified 'multiple issues' regarding Stine about which Traver Stine failed to follow up." *Id.*

After the negative review, "most of Traver Stine's duties were removed from her, including her responsibilities for HR, payroll, and anything related to finances." *Id.* ¶ 15. Traver Stine claims that this negative review and subsequent demotion took place before her credentials were used to access Implicit's computer systems. Because Traver Stine was an hourly employee, the change in job responsibilities "necessarily meant a pay cut." *Id.* ¶ 33. She believes that her association with her husband was "a substantial motivating reason for Implicit's decision to demote [her]." *Id.* ¶ 36.

---

[5] If the public policy claim is derivative of a statutory claim, and the statutory claim fails, then the public policy claim also fails. *See Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 229 (1999) (explaining that "because [plaintiff's] FEHA claim fails, his claim for wrongful termination in violation of public policy fails").

1    The problem with Traver Stine's discrimination counterclaims is that she cannot show that she was damaged by the alleged adverse employment action (her demotion). To plausibly make out a FEHA claim for disability discrimination (or a derivative public policy claim), the plaintiff must plead facts from which the court could infer that the relevant adverse employment action *caused* the damages she suffered. *See Mamou v. Trendwest Resorts, Inc*., 165 Cal. App. 4th 686, 713 (2008) (explaining that to state a FEHA claim based on an adverse employment action, a plaintiff must plead facts that show both damage to the employee and a causal link between the adverse action and the damage). But the timing of and reasons for her termination render Traver Stine's first two counterclaims implausible.

Traver Stine received her negative performance review on June 14, 2024, a Friday. Traver Stine FACC ¶ 14. That evening, her credentials were used to restore Stine's access to Implicit's computer systems after that access had been revoked. Complaint [Dkt. No. 1] ¶¶ 26-27. Because of that, she was placed on *paid* leave as of the next business day, June 17, 2024, and was terminated on June 24, 2024, for interfering with the company's systems without authorization. *See* Initial Traver Stine Counterclaims [Dkt. No. 26] ¶¶ 22-23; *see also* Traver Stine FACC ¶ 20. There is no plausible way that Traver Stine could show that she suffered any reduced hours or reduction in pay stemming from her demotion when she was on paid leave from the time of her demotion until she was terminated for interfering with the company's computer system.[6]

The motion to dismiss Traver Stine's first and second counterclaims is granted.

**B.    Counterclaim Three: Defamation (Against Lavallee)**

Traver Stine has renamed what was once her counterclaim for "Intrusion into Private Affairs" as a counterclaim for defamation against Lavallee. Traver Stine FACC ¶¶ 40-49 (Counterclaim Three). Her defamation counterclaim mirrors her husband's. It is plausibly alleged

---

[6] Implicit identifies two other flaws in these claims that are less persuasive on their own. It points out that a negative performance review is not an adverse employment action, but I understand Traver Stine to identify Lavallee's stripping her of her job responsibilities immediately following her negative performance review as the adverse action, and that is plausible. Also, she has sufficiently alleged that her association with a person with perceived autism was a "substantial factor" in her demotion. But given that Traver Stine cannot show that she suffered damages arising from that act, her claims fall short.

12

for largely the same reasons I outlined *supra*, Section I(C).  Lavallee cannot successfully assert the qualified privilege of a call to law enforcement in his defense at this stage because Traver Stine, like her husband, has plausibly alleged that Lavallee made the call knowing that Stine did not actually pose a threat to her, or at least with reckless disregard to the truth of his allegation to the contrary.  *See* discussion *supra* Section I(C).[7]

The only meaningful differentiating factor between Traver Stine's defamation claim and her husband's is the potential negative reputational impact of being labeled a *victim* of domestic violence as opposed to the potential reputational impact of being labeled a *perpetrator* of the same.  Lavallee insists that his statement to the police with respect to Traver Stine was not defamatory per se because being labeled a victim of domestic violence does not cause reputational harm as defined by the California Code of Civil Procedure.  I disagree.

"A statement is defamatory when it tends 'directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits.'"  Cal. Civ. Code, § 46, subd. 3.  To state that someone is, or could soon be, a victim of domestic violence may directly impact, and potentially injure, that person's professional reputation.  Depending on the context, this injury could arise through the imputation of general disqualification "in those respects which the office or occupation peculiarly requires," or by the imputation of something that tends to lessen the profits of the purported victim's office, profession, trade, or business.  *See id.*

Lavallee's statement to the police that Traver Stine had been or was at risk of being subjected to physical harm at the hands of her husband could be understood as directly injuring her "in respect to [her] office, profession, trade or business." Cal. Civ. Code § 46, subd. 3.  Lavallee protests that Traver Stine offers no case where a court has found that labelling someone a

---

[7] Traver Stine's allegations with respect to what prompted the 911 call mirror her husband's allegations with respect to the same. *Compare* Traver Stine FACC (Counterclaim Three) *with* Stine FACC (Counterclaim Seven).

1  victim of domestic violence falls within the bounds of defamation per se. But to reach the

2  conclusion that the label "victim" does *not* pose a risk of injury to someone's professional

3  reputation, one must ignore the social connotations that accompany that label. There are any

4  number of professional roles—human resources coordinator being among them—where that label

5  could injure the reputation of the person bearing it. A jury could reasonably find that Lavallee's

6  conduct defamed Traver Stine. The motion to dismiss her third counterclaim is denied.

### III.    MOTIONS TO STRIKE

"'To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech.' [Citation.] If the defendant satisfies this requirement, '[t]he burden then shifts to the plaintiff . . . to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal.'" *Herring Networks, Inc. v. Maddow*, 8 F. 4th 1148, 1155 (9th Cir. 2021) (internal citations omitted). A district court must grant the motion and strike the claims arising from the protected activity "if the plaintiff presents an insufficient legal basis for the claims or no reasonable jury could find for the plaintiff." *Id*. (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)).

Obviously, Lavallee's anti-SLAPP motions fail on the second step. Stine and Traver Stine have pleaded facts suggesting that Lavallee's 911 call was defamatory and motivated by retaliatory intent, not justified concern for Traver Stine's safety. A reasonable jury could find that their version of the facts, not Lavallee's, prevails. *See Herring Networks, Inc*., at 1155. The motion to strike is denied.

### CONCLUSION

For the foregoing reasons, the motion to dismiss Stine's counterclaims is GRANTED with respect to his first counterclaim but DENIED with respect to his fifth and seventh counterclaims. The motion to dismiss Traver Stine's counterclaims is GRANTED with respect to her first and

14

1   second counterclaims but DENIED as to her third counterclaim.  Both motions to strike are

2   DENIED.

3       **IT IS SO ORDERED.**

4   Dated: January 30, 2025



William H. Orrick
United States District Judge

15