GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
JOSEPH B. PALMIERI, ESQ. (SBN 31275)
(jp@grellas.com)
550 California Street, Suite 1040
San Francisco, CA 94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff
IMPLICIT CONVERSIONS, INC.

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC, a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JACOB STINE, an individual, JUANITA TRAVER STINE, an individual, PROJECT CRAYON LLC, a California Limited Liability Corporation, and DOES 1-10, inclusive,<br>Defendants. | Case No.  3:24-cv-03744-WHO<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |
| JACOB STINE, an individual; JUANITA TRAVER STINE, an individual,<br><br>Counterclaimants,<br><br>vs.<br><br>IMPLICIT CONVERSIONS, INC, a Delaware Corporation; and ROBIN LAVALLEE, an individual,<br><br>Counterdefendants. | |

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

Plaintiff Implicit Conversions, Inc. ("Implicit" or "Plaintiff") alleges as follows in support of its First Amended Complaint against defendants Jacob Stine ("Stine"), Juanita Traver Stine ("Traver Stine"), and Project Crayon LLC ("Project Crayon") (together with Stine and Traver Stine, "defendants").

## PRELIMINARY STATEMENT

1.     Stine, Implicit's former Chief Technology Officer and co-founder, has launched a concerted scheme to obtain unlawful access to Implicit's computer systems, steal its trade secrets, and usurp control of the company.  To do so, he enlisted the aid of Traver Stine, his spouse, who was still an Implicit employee when she violated her most fundamental duties of loyalty to allow and assist her husband in committing cybercrimes on his former employer.

2.     When Implicit was able to block their continuing efforts to hack into its systems, Stine and Traver Stine, with the assistance of Alawi, fabricated invalid corporate governance documents to create a fake Implicit Board of Directors, which then purported to replace Implicit management.  Defendants are attempting to create chaos within the Implicit workplace and in its relationships with its customers and partners.

3.     Implicit has learned that Stine continues to hold Implicit confidential and proprietary information and Implicit trade secrets and has used them to interfere with Implicit's commercial relationship with its then largest client, Sony Interactive Entertainment LLC ("SIE").  Stine's own unlawful trespass into Implicit's systems damaged Implicit's relationship with SIE because it created security concerns.  Stine also used Implicit trade secrets to bid for SIE's work.  As a proximate result of Stine's unlawful acts, SIE did not renew its contract with Implicit.  Instead, SIE signed a contract for the same services to a newly-formed company, Project Crayon, owned jointly by Stine and Traver Stine.  Project Crayon develops the same types of retro videogames emulators that Implicit develops and the contract is for the same types of services that Implicit formerly provided to SIE.

4.     This lawsuit was filed to hold defendants accountable for the significant economic harms they have caused, to obtain the return of Implicit's trade secrets, to prevent further intrusions into Implicit's computer systems, and to block defendants' attempts to use

fake legal documentation to usurp control of Implicit and to interfere with its business and relationships.

## PARTIES

5.      Implicit is a Delaware corporation with a distributed workforce performing duties in California, Pennsylvania and Canada.   Implicit's core business is offering High Level Emulation engines to bring classic or retro video games to modern gaming consoles, like the Playstation 5 or the Nintendo Switch.

6.      Stine is an individual residing in San Mateo County, California.

7.      Traver Stine is an individual residing in San Mateo County, California.

8.      Upon information and belief, Project Crayon is a limited liability company formed under the laws of the State of California.

9.      The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named herein as Does One through Ten, inclusive, are unknown to Implicit who therefore sues these defendants by such fictitious names.  Implicit will seek to amend this complaint and include these Doe Defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible, in some manner, for the conduct alleged herein and for the injuries suffered by Implicit.

## JURISDICTION AND VENUE

10.      This action arises under both the DTSA (18 U.S.C. § 1836, *et seq*) and the CFAA (18 U.S.C. § 1030).   Therefore, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Supplemental jurisdiction over the state law claims is appropriate under principles of supplemental jurisdiction, 28 U.S.C. § 1367.

11.      This Court has personal jurisdiction because Stine, Traver Stine, and Project Crayon reside in the State of California.

12.      Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400 because Stine, Traver Stine, and Project Crayon reside in this district and division, a substantial part of the events and omissions giving rise to Implicit's claims occurred

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

in this district and a substantial part of the property that is the subject of Implicit's claims is located in this district.

### FACTS

13.    Robin Lavallee ("Lavallee") and Stine co-founded Implicit Conversions LLC, the predecessor of Implicit, in 2019.

14.    Lavallee incorporated Implicit in 2023 and Implicit Conversions LLC and Implicit merged.  Implicit is the surviving entity.

15.    Lavallee was the original director of Implicit.  The Implicit Bylaws specify that Implicit will have a 2-person Board of Directors.  Though Stine was not formally appointed to the Implicit Board of Directors through stockholder vote or stockholder consent, both Lavallee and Stine agreed that he would fill the second vacant Board seat.  Until he was recently removed from the Implicit Board of Directors, Stine acted as an Implicit director, including participating in Board meetings and executing Board resolutions.

16.    On or around January 26, 2023, Implicit issued 4,250,000 shares of Common Stock to Lavallee and 4,250,000 shares of Common Stock to Stine, both subject to vesting over a 4-year period.  A true and correct copy of Implicit's Common Stock Purchase Agreement ("CSPA") with Stine is attached as Exhibit **A**.  The CSPA provides that upon Stine's termination from Implicit, Implicit has the right to repurchase all unvested shares.

17.    250,000 shares of Common Stock of Implicit were subsequently issued to Alawi.

18.    In addition, the Board of Directors reserved shares for incentive stock options for its employees.  Through options exercises, Traver Stine owns 1,666 shares of Implicit stock and Isabelle Gagnon owns 541 shares of Implicit stock.

19.    Implicit's Bylaws authorize the Board to appoint a Chief Executive Officer ("CEO") of Implicit.  Per the Bylaws, the CEO is the senior executive officer and has general supervision, direction and control of the business and subordinate officers. Further, the CEO has the authority to remove subordinate officers.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

20.     The Implicit Board appointed Lavallee as CEO of Implicit.  Lavallee, in his capacity as CEO, made Stine Implicit's Chief Technology Officer ("CTO").  Stine was Implicit's CTO until Implicit recently terminated his employment.

21.     Implicit and Stine entered into a Confidential Information and Invention Assignment Agreement ("CIIAA") dated November 21, 2022.  A true and correct copy of the CIIAA is attached as Exhibit **B**.

22.     On April 1, 2024, Implicit hired Traver Stine, Stine's spouse, as Human Resources and Payroll Administrator.

23.     Implicit had grown increasingly concerned at Stine's erratic behavior and poor performance.  As a manager, Stine fostered a toxic workplace relationship with other key personnel, impairing their ability to perform their jobs.  Moreover, Stine made increasingly alarming statements to co-workers in work communication channels which escalated to threats that he would harm or kill others or inflict harm on himself.

24.     On June 14, 2024, Implicit notified Stine that his employment was terminated effective immediately.  Implicit also notified Stine that his access to company computer systems was being disabled and that Implicit was exercising its right to repurchase his unvested shares.  A true and correct copy of the Employment Termination Letter and Notice of Intent to Exercise Repurchase Option is attached hereto as Exhibit **C**.

25.     Upon termination, Stine had no authority to access Implicit's computer systems.  Implicit disabled Stine's access to Implicit's computer systems upon his termination.

26.     In the evening of June 14, after his access had been disabled, Stine unlawfully accessed and tampered with Implicit's computer systems.  Although Implicit's investigation into Stine's activities is ongoing, at a minimum he restored his own full access to Implicit's computer systems and disabled Lavallee's access to Implicit's computer systems.

27.     Traver Stine's credentials were used to access Implicit's computer systems and to restore Stine's access.  Upon information and belief, Traver Stine and Stine entered into a civil conspiracy to unlawfully access Implicit's computer systems.  Either Traver Stine provided her credentials to Stine to enable his unlawful entry into Implicit's computer systems

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

or Traver Stine used her credentials herself to enter Implicit's computer systems to restore her husband's access and disable Lavallee's access. Stine was not authorized to access Implicit's computer systems after his termination or to copy any documents from Implicit's computer systems. Likewise, Traver Stine was not authorized to provide Stine access to Implicit's computer systems. Nor was Traver Stine authorized to disable Lavallee's access to Implicit's systems.

28.    By disabling Lavallee's access to Implicit's computer systems, Stine caused significant disruption to Implicit's business operations.

29.    Stine also made unauthorized copies of vast quantities of Implicit's confidential and proprietary information and its trade secrets. Among other things, Stine has copies of all of Implicit's source code, business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology.

30.    Stine also deleted information from Implicit's computer systems and tampered with other systems in a manner that brought them offline.

31.    Stine subsequently used Implicit's email system to send a message to all Implicit employees. Stine admitted that he had regained access to Implicit's computer systems and that he had blocked Lavallee's access to Implicit's computer systems. A true and correct copy of this message to Implicit's employees is attached as Exhibit **D**.

32.    The following day, Stine sent another message to employees that he had decided to restore Lavallee's access to Implicit's systems.

33.    Eventually, Lavallee's access was restored.

34.    Implicit began diagnostic testing to assess whether Stine had installed kill switches or other malicious artifacts on Implicit's computer systems. Once it became comfortable that it could safely do so, it again disabled Stine's access to Implicit's computer systems and also disabled Traver Stine's access to Implicit's computer systems.

35.    On June 17, 2024, Implicit sent to Stine via overnight Fedex delivery a Notice of Exercise of Repurchase Option with a copy sent via email.  Through this letter, Implicit repurchased Stine's 2,656,250 unvested common shares of Implicit stock.  Implicit enclosed a certified check in the amount of $26.57 made payable to Stine for the repurchase.  Implicit also emailed this notice to Stine on the same day.  A true and correct copy of this notice is attached as Exhibit **E**.

36.    As a result of the repurchase, Stine held only 1,593,750 vested shares of Implicit common stock.

37.    Lavallee subsequently executed a Stockholder Resolution By Written Consent, voting his 4,250,000 shares, which represents a majority of all outstanding Implicit shares, to remove Stine from the Implicit Board of Directors.  Implicit also sent Stine this stockholder resolution on June 17, 2024.  A true and correct copy of this stockholder resolution is attached as Exhibit **F**.

38.    Also on June 17, 2024, Implicit suspended Traver Stine with pay pending investigation.

39.    On June 18, 2024, Implicit demanded that Stine return all physical hardware and digital files held at his La Honda, California office.  Implicit normally maintained three data centers, one in Pennsylvania, one in Canada, and one in a home office at Stine's residence in La Honda.  The La Honda data center contained hardware critical to Implicit's ongoing operations.  Implicit offered to send a courier to the La Honda office to pick up the components or, if Stine preferred, for Stine to ship the data center back to Implicit with all costs to be reimbursed.  Stine did not comply with Implicit's request and has apparently converted this company property to his own use.

40.    As a result of his termination and his removal from the Implicit Board of Directors, Stine has no further role of any kind in Implicit other than as a stockholder.

41.    But Stine and Traver Stine were not finished.

42.    On the morning of June 20, 2024, Stine, through counsel, sent an Action By Written Consent of the Majority Stockholders, signed by Stine and Alawi, who purported to

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

act as Implicit stockholders.  The written consent states that Stine is still an Implicit Board member and purports to remove Lavallee from the Implicit Board and to appoint Traver Stine and Alawi to the Board.  Notably, Stine, who has 1,593,750 shares, and Alawi, who has 250,000 shares, possess nowhere near a majority of Implicit's 6,095,957 outstanding common shares.  In other words, the document is a farce and has no legal import.  A true and correct copy of the written consent is attached as Exhibit **G**.

43.    Having created a fake Board of Directors for Implicit, Stine then transmitted a purported Unanimous Written Consent purporting to remove Lavallee as CEO of Implicit and appointing Stine as interim CEO.  A true and correct copy of this unanimous written consent is attached as Exhibit **H**.

44.    Stine then sent these specious documents to Implicit personnel, demanding that they surrender access to Implicit's computer systems to Stine.  These acts caused, and continue to cause, significant confusion and disruption to Implicit's workplace and to its business.

45.    Upon information and belief, Stine intends to continue operating this fake Implicit Board of Directors to issue additional resolutions and intends to continue holding himself out as Implicit's CEO to Implicit employees, partners, customers, and the marketplace.

46.    On or around July 11, 2024, Stine and Traver Stine formed Project Crayon, in which they are both co-owners.  Project Crayon develops, among other things, the same type of emulators for retro videogames that Implicit develops.

47.    After its formation, Project Crayon conspired with Stine to interfere with Implicit's commercial relationship with SIE.

48.    Implicit's commercial relationship with SIE was of immense importance to Implicit.  Implicit entered into its first contract with SIE for these services in or around January 20, 2022, with the contract being renewed on an annual basis.

49.    Stine's unauthorized and unlawful access to Implicit's protected computer systems and misappropriation of Implicit confidential and trade secret information created a security event that seriously interfered with Implicit's relationship with SIE by creating

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

50.    Starting in or around July 2024, Stine and Project Crayon began actively soliciting SIE to non-renew its contract with Implicit and sign a contract with Project Crayon for the same services.  Upon information and belief, Stine and Project Crayon used Implicit confidential and proprietary trade secret information during the bidding process with SIE to interfere with Implicit's commercial relationship with SIE and to obtain a new contract for the same services for Project Crayon.

51.    Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security, caused by Stine's own trespass into Implicit's computer systems, in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

52.    Upon information and belief, Stine and Project Crayon used confidential and proprietary information Stine had misappropriated from Implicit.

53.    In March 2025, SIE notified Implicit that, following Stine's termination, it would not renew its contract with Implicit.  On or around May 15, 2025, SIE signed a lucrative new contract with Project Crayon for the same types of retro videogame emulator services that Implicit formerly provided for SIE.

54.    Stine, Traver Stine and Project Crayon also continue to hold Implicit's source code base and other Implicit confidential and proprietary information and trade secrets and, upon information and belief, Stine and Project Crayon are using these materials in the services that Project Crayon provides its customers.

///

///

///

///

///

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

**COUNTS**

**FIRST COUNT**

**[Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*]**

**[Against Stine and Traver Stine]**

55.     Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 54 inclusive.

56.     Implicit's computers are used in or affecting interstate or foreign commerce or communication and are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

57.     Stine and Traver Stine's improper and unlawful conduct as described above includes intentionally accessing Implicit's protected computers without authorization, and accessing and copying confidential, proprietary, and trade secret information, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

58.     Stine and Traver Stine knowingly, willfully and with the intent to defraud Implicit, accessed Implicit's protected computers without authorization or by exceeding authorized access to protected computers.  In doing so, Stine and Traver Stine furthered their intended fraud and obtained confidential, proprietary, and trade secret information, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

59.     Stine and Traver Stine knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization to Implicit's protected computers, including by disabling Lavallee's access to Implicit's computer systems, deleting information from Implicit's computer systems, and tampering with other systems in a manner that brought them offline, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A).

60.     Stine and Traver Stine intentionally accessed Implicit's computer systems without authorization and transmitted Implicit's confidential, proprietary, and trade secret information, and as a result of such conduct, intentionally, or recklessly, or without regard for their actions, caused damage and loss to Implicit's protected computers, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(B)-(C).

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

61.    Stine's unauthorized and unlawful access to Implicit's protected computer systems created a security event that seriously interfered with Implicit's relationship with SIE by creating concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

62.    Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

63.    Implicit has suffered damage and loss by reason of these violations, including, without limitation, (1) harm to its computer systems and its confidential, proprietary, and trade secret information; (2) impairment to the security of databases and the integrity of its confidential credentials; (3) investigative and remedial time, labor and expenses, (4) serious interference with the business relationship between Implicit and SIE, resulting in SIE's decision not to renew its contract with SIE, and (5) other losses and damage in an amount to be proved at trial, but in any event, in an amount well over $5,000 over a one-year period.

64.    Implicit also seeks recovery of its reasonable attorney's fees and costs.

65.    Implicit also seeks preliminary and permanent injunctive relief.

## SECOND COUNT

### [Violation of California Penal Code § 502(c) *et seq.*]

### [Against Stine and Traver Stine]

66.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 65 inclusive.

67.    Stine and Traver Stine's improper and unlawful conduct as described above includes intentionally accessing Implicit's protected computers without authorization, and accessing and copying confidential, proprietary, and trade secret information, constituting a violation of California Penal Code § 502(c).    Further, Traver Stine assisted Stine's unauthorized access to Implicit's protected computers in violation of Penal Code § 502(c).

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

68.    Stine and Traver Stine knowingly accessed and without permission altered, damaged, deleted, destroyed, or otherwise used Implicit's data, computer, computer system, or computer network in order to defraud Implicit and to wrongfully control or obtain Implicit's property or data, including Implicit's confidential, proprietary, and trade secret information, constituting a violation of Penal Code § 502(c)(1).

69.    Stine and Traver Stine knowingly accessed and without permission took, copied, or made use of data from Implicit's computer, computer system, or computer network, including Implicit's confidential, proprietary, and trade secret information, constituting a violation of Penal Code § 502(c)(2).

70.    Stine and Traver Stine knowingly and without permission used or caused to be used computer devices, constituting a violation of Penal Code § 502(c)(3).

71.    Stine and Traver Stine knowingly accessed and without permission altered, damaged, deleted, or destroyed Implicit's data, computer software, or computer programs which resided or existed internal or external to Implicit's computer, computer system, or computer network, by deleting information from Implicit's computer systems and tampering with other systems in a manner that brought them offline, constituting a violation of Penal Code § 502(c)(4).

72.    Stine and Traver Stine knowingly and without permission disrupted or caused the disruption of computer services or denied or caused the denial of computer services to an authorized user of a computer, computer system, or computer network by disabling Lavallee's access to Implicit's computer system, constituting a violation of Penal Code § 502(c)(5).

73.    Traver Stine knowingly and without permission provided or assisted in providing a means of accessing Implicit's computer, computer system, or computer network to Stine, either by providing her credentials to Stine to enable his unlawful entry into Implicit's computer systems or using her credentials herself to enter Implicit's computer systems to restore her husband's access and disable Lavallee's access, constituting a violation of Penal Code § 502(c)(6).

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

74.    Stine and Traver Stine knowingly accessed and without permission accessed or caused to be accessed Implicit's computer, computer system or computer network, constituting a violation of Penal Code § 502(c)(7).

75.    Stine and Traver Stine knowingly and without permission accessed and transmitted Implicit's confidential, proprietary, and trade secret information, and as a result of such conduct, intentionally, or recklessly, or without regard for their actions, caused damage and loss to Implicit's protected computers, constituting a violation of Penal Code § 502(c).

76.    Stine's unauthorized and unlawful access to Implicit's protected computer systems created a security event that seriously interfered with Implicit's relationship with SIE by creating concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

77.    Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

78.    Implicit has suffered damage and loss by reason of these violations, including, without limitation, (1) harm to its computer systems and its confidential, proprietary, and trade secret information; (2) impairment to the security of databases and the integrity of its confidential credentials; (3) investigative and remedial time, labor and expenses, (4) serious interference with the business relationship between Implicit and SIE, resulting in SIE's decision not to renew its contract with SIE, and (5) other losses and damage in an amount to be proved at trial.

79.    Stine and Traver Stine committed willful violations of Penal Code § 502(c) and acted with oppression, fraud or malice, entitling Implicit to recover punitive or exemplary damages.

80.    Implicit also seeks recovery of its reasonable attorney's fees and costs.

81.    Implicit also seeks preliminary and permanent injunctive relief.

///

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

**THIRD COUNT**

**[Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836]**

**[Against Stine, Traver Stine, and Project Crayon]**

82.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 81 inclusive.

83.    Implicit takes reasonable measures to protect its trade secrets.  All of its employees who are given access to company confidential information are required to enter into a contractual agreement to maintain the confidentiality of company information and to return any company data immediately upon termination.  All material company systems are password protected.  Implicit regularly enters into non-disclosure agreements with customers before disclosing confidential information.

84.    Implicit has invested significant time and resources into developing its trade secrets.  Measures are taken to ensure the confidentiality of this information because Implicit derives significant independent value from maintaining the secrecy of the trade secrets to which it knows or has good reason to believe Stine and Traver Stine have retained access, including Implicit's source code, business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology (collectively the "Trade Secrets").  If these Trade Secrets were made public or given to competitors, Implicit competitors would be able to unfairly compete with Implicit, copy Implicit features, and get insight into Implicit's product plans.

85.    The Trade Secrets were used in and affected interstate commerce because they were created and used by Implicit to deploy and sell its products and services throughout the United States.

86.    Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act (DTSA).

///

///

87.     Stine, Traver Stine, and Project Crayon, knew or had reason to know that their knowledge of the Trade Secrets was acquired under a circumstance giving rise to a duty to maintain the secrecy of that information or limit its use.

88.     Stine misappropriated the Trade Secrets by accessing, using and disclosing such data after his employment was terminated and he was prohibited from making any use of such data in any manner.  Upon information and belief, Traver Stine entered into a civil conspiracy with Stine with the common end of misappropriating Implicit's Trade Secrets.  In furtherance of this conspiracy, Traver Stine assisted Stine by either allowing him to use her credentials to make unauthorized access to Implicit's computer systems, or using her access to Implicit's systems in unauthorized ways by restoring Jacob's Stine's access to those systems.   Stine disclosed the Trade Secrets to Project Crayon.   Project Crayon misappropriated the Trade Secrets by acquiring them and by using them.

89.     Upon information and belief, Stine and Project Crayon used the Trade Secrets in the bidding process to induce SIE to non-renew its contract with Implicit and to enter into a new contract with Project Crayon.  Upon information and belief, Stine and Project Crayon are also using the Trade Secrets in the services that Project Crayon provides its customers.

90.      Stine's misappropriation of Implicit Trade Secrets created a security event that seriously interfered with Implicit's relationship with SIE by creating concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

91.     Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

92.     Stine, Traver Stine, and Project Crayon's actions constitute a misappropriation of trade secrets under the Defend Trade Secrets Act.

93.     Each act of misappropriation was done willfully and maliciously by Stine, Traver Stine, and Project Crayon, thereby entitling Implicit to exemplary damages and/or attorney's fees to be determined at trial under 18 U.S.C. § 1836(b)(3)(C) and (D).

94.     As a direct and proximate cause of Stine, Traver Stine, and Project Crayon's misappropriation of the Trade Secrets, Implicit has suffered damages in an amount to be proven at trial.

95.     Implicit also seeks preliminary and permanent injunctive relief.

## FOURTH COUNT

**[Violation of the California Uniform Trade Secrets Act,**

**[Cal. Civil Code § 3426 et. seq.]**

**[Against Stine, Traver Stine, and Project Crayon]**

96.     Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 95 inclusive.

97.     Implicit takes reasonable measures to protect its trade secrets.  All of its employees who are given access to company confidential information are required to enter into a contractual agreement to maintain the confidentiality of company information and to return any company data immediately upon termination.  All material company systems are password protected.  Implicit regularly enters into non-disclosure agreements with customers before disclosing confidential information.

98.     Implicit has invested significant time and resources into developing its trade secrets.  Measures are taken to ensure the confidentiality of this information because Implicit derives significant independent value from maintaining the secrecy of the trade secrets to which it knows or has good reason to believe Stine and Traver Stine have retained access, including Implicit's source code, business development opportunity plans and strategic initiatives, information about ongoing customer negotiations, software tools and assets, confidential customer contracts, internal budgets and forecasting, and the core methods and know-how of Implicit's technology.  If these Trade Secrets were made public or given to competitors, Implicit competitors would be able to unfairly compete with Implicit, copy Implicit features, and get insight into Implicit's product plans.

///

///

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

99.    The Trade Secrets were used in and affected interstate commerce because they were created and used by Implicit to deploy and sell its products and services throughout the United States.

100.    Accordingly, the above-described information constitutes "trade secrets" under the California Uniform Trade Secrets Act (CUTSA).

101.    Stine, Traver Stine, and Project Crayon, knew or had reason to know that their knowledge of the Trade Secrets was acquired under a circumstance giving rise to a duty to maintain the secrecy of that information or limit its use.

102.    Stine misappropriated the Trade Secrets by accessing, using and disclosing such data after his employment was terminated and he was prohibited from making any use of such data in any manner.  Upon information and belief, Traver Stine entered into a civil conspiracy with Stine with the common end of misappropriating Implicit's Trade Secrets.  In furtherance of this conspiracy, Traver Stine assisted Stine by either allowing him to use her credentials to make unauthorized access to Implicit's computer systems, or using her access to Implicit's systems in unauthorized ways by restoring Jacob's Stine's access to those systems.  Stine disclosed the Trade Secrets to Project Crayon.  Project Crayon misappropriated the Trade Secrets by acquiring them and by using them.

103.    Upon information and belief, Stine and Project Crayon used the Trade Secrets in the bidding process to induce SIE to non-renew its contract with Implicit and to enter into a new contract with Project Crayon.  Upon information and belief, Stine and Project Crayon are also using the Trade Secrets in the services that Project Crayon provides its customers.

104.    Stine's misappropriation of Implicit Trade Secrets created a security event that seriously interfered with Implicit's relationship with SIE by creating concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

105.    Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

106.    Stine, Traver Stine, and Project Crayon's actions constitute a misappropriation of trade secrets under CUTSA.

107.    As a direct and proximate cause of Stine, Traver Stine, and Project Crayon's misappropriation of the Trade Secrets, Implicit has suffered damages in an amount to be proven at trial.

108.    Each act of misappropriation was done willfully and maliciously by Stine, Traver Stine, and Project Crayon, thereby entitling Implicit to exemplary damages under Civil Code § 3426.3(c) and attorney's fees under Civil Code § 3426.4.

109.    Implicit also seeks preliminary and permanent injunctive relief.

### FIFTH COUNT

**[Breach of Contract]**

**[Against Stine]**

110.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 109 inclusive.

111.    Effective November 21, 2022, Implicit and Stine entered into the CIIAA.

112.    Implicit has fully performed all conditions, covenants and obligations under the CIIAA, or the performance of those conditions, covenants and obligations has been prevented or excused by Stine's conduct.

113.    Stine breached the CIIAA by failing to perform the conditions, covenants and obligations required on his part.

114.    In particular, the CIIAA states that Stine will not make unauthorized use or copies of Implicit confidential information.  The CIIAA further requires that upon termination Stine return all company confidential information and all company property.

115.    Contrary to the requirements of the CIIAA, Stine made unauthorized use and copies of company confidential information.  Stine also failed to return company property, including data center hardware and company digital files, upon termination.

116.    As a direct and proximate result of Stine's breach of the CIIAA, Implicit has been damaged in an amount to be proven at trial.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

117.    Implicit also seeks preliminary and permanent injunctive relief.

### SIXTH COUNT

### [Breach of Duty of Loyalty]

### [Against Traver Stine]

118.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 117 inclusive.

119.    Traver Stine was an Implicit employee from April 1, 2024, to June 22, 2024.

120.    During her employment, Traver Stine owed Implicit a duty of utmost loyalty.

121.    Implicit put reasonable trust and confidence in Traver Stine not to act disloyally or to take actions to harm Implicit's interests.

122.    Traver Stine breached her duty of loyalty by either providing her credentials to Stine with the intent that he would use her credentials to make unauthorized access to Implicit's computer systems and misappropriate Implicit's trade secrets, or she used her own credentials to restore Stine's access to Implicit's computer systems with the intent that he use this unauthorized access to misappropriate Implicit's trade secrets.

123.    As a direct and proximate result of Traver Stine's breaches of her duty of loyalty, Implicit has also suffered damages in an amount to be proven at trial.

124.    Traver Stine's acts were willful, oppressive and malicious.  As a consequence, Implicit is entitled to punitive damages in an amount to be proven at trial.

### SEVENTH COUNT

### [Declaratory Relief]

### [Against Stine and Traver Stine]

125.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 124 inclusive.

126.    An actual controversy has arisen and now exists between and among Implicit, on the one hand, and Stine and Traver Stine, on the other, concerning the matters set forth herein.

///

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

127.    Implicit has a 2-person Board of Directors, with Lavallee filling one seat and the other one remaining vacant.

128.    Lavallee was Implicit's CEO until March 3, 2025, when he stepped down and became Implicit's Chief Gaming Officer.  Implicit's Board appointed Bill Litshauer to become CEO on March 3, 2025.

129.    Implicit repurchased 2,656,250 unvested shares from Stine under the terms of Implicit's Common Stock Purchase Agreement.

130.    Stine contends, however, that Implicit did not repurchase his shares or the repurchase was ineffective and that he continues to hold his unvested shares.

131.    Stine, Traver Stine and Alawi further contend that they are directors in a 3-member Board of Directors of Implicit.

132.    Stine further contends that he is the CEO of Implicit and Traver Stine and Alawi contend that they were empowered to remove Implicit's sitting CEO and appoint Stine to that position.

133.    Implicit desires and requests a judicial determination of the rights and duties of the parties as set forth above.  Such a declaration is necessary and appropriate to preserve and protect the parties' respective legitimate rights.

## EIGHTH COUNT

### [Tortious Interference with Prospective Economic Advantage]

### [Against Stine and Project Crayon]

134.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 133 inclusive.

135.    Implicit and SIE were in an economic relationship through which Implicit provided services to SIE for retro videogame emulators.  Specifically, Implicit provided these services through a contract with SIE from January 20, 2022, to March 31, 2025, with contracts being renewed by SIE on a yearly basis, starting April 1 of each year.

136.    The final contract between Implicit and SIE ended on March 31, 2025, and SIE did not renew its contractual relationship with Implicit for the 2025-2026 contract year.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

137. Should SIE have renewed its contract with Implicit, the contract would have resulted in future economic benefit to Implicit in the range of millions of dollars.

138. Project Crayon, through its owners, Stine and Traver Stine, knew of the relationship between Implicit and SIE.

139. Stine knew of the relationship between Implicit and SIE by virtue of his former roles as Implicit board member and Implicit CTO.

140. Traver Stine knew of the relationship between Implicit and SIE by virtue of her role as head of Implicit's human resources.

141. Stine and Project Crayon knew or should have known that this relationship would be disrupted if it failed to act with reasonable care.

142. Stine's unauthorized and unlawful access to Implicit's protected computer systems and misappropriation of Trade Secrets created a security event that seriously interfered with Implicit's relationship with SIE by creating concerns for SIE about Implicit's ability to maintain the security of SIE's proprietary and confidential information.

143. Upon information and belief, Stine exploited SIE's concerns over Implicit's computer security in order to further degrade the relationship between Implicit and SIE resulting in SIE's decision to not renew its contract with Implicit and to instead, through Stine's solicitation, contract with Project Crayon.

144. Stine and Project Crayon also intentionally and wrongfully interfered with Implicit's prospective economic advantage from its commercial relationship with SIE by using the Trade Secrets in the bidding process to obtain the contract with SIE.

145. Stine's and Project Crayon's wrongful acts were a substantial factor in SIE not renewing its contract with Implicit.

146. Implicit has suffered harms including, but not limited to, Implicit's loss of revenue from future contracts with SIE and harm to Implicit's reputation.

147. Implicit has suffered damages in an amount to be proven at trial.

148. Stine and Project Crayon's acts were willful, oppressive, and malicious. As a consequence, Implicit is entitled to punitive damages in an amount to be proven at trial.

## NINTH COUNT

### [Violation of California Business and Professions Code §17200]

### [Against Project Crayon]

149.    Implicit refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 148 inclusive.

150.    Project Crayon has engaged in unlawful, unfair or fraudulent business acts and practices in violation of California Business and Professions Code §17200.

151.    Implicit and SIE were in an economic relationship through which Implicit provided services to SIE for retro videogame emulators.  Specifically, Implicit provided these services through a contract with SIE from January 20, 2022, to March 31, 2025, with contracts being renewed by SIE on a yearly basis, starting April 1 of each year.

152.    The final contract between Implicit and SIE ended on March 31, 2025, and SIE did not renew its contractual relationship with Implicit for the 2025-2026 contract year.

153.    Project Crayon intentionally and wrongfully interfered with Implicit's prospective economic advantage from its commercial relationship with SIE by using the Trade Secrets in the bidding process to obtain the contract with SIE.

154.    As a result, the relationship between Implicit and SIE was disrupted, with SIE not renewing its contract with Implicit.

155.    Implicit has suffered harms including, but not limited to, Implicit's loss of revenue from future contracts with SIE and harm to Implicit's reputation.

156.    Implicit is entitled to disgorgement of unjust enrichment or restitution for Project Crayon's in unlawful, unfair, and fraudulent business acts and practices.

### PRAYER FOR RELIEF

WHEREFORE, Implicit respectfully prays for judgment against Defendants and in Implicit's favor as follows:

A.    For a preliminary and permanent injunction, enjoining Stine and Traver Stine from accessing Implicit's computer systems.

///

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

B. For a preliminary and permanent injunction, enjoining Stine, Traver Stine, and Project Crayon, from accessing, using, transmitting and disclosing any Implicit's confidential, proprietary, and trade secret information.

C. For a preliminary and permanent injunction, directing Stine, Traver Stine, and Project Crayon to return all Implicit confidential information and all Implicit property.

D. For a declaration that Implicit repurchased Stine's 2,656,250 unvested common shares and that Stine only has 1,593,750 vested common shares remaining.

E. For a declaration that Lavallee is on the Implicit Board of Directors and that Stine, Traver Stine and Alawi are not on the Implicit Board of Directors.

F. For a declaration that Stine is not the CEO or Interim CEO of Implicit.

G. For a declaration that the June 19, 2024, Action by Written Consent attached as Exhibit G, and the June 20, 2024, Unanimous Written Consent, attached as Exhibit H, are invalid and of no force or effect;

H. For pre-judgment and post-judgment interest as provided for by law;

I. For an award of all actual and compensatory damages in an amount to be proven at trial;

J. For a reasonable royalty, disgorgement of unjust enrichment, and restitution;

K. For an award of attorney's fees and costs of suit;

L. For exemplary and punitive damages;

M. For the imposition of a constructive trust and other equitable remedies as the Court deems just and proper;

N. For treble damages; and

O. For such other, further, and different relief as permitted by law and as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Implicit demands a trial by jury on all claims asserted herein.

//

//

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

1

2    Dated: June 16, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

GRELLAS SHAH LLP

By: __/s/ Dhaivat H. Shah_____
Dhaivat H. Shah
Attorneys for Plaintiff
IMPLICIT CONVERSIONS, INC.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

FIRST AMENDED COMPLAINT

# Exhibit A

# IMPLICIT CONVERSIONS, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (this "Agreement") is made as of the last date set forth on the signature pages hereto by and between Implicit Conversions, Inc., a Delaware corporation (the "Company"), and Jacob Stine ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 4,250,000 shares of the Company's Common Stock (the "Shares") at a purchase price of $0.00001 per share for a total purchase price of $42.50 (the "Aggregate Purchase Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the Company and the Company will enter the Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company. The Company will deliver to Purchaser, upon request, a notice of issuance with respect to the Shares as soon as practicable following such date. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Consideration.** As consideration for the mutual promises and covenants set forth in this Agreement, Purchaser will deliver the Aggregate Purchase Price to the Company by cash payment (via check, wire transfer, ACH transfer or other such means as is acceptable to the Company).

3. **Limitations on Transfer.** Purchaser acknowledges and agrees that the Shares purchased under this Agreement are subject to (i) the terms and conditions that apply to the Company's Common Stock including (without limitation) certain transfer restrictions set forth below, as may be in effect at the time of any proposed transfer (the "Transfer Restrictions"), and (ii) any other limitation or restriction on transfer created by applicable laws.

    (a) **No Transfer Without Consent.**

        (i). No Shares of the Company may be transferred, conveyed, encumbered or otherwise disposed of in any way without the consent of a majority of the Board of Directors. Any purported transfer, conveyance, encumbrance or other disposition attempted without such consent shall be null and void.

        (ii). **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3 notwithstanding, the transfer of any or all of the Shares on Holder's death by will or intestacy to Holder's Immediate Family or a trust for the benefit of Holder or Holder's Immediate Family shall be exempt from the provisions of this Section 3. "Immediate Family" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing Holder's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the Transfer Restrictions and the provisions of this Agreement, including this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3 and the Transfer Restrictions.

In addition to the foregoing limitations on transfer, Purchaser shall not assign, encumber or dispose of any interest in the Shares while the Shares are subject to the Company's Repurchase Option (as defined below).

(b) **Repurchase Option; Vesting.**

(i). In the event of the voluntary or involuntary termination of Purchaser's Continuous Service Status (as defined below) for any reason (including, without limitation, resignation, death or Disability (as defined below)), with or without cause, the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive option (the "Repurchase Option") for a period of 3 months from such date to repurchase all or any portion of the Unvested Shares (as defined below) held by Purchaser as of the Termination Date at the original purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section 1. As used in this Agreement, "Unvested Shares" means Shares, if any, that have not yet been released from the Repurchase Option.

(ii). Unless the Company notifies Purchaser within 3 months from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Unvested Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such 3-month period following such Termination Date, provided that the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such 3-month period. Unless Purchaser is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Unvested Shares to which it applies at the time of termination, execution of this Agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option with respect to all Unvested Shares to which such Repurchase Option applies. The Company, at its choice, may satisfy its payment obligation to Purchaser with respect to exercise of the Repurchase Option by either (A) delivering a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased, or (B) in the event Purchaser is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Unvested Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(b)(ii) in which Purchaser is indebted to the Company, such indebtedness equal to the purchase price of the Unvested Shares being repurchased shall be deemed automatically canceled as of the end of the 3-month period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Unvested Shares pursuant to this Section 3(b), the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Unvested Shares being repurchased by the Company, without further action by Purchaser.

(iii). 100% of the Shares shall initially be subject to the Repurchase Option (the "Vesting Shares"). 25% of the Vesting Shares shall be released from the Repurchase Option on November 21, 2023, and an additional 1/48th of the Vesting Shares shall be released from the Repurchase Option on the corresponding day of each month thereafter (and if there is no corresponding day, the last day of the month), until all Vesting Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded down to the nearest whole share.

(iv). Notwithstanding the foregoing, if Purchaser is terminated without Cause (as defined below) by the Company (or a successor, if appropriate) or resigns for Good Reason (as defined below) in connection with or following the consummation of a Change of Control (as defined below), then the vesting of the Unvested Shares shall accelerate such that the Repurchase Option in Section 3(b) shall lapse as to 100% of the Unvested Shares. The lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to the Termination Date. In the case of a sale of all or substantially all of the Company's assets other than to an Excluded Entity, if the acquirer of the Company's assets does not agree to assume this Agreement, or to substitute an equivalent award or right for this Agreement, and Purchaser transfers Purchaser's employment to such acquirer in connection with such asset sale transaction, then any acceleration of vesting that

would otherwise occur upon Purchaser's termination shall occur immediately prior to, and contingent upon, the consummation of such asset sale transaction. As used in this Agreement, "Change of Control" means (1) a sale of all or substantially all of the Company's assets other than to an Excluded Entity (as defined below), (2) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (3) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of all of the Company's then outstanding voting securities. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Board of Directors. An "Excluded Entity" means a corporation, limited liability company or other entity of which the holders of voting capital stock of the Company outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes entitled to be cast by all of such corporation's, limited liability company's or other entity's voting securities outstanding immediately after such transaction. As used in this Agreement, "Cause" for the Company (or a successor, if appropriate) to terminate Purchaser's employment shall exist under the following conditions (I) Purchaser's willful and continued failure to substantially perform Purchaser's duties to the Company after there has been delivered to Purchaser by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Purchaser has not substantially performed Purchaser's duties; (II) Purchaser having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Purchaser's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Purchaser's material breach of any material written agreement between Purchaser and the Company (including without limitation Purchaser's Confidential Information and Invention Assignment Agreement with the Company) and Purchaser's failure to cure such breach within 30 days after receiving written notice thereof. For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Purchaser's death or disability. The determination as to whether Purchaser's Continuous Service Status has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on Purchaser. The foregoing definition does not in any way limit the Company's ability to terminate Purchaser's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate. As used in this Agreement, "Good Reason" will mean Purchaser's resignation due to the occurrence of any of the following conditions which occurs without Purchaser's written consent, provided that the requirements regarding advance notice and an opportunity to cure set forth below are satisfied: (1) a reduction of Purchaser's then current base salary by 10% or more unless such reduction is part of a generalized salary reduction affecting similarly situated employees; (2) a change in Purchaser's position with the Company that materially reduces Purchaser's duties, level of authority or responsibility; or (3) the Company conditions Purchaser's continued service with the Company on Purchaser's being transferred to a site of employment that would increase Purchaser's one-way commute by more than 35 miles from Purchaser's then principal residence. In order for Purchaser to resign for Good Reason, Purchaser must provide written notice to the Company of the existence of the Good Reason condition within 60 days of the initial existence of such Good Reason condition. Upon receipt of such notice, the Company will have 30 days during which it may remedy the Good Reason condition and be not be required to provide for the vesting acceleration described herein as a result of such proposed resignation. If the Good Reason condition is not remedied within such 30-day period, Purchaser may resign based on the Good Reason condition specified in the notice effective no later than 30 days following the expiration of the 30-day cure period. If Purchaser is a Director but not an Employee or Consultant of the Company (or a successor, if appropriate) at the time of consummation of the Change of

Control and Purchaser is removed from, or is not reelected to, the Board of Directors of the Company (or a successor, as appropriate) in connection with or following the consummation of a Change of Control, the vesting of any Unvested Shares shall accelerate such that the Repurchase Option shall lapse to the same extent as if Purchaser had been terminated without Cause as described above.

(c) **Transfer Restrictions; Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company shall first, to the extent the Company's approval is required by any applicable Transfer Restriction, have the right to approve such sale or transfer, in full or in part, and shall then have the right to purchase all or any part of the Shares proposed to be sold or transferred, in each case, in its sole and absolute discretion (the "Right of First Refusal"). If the Holder would like to sell or transfer any Shares, the Holder must provide the Company or its assignee(s) with a Notice (as defined below) requesting approval to sell or transfer the Shares and offering the Company or its assignee(s) a Right of First Refusal on the same terms and conditions set forth in this Section 3(c). The Company may either (1) exercise its Right of First Refusal in full or in part and purchase such Shares pursuant to this Section 3(c), (2) decline to exercise its Right of First Refusal in full or in part and permit the transfer of such Shares to the Proposed Transferee (as defined below) in full or in part or (3) decline to exercise its Right of First Refusal in full or in part and, to the extent the Company's approval is required by any applicable Transfer Restriction, decline the request to sell or transfer the Shares in full or in part.

(i). **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be sold or transferred to each Proposed Transferee; (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Transfer Purchase Price"); and (E) the Holder's offer to the Company or its assignee(s) to purchase the Shares at the Transfer Purchase Price and upon the same terms (or terms that are no less favorable to the Company).

(ii). **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) shall deliver a written notice to the Holder indicating whether the Company and/or its assignee(s) elect to permit or reject the proposed sale or transfer, in full or in part, and/or elect to accept or decline the offer to purchase any or all of the Shares proposed to be sold or transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

(iii). **Payment.** Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(iv). **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be sold or transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this Section 3(c) and (B) approved by the Company to be sold or transferred, then the Holder may sell or otherwise transfer any such Shares to the applicable Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice; provided that any such sale or other transfer is also effected in accordance with the Transfer Restrictions and any applicable laws and the Proposed Transferee agrees in writing that the Transfer Restrictions and the provisions of this Agreement, including this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may

require the Holder to provide an opinion of counsel evidencing compliance with applicable laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

(d)  **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including intestate transfer upon death, but excluding transfer upon death by will (to any transferee) or a transfer to Immediate Family as set forth in Section 3(a)(ii) above) of all or a portion of the Shares, the Company shall have an option to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(e)  **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(f)  **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the Transfer Restrictions and the provisions of this Agreement, including, without limitation, Section 3 , including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee shall be obligated, if requested by the Company, to transfer the Shares or interest to Purchaser for consideration equal to the amount to be paid by the Company hereunder. In the event the Repurchase Option is deemed exercised by the Company pursuant to Section 3(b)(ii) hereof, the Company may deem any transferee to have transferred the Shares or interest to Purchaser prior to the purchase of the Shares by the Company, and payment of the purchase price by the Company to such transferee shall be deemed to satisfy Purchaser's obligation to pay such transferee for such Shares or interest, and also to satisfy the Company's obligation to pay Purchaser for such Shares or interest . Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(g)  **Termination of Rights.** The transfer restrictions set forth in Section 3(c) above, the Right of First Refusal granted the Company by Section 3(c) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(d) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(h)  **Lock-Up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

4. **Escrow of Unvested Shares.** For purposes of facilitating the enforcement of the provisions of Section 3 above, Purchaser agrees to deliver a Stock Power in the form attached to this Agreement as Exhibit A executed

by Purchaser, in blank, and such stock certificate(s), if any, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are required in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board of Directors of the Company shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

5. **Investment and Taxation Representations**. In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d) Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 5(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 5(e) below.

(e) Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f) Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Purchaser also agrees to notify the Company if Purchaser becomes subject to such disqualifications after the date hereof.

(g) Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any

tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6. **Restrictive Legends and Stop-Transfer Orders.**

(a) **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares, shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i). "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii). "THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(iii). "THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO THE APPLICABLE COMMON STOCK PURCHASE AGREEMENT, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH SUCH AGREEMENT."

(b) **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d) **Legend and Notice Removal.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend specified in Section 6(a)(ii) and the Company will remove any stop-transfer notices associated with the transfer restrictions imposed by this Agreement:

(i). the termination of the Right of First Refusal;

(ii). the expiration or exercise in full of the Repurchase Option; and

(iii). the expiration or termination of the lock-up provisions of Section 3(h) (and of any agreement entered pursuant to Section 3(h)).

After such time and upon Purchaser's request, a new stock certificate or, in the case of uncertificated securities, notice of issuance, for the remaining Shares, shall be issued without the legend specified in Section 6 and delivered to Purchaser.

(e) **Required Notices.** Purchaser acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 6, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company. A statement

of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement. Purchaser acknowledges that the provisions of this Section 6 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and Purchaser hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation Law that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.

7. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

8. **Section 83(B) Election.** Purchaser understands that Section 83(a) of the Internal Revenue Code of 1986, as amended (the "Code"), taxes as ordinary income the difference between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" means the right of the Company to buy back the Shares pursuant to the Repurchase Option set forth in Section 3(b) of this Agreement. Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under Section 83(b) (an "83(b) Election") of the Code with the Internal Revenue Service within 30 days from the date of purchase. Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the election must be made to avoid income under Section 83(a) in the future. Purchaser understands that failure to file such an election in a timely manner may result in adverse tax consequences for Purchaser. Purchaser further understands that an additional copy of such election form should be filed with Purchaser's federal income tax return for the calendar year in which the date of this Agreement falls. Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares hereunder, does not purport to be complete, and is not intended or written to be used, and cannot be used, for the purposes of avoiding taxpayer penalties. Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death, and Purchaser has consulted, and has been fully advised by, Purchaser's own tax advisor regarding such tax laws and tax consequences or has knowingly chosen not to consult such a tax advisor. Purchaser further acknowledges that neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to Purchaser with respect to the tax consequences of Purchaser's purchase of the Shares or of the making or failure to make an 83(b) Election. PURCHASER (AND NOT THE COMPANY, ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR APPROPRIATELY FILING SUCH FORM WITH THE IRS, EVEN IF PURCHASER REQUESTS THE COMPANY, ITS AGENTS OR ANY OTHER PERSON MAKE THIS FILING ON PURCHASER'S BEHALF. Purchaser agrees that Purchaser will execute and deliver to the Company with this executed Agreement a copy of the Acknowledgment and Statement of Decision Regarding Section 83(b) Election (the "Acknowledgment"), attached hereto as Exhibit B and, if Purchaser decides to make an 83(b) Election, a copy of the 83(b) Election, attached hereto as Exhibit C.

9. **Certain Defined Terms.**

(a) "**Affiliate**" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) "**Continuous Service Status**" means the absence of any interruption or termination of service as an Employee or Consultant. Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of: (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between Company, its Parents,

Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(c) "**Director**" means a member of the Board of Directors of the Company.

(d) "**Disability**" means "disability" within the meaning of Section 22(e)(3) of the Code.

(e) "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(f) "**Parent**" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such a chain.

(g) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

10. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware or the federal courts of the United States located in Delaware and no other courts.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under

applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i) **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(j) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

[Signature Page Follows]

The parties have executed this Common Stock Purchase Agreement as of the last date set forth below.

THE COMPANY: Implicit Conversions, Inc.
Dated: 1/26/2023

*Robin Lavallee*
_____
Robin Lavallee


PURCHASER:
Dated: 1/26/2023

*Jacob Stine*
_____
Jacob Stine

**EXHIBIT A**

**STOCK POWER**

FOR VALUE RECEIVED, the undersigned ("Holder"), hereby sells, assigns and transfers unto
_____ ("Transferee")
_____ shares of the Common Stock of _____, a Delaware corporation (the
"Company"), standing in Holder's name on the Company's books as Certificate No. UCS-_____ whether held in
certificated or uncertificated form, and does hereby irrevocably constitute and appoint
_____ to transfer said stock on the books of the Company with full power of
substitution in the premises.

HOLDER: Implicit Conversions, Inc.
Dated:

*Jacob Stine*
_____
Jacob Stine

This Stock Power may only be used as authorized by the Common Stock Purchase Agreement between the Holder
and the Company, dated _____ and the exhibits thereto.

***Instructions:*** Please do not fill in any blanks other than the signature line. The purpose of this Stock Power is to
enable the Company to exercise its repurchase option set forth in the Agreement without requiring additional
signatures on the part of Holder.

IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS YOUR RESPONSIBILITY.

THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT.

YOU MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.

YOU (AND NOT THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY, ITS AGENTS OR ANY OTHER PERSON TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON HAS PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.

The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See www.irs.gov.

**EXHIBIT B**

**ACKNOWLEDGMENT AND STATEMENT OF DECISION**
**REGARDING SECTION 83(B) ELECTION**

The undersigned has entered into a stock purchase agreement with _____, a Delaware corporation (the "Company"), pursuant to which the undersigned is purchasing _____ shares of Common Stock of the Company (the "Shares"). In connection with the purchase of the Shares, the undersigned hereby represents as follows:

1. The undersigned has carefully reviewed the stock purchase agreement pursuant to which the undersigned is purchasing the Shares.
2. The undersigned either [check and complete as applicable]:
    a. _____ has consulted, and has been fully advised by, the undersigned's own tax advisor, _____, whose business address is _____, regarding the federal, state and local tax consequences of purchasing the Shares, and particularly regarding the advisability of making elections pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code") and pursuant to the corresponding provisions, if any, of applicable state law; or
    b. _____ has knowingly chosen not to consult such a tax advisor.
3. The undersigned hereby states that the undersigned has decided [check as applicable]:
    a. _____ to make an election pursuant to Section 83(b) of the Code, and is submitting to the Company, together with the undersigned's executed stock purchase agreement, an executed form entitled "Election Under Section 83(b) of the Internal Revenue Code of 1986;" or
    b. _____ not to make an election pursuant to Section 83(b) of the Code.
4. Neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to the undersigned with respect to the tax consequences of the undersigned's purchase of the Shares or of the making or failure to make an election pursuant to Section 83(b) of the Code or the corresponding provisions, if any, of applicable state law.

Dated:                                  **PURCHASER:**

_____    _____
                                                        (PRINT NAME)

                                               _____
                                                          (Signature)

**EXHIBIT C**

**ELECTION UNDER SECTION 83(B)**
**OF THE INTERNAL REVENUE CODE OF 1986**

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, to include in taxpayer's gross income for the current taxable year, the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below:

1. The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

   NAME OF TAXPAYER: _____
   ADDRESS: _____
   _____
   IDENTIFICATION NO. OF TAXPAYER: _____
   TAXABLE YEAR: _____

2. The property with respect to which the election is made is described as follows:

   _____ shares of the Common Stock of _____, a Delaware corporation (the "Company").

3. The date on which the property was transferred is: _____.

4. The property is subject to the following restrictions:

   Repurchase option at cost in favor of the Company upon termination of taxpayer's employment or consulting relationship.

5. The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6. The amount (if any) paid for such property: Paid for with cash and/or property having a value of $_____ and equivalent to the value of the Shares.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

<u>The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.</u>

Dated:                                              **PURCHASER:**

_____    _____
                                                        (PRINT NAME)


                                                _____
                                                        (Signature)

                                                Address:

                                                _____

## **RECEIPT**

Implicit Conversions, Inc., a Delaware corporation (the "Company"), hereby acknowledges the receipt of cash and other consideration having an aggregate value equal to at least $_____ given by _____ as consideration for _____ shares of Common Stock of the Company recorded on the books of the Company.

Dated:                                                    **THE COMPANY:**
                                                         Implicit Conversions, Inc.

_____

                                                         By: Robin Lavallee


                                                         _____
                                                                        (Signature)

# Exhibit B

**IMPLICIT CONVERSIONS, INC.**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

*Employee Name: Jacob Stine*

*Effective Date: November 21, 2022*

As a condition of my becoming employed (or my employment being continued) by Implicit Conversions, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree to the following:

1.  **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement" ) will apply to my employment relationship with the Company. If that relationship ends and the Company, within one (1) year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.  **Applicability to Past Activities.** The Company and I acknowledge that I may have performed work, activities, services or made efforts on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been within the scope of my duties under this agreement if performed during the term of this Agreement, for a period of time prior to the Effective Date of this Agreement (the "Prior Period"). Accordingly, if and to the extent that, during the Prior Period: (i) I received access to any information from or on behalf of the Company that would have been Confidential Information (as defined below) if I received access to such information during the term of this Agreement; or (ii) I (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been an Invention (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a Prior Invention (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

3.  **Confidential Information.**

    (a)  **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of my

obligations to the Company under the Relationship.

(b) **Confidential Information.** I understand that "<u>Confidential Information</u>" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c) **Third Party Information.** My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence. During the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I will not bring any such information onto the Company's property or place of business.

(d) **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e) **U.S. Defend Trade Secrets Act.** Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("<u>DTSA</u>") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

4. **Ownership of Inventions.**

(a) **Inventions Retained and Licensed.** I have attached hereto, as <u>Exhibit A</u>, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date: (i) have been created by or on behalf of me, and/or (ii) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively "<u>Prior Inventions</u>"); or, if no such list is attached, I represent and warrant that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on <u>Exhibit A</u>, I hereby irrevocably and forever waive any and all rights or claims of ownership to such Inventions. I understand that my listing of any Inventions on <u>Exhibit A</u> does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions. I further understand that I must receive the formal approval of the Company before

commencing my Relationship with the Company.

(b)  **Use or Incorporation of Inventions**. If in the course of the Relationship, I use or incorporate into any of the Company's products, services, processes or machines any Invention not assigned to the Company pursuant to Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)  **Inventions**. I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship or otherwise in connection with the Relationship, except as otherwise provided in Section 4(g) below.

(d)  **Assignment of Company Inventions**. I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all of my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If I have any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, I hereby unconditionally and irrevocably grant to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e)  **Maintenance of Records**. I shall keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I shall not remove such records from the Company's place of business or systems except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I shall deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 5 and Section 6.

(f) **Intellectual Property Rights.** I shall assist the Company, or its designee, at its expense, in every proper way in securing the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and shall never assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. My obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g) **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.   **Company Property; Returning Company Documents.** I acknowledge that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further acknowledge that any property situated on the Company's premises or systems and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. At the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6.   **Termination Certification.** In the event of the termination of the Relationship, I shall sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7.   **Notice to Third Parties.** During the periods of time during which I am restricted in taking certain actions by the terms of Section 8 of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I acknowledge that the Company may, with or without prior notice to me and whether during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. Upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

8. **Solicitation of Employees, Consultants and Other Parties.** As described above, I acknowledge that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and I will not use or disclose such Confidential Information except as authorized by the Company in advance in writing. I further agree as follows:

    (a)  **Employees, Consultants.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate such employees' or consultants' relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

    (b)  **Other Parties.** During the term of the Relationship, I will not influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

9. **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

10. **Representations and Covenants.**

    (a)  **Facilitation of Agreement.** I shall execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

    (b)  **No Conflicts.** I represent and warrant that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I represent and warrant that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement.

    (c)  **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

11. **Electronic Delivery.** Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means. I hereby consent to receive

such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

12. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c) **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e) **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f) **Remedies.** I acknowledge that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g) **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND

I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(h)  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

THE COMPANY: IMPLICIT CONVERSIONS, INC.
Executed on 1/24/2023

*Robin Lavallee*

Robin Lavallee


Employee:
Executed on 1/24/2023

*Jacob Stine*

Jacob Stine


CONFIDENTIAL INFORMATION AND INVENTION
ASSIGNMENT AGREEMENT OF IMPLICIT CONVERSIONS, INC.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**
**EXCLUDED UNDER SECTION 4(a)**
**AND CONFLICTING AGREEMENTS DISCLOSED UNDER SECTION 10(b)**

The following is a list of (i) all Inventions that, as of the Effective Date: (A) have been created by me or on my behalf, and/or (B) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

| Title | Date | Identifying Number or Brief Description |
|-------|------|-----------------------------------------|
|       |      |                                         |

Except as indicated above on this Exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 4(a) of this Agreement and no agreements to disclose pursuant to Section 10(b) of this Agreement.

Executed on 1/24/2023

*Jacob Stine*
_____
Jacob Stine, Employee

## EXHIBIT B

Section 2870 of the California Labor Code is as follows:

    (a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of the employee's rights in an invention to the employee's employer shall not apply to an invention that the employee developed entirely on the employee's own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

    (1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

    (2)    Result from any work performed by the employee for the employer.

    (b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

RCW 49.44.140 of the Revised Code of Washington is as follows:

    (1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

    (2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

    (3)    If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:

    (1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that the employee's invention qualifies under this

subsection.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)    If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.


Sections 44-130 of the Kansas Labor and Industries Code is as follows:


(a)    Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    the invention results from any work performed by the employee for the employer.

(b)    Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

(c)    If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    The invention results from any work performed by the employee for the employer.

(d)    Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.


Section 181.78 of the Minnesota Labor, Industry Code is as follows:

Subdivision 1. Inventions not related to employment. Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the

business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

Subd. 2. Effect of subdivision 1. No employer shall require a provision made void and unenforceable by subdivision 1 as a condition of employment or continuing employment.

Subd. 3. Notice to employee. If an employment agreement entered into after August 1, 1977 contains a provision requiring the employee to assign or offer to assign any of the employee's rights in any invention to an employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

**EXHIBIT C**

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Implicit Conversions, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by the Confidentiality Agreement, and I acknowledge my continuing obligations under the Confidentiality Agreement.

I further agree that, in compliance with the Confidentiality Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months immediately following the termination of my Relationship with the Company, I shall not either directly or indirectly solicit any of the Company's employees or consultants to terminate such employees' or consultants' relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

Date:

_____

Jacob Stine, Employee

# Exhibit C

June 14, 2024


Via email only to jake.stine@gmail.com


Jacob Stine
100 Redwood Drive
La Honda, CA 94020


RE:      **Employment Termination Letter**
          **Notice of Intent to Exercise Repurchase Option**


Dear Jacob:

I regret to inform you that your employment as Chief Technology Officer with Implicit Conversions, Inc., a Delaware corporation, is hereby terminated immediately for cause as of June 14, 2024 (the "**Effective Date**").

You have repeatedly demonstrated gross misconduct in the performance of your duties, including but not limited to mismanagement of multiple employees, mismanagement of the company, interpersonal misconduct, including violent physical threats against an employee, failure of duties and denigration of business partners. Implicit Conversions has carefully considered the issues at hand and has conducted a thorough investigation, including discussions with you and warnings to address the concerns. Despite these efforts, it has become evident that your conduct has not improved and your negative impact on Implicit Conversions' operations and work environment cannot continue.

Except as set forth in this letter, the Effective Date will be your employment termination date for all purposes, meaning you will no longer be entitled to any further compensation, monies, or other benefits from Implicit Conversions, including coverage under any benefits plans or programs sponsored by Implicit Conversions. Notwithstanding the previous sentence, Implicit Conversions will pay you vested or bonus royalty funds you earned during the term of your employment.

Your final paycheck, including your full pay as well as accrued but unused PTO, vacation, and sick days through the Effective Date will be paid in accordance with Implicit Conversions' standard payroll practices subject to all withholdings and deductions as required by law.

Implicit Conversions will reimburse you for any expenses you incurred in the performance of your duties in accordance with our expense reimbursement policy.

Your access to company systems will be disabled by the end of today. Within one week of the Effective Date, you must return all Implicit Conversions property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other Implicit Conversions

property and information in your possession. Shipping costs will be paid by Implicit Conversions. Please return this property and information to me by the Effective Date.

In accordance with the Common Stock Purchase Agreement dated January 26, 2023 (the "**Stock Purchase Agreement**"), Implicit Conversions hereby notifies you that it intends to exercise its repurchase option under Section 3 of the Stock Purchase Agreement with respect to all 2,744,795 unvested shares at the original purchase price of $0.00001 per share for a total purchase price of $27.45. Implicit Conversions will deliver a check to you in the amount of the total purchase price.

Nothing contained or omitted in this letter is or shall be deemed a limitation, restriction, or waiver of any of Implicit Conversions' right or remedies, either at law or in equity. All such rights and remedies are expressly reserved.

We wish you success in your future endeavors. If you have any questions or concerns about this letter or the agreements referenced herein, please contact Premack Rogers Downs P.C., legal counsel for Implicit Conversions, at benjamin@premackrogers.com and William Litshauer. Sr. Executive Producer, at bill@implicitconversions.com.

Sincerely,

DocuSigned by:

Robin Lavallée

BE54E77432C14C7...

Robin Lavallée, CEO
Implicit Conversions, Inc.
robin.lavallee@implicitconversions.com

# Exhibit D

 Gmail

**Robin Lavallée <robin.lavallee2@gmail.com>**

---

## Fwd: Important Notice Regarding Recent Employment Status Changes
1 message

---

**Drew McLean** <drew.mclean@gmail.com>                                          15 juin 2024 à 00 h 57
À : Robin Lavallee <robin@guibec.com>

---------- Forwarded message ---------
From: **Drew McLean** <drew@implicitconversions.com>
Date: Fri, Jun 14, 2024 at 9:56 PM
Subject: Fwd: Important Notice Regarding Recent Employment Status Changes
To: Drew McLean <drew.mclean@gmail.com>

---------- Forwarded message ---------
From: **Jake Stine** <jake.stine@implicitconversions.com>
Date: Fri, Jun 14, 2024 at 9:53 PM
Subject: Important Notice Regarding Recent Employment Status Changes
To: <all@implicitconversions.com>

Hi Team,

I am writing this message today with a heavy heart to inform you that Robin Lavallee's access to Google Admin, including Drive and Gmail, has been temporarily revoked. This action was done in response to bypassing the proper due processes which are required by our company policies, and also his repeated efforts to undermine efforts to engage in due diligence and fair communication. The announcement of my termination was not in accordance with company protocols, and the actions taken against me are unjust and inappropriate.

I want to be clear that Robin is not being terminated. This action is taken to help enforce a more stable environment where both parties are afforded the respect of due diligence and fair representation.

I have always valued my role here and have worked diligently to contribute to our team's success. It is disheartening to find myself in this situation, but I am committed to pursuing the appropriate channels to address this issue and seek a fair and amicable resolution.

I kindly request your understanding and support during this challenging time. If you have any questions or concerns, please do not hesitate to reach out to me directly. At this time I do not have access to Slack or Github, so please contact me via other contact methods listed below.

Sincerely,

Jake Stine
CTO & Co-Founder
Implicit Conversions, Inc
cell: 650-335-8946
discord: mysteriousnixon
jake.stine@gmail.com

# Exhibit E



June 17, 2024

VIA Registered Mail

Jacob Stine

<u>Notice of Exercise of Repurchase Option</u>

Dear Jacob,

Following the termination of your employment relationship with Implicit Conversions, Inc., a Delaware corporation (the "<u>Company</u>"), as of June 14, 2024, your 4,250,000 shares of Common Stock of the Company ceased to vest in accordance with Section 3(b) of your Common Stock Purchase Agreement dated January 26, 2023 (the "<u>Purchase Agreement</u>").

This letter serves to inform you that, pursuant to the terms of the Purchase Agreement, the Company is hereby exercising its right to repurchase from you 2,656,250 shares of unvested Common Stock of the Company. Please find enclosed a check in the amount of $26.57, the original purchase price for the repurchased unvested shares. Upon receipt of the check, all 2,656,250 shares of your Common Stock of the Company shall be deemed repurchased, pursuant to procedures specified in Section 3(c) of the Purchase Agreement and the Company shall transfer such shares to its own name. You shall continue to own 1,593,750 shares, which shall be deemed fully-vested.

If you have any questions, please contact me directly.

Sincerely,

Robin Lavallee
Chief Executive Officer

Acknowledged and Agreed:

_____

Jacob Stine

Dated: _____

# Exhibit F

## IMPLICIT CONVERSIONS, INC.
### RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF STOCKHOLDERS IN LIEU OF SPECIAL MEETING

The undersigned, being holders of a majority of the outstanding capital stock of Implicit Conversions, Inc., a Delaware corporation (the "**Company**"), pursuant to the provisions of Section 228 of the Delaware General Corporation Law and the Bylaws of the Company, do hereby consent that the following recitals and resolutions shall be deemed to be adopted to the same extent and to have the same force and effect as if such recitals and resolutions were adopted by the vote of the holders of the outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a special meeting of the stockholders of the Company duly called and held for the purposes of acting upon proposals to adopt such recitals and resolutions (the "**Requisite Vote**"), including, at least a majority of the Company's outstanding Common Stock, par value $0.00001 per share.

### REMOVAL FROM BOARD OF DIRECTORS

**WHEREAS**, the board of directors of the Company (the "**Board**") currently consists of two members, Robin Lavallee and Jacob Stine; and

**WHEREAS**, pursuant to Section 3.13 of the Bylaws of the Company, the stockholders constituting the Requisite Vote desire to remove Jacob Stine from the Board.

**IT IS THEREFORE RESOLVED AS FOLLOWS,** that Stockholders constituting the Requisite Vote hereby ratify and approve the removal of Jacob Stine as a director on the Board; and

**IT IS FURTHER RESOLVED,** that all acts and actions taken by the Company, or any officer, director, employee, agent or attorney of, or acting on behalf of, the Company, prior to the date hereof with respect to the foregoing resolutions prior to, on or after the date hereof, be, and hereby are, in all respects confirmed, approved, and ratified

This written consent may be executed in counterparts either manually or electronically, each of which shall constitute an original and all of which together shall constitute one instrument, to be effective upon the receipt of signatures from stockholders constituting the Requisite Vote. A copy of this written consent that is executed and delivered by e-mail or other electronic transmission shall constitute an original, executed written consent.

**STOCKHOLDERS:**

Dated: ___06/17/2024___          _____

Robin Lavallee

Dated: _____          _____

# Exhibit G

**WRITTEN CONSENT**
**OF THE MAJORITY STOCKHOLDERS OF**
**IMPLICIT CONVERSIONS, INC.,**
**a Delaware corporation**

_____

The undersigned, being the majority stockholders (the **"Majority Stockholders"**) of all issued and outstanding capital stock of Implicit Conversions, Inc., a Delaware corporation (the **"Company"**), pursuant to Section 228 of the Delaware General Corporation Law, hereby adopts the following resolution by their written consent thereto, effective June 19, 2024, having the same force and effect as if adopted at a special meeting of the Majority Stockholders duly called and held on such date.

**REMOVAL FROM BOARD OF DIRECTORS**

**WHEREAS**, the board of directors of the Company (the **"Board"**) currently consists of two members, Jacob Stine and Robin Lavallee; and

**WHEREAS**, pursuant to Section 228 of the Delaware General Corporation Law, the Majority Stockholders of the Company wish to remove Robin Lavallee from the Board; be it therefore

**RESOLVED**, that the removal of Robin Lavallee from the Board is hereby approved by the Majority Stockholders.

**ELECTION OF DIRECTORS**

**WHEREAS**, the Majority Stockholders desire to elect new members of the Company's Board; and

**WHEREAS**, upon motion duly made by the Majority Stockholders, the following individuals were nominated and all votes were cast in equal amounts for their election to the Board:

Sayed Mahmood Alawi

Juanita Traver Stine

**RESOLVED**, that Sayed Mahmood Alawi and Juanita Traver Stine are hereby elected as members of the Board to serve until they resign, are removed from the Board or are otherwise disqualified from serving as members of the Board.

**RESOLVED FURTHER**, that this written consent may be executed by facsimile signature, signature on an electronic image (such as .pdf or .jpg format) or electronic signature and shall be deemed an original.

**IN WITNESS WHEREOF**, the undersigned has executed this written consent as of the date first written above.

MAJORITY STOCKHOLDERS OF IMPLICIT CONVERSIONS, INC., A DELAWARE CORPORATION

_____
Jacob Stine

_____
Sayed Mahmood Alawi

# Exhibit H

**UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**IMPLICIT CONVERSIONS, INC.,**
**a Delaware corporation**

The undersigned, being all of the Directors of Implicit Conversions, Inc., a Delaware corporation (the **"Company"**), pursuant to Section 141 of the Delaware General Corporation Law, hereby waive the calling and convening of a meeting and consent to the adoption of the following recitals and resolutions effective as of June 20, 2024:

**REMOVAL OF OFFICER**

**WHEREAS**, the office of Chief Executive Officer (the **"CEO"**) is currently held by Robin Lavallee; and

**WHEREAS**, pursuant to Section 141 of the Delaware General Corporation Law, the Directors of the Company wish to remove Robin Lavallee as CEO and place Robin Lavallee on administrative leave pending further investigation; be it therefore

**RESOLVED**, that the Directors of the Company hereby approve the removal of Robin Lavallee from the position of CEO and authorize placing Robin Lavallee on paid administrative leave pending further determination.

**RESOLVED**, that Jacob Stine is hereby appointed interim CEO, until such time as the Board appoints a new CEO or he resigns.

**RESOLVED FURTHER**, that this written consent may be executed by facsimile signature, signature on an electronic image (such as .pdf or .jpg format) or electronic signature, and shall be deemed an original.

**IN WITNESS WHEREOF**, the undersigned have executed this written consent as of the date first written above.

BOARD OF DIRECTORS OF IMPLICIT CONVERSIONS, INC., A DELAWARE CORPORATION

_Sayed Mahmood Alawi_
_____
Sayed Mahmood Alawi

_[signature]_
_____
Jacob Stine

_Juanita Traver Stine_
_____
Juanita Traver Stine