GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
JOSEPH B. PALMIERI, ESQ. (SBN 312725)
(jp@grellas.com)
550 California Street, Suite 1040
San Francisco, CA  94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff
IMPLICIT CONVERSIONS, INC.

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT CONVERSIONS, INC, a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JACOB STINE, an individual, JUANITA TRAVER STINE, an individual, PROJECT CRAYON LLC, a California Limited Liability Corporation, and DOES 1-10, inclusive,<br>Defendants.<br><br>JACOB STINE, an individual; JUANITA TRAVER STINE, an individual,<br><br>Counterclaimants,<br><br>vs.<br>IMPLICIT CONVERSIONS, INC, a Delaware Corporation; and ROBIN LAVALLEE, an individual,<br><br>Counterdefendants. | Case No.  3:24-cv-03744-WHO<br><br>**DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF PLAINTIFF IMPLICIT CONVERSIONS INC.'S MOTION FOR SANCTIONS** |

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

1

I, Robin Lavallee, declare that:

1.     I have personal knowledge of the facts stated herein.  If called upon as a witness, I could and would testify competently to the following facts.

2.     I am the co-founder and Chief Gaming Officer of Implicit Conversions, Inc. ("Implicit"), a Delaware corporation.  I am also the sole member of Implicit's Board of Directors.

3.     I was previously the Chief Executive Officer ("CEO") of Implicit.

4.     Implicit's core business is producing proprietary video game emulators that allow classic video games that were produced for legacy consoles (e.g., PlayStation, Genesis, and Nintendo Entertainment System) to be played on modern video game consoles, such as PlayStation 5 and Nintendo Switch.

5.     On June 14, 2024, Implicit notified Jacob Stine that his employment was terminated effective immediately.  Implicit also notified Jacob Stine that his access to company computer systems was being disabled.  Implicit disabled Jacob Stine's access to Implicit's major computer systems upon his termination.

6.     Upon termination, Jacob Stine had no authority to access Implicit's computer systems.

7.     On the evening of June 14, after his access had been disabled, Juanita Traver Stine's credentials were used to access Implicit's computer systems and restore Jacob Stine's access rights.  Once his access was restored, Jacob Stine disabled my access to Implicit's systems.  That evening, I received an automated email alert Google Workspace notifying me that the primary administrator for Implicit had been changed from myself to Juanita Traver Stine.

8.     That same evening, Jacob Stine used Implicit's email system to send a message to all Implicit employees.  Jacob Stine admitted that he had regained access to Implicit's computer systems and that he had blocked my access to Implicit's computer systems.

9.     Jacob Stine was not authorized to access Implicit's computer systems after his termination or to copy any documents from Implicit's computer systems.  Likewise, Juanita

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

Traver Stine was not authorized to provide Jacob Stine access to Implicit's computer systems. Nor was Juanita Traver Stine authorized to disable my access to Implicit's systems.

10. On June 18, 2024, Implicit demanded that Jacob Stine return all physical hardware and digital files held at his La Honda, California home office. This demand included the return of Implicit's most powerful data center, referred to at Implicit as "Reynard."

11. Prior to these events, Implicit maintained three data centers: one in Pennsylvania, one in Canada, and Reynard, kept in a home office at Jacob Stine's residence in La Honda. Implicit's confidential and proprietary information and trade secrets were stored on and accessible through these servers.

12. At the time of Jacob Stine's unlawful entry into the Implicit computer network, Reynard housed hardware and software that was critical to Implicit's ongoing operations and was the strongest and fastest data center of the three data centers that Implicit used. Each of these data centers also contained computers and hardware proprietary to one of Implicit's clients that Implicit used to develop its video game emulation software that it provided to them.

13. Implicit used physical data centers because the games it produces must be run on proprietary hardware provided by its clients. This involves large data transfers and would be cost-prohibitive and inefficient to run on the cloud. Because of this, each data center was connected to each other using virtual private network ("VPN") software called TailScale. This protocol allowed the data centers to communicate privately over a public communication channel. Furthermore, having three data centers allowed Implicit to continue functioning should one of the data centers fail. Thus, access to one data center provided access to all the data centers.

14. After Jacob Stine took over Implicit's systems, including deleting files, not only did he directly disrupt Implicit's operations and shipping Implicit's product, but Implicit was unaware of the scope of Jacob Stine's tampering, and whether he had placed backdoors or other security risks in the system.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR SANCTIONS
CASE NO.: 3:24-cv-03744-WHO

15. Given Jacob Stine's continued possession of Reynard, the Canada and Pennsylvania data centers had to be turned offline to prevent the possibility of him tampering with those data centers through Reynard, which he had access to through Reynard.

16. One of Reynard's functions is as a "build machine." To perform this function, Reynard downloaded all source code locally. Source code would get pushed to Reynard, then the compiler would run and create executable files and libraries. As a result, Reynard contains a complete set of Implicit's source code, which was updated through at least the time that Reynard was fully disconnected.

17. Following Jacob Stine's unlawful post-termination access to the Implicit computer systems, Implicit disconnected its other data centers to prevent Jacob Stine from accessing them. Implicit tried to at first avoid fully disconnecting Reynard completely from the Implicit computer network because doing so would have brought Implicit's ability to produce and deliver its products and services to a halt. Yet leaving Reynard connected would have allowed Jacob Stine to keep accessing changes and updates to Implicit's source code.

18. Implicit balanced these concerns by disconnecting Reynard from the Implicit computer system in an iterative fashion from June 16, 2024, through June 20, 2024. Before completely disconnecting Reynard on June 20, 2024, Implicit rebuilt its infrastructure and networks on the other two data centers and diverted its operations to those data centers so that it was able function as a company without the use of Reynard.

19. Implicit still hoped that Jacob Stine would return Reynard to Implicit if Implicit demanded that it be returned. Given that there was no reasonable dispute that Reynard was a dedicated build computer that belonged to Implicit, and not Jacob Stine, Implicit twice demanded the return of Reynard as well as certain other items of Implicit property on June 18, 2024. None of the requested items, including Reynard, were returned to Implicit.

20. When it became apparent that Jacob Stine would not return Reynard, Implicit sought a temporary restraining order on July 2, 2024, that requested among other things, that Jacob Stine be ordered to return Reynard so that Implicit could make it operational again.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

21.     I understand that the Court denied the return of Reynard on the ground that Jacob Stine represented to the Court that it was a "personal computer" and Jacob Stine implied that he may have personal materials on Reynard. These were misrepresentations, as Reynard was always Implicit's property and was used as a build computer used exclusively to ship Implicit's product in connection with the two other build computers.

22.     I cannot state the exact last date that Implicit personnel accessed Reynard, but I can definitively state that it was not after Reynard was completely disconnected, which was no later than June 20, 2024. At this time, Implicit resumed its operations on the rebuilt Implicit network operating on the other data centers.

23.     In addition to the source code I previously described, Reynard also contained certain files that contain what are referred to as "authentication tokens." These authentication tokens were like physical keys that could be used to unlock and access the rest of the Implicit network. It was imperative that Implicit remove any authentication tokens that could provide Jacob Stine access to the other Implicit data centers once the Implicit network was fully migrated to the other data centers. Implicit could not risk the possibility of Jacob Stine attempting to further tamper with the Implicit computer systems.

24.     Given Implicit's concern about Jacob Stine regaining access to the Implicit computer network, Implicit remotely deleted security files from Reynard containing these authentication tokens prior to disconnecting Reynard. These files related only to the build system portion of Reynard, leaving the rest of the machine untouched. This was necessary so that Jacob Stine could not gain access to the newly rebuilt Implicit computer network. Again, I do not remember the exact date that the authentication tokens were deleted, but it could not have been after the June 20, 2024, complete disconnection of Reynard from Implicit's computer systems.

25.     Other than the authentication tokens, Implicit did not remove or delete any other data from Reynard following Jacob Stine's termination from Implicit on June 14, 2024.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

5

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR SANCTIONS
CASE NO.: 3:24-cv-03744-WHO

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

August 11, 2025, in Lansdale, PA.

By: _____

Robin Lavallee

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

DECLARATION OF ROBIN LAVALLEE IN SUPPORT OF MOTION FOR SANCTIONS
CASE NO.: 3:24-cv-03744-WHO